# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

**RANDALL SCARBOROUGH**  *****CIVIL NO. 6:12-0396**

**VERSUS**  *****MAGISTRATE JUDGE HILL**

**INTEGRICERT, LLC.**  *****BY CONSENT OF THE PARTIES**

## RULING ON CLAIM CONSTRUCTION

This patent case is before the Court for construction of the ten disputed claim terms in United States Patent Nos. 6,848,322 ("the 322 Patent") and 7,284,447 ("the 447 Patent"), that is, the terms "pad eye", "non-destructive(ly)", "attachment means", "attachment structure", "control means" "control manifold", "fluid attachment means (or apparatus)", "lifting lug", "testing the integrity of the welding (or weld)" and "about said at least one desired test piece."[1] Plaintiff, Randall Scarborough ("Scarborough") accuses the Defendant, Integricert, LLC ("Integricert"") of infringing several claims of the 322 and 447 Patents.

The Court conducted a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) ("the *Markman* hearing") on August 27, 2013.[2] Thereafter, re-examination of five claims of the 447 Patent and all claims of the 322

---

[1]The parties originally submitted several claim terms for construction. [rec. doc. 71]. However, prior to the hearing, the parties agreed upon a construction of all disputed claim terms, except those listed above; an Amended Joint Claim Construction Chart was filed into the record. [rec. doc. 78]. At the *Markman* hearing, Integricert acknowledged that it does not take the position that "substantially perpendicular" excludes a perfect 90 degree angle and that it would forgo the inclusion of "to the test piece" in its proposed definition. Therefore, the parties agreed upon a construction of an eleventh term, "substantially perpendicular" to mean "approximately, near or at, a right angle". [*See* rec. doc. 82 at pg. 62-65].

[2]The transcript of the *Markman* hearing has been filed in the record. [rec. doc. 82].

Patent was granted.  Accordingly, the action was stayed. [rec. doc. 103].

The stay was lifted on February 5, 2015 after the PTO issued certificates of re-examination.  [rec. doc. 109].  Upon re-examination, all claims of the 322 Patent (1-21) were determined to be patentable as amended; four claims of the 447 Patent were determined to be patentable as amended and one claim (29) was canceled.[3]  Accordingly, the parties were permitted to file Supplemental Claim Construction Briefs on or before May 4, 2015. [rec. doc. 131].

Upon review and consideration of the evidence before the Court, the claim construction, post-*Markman* hearing and post-re-examination supplemental briefs filed by the parties[4], the arguments presented by counsel at the *Markman* hearing, and the controlling legal authority, the Court issues this Ruling on Claim Construction.

## Background

Scarborough is the inventor and owner of both the 322 and 447 Patents, originally issued on February 1, 2005 and October 23, 2007, respectively, and titled "Apparatus and

---

[3]As a result, Scarborough filed a Motion for Partial Summary Judgment on Validity [rec. doc. 107], and Cross-Motions for Partial Summary Judgment on absolute intervening rights were filed. [rec. docs. 122 and 123].  Oral argument on those Motions was heard on April 22, 2015. [rec. docs. 131 and 132]. These Motions have been determined by separate Rulings. [rec. docs. 150 and 151].

[4]Scarborough filed an Opening Claim Construction Brief [rec. doc. 63], a Reply Brief on Claim Construction [rec. doc. 70], a Post-*Markman* Hearing Brief [rec. doc. 83] and a Post-Re-Examination Supplemental Brief [rec. doc. 134].  Integricert filed a Responsive Claim Construction Brief [rec. doc. 66], a Post-*Markman* Hearing Brief [rec. doc. 81] and a Post-Re-Examination Supplemental Brief [rec. doc. 135].

Method for Testing Weld Integrity".[5]  The 447 Patent is a continuation-in-part of the 322 Patent.  Accordingly, the specification for the 447 Patent was "borrowed" from the 322 Patent and, unless specifically noted, contains the same, or substantially the same, language.

Both Patents in suit relate to apparatuses and methods for testing the integrity of welds used to attach lifting points, such as pad eyes, lifting lugs or other lifting devices, to structures intended to be lifted. Typically, these structures are large cargo or shipping containers and oilfield or offshore drilling equipment. The apparatuses are portable, self-contained, easily transportable and the method of testing is non-destructive.  Both employ one or more hydraulic cylinders to apply a non-destructive test force to the pad eye or lifting lug welded to the structure to be lifted which mimics the forces on the attachment weld that occur during lifting. After application of the test force, the pad eye and welding are examined for defects and deformities.

The 322 Patent contains twenty-one claims.  Claims 1, 13, 20, and 21 are independent claims and the remaining seventeen claims are dependent claims.  The 447 Patent, as originally issued, contained 31 claims and, after reexamination and reissuance, contains 30 claims, claim 29 having been canceled.  Claims 1, 14, 27 and 30 are independent claims and the remaining claims are dependent claims.

---

[5]The numbers cited in this Ruling refer to the numbers assigned to specific named parts of the inventions set forth in the illustrations and figures of the 322 and 447 Patents.

## Legal Standard on Claim Construction

A patent describes "the exact scope of an Invention and its manufacture to 'secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them.'" *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (citation omitted).  Indeed, "it is only fair (and statutorily required) that competitors be able to ascertain to a reasonable degree the scope of the patentee's right to exclude."  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (5th Cir. 1995) ( *en banc* ), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384 (1996).  The claims of a patent define the patented invention to which the patentee is entitled the right to exclude. *Markman*, 517 U.S. at 373-374; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ( *en banc*) (citations omitted).

"Victory in any infringement suit requires a finding that the patent claim[s] 'cover[] the alleged infringer's product . . .' which in turn necessitates a determination of 'what the word[s] in the claim[s] mean.'" *Markman*, 517 U.S. at 374 (citation omitted). The meaning and scope of any disputed terms and limiting expressions in the claims are determined by the court as a matter of law.  *Vivid Technologies, Inc. v. American Science & Engineering, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999) *citing Markman*, 52 F.3d at 976 and *EMI Group North America, Inc. v. Intel Corp*., 157 F.3d 887, 891 (Fed. Cir. 1998);  *Markman*, 517 U.S. at 389-390.  "[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Technologies, Inc.,* 200 F.3d at 803 *citing U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is for "resolution of

4

disputed meanings").

"The words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312 *quoting Vitronics*, 90 F.3d at 1582. "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, that is, as of the effective filing date of the patent application." *Phillips*, 415 F.3d. at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent . . . . " *Id*.

For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips,* 415 F.3d at 1314 *citing Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).

For other claim terms, however, the meaning of the claim language may be less apparent. To construe those terms, the court considers "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id. quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

5

"[T]here is no magic formula or catechism for conducting claim construction"; the court is not barred from considering any particular source, nor is the court required to analyze sources in any specific sequence. *Phillips,* 415 F.3d at 1324 (citations omitted).  However, the court must assign the appropriate weight to each source consulted.  *Id.*

Intrinsic evidence of record consists of "the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp.*, 90 F.3d at 1582 *citing Markman*, 52 F.3d at 979.  The Federal Circuit has repeatedly emphasized the primary importance of intrinsic evidence in claim construction, deeming intrinsic evidence "the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp.,* 90 F.3d at 1582*; Phillips*, 415 F.3d at 1317.

Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips,* 415 F.3d at 1317 *citing Markman*, 52 F.3d at 980.  "Extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean . . . ." *Id*. at 1319.

Accordingly, extrinsic evidence may be admitted and used by the Court in claim construction.  *Id.*  However, such evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id*. at 1317 (internal quotations and citation omitted).  This is so because, in general, extrinsic evidence is less reliable than

intrinsic evidence in determining how to read claim terms.[6]  *Id.* at 1318-1319.

Moreover, intrinsic evidence constitutes "the public record of the patentee's claim, a record on which the public is entitled to rely" in ascertaining the scope of the patentee's claimed invention to design around it. *Vitronics Corp.,* 90 F.3d at 1583.  Allowing the public record to be altered or changed by extrinsic evidence would make this right meaningless.  *Id.*

Within the class of intrinsic evidence, the claims themselves provide substantial guidance as to the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314 *citing Vitronics*, 90 F.3d at 1582 and *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms").

In the absence of modifiers, general descriptive terms are typically construed as having their full meaning.  *Innova/Pure Water, Inc.*, 381 F.3d at 1118.  The context in which a term is used in the asserted claim can be highly instructive.  *Phillips*, 415 F.3d at 1314.  Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. *Id. citing Vitronics*, 90 F.3d at 1582.  Because

_____

[6]The Federal Circuit has explained that, in general, extrinsic evidence is less reliable than intrinsic evidence in determining how to read claim terms because: (1) "extrinsic evidence is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning", (2)  "extrinsic publications may not be written by or for skilled artisans and therefore may not reflect the understanding of a skilled artisan in the field of the patent", (3) "extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence", (4) "there is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question [and] each party will naturally choose the pieces of extrinsic evidence most favorable to its cause" and (5) "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents.  *Id.* at 1318-1319.

claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Id. citing Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) and *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997).

Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. *Id. citing Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991). For example, the doctrine of claim differentiation creates a presumption that each claim in a patent has a different scope. *SunRace Roots v. Enterprise Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1302 (Fed. Cir. 2003); *Wenger Mfg. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225, 1234 (Fed. Cir. 2001). Thus, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim. *Phillips*, 415 F.3d at 1315 *citing Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). This presumption is strongest when the limitation in dispute is the only meaningful difference between an independent and a dependent claim. *Liebel-Flarsheim Co.,* 358 F.3d at 910.

The claims, of course, do not stand alone. Rather, they are part of "a fully integrated written instrument," consisting principally of a specification that concludes with the claims. For that reason, claims "must be read in view of the specification, of which they are a part." *Id. citing Markman*, 52 F.3d at 978-979. The specification "is always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term." *Id. citing Vitronics Corp.*, 90 F.3d at 1582. This is so because "the words of the claims must be

based on the description [in the specification] . . ." and, hence, the specification is "the best source for understanding a technical term . . . from which it arose." *Id citing Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985), *Multiform Desiccants*, 133 F.3d at 1478 and *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004).

The importance of the specification in claim construction derives from its statutory role. The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed invention in "full, clear, concise, and exact terms." *Phillips,* 415 F.3d at 1316 *citing* 35 U.S.C. § 112, ¶ 1. Consistent with that general principle, cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. *Id.*  In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive. *Id.*  For example, where the patent criticizes a feature of prior products, such criticism operates as a clear disavowel of that feature. *Astrazeneca AB, et al. v. Mutual Pharmaceutical Company, Inc*., 384 F.3d 1333, 1340 (Fed. Cir. 2004).

The patentee's choice of preferred embodiments can shed light on the intended scope of the claims.[7] *Astrazeneca AB,* 384 F.3d at 1340.  However, "particular embodiments appearing

---

[7]In *Phillips,* the Federal Circuit explained that "[o]ne of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification [keeping in mind that

in the specification will not generally be read into the claims . . . . What is patented is not

restricted to the examples, but is defined by the words in the claims if those claims are

supported by the specification in the manner required by [the Patent Act]." *Specialty*

*Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) (citations omitted); *Phillips*,

415 F.3d at 1323.

The Federal Circuit has "expressly rejected the contention that if a patent describes only

a single embodiment, the claims of the patent must be construed as being limited to that

embodiment." *Phillips,* 415 F.3d at 1323 *citing Gemstar-TV Guide*, 383 F.3d at 1366.  Thus,

"even where a patent describes only a single embodiment, claims will not be 'read restrictively

unless the patentee has demonstrated a clear intention to limit the claim scope using words or

expressions of manifest exclusion or restriction.'" *Innova/Pure Water, Inc.*, 381 F.3d at 1117

*citing Liebel-Flarsheim*, 358 F.3d at 906 *quoting Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299

F.3d 1313, 1327 (Fed. Cir. 2002).

The prosecution history, which is likewise designated as part of the intrinsic evidence,

should be considered by the court, if it is in evidence. *Phillips*, 415 F.3d at 1317 *citing*

*Markman*, 52 F.3d at 980, *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d

545 (1966) ("[A]n invention is construed not only in the light of the claims, but also with

reference to the file wrapper or prosecution history in the Patent Office.").  The prosecution

---

the purposes of the specification are to teach and enable those of skill in the art to make and use the
invention and to provide a best mode for doing so], it will become clear whether the patentee is setting
out specific examples of the invention to accomplish those goals, or whether the patentee instead intends
for the claims and the embodiments in the specification to be strictly coextensive."  *Phillips*, 415 F.3d at
1323 (citations omitted).

history consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent.  *Id. citing Autogiro*, 384 F.2d at 399.

This "'undisputed public record' of proceedings in the PTO is of primary significance in understanding the claims." *Markman*, 52 F.3d at 980 *citing Autogiro*, 384 F.2d at 397.  Thus, the "court has broad power to look to the prosecution history of the patent in order to ascertain the true meaning of the language used in the patent claims." *Id.*  However, because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.  *Id.* at 1317 (citations omitted)*.*

Certain claims may also use functional language and therefore be subject to "means-plus-function" construction pursuant to § 112(f).[8]  To determine whether § 112(f) applies, the Federal Circuit has long recognized the importance of the presence or absence of the word "means." *Williamson v. Citrix Online, LLC*, - - F.3d - -, 2015 WL 3686459, *6 (Fed. Cir. 2015).

If a claim element contains the word "means" and recites a function, a rebuttable presumption arises that § 112(f) applies.  *Id. citing Personalized Media Communications, LLC v. International Trade Commission,* 161 F.3d 696, 703-704 (Fed. Cir. 1998) (citing cases); *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1364 (Fed. Cir. 2000); *Apex Inc. v.*

---

[8]35 U.S.C. § 112(f) provides as follows:
(f) Element in claim for a combination. – An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

*Raritan Computer, Inc.*, 325 F.3d 1364, 1371-1372 (Fed. Cir. 2003).  The presumption can be

overcome "if the claim itself recites sufficient structure to perform the claimed function."

*Envirco Corp.*, 209 F.3d at 1364.  The essential inquiry is "whether the words of the claim are

understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the

name for structure." *Greenberg v. Ethicon Endo–Surgery, Inc.*, 91 F.3d 1580, 1583, 39

USPQ2d 1783, 1786 (Fed. Cir. 1996); *Apex*, 325 F.3d at 1372 (noting that the inquiry is

whether the "term, as the name for the structure, has a reasonably well understood meaning in

the art").

Applying the converse, the failure to use the word "means" creates a rebuttable

presumption that § 112(f) does not apply.[9]  *Williamson,*  - - F.3d - -, 2015 WL 3687459 at *6; *Apex*

*Inc.*, 325 F.3d at 1371-1372.  When a claim term lacks the word "means," the presumption can be

overcome, and § 112(f) will apply, if the challenger demonstrates that the claim term fails to

"recite[ ] sufficiently definite structure" or else recites "function without reciting sufficient

structure for performing that function." *Williamson,*  - - F.3d - -, 2015 WL 3687459 at *7 *citing*

*Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000); *Apex*, 325 F.3d at 1372.

Thus, "when it is apparent that the element invokes purely functional terms, without the

additional recital of specific structure or material for performing that function, the claim

element may be a means-plus-function element despite the lack of express means-plus-function

---

[9]The Federal Circuit recently has expressly overruled cases which describe the characterization
of the presumption in cases without the word "means" as "strong"and those which employ a heightened
burden requiring "a showing that the limitation essentially is devoid of anything that can be construed as
structure." *Williamson*, - - F.3d - -, 2015 WL 3687459 at *7.

language." *Al-Site Corp. v. VSI Intern, Inc*., 174 F.3d 1308, 1318 (Fed. Cir. 1999).  Moreover, while the word "means" may not appear in a claim, generic terms and other "nonce words" that reflect nothing more than verbal constructs may be used in a manner that can operate as a substitute for the word "means" because they "typically do not connote sufficiently definite structure"; the use of these terms may therefore rebut the presumption and invoke § 112(f). *Williamson*,  - - F.3d - -, 2015 WL 3687459 at *9.

The burden to overcome the presumptions for and against the application of § 112(f) must be met by a preponderance of the evidence.  *Apex, Inc*., 325 F.3d at 1372.  If the party who must bring forth evidence fails to proffer sufficient evidence to meet its burden, the presumption, either for or against the application of § 112(f), prevails.  *Id.*

Once the court has found that a claim is in means-plus-function form, the court then construes the claim term utilizing a two-step process.  The court must first identify the claimed function.  *Williamson*,  - - F.3d - -, 2015 WL 3687459 at *9.  Then, the court must determine what structure, if any, disclosed in the specification performs the claimed function.  *Id*.  The "specification must be read as a whole to determine the structure capable of performing the claimed function." *Chicago Bd. Options Exchange, Inc. v. International Securities Exchange*, LLC, 677 F.3d 1361, 1369 (Fed. Cir. 2012).[10]

---

[10] In exchange for being able to draft a claim limitation in purely functional language, "[t]he applicant must describe in the patent specification some structure which performs the specified function." *Noah Systems, Inc. v. Intuit, Inc.,* 675 F.3d 1302, 1318 (Fed. Cir. 2012) *quoting Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042 (Fed. Cir. 1993). "And, importantly, the functional claim language covers only 'the corresponding structure, material, or acts described in the specification and equivalents thereof.' " *Id*. (citations omitted).  "Requiring the disclosure of a corresponding structure, thus, confines the breadth of protection otherwise permitted by purely functional claiming." *Id.* (internal quotations and citations omitted).

13

The court should not adopt a function different from that explicitly recited in the claim. *Micro Chemical, inc. v. Great Plains Chemical Co., Inc*., 194 F.3d 1250, 1258 (Fed. Cir. 1999).  Nor should the court incorporate structure from the written description beyond that necessary to perform the claimed function. *Id*.  Structure disclosed in the specification qualifies as "corresponding structure" if the intrinsic evidence clearly links or associates that structure to the function recited in the claim. *Williamson,*  - - F.3d - -, 2015 WL 3687459 at *10.  Moreover, the corresponding structure must be "adequate" to achieve the claimed function. *Id.*  Stated differently,  a person of ordinary skill in the art must be able to recognize the structure in the specification and associate it with the corresponding function in the claim.  *Id.*

Within the class of extrinsic evidence, the Federal Circuit has observed that dictionaries can be useful in claim construction. *Phillips,* 415 F.3d at 1318 *citing Renishaw*, 158 F.3d at 1250 and *Rexnord*, 274 F.3d at 1344.  Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words in claim interpretation.  *Id*. at 1322 *citing Exhibit Supply Co. v. Ace Patents Corp*., 315 U.S. 126, 134, 62 S.Ct. 513, 86 L.Ed. 736 (1942), *Weber Elec. Co. v. E.H. Freeman Elec. Co.*, 256 U.S. 668, 678, 41 S.Ct. 600, 65 L.Ed. 1162 (1921), *Renishaw*, 158 F.3d at 1247-53 (approving the use of dictionaries with proper respect for the role of intrinsic evidence).

Likewise, technical dictionaries may help a court "to better understand the underlying technology and the way in which one of skill in the art might use the claim terms."  *Id.* at 1318 *citing Vitronics*, 90 F.3d at 1584 n. 6.  Because "dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of

science and technology, those resources have been properly recognized as among the many

tools that can assist the court in determining the meaning of particular terminology to those of

skill in the art of the invention." *Id. citing Teleflex, Inc.*, 299 F.3d at 1325.

Such evidence, "may be considered if the court deems it helpful in determining 'the true

meaning of language used in the patent claims.'" *Id. citing Markman*, 52 F.3d at 980. In sum,

"judges are free to consult dictionaries and technical treatises at any time in order to better

understand the underlying technology and may also rely on dictionary definitions when

construing claim terms . . . ." *Id*. at 1322.

However, given the primary importance of intrinsic evidence, the court's consultation

and reliance on dictionaries and technical treatises is limited to the extent that "the dictionary

definition does not contradict any definition found in or ascertained by a reading of the patent

documents." *Id.* at 1322-1323 *citing Vitronics*, 90 F.3d at 1584 n. 6.

In addition, a court in its discretion may rely on prior art proffered by one of the parties.

*Vitronics*, 90 F.3d at 1584.  This prior art can often help to demonstrate how a disputed term is

used by those skilled in the art and what those skilled in the art generally believe a certain term

means.  *Id.*  Prior art evidence is useful "to show what was then old, to distinguish what was

new, and to aid the court in the construction of the patent." *Markman,* 52 F.3d at 980 *citing*

*Brown v. Piper*, 91 U.S. 37, 41, 23 L.Ed. 200 (1875).

Prior art cited in the prosecution history falls within the category of intrinsic evidence,

while prior art not considered by the examiner is extrinsic evidence.  *Tate Access Floors, Inc. v.*

*Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1372 fn. 4 (Fed. Cir. 2002). As with

other types of extrinsic evidence, prior art not considered by the examiner is afforded less

weight and, accordingly, should not be used to contradict claim meaning that is unambiguous in

light of the intrinsic evidence.  *See Phillips*, 415 F.3d at 1319 and 1324.

## Construction of Claim Terms

### Pad Eye and Lifting Lug

Scarborough proposes the following construction for "Pad Eye": "an attachment point

welded to a structure to be lifted, through which a line or pin can be placed."

Scarborough proposes the following construction for "Lifting Lug": "an attachment

point welded to a structure to be lifted."

Integricert proposes the following construction for both terms: "a device attached as an

attachment point to another device."

For the following reasons, the Court adopts Scarborough's constructions of both terms

in their entirety as those constructions are consistent with the intrinsic evidence, accords the

terms their ordinary meanings and appropriately differentiates the terms which are consistently

used in proximity to each other throughout the claims and the specifications.

Integricert argues that each term should be construed identically, presumably on grounds

that they are both "lifting connections", which is not a claim term, and that both are allegedly

used throughout the claims interchangeably.  This argument ignores the fact that these terms in

the claims and the specifications of each Patent are consistently listed in the alternative, with

the use of the disjunctive "or", thereby signifying that the terms do not carry the same meaning.

16

Furthermore, this argument is inconsistent with Integricert's agreement with Scarborough that a "pad eye" is a subset of "lifting lug", thereby apparently acknowledging that the term "lifting lug" carries a broader definition than that to be accorded to "pad eye." Finally, this argument ignores the fact that these terms are used in proximity to each other, thereby creating an inference that the terms are intended to have different meanings.

For those reasons more fully set forth in this Court's Reasons for Ruling on the Cross-Motions for Partial Summary Judgment on whether Integricert is entitled to application of the doctrine of absolute intervening rights, the Court agrees with Scarborough that the Patents, read in light of the claims and specification as a whole, describe "pad eye[s]" and "lifting lug[s]" as attachment points for lifting equipment or structures on, or in which, equipment is transported.[11]

For those reasons set forth in the Reasons for Ruling on the Cross-Motions for Partial Summary Judgment, it is also clear from the claims and specifications of the Patents that the

_____

[11]*See e.g.* rec. doc. 122-17 at 1:5-8; rec. doc. 122-19 at 1:11-15 (Area of Technology/Field of Invention stating the claimed "apparatus relates, generally, to non-destructive testing of weld integrity and strength in the attachment weld of pad eyes and other lifting lugs."); *Id.* at 1:21-28; *Id.* at 1:29-36; *Id.* at 1:54-59; *Id.* at 1:62 - 2:1 (Background of Invention/ Description of the Related Art explaining that "[p]ad eyes and lifting lugs are primarily used as an attachment point for any rigging employed to hoist, transport, or secure heavy equipment" and that "[t]hese pad eyes are typically welded either to the equipment or to some device on which the equipment is transported on . . . ", but that under prior art "[t]he strength of these welds cannot be easily tested . . . ." Therefore, it was Scarborough's desire to create "a testing apparatus which is portable and can quickly and accurately check the integrity of a pad eye and its attachment weld before each field use . . . ."); *see also* rec. doc. 135-2, pg. 78 (statement by Scarborough to the Examiner during the initial 2006 prosecution of the 447 Patent that unlike the Hodo device, his "device is used to determine the integrity of the attachment weld to determine if some apparatus, to which the test piece is attached, can be safely lifted while carrying some pre-determined load."); rec. doc. 138-1 (Scarborough's initial submission in the 447 Patent reexamination repeatedly and consistently describing his invention as an apparatus and method which non-destructively tests the strength and integrity of attachment welds, which attach pad eyes or lifting lugs to another base structure to be lifted).

referenced "pad eye[s]" and "lifting lug[s]"must be welded to the equipment or to the structure to be lifted.  Without this requirement, it would not be possible for the claimed inventions to test the integrity of a weld attaching these lifting points to the equipment or structure to be lifted.[12]  Stated differently, the attached lifting points must be welded to the object to be lifted in order to create the opportunity to test the weld strength and integrity, which is the stated purpose of each Patent.[13]  Integricert's proposed definition fails to acknowledge this obvious requirement and thereby ignores the purpose of the inventions.

Integricert's proposed definition of "pad eye" also ignores the "eye" portion of the term. In essence, Integricert "reads out" the requirement that a "pad eye" has an "eye."  The proposed definition also fails to afford the term its ordinary, customary and widely accepted meaning understood by one of ordinary skill in the art, as well as lay persons unskilled in the art.  *See Phillips,* 415 F.3d at 1314 *citing Brown*, 265 F.3d at 1352.  An "eye" in this context necessarily denotes an interior hole or opening for receiving a line or pin.[14]  Indeed, element 19 of both Patents depicts an exemplary "pad eye" which includes such a hole, and this element, 19, is

---

[12]*See e.g.*  Claim 1 of each Patent, rec. doc. 122-17 at 9:46-50 and rec. doc. 122-19 at 12:43-26.

[13]*See e.g.* Title "Apparatus and Method for Testing Weld Integrity"; Area of Technology/Field of Invention, cited *supra.* at fn. 11; Background of Invention/ Description of the Related Art  cited *supra.* at fn. 11

[14]The term "eye" is defined by Webster's Online Dictionary as "A small hole or loop (as in a needle); "the thread wouldn't go through the eye", and "A loop forming part of anything, or a hole through anything, to receive a rope, hook, pin, shaft, etc.; as an eye at the end of a tie bar in a bridge truss; as an eye through a crank; an eye at the end of rope."  www. Websters-online-dictionary.org; http://www.totodefinition.com/search.php?word=eye

consistently described as different than other types of lifting connections.[15]

Moreover, to adopt Integricert's proposed same definition for both terms would fail to give meaning to all terms in the claims, which is the preferred construction over those which do not. *See Merck & Company, Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005). Both terms are repeated throughout the claims and the specifications; thus, construing the terms differently as proposed by Scarborough avoids rendering either term mere excess verbiage. *See Id.*

Finally, because "pad eye" is a subset of "lifting lug", the term "lifting lug" necessarily carries a broader definition than that to be accorded to "pad eye." In this context, the difference is apparent. A "pad eye", like a "lifting lug", is an attachment point for lifting, but unlike a "lifting lug", a "pad eye" contains an "eye", that is, an interior hole or opening for receiving a line or pin. Thus, "pad eye" is a narrower and more specific type of "lifting lug." Scarborough's proposed construction appropriately accounts for this distinction, thereby properly differentiating the claims terms.

**Non-Destructive(ly)[16]**

Scarborough proposes the following construction for "Non-Destructive(ly)": "wherein the test piece remains intact and usable."

---

[15]*See Id*. at 2:59 and 66, *Id*. at 3:13 and 20-21 ("pad eye 19 or lifting lug" and "pad eye 19, lifting lug, or other lifting connection").

[16]The Claims contain several variations of the disputed term including "non-destructive", "non-destructive manner" and "non-destructively". The parties have agreed that these terms are equivalent.

Integricert proposes the following construction  "Non-Destructive(ly)": "testing that does not damage or destroy."

For the following reasons, the Court accepts neither proposal, but rather adopts the following construction: "wherein the test piece is not inherently damaged or destroyed through removal or disassembly for testing and therefore remained intact and usable following testing." This construction is consistent with the original prosecution history of the Patents and is consistent with the claims and specifications in the Patents, thereby correctly stating what a person of ordinary skill in the art would understand the term to mean.

Both Scarborough and Integricert agree as to the importance of the original prosecution history in construing this term.  They disagree, however, on the proper interpretation of that history.  The Court largely agrees with the interpretation and construction proposed by Scarborough, but with the above modifications.

During the original 2004 prosecution of the 322 Patent, the Examiner rejected several of Scarborough's claims as anticipated by Gram. [rec. doc. 135-1 at 32].  In response, Scarborough amended several of his claims, and explained why his claims, as amended, were patentable over the Gram device, stating that the claims were amended "to reflect, as per the specification, that the testing to be performed by the invention in question is nondestructive and that the testing on the test piece is done substantially external to the testing apparatus."  Gram, on the other hand, utilizes testing techniques "that are destructive in nature" and "requires that the piece, to be tested, is removed from its original location and  placed into the Gram testing

20

apparatus", whereas Scarborough's invention "does not require the removal of a representative piece of the test subject from the body of the test subject . . . .", but rather "attaches . . . external to the pad eye and does not damage or destroy the testing piece."  [*Id.* at 25].

Scarborough's distinguishing the Gram Patent was therefore the inherent destructive nature of the Gram testing as a result of the need to remove the pad eye from the body of the test piece to place it into the Gram apparatus, thereby damaging and destroying the test piece. Scarborough's device on the other hand allows a properly welded test piece to remain intact and useable following testing.

Similarly, in his initial 2006 prosecution of the 447 Patent, the Examiner rejected several of Scarborough's claims as anticipated by Hodo. [rec. doc. 135-2 at 83-84].  In response, Scarborough amended several of his claims, and explained why his claims, as amended, were patentable over the Hodo device, stating that "[i]n sharp contrast [to Scarborough's device], the Hodo device is a fatigue testing device which inherently destroys the test piece in order to determine the fatigue strength of the material.  Further, the Hodo device requires for the test piece to be inserted into the Hodo structure and then it is basically pulled apart."

Unlike the Hodo device, Scarborough explained that his "device is for non-destructively testing the weld strength . . . and does not require any substantial disassembly of the piece to be tested . . . to determine the integrity of the attachment weld to determine if some apparatus, to which the test piece is attached, can be safely lifted while carrying some pre-determined load. Thus, if a weld fails while being tested with the [Scarborough] device it is known that the

apparatus and the attached test piece must be repaired.  However, it would frustrate the purpose

of testing, by [Scarborough's] device, should the test piece, to which the [Scarborough] device

is attached, be destroyed each and every time as is the purpose of Hodo . . . ." [rec. doc. 135-2,

pg. 78].

Thus, as was the case with the Gram device, Scarborough's reasoning for distinguishing

the Hodo Patent was, again, the inherent destructive nature of the Hodo testing as a result of the

need to remove the test piece from the body of the lifted object to place it into the Hodo

apparatus, thereby damaging and destroying the test piece.[17] Scarborough's device on the other

hand allows a properly welded test piece to remain intact and useable following testing.

These considerations are reflected in the specifications of the Patents wherein

Scarborough distinguishes his inventions over prior art on grounds that the prior art "utilizes a

method of destructive testing which would render the pad eye useless", but that his apparatus

"check[s] the integrity of a pad eye and its attachment weld before each field use." [rec. doc.

122-17 at 1:32-34 and 54-56; rec. doc. 122-19 at 1:41-43 and 63-65].  The Court's construction

takes into account the concept that a properly welded test piece remains intact and usable

following Scarborough testing.

 While Integricert quotes portions of the prosecution history cited above, it omits from

its discussion those statements which set forth one of the primary distinguishing factors cited

by Scarborough, that is, that the test piece is not inherently damaged or destroyed by removal or

---

[17]The parties do not appear to dispute that because the 447 Patent is a continuation-in-part of the
322 Patent, the prosecution history of the 322 Patent is incorporated into the 447 Patent.

disassembly and placement in the testing device.  Integricert's proposed definition therefore fails to adequately acknowledge that a properly welded test piece will remain intact and usable following testing.

On the other hand, Scarborough's proposed definition ignores the possibility that the testing may result in damage or destruction of the test piece in instances where the weld fails, thereby signifying that the weld must be repaired.  This possibility is incorporated into the methodology, wherein it is claimed the "testing technician or test operator" can inspect the lifting connection and its attachment weld "for any structural damage or deformation." *See* Claims 13, 20 and 21 of the 322 Patent and Claims 14 and 27[18] of the 447 Patent.

The Court's construction adequately accounts for all of these concepts and possibilities, thereby correctly stating what a person of ordinary skill in the art would understand the term to mean.

**Attachment Means/Fluid Attachment Means (or Apparatus)[19]**

Scarborough argues that means-plus-function construction applies and therefore proposes the following construction for "Attachment Means/Fluid Attachment Means (or Apparatus)": "means-plus-function term encompassing pressure containing hoses, cylinder

---

[18]Claim 27 reads "damage or deformation."

[19]The phrase "fluid attachment means" appears in Claims 7 and 9 of the 322 Patent; the phrase "attachment means" appears in Claims 13 and 18 of the 322 Patent and the phrases "fluid attachment apparatus" and  "attachment apparatus" appear in claims 6 and 14 of the 447 Patent, respectively.  The parties agree that these terms are equivalent to each other and should therefore be construed in the same manner.

fittings, pressure containing fittings, manifold fittings, pump fittings, and any equivalents thereto."

Integricert argues that means-plus-function construction should not apply and proposes the following construction for "Attachment Means/Fluid Attachment Means (or Apparatus)": "a fitting for attaching fluid lines to the cylinders."

For the following reasons, the Court finds that the disputed claim term is in means-plus-function form, reciting a function in the claims without sufficient structure to perform the claimed function and therefore adopts Scarborough's construction in its entirety as that construction properly identifies the structures disclosed in the specifications which perform the claimed function.

The disputed phrases contain the term "means" in association with a function.[20] Accordingly, the rebuttable presumption that the phrase be construed as a means-plus-function

_____

[20]Claim 7 of the 322 Patent provides in pertinent part, "[t]he apparatus of claim 1, wherein the cylinder further comprises: a first and second end; . . . first and second pressurized fluid attachment means; wherein said first pressurized attachment means is disposed axially between said cylinder first end and said piston; wherein said second pressurized fluid attachment means is disposed axially between said cylinder second end and said piston; wherein pressurized fluid enters said cylinder through said first attachment means or second attachment means."

Claim 9 of the 322 Patent provides in pertinent part: "[t]he apparatus in claim 1, further including: a control means for allowing pressurized fluid to be alternately supplied to and exhausted from said cylinder . . . when the pressurized fluid enters through said first pressurized fluid attachment means, and . . . when the pressurized fluid enters through said second pressurized fluid attachment means.

Claim 13 of the 322 Patent provides in pertinent part: [a] method for testing weld strength and integrity of an attachment weld . . . providing at least one fluid cylinder, having a first end and a second end . . . providing a first and second attachment means, wherein a pressurized fluid can enter in or exhaust from said cylinder . . . "

Claim 18 of the 322 Patent provides in pertinent part: "[t]he method in claim 17, wherein: said cylinder piston moves . . . when said pressurized fluid enters said cylinder through said first attachment means and the piston moves . . . when said  pressurized fluid enters said cylinder through said second attachment means . . . ."

term under § 112(f) arises.

While Integricert argues that the claims sufficiently describe structure, the Court disagrees.  Examination of the Claims reveals no sufficiently identified fluid attachment structure.[21]  Moreover, the Court cannot find on the record before this Court that the words of the claims may be understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure. To the contrary, the claims recite "attachment means" and "fluid attachment means" without reciting any specific fluid attachment structure. As such, Integricert has not overcome the presumption that § 112(f) applies. The Court therefore must apply the two-step process to construe the claim term.

The function identified in the claims which is accorded to the "fluid attachment means" is to provide a connection to a cylinder whereby pressurized fluid can enter in, or exhaust from, a cylinder.  *See e.g.* Claims 7, 9, 18 and 18 of the 322 Patent.  Simply stated, the function to be accomplished is a means to attach a source of pressurized fluid to a cylinder.

The structures disclosed in the specification that corresponds to this function must next be identified. Scarborough cites the structures and identifies the portions of the Detailed Description of an Embodiment of the Present Apparatus.  The cited portions describe the apparatus as having a "flow control manifold 50 [which] is preferably connected to the upper 7 and lower 7a cylinder fittings by means of pressure containing hoses." [rec. doc. 122-17 at 7:3-5; *see also* 122-19 at 8:57-59].  The cited portion further explains the connections in detail as

---

[21]*See* fn. 20, *supra*.

follows:

> In addition, a pressure containing hose is connected to each of the cylinder fittings 7 and 7A on the cylinders 5.  The other end of each pressure containing hose is connected to the flow control manifold 50.  The preferred embodiment utilizes 'quick connect' connectors for the pressure containing fittings, however, other types of pressure containing fittings may be utilized.  Preferably, the cylinder fittings 7 and 7A, the manifold fittings 81, and the pump fittings 73 are all male "quick connect" pressure containing fittings.  Each pressure containing hose is preferably comprised of some length of hydraulic quality hose with a female 'quick connect' fitting on each end. The pressure containing hose will have a pressure rating which exceeds the pressure required for the testing.  Another set of the above described pressure containing hoses is connected between the flow control manifold 50 and the hand pump 40.  It should be understood that the exact sequence and location of connections of the pressure containing hoses may vary depending on the version of the testing apparatus as well as the type and model of pump and flow control manifold.

[*Id*. at 7:51-8:4; *Id*. at 9:39-59].

Based on the above, the Court agrees with Scarborough that the structures disclosed in the Patent specifications as able to perform the claimed fluid connection function include pressure containing hoses, pressure containing fittings, cylinder fittings, manifold fittings and pump fittings, as well as any equivalents thereto.  While Integricert argues that including all of these items "sweeps too broadly" and instead should include only cylinder fittings, the Court disagrees.  The portions of the Patents cited above contain clear references to structures besides cylinder fittings able to perform the claimed fluid connection function.  Further, all of these structures either achieve the claimed function or may easily be linked or associated with that function by a person of ordinary skill in the art. *See Williamson*, - - F.3d - - , 2015 WL 3686459

at *10.[22]

## Attachment Structure

Scarborough argues that means-plus-function construction applies and proposes the following construction for "Attachment Structure": "means-plus-function term encompassing pinned connections, threaded fasteners, taper pins, welding, cable assemblies, footings and attachment plates, clamps and any equivalents thereto."

Integricert argues that means-plus-function construction should not apply and proposes the following construction for "Attachment Structure": "any device for attaching a testing apparatus to a test piece which provides adequate support and connection."

For the following reasons, the Court finds that the disputed claim term is in means-plus-function form, reciting a function in the claims without sufficient structure to perform the claimed function and therefore adopts Scarborough's construction in its entirety as that construction properly identifies the structures disclosed in the specifications which perform the claimed function.

The disputed phrase does not contain the term "means".  Accordingly, a rebuttable presumption that the phrase not be construed as a means-plus-function term under § 112(f) arises.

---

[22]Although the parties have agreed the term "fluid attachment apparatus" and "attachment apparatus" in claims 6 and 14 of the 447 Patent be construed the same, the Court nevertheless notes that these terms are likewise drafted in a format consistent with traditional means-plus-function claim limitations. The term "apparatus" replaces the term "means" but recites the same function performed by the "attachment means" and "fluid attachment means" set forth in the claims of the 322 Patent, and the claims disclose no sufficiently identified fluid attachment structure to perform the claimed function.

Scarborough argues, however,  that the phrase fails to recite definite structure and, to the contrary, recites function without reciting sufficient structure for performing that function. The Court agrees.  Examination of the phrase in the Claims reveals that the phrase is written in purely functional terms with no sufficiently identified attachment structure for performing the recited function.[23]  *See Al-Site Corp.*, 174 F.3d at 1308.  To the contrary, the claims recite "attachment structure" without reciting any specific attachment structure means that would attach the claimed apparatus externally to a pad eye, lifting lug or other lifting device to be lifted.  As such, Scarborough has overcome the presumption that § 112(f) does not apply. The Court therefore must apply the two-step process to construe the claim term.

The function of the "attachment structure" identified in the claims is for releaseably or permanently attaching the testing apparatus externally to a pad eye, lifting lug or other device. *See* fn. 23, *infra.*.  Simply stated, the function to be accomplished is a means to attach the claimed testing device to a pad eye, lifting lug or other device attached to another structure to be lifted.

The structures disclosed in the specification that corresponds to this function must next be identified. Scarborough cites the structures and identifies the portions of the Detailed

---

[23]Claim 1 of the 447 Patent as amended  includes the limitation "an attachment structure for attaching to a pad eye or other device joined by the at least one attachment weld to another structure." [rec. doc. 106-2, at 1:29-31].  Claim 14 similarly states "providing an attachment structure for attaching to said pad eye, lifting lug or other device joined to said another structure . . . ." [*Id.* at 2:4-6].
  The phrase appears in Claims 13 and 21 of the 322 Patent as amended as "providing an attachment structure for attaching externally to said pad eye, lifting lug or other device joined to said another structure . . . ",  in Claim 20 as "providing an attachment structure for attaching external to said test piece . . . " and in Claim 1 as " structure for releaseably or permanently attaching to a pad eye, lifting lug or other device joined by the attachment weld to another structure . . . ." [rec. doc. 106-1, at 2:42-44; 4:19-21; 3:30-31; 1:29-31].

Description of an Embodiment of the Present Apparatus.  The cited portions describe the types

of attachment structures which can accomplish this function as follows:

> Both the cylinder shaft 13 and the bottom adaptor 15 are adapted to allow
> connection to a mating part preferably utilizing a pin connection.  It should be
> appreciated that although the present device contemplates primarily pinned
> connections, other methods of attachment can also be used.  Examples of such
> attachments include, but are not limited to: various threaded fasteners, taper pins,
> welding and the like.  The figures illustratively show two types of pins 39, 41.
> However, these pins can be substituted by a variety of other attachment methods
> as mentioned above.  The cylinder shaft 13 is sandwiched between and
> connected, by a pin 41, to the two bridge plates1.  The bottom adaptor 15 is
> connected by a pin 41 and sandwiched between the attachment plates 17 . . .

[122-17 at 3:31-24; 122-19 at 3:33-46[24]].  The Patents also disclose footings and attachment

plates as capable of accomplishing the attachment structure function. [122-17 at 2:57-61 and

4:57-61; 122-19 at 3:11-15[25]].  Moreover, cable assemblies are disclosed in the 447 Patent.

[rec. doc. 122-19 at 7:1-10[26]].  Finally, in several places in both Patents, clamps are disclosed as

a means to attach the apparatus. [rec. doc.122-17 at 2:19-22, 2:26-28, 2:37-39; 122-19 at 2:31-

33, 2:37-39, 2:48-51].

　　　For the above reasons, the Court agrees with Scarborough that the structures disclosed in

the Patent specifications as able to perform the claimed attachment function include pinned

---

[24]The 447 Patent adds "interchanged as well as" before "be substituted by a variety . . . ." the
remainder of the passage is identical.

[25]"It should be appreciated that the footings 9 and the attachment plates 17 are an illustrative
method of attaching the apparatus to the pad eye or lifting lug."

[26]"[T]he first end of arms 108 is attached to the pad eye 19 by the use of a tension cable 292,
which can be but is not limited to a steel or other high tensile strength cable.  Tension cable 292 can be
attached to the arm 108 via a pin 339 through an O-loop arrangement of cable, or any other means
conventional in the art.  It should be noted that the cable 292 can be a plurality of cables.  Tension cable
292 can be attached to a pad eye 19 via a pin 239 through an O-loop arrangement of cable, or any other
means conventional in the art."

connections, threaded fasteners, taper pins, welding, cable assemblies, footings and attachment plates and clamps as well as any equivalents thereto.  While Integricert argues that its proposed construction is the "simplest . . . [and] not overly-complicated" definition of the phrase, that argument is not supported by law and, in fact, is contrary to the requirements of § 112(f).

Finally, while Integricert argued at the claim construction hearing that equivalents are a question of fact for the jury, not a matter of claim construction, that argument misses the point. The inquiry at this stage of the proceedings is not to identify equivalents, but, rather, to identify those structures disclosed in the Patent specifications which can accomplish the claimed function.  This the Court has done.

**Control Means**

Scarborough argues that means-plus-function construction applies and proposes the following construction for "Control Means": "means-plus-function term encompassing a hand pump, directional valves, or a flow control manifold and any equivalents thereto."

Integricert argues that means-plus-function construction should not apply and proposes the following construction for "Control Means": "any means of effecting flow control for fluid to and from a hydraulic cylinder."

For the following reasons, the Court finds that the disputed claim term is in means-plus-function form, reciting a function in claim 9 of the 322 Patent which is without sufficient structure to perform the claimed function and therefore adopts Scarborough's construction in its entirety as that construction properly identifies the structures disclosed in the specification which perform the claimed function.

The disputed phrase contains the term "means" in association with a function without disclosing a structure for performing the claimed function.[27]  Accordingly, the rebuttable presumption that the phrase be construed as a means-plus-function term under § 112(f) arises.

Integricert has not rebutted the presumption that § 112(f) applies. To the contrary, Integricert agrees with Scarborough that the phrase "is a 'means-plus-function' element . . . ." [rec. doc. 66, pg. 28].  However, without explanation, Integricert asserts that "[w]hile [Scarborough] enumerates some potential structures for accomplishing the given function, [Integricert's] proposed construction is simpler and more comprehensive." [*Id.*].  At oral argument, although unclear, Integricert appeared to argue that the structures identified by Scarborough are not equivalents and, therefore, Scarborough's construction is incorrect.  The Court disagrees.

As noted above, and as conceded by Scarborough during the claim construction hearing, equivalents to the structures disclosed in the specification is a question of fact which will be determined by the jury later in the proceeding. The Court's task at this time is merely to identify those structures disclosed in the Patent specifications which can accomplish the claimed function.  Furthermore, the argument by Integrecert that its proposal is the "simplest . . . [and] not overly-complicated" definition of the phrase, is not supported by law and, in fact, is contrary to the requirements of § 112(f). Section 112(f) mandates that means-plus-function terms be limited to structures disclosed in the specification and their equivalents, not "any

---

[27]Claim 9 of the 322 Patent provides in pertinent part: "[t]he apparatus in claim 1, further including: a control means for allowing pressurized fluid to be alternately supplied to and exhausted from said cylinder . . . ."  [rec. doc. 122-17 at 10: 33-36].

means" as proposed by Integricert. *See WMS Gaming, Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1348 (Fed. Cir. 1999) *citing Valmont Indust., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042 (Fed. Cir. 1993).

The function of "control means" identified in claim 9 is to allow "pressurized fluid to be alternately supplied to and exhausted from said cylinder . . . ." [rec. doc. 122-17 at 10: 34-36].

The structures disclosed in the specification that can control the pressurized fluid that flows into and out of the cylinder include actuation by a hand pump, use of a flow control manifold and directional valves [*Id.* at 6:36 through 7:3 and Fig. 6]. The Court agrees therefore with Scarborough that "control means" must be construed to include these structures as well as any of their equivalents.

**Control Manifold**

Scarborough proposes that "Control Manifold" requires no construction because the term is understandable to a person of ordinary skill in the art, as well as a lay person. Alternatively, Scarborough proposes the following construction for "Control Manifold": "a device containing an actuator that regulates fluid control."

Integricert proposes the following construction for "Control Manifold": "any means of effecting flow control of fluid to and from a hydraulic cylinder."

The Court agrees with Scarborough that the disputed claim term requires no construction.  A control manifold is understandable in the context of the 322 Patent's specification to a person of ordinary skill in the art as well as a lay person.  The term obviously

refers to the structure or device which effects flow control of fluid to and from a cylinder.[28]

The term appears only in Claims 18 and 19 of the 322 Patent.  Claim 18 clearly recites that

"pressurized fluid into said cylinder is controlled by a flow control manifold . . ." and Claim 19

likewise recites that "fluid pressure, in said cylinder, is determined at the control manifold and

monitored by a pressure gauge." The specification recites that the "flow control manifold 50 is

preferably connected to the upper 7 and lower 7A cylinder fittings . . . [and]  controls the

direction of flow either into the lower cylinder fitting 7A . . . or into the upper cylinder fitting 7

. . . . [and] also measures the pressure of the fluid." [rec. doc. 122-17 at 7:3-10]. Moreover,

Figure 6 provides an exemplary illustration of a control manifold.  There is, therefore, no need

for this Court to construe the term.

Trial courts need not repeat and restate every claim term, and "are not (and should not

be) required to construe every limitation present in a patent's asserted claims." *U.S. Surgical*

*Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *O2 Micro International Ltd. v.*

*Beyond Innovation Tech, Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). If this were the case,

trial courts would be "inundated with requests to parse the meaning of every word in the

asserted claims." *Shell Global Solutions (US), Inc. v. RMS Engineering, Inc.*, 782 F.Supp.2d

317, 334 (S.D. Tex. 2011) *citing O2*, 521 F.3d at 1360.  Simply stated, claim construction is not

---

[28]Indeed, it appears that the parties virtually agreed to that construction during the *Markman* hearing. [rec. doc. 82 at pg. 59-62]. Integricert did not agree to the term "actuator" proposed by Scarborough, instead preferring to describe the device as "effecting fluid control." Scarborough on the other hand objected to Integricert's use of the terms "any means" and "hydraulic" as those terms imply "means-plus-function" claiming and improper limitation by example, respectively.  *See e.g. Comark Communications*, *Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-1187 (Fed. Cir. 1998); *Martek Biosciences Corp. v. Nutrinova, Inc*., 579 F.3d 1363, 1381 (Fed. Cir. 2009); *Primos, Inc. v. Hunter's Specialties, Inc*., 451 F.3d 848 (Fed. Cir. 2006); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

an obligatory exercise in redundancy." *U.S. Surgical*, 103 F.3d at 1568.

**Testing the Integrity of the Welding (or Weld)[29]**

Scarborough proposes that "Testing the Integrity of the Welding (or Weld)" requires no construction because the term is understandable to a person of ordinary skill in the art, as well as a lay person.  Alternatively, Scarborough proposes the following construction for "Testing the Integrity of the Welding (or Weld)": "challenging the soundness of the welding or weld."

Integricert proposes the following construction for "Testing the Integrity of the Welding (or Weld)": "determining the load capacity of a weld to a pre-determined load."

The Court does not believe this phrase requires construction. However, to the extent that construction is required, the Court would adopt Scarborough's construction in its entirety, "challenging the soundness of the welding or weld."

Integricert  essentially argues that the limitation set forth in Claim 16 of the 322 Patent, a dependent claim, be incorporated into the other claims of the Patent where this language appears, including independent claims 1 and 13, as well as, apparently, all claims of the 447 Patent containing this language. This construction violates black letter patent law, and in particular, the doctrine of claim differentiation.  The doctrine of claim differentiation creates a presumption that a limitation appearing in one claim not be incorporated into other claims; that presumption is strongest in cases such as that presented to this Court, where the limitation

---

[29]During re-examination, the term "attachment" was inserted before the term "weld" in several claims of both the 322 and 447 Patents.  However, for the reasons set forth in this Court's ruling on the cross-motions for partial summary judgment on doctrine of absolute intervening rights, the Court does not find that this amendment affects the Court's construction of the disputed term.

appears in a dependent claim and is sought to be read into an independent claim.[30]  *See*

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("The presence of a

dependent claim that adds a particular limitation raises a presumption that the limitation in

question is not found in the independent claim.") *citing Wenger Mfg., Inc. v. Coating Mach.

Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir.2001) and *Comark Communications, Inc. v. Harris

Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).

The presumption can be overcome if the circumstances suggest a different explanation,

or if the evidence favoring a different claim construction is strong.  *Id.*  The presumption is

unrebutted, however, in this case.  Integricert  has not shown any reason sufficient to rebut the

presumption that the limitation appearing in claim 16 not be read into claims 1 or 13 of the 322

Patent to preserve the distinction between these claims, nor any sufficient reason to incorporate

the limitation contained in Claim 16 of the 322 Patent to any claim of the 447 Patent containing

the disputed phrase.

Furthermore, to construe the term as proposed by Integricert would effectively

improperly import an added limitation to the all claims containing the phrase as requiring a

quantitative determination of weld capacity to a predetermined load. *See  Comark

Communications*, 156 F.3d at 1186 (dictating against importation of limitations from the

specification into the claims).

---

[30]Claim 13 recites a method for testing weld strength and integrity without reference to any
calculation of "cylinder test pressure" by "determining a required test load based on the weight to be
supported . . . ." Claim 16, which depends from claim 13, adds this limitation.  A comparison of claims
13 and 16 makes clear that this is the only significant distinction between the two claims, that is, claim 16
requires load calculation, whereas claim 13 does not.

At the *Markman* hearing Integricert additionally argued, on the basis of its proposed construction of the term "nondestructive", that Scarborough disclaimed a method or apparatus of challenging the soundness of a weld until it breaks, therefore requiring a load capacity limitation be read into the claims. For the reasons assigned by the Court with respect to the proper construction of that term, Integricert's argument cannot be accepted.  As set forth in detail above, Scarborough did not disclaim a method or apparatus which could potentially damage or destroy an improperly welded test piece, he merely distinguished his invention from prior art on grounds that his invention did not inherently damage or destroy (by removal or disassembly and placement in the testing device), thereby allowing a properly welded test piece to remain intact and usable following testing.

**About Said at Least One Test Piece**[31]

Scarborough proposes that "about said at least one test piece" requires no construction. Alternatively, during the *Markman* hearing Scarborough proposed the following construction for "about": "near."

Integricert proposes the following construction for "about said at least one test piece": "in a manner that surrounds or encloses said at least one [desired][32] test piece."

The Court adopts the following definition for "about said at least one test piece": "around or in a proximate location to, but not necessarily completely surrounding or enclosing."

---

[31]During re-examination, the word "desired" which appeared before the term "test piece" was deleted.  This amendment has no effect on the Court's construction of the phrase.

[32]*See* fn. 31, *supra*.

The crux of the dispute centers on the proper construction of the term "about". Scarborough argues the term means "near" and Integricert argues, without limitation, that the term means "surrounding or enclosing."  The Court cannot accept either of these proposed constructions and, instead, construes the term as an amalgamation of both constructions.

The term "about" is not defined in the specification of either patent, and appears solely in claim 27 of the 447 Patent.[33]  Both parties rely on the depictions of embodiments shown in the figures of the 447 Patent, as well as various dictionary definitions.  The Court has done the same.

Viewing these figures, it is clear that construing the term as meaning only "near" would not accurately define that which is depicted in the drawings, which show the framework as being essentially equidistant from the test piece (referred to as element 19, a pad eye).  On the other hand, while the drawings depict the framework of the apparatus in proximity to the test piece, the framework, particularly as shown in figure 1A, does not necessarily completely surround or enclose the test piece as those terms connote.  It would therefore be inappropriate to construe the term as such, thereby excluding a preferred embodiment.  *See Vitronics Corp.*, 90 F.3d at 1584.

The term "about" is defined by Webster's Online Dictionary as including "around" and "in the immediate neighborhood of; in contiguity or proximity to." In the context of this Patent, the Court finds that these definitions of the term are most appropriate.[34]

---

[33] While the term also appeared in claim 29 of the 447 Patent, that claim was cancelled during reexamination.

[34] http://www.websters-online-dictionary.org/

**Additional Terms Post-Reexamination**

In its Supplemental Claim Construction Brief, Integricert argues that this Court should construe numerous additional terms as they existed before and after reexamination. The majority of Integricert's argument consists of Integricert's reassertion that the scope of the claims of the Patents in suit were substantively changed during reexamination and were not originally limited to "attachment welds."

Given this Court's Ruling on the Cross-Motions for Partial Summary Judgment on whether Integricert is entitled to application of the doctrine of absolute intervening rights, the Court declines to construe any additional terms. The majority of the terms cited by Integricert were considered and discussed in the Ruling, thereby mooting the need for construction. To the extent that a construction of any such term was necessary, the Court would adopt a construction consistent with its Ruling. For example, although the parties had apparently agreed to a construction of the term "attachment weld" prior to reexamination, to the extent construction of that term is necessary, the Court would adopt "a weld which attaches lifting points referred to as pad eyes or lifting lugs to other structures which are to be lifted." The parties, however, are free to agree on an alternate definition consistent with this Court's Ruling.

**Conclusion**

For the foregoing reasons, the Court construes the disputed terms as set out above.

Signed this 31st day of August, 2015, at Lafayette, Louisiana.

_C. Michael Hill_

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE