Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

RANDALL SCARBOROUGH        CIVIL ACTION NO. 6:12-CV-00396

VERSUS                     JUDGE REBECCA F. DOHERTY

INTEGRICERT, LLC           MAGISTRATE JUDGE C. MICHAEL
                           HILL

*********************************************************

VIDEOTAPED DEPOSITION OF STEPHEN KILLINGSWORTH

    The videotaped deposition of STEPHEN

KILLINGSWORTH was taken in the above entitled cause,

pursuant to the following stipulation before Sylvia C.

Molbert, Certified Court Reporter, at the law offices

of Domengeaux, Wright, Roy, Edwards & Colomb, LLC, 556

Jefferson Street, Suite 500, Lafayette, Louisiana, on

the 23rd day of May, 2016, beginning at 1:10 p.m.

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

 3   FOR THE PLAINTIFF, RANDALL SCARBOROUGH:

 4        MS. HOLLY H. BARNES
          MATTHEWS, LAWSON, McCUTCHEON & JOSEPH, PPLC
 5        2000 BERING DRIVE, SUITE 700
          HOUSTON, TEXAS   77057
 6        (713) 355-4200

 7

     CO-COUNSEL FOR THE PLAINTIFF, RANDALL SCARBOROUGH:

 8

          MR. ELWOOD STEVENS
 9        DOMENGEAUX, WRIGHT, ROY & EDWARDS & COLOMB, LLC
          556 JEFFERSON STREET, SUITE 500
10        POST OFFICE BOX 3668
          LAFAYETTE, LOUISIANA   70502
11        (337) 233-3033

12

     FOR THE DEFENDANT, INTEGRICERT, LLC:

13

          MR. WILLIAM W. STAGG
14        MR. RYAN GOUDELOCKE
          DURIO, McGOFFIN, STAGG & ACKERMANN
15        220 HEYMANN BOULEVARD
          POST OFFICE BOX 51308
16        LAFAYETTE, LOUISIANA   70505
          (337) 233-0300

17

18   ALSO PRESENT:

19        COREY SMILEY, VIDEOGRAPHER
          KENNY HICKS (INTEGRICERT)
20        RANDY SCARBOROUGH
          SAMUEL HAWKINS

21

22

23

24

25
```



```
 1                       I-N-D-E-X

 2   APPEARANCES                                          2

 3   STIPULATION                                          4

 4

 5   EXAMINATION:

 6        MS. BARNES                                      5

 7        MR. STAGG                                     117

 8   RE-EXAMINATION:

 9        MS. BARNES                                    127

10

      EXHIBITS:

11

          KILLINGSWORTH 1   REPORT OF STEPHEN

12                          KILLINGSWORTH               18

13        KILLINGSWORTH 2   NOTICE OF DEPOSITION         18

14        KILLINGSWORTH 3   DRAWING                      53

15        KILLINGSWORTH 4   AFFIDAVIT OF KILLINGSWORTH   54

16        KILLINGSWORTH 5   FIGURE 1-INTEGRICERT 569

                            PATENT                       63

17

          KILLINGSWORTH 6   PHOTOGRAPH                   69

18

19   ADDITIONAL INFORMATION REQUESTED:

20        COMPLETE FILE OF STEPHEN KILLINGSWORTH         21

21        LIST OF CURRENT EXPERT ENGAGEMENTS FOR

          LITIGATION                                     44

22

23   REPORTER'S PAGE                                    132

24

25   REPORTER'S CERTIFICATE                             133
```



Page 4

1                        S T I P U L A T I O N

2

3          IT IS HEREBY STIPULATED AND AGREED among counsel

4     for the parties herein that the videotaped deposition

5     of

6                        STEPHEN KILLINGSWORTH

7     be taken before SYLVIA C. MOLBERT, a Certified Court

8     Reporter, by counsel for plaintiff, for all purposes,

9     pursuant to notice and to the provisions of the

10    appropriate statutes of the Federal Code of Civil

11    Procedure.

12              The parties hereto waive all formalities in

13    connection with the taking of said deposition,

14    including the reading and signing thereof, except the

15    swearing of the witness and the reduction of the

16    questions and answers to typewriting.

17          Counsel for all parties reserve all objections,

18    except as to the form of the question and

19    responsiveness of the answer, at the time of taking

20    said deposition, but they also reserve the right to

21    make objections at the time said deposition or any

22    part thereof may be offered in evidence, with the same

23    rights as if the testimony had been taken and given in

24    Open Court.

25                             *   *   *



Page 5

```
 1                 VIDEOGRAPHER:
 2                     This is the beginning of tape two in
 3                 the deposition of Stephen Killingsworth.
 4                 THE WITNESS:
 5                     K-I-L-L-I-N-G-S-W-O-R-T-H.
 6                 VIDEOGRAPHER:
 7                     And we're going on the record.  The
 8                 time is 1:12.  And would the representing
 9                 attorneys state your appearances and who
10                 you represent.
11                 MS. BARNES:
12                     Holly Barnes, I represent the
13                 plaintiff, Randy Scarborough.  And I have
14                 Elwood Stevens with me.  Also present is
15                 our expert, Sam Hawkins, and Mr. Randy
16                 Scarborough.
17                 MR. STAGG:
18                     I'm William Stagg.  I represent the
19                 defendant, IntegriCert, LLC.  Present with
20                 me at some point today will be Ryan
21                 Goudelocke, associate counsel.  And client
22                 representative Kenny Hicks is here.
23            STEPHEN KILLINGSWORTH, after having been duly
24      sworn, was examined and did testify as follows:
25      EXAMINATION BY MS. BARNES:
```



```
 1    Q    All right, Mr. Killingsworth, will you tell me
 2         what a framework is?
 3    A    It depends on the context.
 4    Q    You've given a report in this case, correct?
 5    A    Yes.
 6    Q    And you have made some opinions or statements
 7         about what a framework is or isn't, right?
 8    A    Yes.
 9    Q    What do you think a framework is?
10    A    A framework is an outline in which you can place
11         items within it.
12    Q    Where do you get that definition?
13    A    From the dictionaries.
14    Q    What dictionaries have you used to --
15    A    "Webster."
16    Q    -- define an outline?  Okay.  "Webster."
17         Anything else?
18    A    No.
19    Q    Does a framework have to be a closed outline?
20         Does it have to be a closed outline?
21    A    It depends on the context.
22    Q    In the context of the 322 and 447 Patents that
23         you've provided an opinion on, does a framework
24         have to be a closed outline?
25    A    The way it's offered by the plaintiff, to me,
```



```
 1            yes.
 2    Q       Why?
 3    A       Otherwise it won't work for his patents.
 4    Q       Okay.  What won't work if the framework is not
 5            closed?
 6    A       As the framework is depicted, it is depicted with
 7            top, sides, and a bottom -- or top, sides, and an
 8            open section that's attached to another piece.
 9    Q       That open section, you think, is still closed?
10    A       No.  It can be -- it's offered as being closed
11            and offered as being open.  But when it's
12            classified as a bottom, I think of a bottom being
13            attached, physically attached, okay, and the
14            structure underneath of it being stiff enough
15            that it truly is a bottom.
16    Q       Okay.  What is your definition of a base or a
17            bottom?
18    A       A base or a bottom, again, in this context?
19    Q       Yes.
20    A       Well, the way the patent is issued by the
21            plaintiff, it can be anything.
22    Q       Can it be two feet?
23    A       Could it be two feet?
24    Q       Yes.
25    A       Yes.
```



Page 8

1   Q   Do you -- and I should have asked you this for

2        framework.  Do you believe that framework, as

3        used in the 322 and 447 Patent, is entitled to

4        the full scope of its ordinary meaning?

5   A   It depends on where you get the definition.

6   Q   Do you agree that in this case the parties agreed

7        that the term didn't need to be construed, so you

8        leave it to its ordinary meaning?

9   A   Yes.

10   Q   And the same question for base, do you agree that

11       the parties didn't seek claim construction for

12       that, so it's just the full scope of its ordinary

13       meaning?

14   A   That's correct.

15   Q   What do you think a side piece is -- and, again,

16       in the context of these two patents.

17   A   It's a piece -- to me, a side piece has height,

18       width, and length to it.  The bottom would also

19       have height, width, and length to it.

20   Q   What makes a side piece the side piece?  Just

21       simply being something with height, width, and

22       length --

23   A   It occupies --

24   Q   -- on the side of the framework, correct?

25   A   To me, okay, according to the discussions being



```
 1          taken relative to the patents, it's been anything
 2          that sits out there, any structure that sits out
 3          there, or any part that sits out there.
 4    Q     On the side?
 5    A     On the side or on the bottom.
 6    Q     A side piece can be on the bottom?
 7    A     No.  But a bottom can have -- a bottom, to me,
 8          okay, I would -- as I look at it, it looks like
 9          it has width, depth, and thickness.  The same
10          thing on the top.
11    Q     A top would have width, depth, and thickness?
12    A     Correct.
13    Q     But it would exist somewhere on the top to make
14          it a top?
15    A     Well, it can't hang down on either side if it's
16          going to be a top.
17    Q     So I'm asking you a similar question for a side
18          piece.  It would have to be just a piece on the
19          side, correct?
20    A     No, not a piece on the side.  A piece that forms
21          the side, that covers the side.
22    Q     It has to cover a side of what?
23    A     It has to occupy space on the side.
24    Q     Okay.  So the framework would include the base
25          that we discussed, side pieces, and a top.  Do
```



1           you agree with that?

2    A     As it's defined by the patent.

3    Q     Was that a yes --

4    A     That's the way it's --

5    Q     -- or a no?

6    A     Yes.

7    Q     Do you agree with me that there can be

8          intervening pieces between the base and the side?

9    A     Define "intervening pieces."

10   Q     Can there be any piece between the base and the

11         side on the framework?  For example, can there be

12         a corner piece or something that goes in between

13         the side and the base?

14   A     If you've got a side and a base, okay, and

15         they're together and they form one piece, I'd say

16         they've got width, length, and height, or depth.

17         Okay.  There's a dimension with it.  You don't

18         need a corner piece.

19   Q     That's not what I asked you, though.  Can you

20         have a corner piece?  Can there be an intervening

21         piece of material between the base and the side

22         to create a framework?

23   A     Yes.

24   Q     And then the same question for the top.  Can

25         there be an intervening piece or structure



```
 1          between a top and a side --
 2    A     You're changing it.  You're changing it.  Now
 3          you're adding the word "structure."  Okay?
 4    Q     Okay.
 5    A     We have not been talking about structure.  We've
 6          been talking about --
 7    Q     Could there be --
 8    A     -- pieces.
 9    Q     -- an intervening piece in the framework between
10          the top and a side piece?
11    A     There can be a piece.
12    Q     What do you think is different about the word
13          "structure" than "piece"?
14    A     Because "structure" isn't defining something that
15          has width, length, or height.  It doesn't have
16          dimensional characteristics to it.
17    Q     "Structure" does not?
18    A     I don't take it that way.
19    Q     Okay.  What do you think a structure is?
20    A     A structure is multiple pieces tied together.
21    Q     Or a framework?
22    A     Well, a framework -- if you look at the
23          definition, in some cases, "structure" is used as
24          a replacement for "framework."
25    Q     What do you think the phrase "mounted with the
```



Page 12

```
 1          framework" means?
 2   A      That if you have these pieces, that you have --
 3          and you want to have pieces within the framework,
 4          as you've defined, you have the ability to attach
 5          to it in some manner.
 6   Q      Have you looked at the claim construction
 7          documents in this case?
 8   A      I don't think so.
 9   Q      Are you aware that the parties agreed that the
10          term "mounted with the framework" would mean
11          framework to which at least one fluid cylinder
12          has been attached?
13   A      That's correct.  Yes.
14   Q      You agree with that?
15   A      Yes.
16   Q      Did you review the joint claim construction chart
17          about the agreed claim construction?
18   A      No.
19   Q      Did you review the court's claim construction
20          order?
21   A      No.
22   Q      How did you determine what any of the terms in
23          the patent mean if you didn't look at the claim
24          construction?
25   A      Because I read through the patent.
```



```
 1   Q    So you made your own claim constructions,

 2        ignoring the ones from the court?

 3   A    No.

 4   Q    How did you not ignore them if you didn't look at

 5        them?

 6   A    I didn't look at them.  But you asked me how did

 7        I determine those.

 8   Q    Right.  How did you determine --

 9   A    I read the patent.

10   Q    So the only documents that you used to determine

11        the meanings of the claim terms would be the

12        patent?

13   A    The patent, and there were additional documents

14        that came in.  There were additional documents

15        that were submitted to the report for review.

16   Q    Okay.  We can look at those.  They would be in

17        your report, I believe?

18   A    No.  They would be in -- I think it was motions

19        for -- various motions that were tied to it.

20   Q    Right.  Your report would reference what those

21        motions were that you reviewed, correct?

22   A    I believe so.

23   Q    If you'll look at page 2 of 22 of your report,

24        you have listed "Documents and References,"

25        which, I believe, are the things you relied upon;
```



Page 14

1       is that correct?

2   A   That's correct.

3   Q   The only things listed are the 322 Patent and

4       Reexamination Certificate, the 447 Patent and

5       Reexamination Certificate, the 569 Patent and its

6       Reexamination Certificate.

7   A   Yes.

8   Q   Mr. Hawkins' report and the attachments.  Did you

9       get claim construction from Mr. Hawkins' report

10      or attachments?

11  A   No.  I may have gotten it from Mr. Stagg.

12  Q   It's not listed under things that you have

13      reviewed or relied upon, though, correct?

14  A   That's correct.

15  Q   What else did you review or rely upon that is not

16      listed under "Documents and References" of things

17      you would have used?

18  A   I believe that's it.

19  Q   And what is it that you're referring to when you

20      say "that's it"?

21  A   The documents and references and the background

22      that was listed here.

23  Q   I'm sorry.  I may not have asked you a good

24      question.  The document that you received from

25      Mr. Stagg that you relied upon that's not on this



1        list, what is it?

2  A    No.  Mr. Stagg and I discussed it.  There was

3        motions that I had been provided.

4  Q    Do you recall what those motions were?

5  A    Not off the top of my head.

6  Q    Are they motions for summary judgment?

7  A    I don't recall.

8  Q    Do you have any copies of those with you today?

9  A    No.

10  Q    Do you recall seeing anything in those motions

11        that would set forth the court's claim

12        construction?

13  A    I don't recall.

14  Q    You don't recall if you've seen them or you don't

15        recall the court's claim construction?

16  A    I don't recall if I've seen -- no.  I don't

17        recall either one.

18  Q    Did you bring any documents with you today to

19        produce?

20  A    I brought -- since I got the notice for this over

21        the weekend, I brought a copy of my resume and a

22        copy of my case list.

23  Q    You didn't bring anything else in response to --

24  A    No.

25  Q    -- our notice?



Page 16

```
 1    A    Because I didn't have a notice listing the
 2         documents or information that you wanted.  I
 3         didn't get it until the last minute.
 4    Q    You didn't get it until this past weekend?
 5    A    I wasn't in Lafayette this last weekend.
 6    Q    That's not what I asked you.  When did you
 7         receive the request for documents that my firm
 8         served on your counsel?
 9    A    I don't know.  Oh, served on him?  I don't know
10         when you served it on him.
11    Q    I'm asking when you received it.
12    A    I received it apparently over the weekend because
13         I received it by email.
14    Q    Within the last several days?
15    A    I was gone all weekend.  I cannot receive it if
16         I'm not near a computer or have access to it.
17         The first time that I saw it was this morning.
18         That's what I'm trying to tell you.
19    Q    Okay.  Do you have documents now that you believe
20         are responsive that you weren't able to gather in
21         time?
22    A    No, because this morning I read the document of
23         what was to be produced, didn't have time to put
24         it together and I came over here -- or came to
25         Mr. Stagg's office.
```



Page 17

1           MR. STAGG:

2                   That's not her question.

3           MS. BARNES:

4                   That's what --

5           MR. STAGG:

6                   The question is, do you have any

7           documents that are responsive to that

8           request?

9           MS. BARNES:

10                  Right.

11   BY MS. BARNES:

12   Q    Have you -- when you went through it this

13        morning, did you think, "I have that document" or

14        "I have that document, but I" --

15   A    No.

16   Q    -- "haven't had the chance to pull them

17        together"?

18   A    No.

19   Q    Are you aware of -- and we'll go through it.

20           MS. BARNES:

21                  We'll mark this as "Exhibit 2."

22           COURT REPORTER:

23                  Did you introduce the first one?  We

24           did it off the record.  What is it?

25           MR. STEVENS:



```
 1                    You identified it as "Number 1," but I
 2          don't know if --
 3          MS. BARNES:
 4                    The first -- yeah.  His report is
 5          "Exhibit 1."  And I asked him to look at
 6          page two of that already.  And then we'll
 7          mark your deposition notice as "Exhibit 2."
 8          (EXHIBIT NOS. 1 AND 2 IDENTIFIED)
 9   BY MS. BARNES:
10   Q      You may notice on the front page of this that
11          it's dated May 6, 2016.  But your position is
12          that you didn't receive it until this morning; is
13          that correct?
14   A      It's not my position.  It is not my position.
15          It's what occurred.
16   Q      You're not contending you got this May 6th, 2016,
17          right?
18   A      That's correct.
19   Q      Okay.
20   A      I just told you that I got it over the weekend --
21   Q      Right.
22   A      -- apparently over the weekend.
23   Q      So you didn't receive it until this morning,
24          correct?
25   A      Right, I didn't review it until this morning.
```



1    Q    Right.  That's all I'm asking you.

2    A    Okay.

3    Q    And if you could turn to the third and last page

4         of it, I'd like to ask you, since you haven't had

5         a chance to produce any of these things, whether

6         they exist or not.  The first request is all

7         documents, notes, memos, emails, recordings, or

8         audio files reflecting any interview or

9         discussion between you and IntegriCert.  Do

10        you --

11   A    No.

12   Q    -- have any documents that would be responsive to

13        that?

14   A    No.

15   Q    You didn't keep any notes for any meetings you

16        had with any representative of IntegriCert?

17   A    No.

18   Q    Did you meet with anyone at IntegriCert?

19   A    No.

20   Q    Did you meet with anyone, other than counsel for

21        IntegriCert, to prepare for your deposition?

22   A    No.

23   Q    Or to prepare for your report?

24   A    No, other than counsel.

25   Q    Okay.  The next one is all documents, et cetera,



Page 20

```
 1          reflecting any interview or discussion between
 2          you and any third party relating to your report.
 3    A     No.
 4    Q     Do you have any correspondence, emails, or other
 5          communications between you and IntegriCert
 6          relating to this matter?
 7    A     No.
 8    Q     You haven't exchanged any email with anyone at
 9          IntegriCert?
10    A     That's correct.
11    Q     Only counsel?
12    A     Only counsel.
13    Q     Okay.  Do you have any correspondence with any
14          third party related to this case?
15    A     I thought you just asked me that.  No.
16    Q     Do you have a complete file of every document,
17          information source, or tangible thing that you've
18          used, relied upon, compiled, or created or given
19          to you for this case?
20    A     I don't know.  I may have --
21    Q     Why don't you know what you have to rely on for
22          this case?
23    A     Because I didn't read -- I didn't go through
24          everything in the file because I didn't have this
25          information asking me before.  I didn't throw
```



```
 1            anything away.  But sometimes I'll jot a note or
 2            something on a corner of a piece of paper or
 3            something like that.  And if I did, it'll be in
 4            my office.  But if I didn't, it won't be in my
 5            office.  So I'm not trying to be funny or --
 6       Q    Well, I understand.  If you didn't create it,
 7            it's not in your file?  It doesn't exists.
 8       A    That's correct.  Or sometimes it's not filed.
 9       Q    Right.  You keep a file, though, for this case,
10            correct?
11       A    Yes.
12       Q    And anything that you've used or created that has
13            been filed should remain there, correct?
14       A    Correct.
15       Q    So at some point, can you produce that file for
16            us to review?
17       A    Yes.  I plan on producing everything here.  I
18            just didn't have the time to do it.
19       Q    I understand.  And I'm not quarreling with you
20            about it.  But since this is my chance to take
21            your deposition --
22       A    I understand.
23       Q    -- I need to know what you've got and what you
24            don't have.  Would number five that we just
25            talked about include any workbooks or research
```



Page 22

```
 1          materials?

 2    A     That's correct.

 3    Q     Have you done any --

 4    A     That was actually number six, when you said

 5          "workbooks."

 6    Q     Right.  I asked you about number five already to

 7          be your complete file.

 8    A     Okay.

 9    Q     And then I didn't want to read number six to you,

10          as well, since it includes some of those things.

11          Have you taken any photos of the IntegriCert

12          device?

13    A     No.

14    Q     Have you done any sketches or drawings or

15          schematics of it?

16    A     No.

17    Q     Have you seen the actual IntegriCert device in

18          person?

19    A     I've seen photographs.

20    Q     Those photographs aren't listed on the documents

21          that you relied upon?

22    A     That's correct.

23    Q     Why did you not rely upon them?

24    A     No.  I replied upon them.  They came in from your

25          expert's report.
```



Page 23

```
 1   Q   So the photos that were in Mr. Hawkins' report --
 2   A   That's right.
 3   Q   -- that's what you're referring to?  Okay.  I
 4       think it would help the court reporter if you'd
 5       let me finish a question before you answer, even
 6       if you know what the question is going to be.
 7       Your list of documents and references has five
 8       listed prior art patents, I believe?
 9   A   Correct.
10   Q   Are you going to rely on any either additional
11       prior art that's not included in that list?
12   A   I can't answer it --
13   Q   Why not?
14   A   -- as we sit here now.  Because I don't know
15       what's going to be requested of me.
16   Q   Has anyone requested of you, as of today, to
17       review any additional prior art than those
18       listed?
19   A   Mr. Stagg and I talked.  I don't think -- I know
20       he hadn't produced it, so I can't answer it until
21       I talk to him.
22   Q   What prior art did you discuss that you don't
23       think he's already produced?
24   A   Just other examples.
25   Q   Such as?
```



Page 24

| | | |
|---|---|---|
| 1 | A | Other examples of other patents. |
| 2 | Q | Can you think of any of those by name or number? |
| 3 | A | No. |
| 4 | Q | Do you know what they cover? |
| 5 | A | No, because I haven't seen them. |
| 6 | Q | Have they been described to you? |
| 7 | A | In general, Mr. Stagg and I talked about possibly |
| 8 | | some additional patents but did not go into any |
| 9 | | detail. |
| 10 | Q | Do you intend to provide those in a new report? |
| 11 | A | It depends on what he asks me to do. |
| 12 | Q | Do you know where those prior art references came |
| 13 | | from? |
| 14 | A | Which prior art? |
| 15 | Q | The ones Mr. Stagg raised to you that you may or |
| 16 | | may not, at a later date, provide a report on? |
| 17 | A | No.  Just in a general conversation.  We've had |
| 18 | | several meetings, so -- |
| 19 | Q | Have you reviewed IntegriCert's current request |
| 20 | | for reexamination to the patent office? |
| 21 | A | I don't believe so. |
| 22 | Q | Does your file that we discussed that's in your |
| 23 | | office include all the prior art that you've |
| 24 | | relied upon? |
| 25 | A | Yes.  Well, it's in my office and it's sitting |



1        before us.

2    Q   I think I understand what you're saying, but I

3        want to be clear.  When you say it's before us,

4        it's in your report, which is Exhibit 1?

5    A   Correct.

6    Q   Is there any other prior art that you've relied

7        upon that's not in Exhibit 1?

8    A   As of right now, no.

9    Q   Okay.  Have you done any of your own prior art

10       searches for this case?

11   A   No.  I worked with Mr. Stagg.

12   Q   Have you made a determination of who a person of

13       ordinary skill in the art would be in this case?

14   A   No.

15   Q   Do you have billing records or invoices for this

16       case so far?

17   A   I haven't compiled them.  I do have records of

18       meetings with Mr. Stagg or work for him or work

19       with him.

20   Q   Do you know approximately how many hours you've

21       spent so far on this case?

22   A   No.

23   Q   Do you have any experience with hydraulically

24       operated testing tools?

25   A   Yes.



Page 26

```
 1   Q    What experience is that?
 2   A    I do a lot of -- over the years, I've done a lot
 3        of work, including the use of hydraulic end
 4        tools.
 5   Q    I'm sorry.  Hydraulic what tools?
 6   A    Hydraulics -- a lot of equipment that I have
 7        worked with are utilized or incorporated into
 8        equipment that I've designed have dealt with a
 9        lot of hydraulics, valves, cylinders, control
10        systems and such.
11   Q    Can you give me an example of your specific
12        experience with a hydraulically operated testing
13        device?
14   A    I've designed on some offshore drill ships
15        testing devices in terms of where the legs were
16        positioned, how they were oriented on the rigs.
17        Fairly large equipment.
18   Q    How does that testing device use hydraulics to
19        find where the legs are positioned?
20   A    It gives you feedback through pressure tubes,
21        pressure sensors.
22   Q    Where, on a rig, would that device or structure
23        be stationed?
24   A    On the legs of drill ships, on the legs of
25        drilling platforms.
```



```
 1   Q    What kind of force is measured or used in that
 2        device?
 3   A    It varies.
 4   Q    Based on what?
 5   A    Based on whether I used pilot pressures or I used
 6        just the full pressure.  Also, it's a function of
 7        the flow rates.
 8   Q    Flow rates of what?
 9   A    Of the hydraulic oil.
10   Q    Hydraulic what; arm?
11   A    Oil.  Oil.
12   Q    Oh.  Where does the hydraulic oil come from?
13   A    A reservoir.
14   Q    Where is the reservoir?
15   A    On the boat.
16   Q    So you have a boat that pulls up to an offshore
17        rig?
18   A    No.  No.
19   Q    Where's the boat?
20   A    I've got an offshore rig, okay, that has testing
21        and safety systems incorporated into the vessel.
22        And when pressure drops on certain functions in
23        terms of the support legs, it senses -- provides
24        feedback and senses what's going on.  And either
25        action is taken or it's self-correcting,
```



```
 1          depending upon the equipment.  So it's testing
 2          the operations.  I've also used -- that's one
 3          extreme.  I also have a pneumatic and a hydraulic
 4          tester for slip resistance.
 5     Q    For slip resistance?
 6     A    Uh-huh (affirmative response).
 7     Q    How dose that work?
 8     A    It uses -- depending upon what tester I want to
 9          use with it, it uses a -- fills a reservoir and
10          fires the equivalent of a shoe and measures a
11          slip coefficient of the walkway.
12     Q    Would you agree that both of the devices you've
13          explained to me do not use a cylinder to tension
14          anything?
15     A    Sure it does.  The slip resistant tester does.
16     Q    What does it tension?
17     A    What is in tension?
18     Q    What does it tension?  What does the slip
19          resistant device place a tension upon with a
20          cylinder?
21     A    He uses an air cylinder or a hydraulic cylinder
22          and it fills a reservoir that fires off the
23          reservoir -- fires off.  And that force is
24          recovered in terms of -- it's really a scale.
25          It's very simple.  That's it.
```



```
 1    Q    Have you used or designed any device that has a

 2         piston and a cylinder where the movement of the

 3         piston creates a tensioning force on some device?

 4    A    Yes.  On mooring systems and on docking systems.

 5    Q    How do those things exist in mooring or docking

 6         systems?

 7    A    It uses a combination of cylinder, hydraulic

 8         cylinder, and springs.

 9    Q    What uses a combination of --

10    A    The system, the mooring system uses that to place

11         the tie-up mooring ropes, and then it retrieves

12         it.

13    Q    What retrieves it; the device?

14    A    The system, itself, retrieves it.

15    Q    So what part of the mooring or docking system is

16         tensioned by a piston in a cylinder?

17    A    The piston -- the exterior piston connected to a

18         rod that ties to the mooring rope that throws or

19         tosses the mooring rope over to the dock.  That's

20         where it's at.

21    Q    Are there any other instances you can think of

22         where you've used a hydraulic cylinder to put a

23         tension on something?

24    A    Give me a minute.  I would say anchor launching

25         systems.
```



Page 30

```
 1   Q    Does that work similarly to the mooring or --

 2   A    Yes.

 3   Q    -- docking system?  Now, do any of the things we

 4        just discussed, the hydraulic fluid measurement

 5        or hydraulic or pneumatic slip resistance or

 6        mooring or docking or anchoring, involve testing

 7        of welds?

 8   A    The welds are pretested because it's part of the

 9        system.

10   Q    So is that a no?

11   A    No.  All of the welds on the system have to be

12        tested.  And the pad eyes that some of these tie

13        off to have to be tested.

14   Q    Do you do the testing?

15   A    On a couple of occasions, we built it into the

16        mooring system.  On other cases, we've had people

17        come in and -- because the pad eyes and such that

18        we were using were so large.

19   Q    So in some instances in the mooring system, you

20        built in the testing of the pad eye; is that --

21   A    Right.

22   Q    -- correct?

23   A    Well, no, no.  We tested the welds, but we also

24        had pad eyes that we actually had to test when we

25        were transferring from one ship or one vessel to
```



```
 1        another.

 2   Q    What device did you use, at that time, to test

 3        the pad eye or the welds?

 4   A    Early stages, when they didn't have people out

 5        doing the testing, we tested it ourselves by

 6        putting a strain gauges -- by putting strain

 7        gauges on the pad eyes and testing the pad eyes.

 8        And we used hydraulic cylinders -- if it was a

 9        small test set, hydraulic cylinders to put loads

10        on the pads eyes.

11   Q    What does a strain gauge consists of?

12   A    A strain gauge?  In the very basics, it has a

13        series of wires that run back and forth.  You

14        take the wire.  And it's mounted on a sheet.

15        That sheet, in turn, is mounted on the -- can be

16        either the -- well, if you're testing the pad

17        eye, you place it on the pad eye.  And then you

18        would tie that into an electrical system and

19        you'd measure the change in resistance.

20   Q    Okay.  How did you use that in conjunction with

21        hydraulics, which I think is what you said?

22   A    Right.  We used the hydraulics to put forces on

23        the cabling system to be able to test it.  And we

24        had to tie that up with cabling systems.  In some

25        cases we used some -- what I call a stiff arm.
```



```
 1          And what it would do is we had no -- we just used

 2          a hydraulic cylinder to be able to advance it

 3          forward.

 4    Q     To be able to advance what forward?

 5    A     The load that we were putting on the pad eyes.

 6    Q     There was some kind of --

 7    A     Some of the pad eyes --

 8    Q     -- manual action to it?

 9    A     Yes.  Some --

10    Q     Go ahead.

11    A     Some pad eyes were tested, as I said, by a third

12          party.  And it also depended upon which pad eyes

13          we were dealing with because we were dealing, in

14          some cases, with offshore structures, and in some

15          cases --

16    Q     You weren't finished?

17    A     No, I wasn't.

18    Q     I'm listening.

19    A     In some cases, it dealt with offshore structures,

20          floating structures.  In other cases it dealt

21          with vessels or drill ships.

22    Q     Can you tell me your general education

23          background?

24    A     I have a B.S. in Mechanical Engineering.  I have

25          an M.S. in Engineering Systems, with specific
```



Page 33

```
 1          emphasis on mechanical and structural
 2          engineering.
 3     Q    When you say --
 4     A    I have --
 5     Q    I'm sorry.  I didn't mean to interrupt you.  I
 6          was going to say, when you said "specific
 7          emphasis," is that through your master's degree
 8          or your experience afterwards?
 9     A    Master's.
10     Q    Okay.
11     A    I take continuing education courses, 30 a year --
12          30 every two years, and it covers a variety of
13          subject matters.
14     Q    I think "variety" is probably very accurate.  Can
15          you look at page four of your CV, which is in
16          Exhibit 1 -- I'm sorry -- four of your Exhibit A
17          to your report, which would be this tab.  It
18          should be.  Yes.  Now, if you could look at page
19          four, please.  I believe that this is the
20          continuing education you're referencing?
21     A    Well --
22     Q    We've got new paper in our office and it is the
23          stickiest -- there you go.  So there's a section
24          on page four that starts with "Professional
25          Education."
```



1    A    Yes.

2    Q    And does this cover the 30 every two years

3         continuing education you just referenced?

4    A    No.  I've got two other 30 hours.  Two other

5         times I've taken 30 hours of courses, and they're

6         just not inclusive.

7    Q    It needs to be updated to include --

8    A    Right.

9    Q    -- a couple of more things?

10   A    That's correct.

11   Q    Okay.  I want to ask you a couple of questions

12        about some of the things on here because they

13        cover a wide variety of things.  How do you

14        decide which of these professional education

15        courses to take?

16   A    Usually it depends upon whether I need a

17        refresher or it depends upon whether I'm -- or

18        whether I am involved in particular cases over

19        the years, or I'm going to be involved in

20        different cases over the years.

21   Q    So, for example, the third one on here is "Fire,

22        Designing Means of Escape."

23   A    Right.

24   Q    So you've taken some kind of professional

25        education course in that?



Page 35

```
 1   A    Correct.
 2   Q    Are you an expert now in fire, designing means of
 3        escape?
 4   A    No.
 5   Q    Why not?
 6   A    Because I've got some additional courses I need
 7        to take.
 8   Q    Do you intend to become an expect in fire?
 9   A    No.  But I have some cases that involve some heat
10        issues and being able to control them, and that's
11        why I'm taking additional courses.
12   Q    So you are providing expert testimony in a
13        different case about heat related issues?
14   A    That's correct.
15   Q    Okay.  On page five, a couple down, about five
16        down, is "Solar Electric Generation
17        Technologies."  Is that another education course
18        you've taken?
19   A    Yes.
20   Q    Are you becoming an expert in solar electric
21        generation?
22   A    I've already had some projects that I've worked
23        on.
24   Q    So you've provided expert testimony on solar
25        electric --
```



Page 36

```
 1   A    No.

 2   Q    -- generation?

 3   A    No.  I did some design work on some equipment

 4        that they wanted to include solar electric

 5        generation -- or solar power developed from it.

 6        And rather than some guy sell me down the road, I

 7        wanted to be educated enough that I understood

 8        the issues before I dove into it.

 9   Q    The third one on that same list is "Hydraulic

10        Steel Structure Design."  Is that related to a

11        rig substructure?

12   A    Let's see.  What page are you on?

13   Q    The third bullet point on that same page, page

14        five.

15   A    Oh, that was one I worked on before.  I needed

16        some additional information in terms of types of

17        steel that I wanted to use on a project.  I don't

18        recall that it was a vessel.  Looking at the

19        date, it may have been, but --

20   Q    Are you an expert in hydraulic steel structure

21        design?

22   A    No.  But I'm an expert in hydraulics.

23   Q    And is that through these types of professional

24        education courses?

25   A    Either continuing education or I had projects
```



```
 1          when I worked with companies either as a
 2          consultant in designing different products or I
 3          worked for a company as an individual.
 4    Q     Okay.  A couple of more bullet points further is
 5          "Parking Lots - Lighting, September, 2009."
 6    A     Right.
 7    Q     Are you also an expert in parking lot lighting?
 8    A     No.  I had a guy that was talking to me about it
 9          and I said, "Well, I'll take a class in it."
10    Q     Have you ever given any expert testimony in
11          parking lots?
12    A     No.
13    Q     There's also "Highway Engineering:  Driver,
14          Pedestrian, Vehicle, and Traffic
15          Characteristics."
16    A     Well, I need that just to move around in
17          Louisiana.  But, no, I've -- I do accident --
18          auto accident and multi-vehicle accident
19          reconstruction.
20    Q     Is that also as an expert witness?
21    A     Yes.
22    Q     Is that the real focus of your expert career, is
23          accident reconstruction?
24    A     With this addition:  accident reconstruction
25          primarily on equipment, equipment failure.
```



```
 1           Accident reconstruction, yes, the dynamics and
 2           all of the information that I had when I was in
 3           college.  And I took some classes in regard to
 4           that and I do accident reconstruction on a
 5           vehicular basis.  But my primary focus has been
 6           accident reconstruction on equipment failures,
 7           products that we're -- a variety of different
 8           products, mostly addressed in the oil industry
 9           and commercial industry.  I do a lot of material
10           handling, design of material handling equipment
11           both on shore and offshore and cranes and such
12           like that.  I've designed those for 15, 20 years,
13           at least.
14     Q     When you say "material handling equipment," what
15           do you mean?
16     A     It could be winches, offshore winches.  It could
17           be chain handling units offshore.  It could be on
18           a vessel, equipment that's on a vessel, tanks,
19           large winches that sit on the back of supply
20           vessels, or very specialized equipment.  That
21           also dealt with hydraulics, as well.
22     Q     Back to your list of professional education on
23           that same page five.  Four bullet points from the
24           bottom is "The Genesis of Toxic Mold."  Are you a
25           toxic mold expert?
```



Page 39

```
 1    A    No.  But I've had some people that had some
 2         dealings with toxic mold and I wanted to know
 3         what was their problems and what came in.  I
 4         didn't do it as an expert.  I simply do it as a
 5         general learning process.
 6    Q    All right.  Could you turn the page, please, to
 7         page six?  The first two bullet points on page
 8         six are "Patent Protection:  An Intermediate
 9         Review" and "Patent Protection:  Basics," both of
10         those from September of 2007.
11    A    Right.
12    Q    What kind of courses are those?
13    A    Courses in terms of patents and product design
14         and having them patented, evaluating what to look
15         at, what's patentable, what's not patentable,
16         having an understanding in regard to that.
17    Q    Did those courses cover the clear and convincing
18         burden of proof for validity?
19    A    I think the -- if I recall, the intermediate
20         review was.
21    Q    So do you agree that to prove a patent invalid in
22         a court you have to show invalidity by clear and
23         convincing evidence?
24    A    Yes.
25    Q    Did that class also cover the preponderance of
```



```
 1          the evidence standard for infringement?
 2    A     I can't answer that.  I'd have to go back and
 3          look at the synopsis.
 4    Q     Okay.  Do you agree that you have to prove
 5          infringement by a standard that's more likely so
 6          than not so?
 7    A     Yes.  I think that's reasonable.
 8    Q     On page eight through nine, there's a continuing
 9          list of all of your classes, but they don't have
10          dates.
11    A     Oh.  I'll have to fix that.
12    Q     I just wondered if they were general things that
13          are ongoing.  One more page, please.
14    A     Oh, a lot of these dealt with interaction with
15          the Department of Defense.  You'll see quality
16          control there and cost estimating and these types
17          of things.  In fact, I actually taught courses
18          off of that.  But since I've got to do an update
19          on them, I'll see what I can do about getting you
20          some dates.
21    Q     Okay.  What is your specific education or
22          training that will help a jury understand what
23          non-destructive testing of an attachment weld is?
24    A     My experience?
25    Q     Or education.
```



Page 41

1   A   Taught classes -- undergraduate classes at the

2       university.  I taught them also in the graduate

3       classes, and we dealt with testing, quality

4       control.  What other -- what was the last part of

5       the question on it?

6   Q   What specific experience or education do you have

7       that will help you explain to a jury what non-

8       destructive testing of an attachment weld is?

9   A   Okay.  I taught, in those classes, welding.  I

10      taught, in those classes, quality control, taught

11      them how to weld, taught them to distinguish what

12      was good welds and bad welds, how to form -- pre-

13      form the material before you do the welding, how

14      to select the correct leads and such for the

15      welding process, and then did testing.  I've done

16      non-destructive testing and destructive testing.

17      And I've done it in both classroom and I've also

18      done it out in the field.

19  Q   On welds?

20  A   On welds.  I was responsible for a lot of

21      equipment and I needed to understand both

22      destructive and non-destructive methods of

23      looking at welds or looking at failures of

24      products.

25  Q   And we kind of started your resume from the back,



```
 1            so can we go to the front now?
 2    A       Sure.
 3    Q       If you'll look at page one, please.  And it lists
 4            your current employment as "Design Analyst:
 5            Engineers and Consultants"?
 6    A       Yes, ma'am.
 7    Q       And you're the consultant and president; is that
 8            correct?
 9    A       Yes.
10    Q       Are there other employees?
11    A       One, full-time.  She keeps me going straight.
12            She's my office manager.  And then I hire third
13            parties when I have large jobs to work.
14    Q       So, as a general proposition, you are the design
15            analyst in that company?
16    A       That's correct.
17    Q       And is the main focus of that business providing
18            expert testimony?
19    A       Currently, yes.  Back up five years ago, no.
20            Five years ago I was doing machinery and
21            equipment design, construction.  I also worked
22            with a number of companies that had produced some
23            faulty products and they needed somebody to come
24            in and fix, immediately, the problem and then
25            also come in with new programs to be able to
```



```
 1            solve their problems.
 2     Q     Would you agree that your current employment is
 3            almost exclusively expert witness?
 4     A     Probably about 95 percent, yes.
 5     Q     What are your other current expert engagements
 6            for litigation?
 7     A     I have a -- some I'd prefer not to give because
 8            of the client.  So I have one I'm dealing with
 9            now in which a -- it dealt with a maintenance
10            issue.  Actually, it's a design and maintenance
11            issue for a milling facility that burned to the
12            ground.
13     Q     What did it mill?
14     A     A variety of different products, farm products.
15     Q     Like grains?
16     A     Yes.
17     Q     Okay.
18     A     I have some -- two projects on a series of mowing
19            machines that they're having problems with.  I
20            have got another one with some backhoe problems.
21            A company built backhoes that don't work.
22            They're hydraulic, and they don't work on the
23            hydraulic side and they don't work on the
24            structural side.  So part of it is welding and
25            these types of things.
```



Page 44

```
 1                    And so, basically, it's similar to what
 2            I've done before.  They had some amphibious
 3            carriers that went to China.  And they failed
 4            about a day and a half to two days after they
 5            unloaded them.  And the Chinese were not real
 6            happy, and so I had to solve that problem.  Let's
 7            see.  I had a list on me.
 8     Q      I don't think your list is in your report, so I
 9            haven't given it to you.  But if you have a list
10            of current engagements or testimony, we would
11            appreciate that.
12     A      Okay.
13     Q      If you could just produce that, you know, when
14            you produce other documents.
15     A      All right.  Fair enough.
16     Q      And then, that way, I won't have to belabor you
17            to list everything that you're involved in.  Do
18            you have any other expert assignments from Mr.
19            Stagg or his firm?
20     A      No.
21     Q      Have you ever?
22     A      Yes.
23     Q      What was that case?
24     A      I thought it was a marine issue.  Yeah.  I think
25            it was a patent dealing with a marine.  I can't
```



Page 45

 1              remember the specifics on it.  It's been a number

 2              of years ago, I think.  I have been against him,

 3              as well.

 4    Q    We would all like to be able to say that.  Your

 5              previous employment before you were with your

 6              current consulting firm was Louisiana

 7              Productivity Center?

 8    A    Correct.

 9    Q    What is that?

10    A    It was a business in manufacturing outreach

11              program, NIS.  Originally, it was through the

12              Department of Defense because they were trying to

13              improve on manufacturing shells, big bullets.

14              Later on it turned out to be sponsored through

15              NIS as an outreach program.  The best way I can

16              describe it is the agricultural extension

17              service.  What they do for farmers, we were doing

18              for businesses.

19                   We also brought new businesses in, improved

20              them through quality control testing, these types

21              of things.  And then we also had an outreach

22              program that also went in and evaluated the

23              processes so that they could improve the

24              processes in manufacturing, testing, welding,

25              across the board.  That's the Productivity



Page 46

```
 1        Center.  And then, an example, SMATCO Cross, they
 2        had multiple failures offshore on some hoisting
 3        equipment and it was stranding a rig.  And so I
 4        was called back to SMATCO -- I had worked for
 5        them once before -- to solve the problem and come
 6        up with new designs.  It turned out to be welding
 7        issues.
 8             VIDEOGRAPHER:
 9                  Excuse me, Counselor.  I'm going to
10             have to go off the record for about a one
11             minute for a technical issue.
12             MS. BARNES:
13                  Okay.  We can stop right now.
14             MR. STAGG:
15                  Let's take a quick break for whatever
16             we need to take breaks for.
17             VIDEOGRAPHER:
18                  The time is 2:04 and we're now off the
19             record.
20                       (BREAK)
21        (MR. ELWOOD STEVENS EXITS DEPOSITION)
22             VIDEOGRAPHER:
23                  The time is 2:16, and we are back on
24             the record.
25   BY MS. BARNES:
```


MAGNA
LEGAL SERVICES

Page 47

```
 1   Q    Okay, Mr. Killingsworth, we're still going
 2        through your Exhibit 1, which is your expert
 3        report.  If you could turn to page two, please,
 4        in your report.  Not in your resume.
 5   A    You mean these?
 6   Q    In your actual report, please.  And I guess page
 7        two is actually the first substantive page.  You
 8        have "Fees and Billing" as a section.  Your
 9        hourly rate is three hundred dollars ($300.00) an
10        hour, correct?
11   A    Correct.
12   Q    Do we need to update that or is that still
13        correct?
14   A    That's correct.
15   Q    You said compensation for your services is not
16        contingent upon your evaluation, observations,
17        and/or opinions, or outcome of the litigation,
18        correct?
19   A    Correct.
20   Q    But your career is an expert witness, correct?
21   A    My career is a mechanical engineer.  Whatever
22        the --
23   Q    Currently --
24   A    Whatever the task is, is what I'll take.  Okay?
25        But I put this in so that people understand that
```



Page 48

```
 1          I'm not a hired gun.  I'm going to tell you like
 2          it is, whether you've got an ugly baby or not.
 3     Q    Do you tell people that they have an ugly baby
 4          before they hire you --
 5     A    I don't --
 6     Q    -- so that you don't have to take cases that you
 7          don't agree with?
 8     A    I don't know what the cases are.  What I do is I
 9          sit down and I'll -- they'll say they've got
10          something they want to talk to me about.  I'll
11          tell them, "That's fine."  I say, "Please,
12          understand, I don't care whether you're plaintiff
13          or defendant.  If you have an ugly baby, I will
14          tell you.  And if you want to continue, that's
15          fine.  If not" -- and I've had some people get
16          stupid and continue.  And then I give them the
17          bad news and they get all mad.
18     Q    Well, you wouldn't have a very long career as an
19          expert witness if you didn't take the sides of
20          your clients, correct?
21     A    No, not necessarily.  Because I have people call
22          me before they take a case and say, "This is what
23          I've got.  Can you give me an idea?"  And I go,
24          "It's a bad case."
25     Q    That's not what happened here, though, right?
```



MAGNA
LEGAL SERVICES

Page 49

```
 1   A    I was contacted by Mr. Stagg.  I was asked to do
 2        an evaluation.  And that's what I've done.
 3   Q    Okay.  Is there any evaluation you've done that's
 4        not in your report?
 5   A    No.
 6   Q    Under your "Background" section, you kind of gave
 7        just a background of what the litigation is
 8        about.  And then you said, "IntegriCert uses a
 9        device described in the 569 Patent," that we're
10        going to refer to as the "IntegriCert device."
11   A    Right.
12   Q    Do you understand that you can have a patent
13        while still infringing upon another patent?
14   A    Yes.
15   Q    So you're not making any kind of statement that
16        because IntegriCert has a patent they don't
17        infringe Mr. Scarborough's, correct?
18   A    Or vice versa.
19   Q    Correct?
20   A    Correct.
21   Q    And then let's move to your infringement analysis
22        of the IntegriCert device.  Do I understand it
23        correctly that you --
24   A    What page are you on?
25   Q    I'm on page three.  Is it a correct summary of
```



Page 50

1       your report that you believe IntegriCert does not

2       infringe?

3   A   That's correct.

4   Q   What elements do you believe are missing from the

5       IntegriCert device that keep it from infringing,

6       for example, Claim 1 of the 322 Patent?

7   A   Say it one more time?

8   Q   What elements do you believe the IntegriCert

9       device is lacking that keep it from infringing?

10  A   I've looked at both of the patents, the 322 and

11      the 569, and how they work.  And when I looked at

12      the 322, what comes out is that the 322 is

13      testing pad eyes -- or whatever you wish to call

14      them -- that they are testing them and they are

15      testing them only in a tensile test.  In the 569,

16      the 569 doesn't do just a tensile test.

17          The reason that the -- and from what I've

18      been able to gather and review, the 322 in terms

19      of the structure and in terms of the framework,

20      those are put into place so that you have a

21      vertical or horizontal, however you want to do

22      it, but you have basically a capture, okay, so

23      that you only can test or only test in a tensile

24      manner.  And it tests the specific pad eye that

25      we're dealing with.



```
 1                  When you look at the 569, on the 569 it's
 2           not -- its purpose is not to go in and
 3           individually test the pad eyes.  It's testing the
 4           basket.  It's testing the structural integrity of
 5           the basket.  And it does this -- when it does the
 6           testing, the testing includes loads that are both
 7           tensile, shear, and moments.
 8      Q    What's a moment?
 9      A    A moment?  A moment is a force acting to a
10           distance.  Since you got video here, a moment is
11           a -- if you look at it and it's a round subject,
12           people, a lot of times, want to call it a torque.
13           If you look at -- and it's on a plate -- a pad
14           eye, and you put a load on it and you put a
15           moment -- you put a particular load on it, you
16           can actually create a torque or a moment on it,
17           like this.  It's -- a moment is of typically
18           plates; whereas torque are typically axle, round.
19           Okay?
20      Q    So is it fair to say that the moment on something
21           is a combination of the other forces that are on
22           it?
23      A    No.  A moment occurs because of certain forces
24           that are placed on it.  Well, let me see if I can
25           do it this way.
```



Page 52

```
 1    Q    Well, I think that -- I think we're on the same
 2           page.  I think you actually agree that the moment
 3           is the combination of the forces on something.
 4    A    Watch.  If I've got a device here or something
 5           I'm measuring here, I can put a tensile force on
 6           it.  I can put a -- and if I'm pulling on it in
 7           that direction and this -- let's say this is a
 8           weld (indicating).  I've got a weld here.  I look
 9           at this.  I've got a force -- the ground is
10           pushing up or the structure is pushing up, so
11           I've got a force there.  It can be compression or
12           it can be tension.  I've also got a shear either
13           in this direction or this direction, depending
14           upon what other forces are applied to this.  You
15           also -- because of the fact where you apply these
16           forces, it creates a moment about this area right
17           here (indicating).  And that's why I'm saying
18           it's a force acting through a distance.  Okay?
19    Q    And it's the combination of the tensile force and
20           the shear force that create the moment?
21    A    And it has a distance between it.  I have to have
22           -- watch.  If this force is applied down here,
23           I've got no moment, okay, not produced by this.
24           We call them combined forces.  Okay.  And those
25           combined forces can create a moment or a -- I
```



Page 53

```
 1          hate -- I don't want to say "torque," but it will
 2          create a moment about the contact point.  So it
 3          can be or it cannot be -- it doesn't require to
 4          be both forces, is what I'm getting at.
 5              MS. BARNES:
 6                  Let's mark that as an exhibit just in
 7              case we need it.  We'll mark this as
 8              "Exhibit 3."
 9              (EXHIBIT NO. 3 IDENTIFIED)
10              THE WITNESS:
11                  Oh, to finish the question is that the
12              Integri handles tension, shear, and moment.
13              And the tension can in either the -- if
14              it's 3-D, the tension can be in any one of
15              the three -- off any one of the three
16              planes, X, Y, or Z.
17     BY MS. BARNES:
18     Q     Do you agree that the Scarborough patents focus
19          on testing of an attachment weld?
20     A     There's going to be some qualifiers to it for me
21          to say yes.
22              MS. BARNES:
23                  Let's mark this as "Exhibit 4."  And
24              this is your affidavit that you gave
25              earlier in this case in relation to one of
```



Page 54

```
 1                 the motions.  I don't recall which one.
 2                 (EXHIBIT NO. 4 IDENTIFIED)
 3    BY MS. BARNES:
 4    Q    But if you could turn to paragraph nine, which is
 5         on page two.
 6    A    Okay.
 7    Q    And your statement is, "When reading Claim 1 of
 8         Scarborough's 322 Patent as amended during
 9         reexamination, it is clear that the scope of
10         Claim 1 was redirected to only on an attachment
11         weld rather than any weld in a device as
12         originally claimed."  Do you still agree with
13         this statement?
14    A    Yes.  Because with an attachment weld, you're
15         tying the item, if you will.  You're looking at
16         this weld down here.  You've got -- if it's a pad
17         eye, you've got a pad eye and you're looking at
18         where the weld is.
19    Q    Can you look at paragraph 11, please, which is on
20         page three?
21    A    Okay.
22    Q    And, again, it says, "Claim 1 of the 322 Patent,
23         as it reads after the amendments made during the
24         reexamination, is directed only to testing the
25         attachment weld, i.e., the weld joining the pad
```



Page 55

```
 1          eye, lifting lug or other device to another
 2          structure."
 3   A      That's what I said.  But it's got to be in
 4          tension.
 5   Q      Right.  You still agree with that?
 6   A      Yes.
 7   Q      So I asked you if you agree that the Scarborough
 8          patents are directed only to the testing of an
 9          attachment weld.
10   A      In tension.  You've got to put the qualifier of
11          an "in tension."
12   Q      Why?
13   A      That's an attachment weld.  Okay?  If I put a
14          force on this side, okay, a weld, a tension weld,
15          not another force on here.  Okay?  If I put
16          another force on here, then it's not acting in
17          tension.  And I'm saying in tension only.
18   Q      What, in the 322 or 447 Patent, makes you believe
19          that there can't be forces other than a pure
20          tensile force?
21   A      Because that's what the claim reads.
22   Q      Where?  You have claims in your report if you'd
23          like to look at -- Claim 1 is on page five of
24          your report.
25   A      322.  Outwardly -- this is Claim 1, line 55,
```



Page 56

```
 1              "Whereby moving fluid into the cylinder causes
 2              the piston to move outwardly to tension the pad
 3              eye."  Okay.  Tension the pad eye.  All right.
 4    Q    Where, in that claim, does it say at the
 5              exclusion of all other forces?
 6    A    Because this is tension.  It doesn't include any
 7              other force.  It doesn't say "shear."  It doesn't
 8              say "bending moment."  It says "in tension."  It
 9              says it, "tension," thereby testing there
10              inwardly to tension the pad eye and thereby
11              testing the integrity of the weld.
12    Q    So you believe that when it says "tension the pad
13              eye," that it also means excluding any other
14              forces making the tension less than 100 percent?
15    A    Well, I don't see anywhere else where it gives
16              you -- where it says that you can do two of them
17              at one time.  It says "tension."
18    Q    How do you ensure, using a tension device, that
19              it is pulling in 100 percent upward motion?
20    A    It doesn't have to be upward.  It has to be -- if
21              you're looking at the weld itself, you've got to
22              be perpendicular to the weld, if you're looking
23              at it.
24    Q    Where, in the claim, does it say 100 percent
25              perpendicular to the weld?
```



Page 57

1   A      It doesn't say 100 percent.  But you've got to

2          have it in tension.  And the only way you're

3          going to test the weld in tension is that you've

4          got to have the weld perpendicular to it.

5   Q      So you're saying that the only way to tension is

6          to be 90 degrees from the weld?

7   A      If you want to follow that claim, that's correct,

8          because you have to have tension.  And, in fact,

9          the overall design of it lends itself to it.  And

10         here's why.

11  Q      The overall design of what?

12  A      I'm going to show you if I can find my little

13         picture.  Okay.  The reason that you have

14         perpendicular -- that the two sides, as you call

15         them, are perpendicular -- I'm sorry -- are

16         parallel to one another is so that you move in a

17         straight line because you want to have a straight

18         tension produced by that cylinder.  If you --

19  Q      For the record, I want to make sure we know what

20         you're talking about, though, if you're going to

21         use this --

22  A      This is on the 322 and it's --

23  Q      The face of the patent, the first drawing.

24  A      Oh.

25  Q      That's the re-exam certificate, so it will be the



1        same drawing.

2  A    Well, that's fine.  Okay.  If you look at this,

3       the two side pieces are parallel to one another.

4       And the reason they're parallel is because you

5       want the cylinder parallel, because you say you

6       want tension.  Okay?  And the only way you're

7       going to get tension -- if that cylinder doesn't

8       produce it, if they're not parallel, then they're

9       going to be off.  You're not going to produce a

10      tensile force.  You will create a combination of

11      both tension -- okay.  You'll create a moment

12      because what's going to happen is if you don't

13      have them parallel to one another, you're going

14      to have the pull off of this center line that

15      you've got here.  And, in doing that, you create

16      a -- at the weld, you create forces in more than

17      just the tensile direction.

18  Q    Can't you accommodate for that in calibrating

19      that piece of equipment?

20  A    No.

21  Q    Why not?

22  A    Because they've got to be parallel.  And -- all

23      calibration is going to do is say, "Hey, they're

24      perpendicular."  Okay?  Not perpendicular,

25      "parallel."  Okay?  But if you don't have them



MAGNA
LEGAL SERVICES

Page 59

```
 1            parallel, you're not going to produce a tensile
 2            force, only tensile force.
 3      Q     Right.  You'll produce a tensile force, but some
 4            other force will also be produced at the same
 5            time?
 6      A     No.
 7      Q     Why not?
 8      A     No.
 9      Q     No what?
10      A     No, you're not going to produce one.  You're only
11            going to produce a tensile.
12      Q     If you're pulling only perpendicular, 100 percent
13            perpendicular?
14      A     That's how you get tensile.
15      Q     Right.  But it won't -- so you're saying it won't
16            be a tensile force at 89 degrees?
17      A     It's not, because you're going to have two -- at
18            89 degrees, you're not going to be in line, which
19            means that you're going to apply a force.  And if
20            it's this -- as they call it here, the little tab
21            or the pad eye, that will not line up with it and
22            it will produce a force in two different
23            directions.  And, in turn, that creates a moment.
24            In other words, you look at -- take this one,
25            too.  I don't know if you want to mark it again.
```



Page 60

```
 1   Q     No.  Mark on this one so we just have a single
 2         exhibit with your --
 3   A     Look, when you're sitting here (indicating), and
 4         let's say this is the pad eye and I pull on the
 5         pad eye.  And it says I want to test that weld
 6         and I'm going to do it by pulling on that pad
 7         eye.  All right.  If you're going to test the
 8         weld, truly test the weld, and you don't want to
 9         worry about shear or anything else and test that
10         weld here, I've got to put a vertical force.
11              Now, you said, "Well, what if we do it at
12         89 degrees?"  Well, that's fine.  We'll do it at
13         89 degrees.  Then what we're going to do is
14         you're going to have this (indicating).  Okay?
15         You're going to be at that angle, which says that
16         I'm going to have in the -- I'm going to do it
17         this way.
18              MR. STEVENS:
19                   You've represented the 89-degree angle
20              with a dashed line?
21              THE WITNESS:
22                   Right.  But I'm not finished.
23              MR. STEVENS:
24                   Okay. We're not showing the camera,
25              so --
```



```
 1                THE WITNESS:
 2                     Okay.  I'm going to put an "X" here
 3                and a "Y" here.  That's the two axes I'm
 4                going to work off of.  So if we're working
 5                at this, we're working in a "Y" axis.
 6                Okay.  You want to move it 89 degrees, then
 7                you've moved it out of that plane or off of
 8                that axis.  And that says that what you're
 9                going to have is -- to make this work is
10                you're going to have -- 89 percent of it is
11                going to be vertical and you're going to
12                have one percent going in the other
13                direction if it's off a degree.  So --
14     BY MS. BARNES:
15     Q    Right.  What's that other direction force?  Is
16          that shear?
17     A    No.  Well, it can produce some shear.  Since
18          you're up here, you're going to have a small
19          level of shear, okay, and then you're going to
20          have a large level -- and I've done them by --
21          and I'll do it as "1" and "2."  And that's a
22          shear now, acting on that weld.  And what happens
23          is that -- depending upon where you apply it, if
24          you apply it up here, it's going to be out of the
25          plane.  So, with it being out of the plane, that
```



Page 62

```
 1          means it's moving to my right.  And in that
 2          sense, it's going to create a moment about that
 3          point.  So now I'm going to have shear and moment
 4          and tension.  The claim says you want to do
 5          tensile.  That's why.  And that's why when you --
 6     Q    But are you are aware of any claim language that
 7          says "tensile at the exclusion of moment or
 8          shear"?
 9     A    No.
10     Q    Okay.
11     A    But you can't have -- you cannot have pure
12          tensile if you've got shear or another axis --
13          not another axis -- or a moment.
14     Q    I understand.
15     A    I mean -- but it's like this.  If we look at the
16          law of physics, you cannot produce tensile if
17          they're not parallel -- and I'm not going to go
18          in saying substantially parallel -- if you're not
19          parallel in terms of the two side pieces and the
20          cylinder.  They've all got to be in line.
21     Q    Right.  Do you know what a preferred embodiment
22          is?
23     A    No.
24     Q    Have you considered that some of the drawings or
25          figures in either of the patents are simply
```



```
 1          examples?
 2   A      Yeah.  But I'm using the law of physics.  I'm
 3          using -- it's real straightforward.  In a static
 4          mode, it's called statics.  In a dynamic mode,
 5          it's called dynamics.  But when you're looking at
 6          this and you want to put a tensile load, and
 7          that's what it's saying you're going to do in the
 8          claim -- okay, that's part of this claim -- then
 9          you -- that's the other thing that supports it.
10          That's why the frame is needed, to make sure that
11          these corners are perpendicular.
12                MS. BARNES:
13                     I'm going to give you Exhibit 5.  And
14                this was Exhibit 11 to a previous
15                deposition.  This is --
16                (EXHIBIT NO. 5 IDENTIFIED)
17                THE WITNESS:
18                     Okay.
19   BY MS. BARNES:
20   Q      This is --
21   A      I going to put another number on this so we don't
22          have three and -- I know you wanted them all on
23          one, but --
24   Q      That's okay.
25   A      Okay.
```



1    Q      On Exhibit 5, can you draw which direction the

2           tensile force is -- on yours, on Exhibit 5?

3                  MR. STAGG:

4                      Object to the form.  Is on what?

5                  THE WITNESS:

6                      On what --

7    BY MS. BARNES:

8    Q      When the cylinders extend upward, where will the

9           tensile force be in this setup?

10   A      That will be an angle.  Hang on.  Or the two

11          cylinders have the same force at its center?

12   Q      This is the IntegriCert device that you've

13          reviewed to make a non-infringement position.

14   A      Right.

15   Q      You can tell me what those cylinders do.

16   A      Okay.  These cylinders will lift up.  You've got

17          a sensor in here which picks up the force.  Okay.

18          Since you're connecting -- and what you're

19          picking up -- and it gives you a little bit of

20          miss-view on the thing.  We're looking at a

21          basket around here.  And I like -- I thought we

22          had a red pen.  This is my little basket that

23          we're testing (indicating).  And we're testing --

24          and in testing the basket -- that's the basket.

25          You're tying onto the pad eye.



Page 65

```
 1                    Now, if I can get one that's a little bit
 2            better, I'll show you, and then do it on whatever
 3            you want, but -- okay.  When you're looking at
 4            the basket and I'm placing a load on it here
 5            (indicating), that load in this linkage here is
 6            going to produce a tension along there.
 7   Q        Along the line of that cable assembly?
 8   A        Well, it's going to produce a tension, but it's
 9            going to be in two directions.
10   Q        Which directions?
11   A        Okay.  If the load is acting here (indicating)
12            and I'm looking at both of these cylinders here
13            and this beam coming across, then this -- as I
14            press up with that cylinder, that means that this
15            point is going to move up.  When this point moves
16            up -- and let me -- it's not going to come out
17            right.
18   Q        Can you circle --
19   A        Yeah, because it's not going to come --
20   Q        -- what "this point moves up" is?
21   A        -- it's not going to come out good for the TV or
22            anything.  In this area right here (indicating),
23            when you load this up -- and forget about the
24            basket that you've got here because you're going
25            to be tying on to it.  Here's your cylinder,
```



```
 1            here.  And this is tied down through this linkage
 2            down to this pad eye.
 3    Q       Right.  This linkage is labeled "120" on your
 4            drawing.
 5    A       Okay.  Right.  Now, what you've got is you're
 6            looking at the pad eye.  And since it's not --
 7            since the pad eye is at an angle, it's not
 8            vertical, so I'm not going to produce tension up
 9            in that when I lift it.  I'm going to have it
10            along that link.  If I've got it along that link
11            -- along that link, then on that pad eye I am
12            producing a load vector in two directions, at the
13            "Y" axis and at the "X" axis.
14    Q       Right.  And the "Y" axis is tension and the "X"
15            axis would be sheared?
16    A       No, because -- well, it would be sheared as you
17            get further down.  But you're going to have
18            tensile in this and you're going to have shear in
19            it, yes.  Actually, you'll have moment, as well.
20    Q       And those forces exist on the attachment weld, in
21            addition to the pad eye, correct?
22    A       No.  Because as I was listening before, you were
23            talking about the attachment weld -- you were
24            talking about tying to the pad eye.  Okay.  Do we
25            want to look at the pad eye or do we want to look
```



Page 67

```
 1          at the connection -- the shear connection for the
 2          weld?
 3     Q    The weld.
 4     A    Because -- well, because this patent doesn't care
 5          about that weld.
 6     Q    But it tests it anyway.  So what happens to the
 7          weld?
 8     A    Well, the weld is put -- the weld itself is put
 9          under a load of a combination of an X, Y, and Z
10          because you're working -- this is 3-D.  You would
11          actually have that linkage in three -- in a 3-D
12          plane, if you will.  And you would still -- and
13          what would happen is you would still have shear
14          there.  So you're applying it to the pad eye,
15          okay, applying it to the pad eye so that when it
16          comes up to the frame and the piston comes up,
17          you're not loading each individual one and
18          looking at each individual.  You're looking at
19          what the basket is going to do.  Okay.  Now, if
20          you want to say, "Well, I want to look at each
21          pad eye, okay, individually," it's not set up for
22          that.
23     Q    Right.  It will test the four pad eyes in the
24          entire basket at once?
25     A    It tests the basket through the pad eyes.
```



Page 68

```
 1   Q    Okay.  Can you explain the components of this
 2        device in Exhibit 5?  What are the individuals
 3        pieces?
 4   A    You've got the linkage getting the -- because
 5        you've got to get the force, okay, with the two
 6        cylinders.  And the two cylinders, if you look at
 7        them, they're just --
 8   Q    Well, let me slow you down because it's hard --
 9        we've got to have a record on paper of what --
10   A    I'm sorry.
11   Q    -- the cylinders are and what you're saying.  So
12        I think it would help --
13   A    Let me back up.  I'll back up.
14   Q    -- if you could use the number identifiers.
15   A    Can we get a clearer picture?
16   Q    We can try.
17             MR. STAGG:
18                  We probably can.
19             MS. BARNES:
20                  Actually, yes, I have a different
21        picture.
22             MS. BARNES:
23                  We'll mark this as "Exhibit" --
24             COURT REPORTER:
25                  Six?
```



Page 69

```
 1              MS. BARNES:
 2                   Yes.
 3                   (EXHIBIT NO. 6 IDENTIFIED)
 4              THE WITNESS:
 5                   Okay.  Are we ready?
 6   BY MS. BARNES:
 7   Q    Hold on, please.  This was an attachment to a
 8        motion for summary judgment on infringement, just
 9        so we can tell where it came from.
10   A    All right.
11              MS. BARNES:
12                   Did you give them a copy?
13              MR. STEVENS:
14                   I did not.
15   BY MS. BARNES:
16   Q    Now, in combination with Exhibit 5, Exhibit 6, I
17        think, should be a better visual image of the
18        same device.  Do you agree?
19   A    Right.  We're not going to get a good shot of the
20        linkage or tying in on the crossbar.  But for all
21        intents and purposes, it'll work.  I've got two
22        cylinders.
23   Q    Okay.  Those are the -- the blue squares are
24        cylinder housing, correct?  Are the cylinders --
25   A    Yeah.
```



Page 70

1  Q      -- inside of there?

2  A      Correct.

3  Q      Let's mark those on your version with "120" to

4         match the numbers on Exhibit 5.

5  A      Okay.

6  Q      And then --

7  A      They're simply set -- they set them in the

8         basket.

9  Q      And they've got feet or a base on each cylinder,

10        correct?

11 A      They've got a plate on both of them.

12 Q      IntegriCert identifies that as a cylinder base

13        plate in its drawing.  Do you agree with that?

14 A      That's fine.

15 Q      Can you identify the cylinder base plates on

16        Exhibit 6?

17 A      What's the number?

18 Q      285.

19 A      (Witness complies.)

20 Q      Then can you identify what the top of this device

21        would be?

22 A      You have a bar running across the top.  May I?

23 Q      You may.  I think their number is 110.

24 A      Right.

25 Q      So "110" would be the bar across the top?



Page 71

```
 1   A    Right.  And, let's see.  You've got a cable
 2        assembly which, in this particular one, it looks
 3        like a cable with a shackle that goes into the
 4        pad eye.  And I'm working off on the right-hand
 5        side.  So you've got the pad eye and you've got a
 6        shackle that runs through the pad eye.  It ties
 7        on to a link.  And that's -- I believe it's a
 8        cable, actually.
 9   Q    And I think they label it 130.  So do you agree
10        with that being a cable assembly?
11   A    Yeah.  I want to make sure they don't have
12        something else in there.  Yeah.  So that's cable
13        "130"?
14   Q    Yes.
15   A    All right.  And you've got one on -- you wind up
16        with one on each corner.
17   Q    Right.
18   A    All right.  They tie in to the pivot plate
19        assemblies.
20   Q    Would you agree that the pivot plate assemblies
21        are side pieces?
22   A    I wouldn't.
23   Q    Why not?
24   A    Because what they are used for is -- it's a
25        structure that's used to keep the -- to pick up
```



Page 72

```
 1            the angle that you want.

 2     Q    Okay.  It's a structure on the side, though,

 3          right?

 4     A    No.  Because what it's really used for is when

 5          it's used in conjunction with this beam, it

 6          allows you to pick or choose the angle that

 7          you're going to want to load this thing up with.

 8          Okay.  So I have a hard time saying it's an end

 9          or it's a side piece.  I don't buy that.  It's a

10          -- because then you're looking -- it's like

11          you're looking at this cable assembly and you're

12          going to say, "Is that a side piece, too?"  All

13          it's trying to do is to get me an angle, a known

14          angle that I'm going to come off with.  That's

15          all.  That's all I look at.  So when I say that,

16          I can't call it a side.  I can't call it a front.

17     Q    Well, earlier when I asked you what a side piece

18          was, I think you said it was just simply a piece

19          that had length, width, or depth.

20     A    A plate that had width, length, and depth.

21          That's correct.

22     Q    Okay.  Would you agree that this is a plate?

23     A    No.

24     Q    They call it a pivotal plate assembly themselves.

25          But it's not a plate?
```



Page 73

```
 1   A    All right.  I don't buy -- I just don't buy it
 2        that way because --
 3   Q    You don't buy it as a plate?
 4   A    No.  And the reason is because what you're doing
 5        with these cables is, is you're tying these
 6        cables in to give you an angle that you want to
 7        test this basket at.  Let me put it this way.  It
 8        doesn't matter in the grand scheme of things
 9        because it is not -- in the process of this, it
10        is simply a means of giving you an angle that
11        you're going to be testing this at.
12   Q    Right.  That's the function of what it does?
13   A    Right.
14   Q    But is it on the side and is it a piece?
15             MR. STAGG:
16                  Let me just object to the form of the
17             question.
18             THE WITNESS:
19                  It certainly is a piece.  I just
20             wouldn't call it a plate.  We'll use the
21             "210" number.  I mean --
22   BY MS. BARNES:
23   Q    Do you we agree that it's a side piece, but not a
24        plate?
25             MR. STAGG:
```



Page 74

1                    Object to the form of the question.  A

2            side piece of what?

3            THE WITNESS:

4                See, that's what I'm getting at.  It's

5            simply so that I -- it's a -- actually,

6            it's a transition piece that allows you to

7            transition from the beam -- okay -- where

8            the beam is coming in and you're putting

9            your load back to the linkage.  That's what

10           I look at it as.

11   BY MS. BARNES:

12   Q    Do you agree that it's part of the framework of

13        this device?

14   A    No, because I'm looking at this as a beam.  I'll

15        use a plate.  I'll use a plate.

16   Q    Plate 210?

17   A    210.

18   Q    Is that plate part of the structure of the

19        IntegriCert device?

20           MR. STAGG:

21                Object to the form of the question.

22           Definition of "structure."

23           THE WITNESS:

24                I look at it as a structural --

25           MS. BARNES:



```
 1                   You can object to form and object to
 2              privilege.  I'd appreciate it.
 3              THE WITNESS:
 4                   I'll give it as a plate, but it's a
 5              structural piece.  I don't look at it as a
 6              top or a side.  What it's doing is it's
 7              transferring the load along that linkage to
 8              the beam.  That's its purpose.
 9   BY MS. BARNES:
10   Q   And is it or is it not part of the IntegriCert
11       device's framework?
12   A   It's part of the IntegriCert device.  Would I
13       call it side plate?  No.  I put "plate" on there
14       because of what we've called it.  Is it part of
15       the structure?  Let's see.  Calling it part of
16       the structure won't hurt, since we called it a
17       plate -- structure.
18                   Now, before we go too far, that linkage is
19       not a structure.  Linkage is not a structure
20       before we -- and the cylinders are not structure.
21       This is an adjustment that's -- it's actually a
22       transition from the linkage to the beam.  It's a
23       connector, if anything else, rather than a plate
24       or part of --
25   Q   Right.  When you say "it's a linkage," you're
```



Page 76

```
 1           referring to "130," the cable assembly, correct?
 2   A     That's right.  That's why I have difficulty with
 3           that because it's a transition piece.  A
 4           transition simply provides me a connecting -- a
 5           link or a connector to the beam itself.
 6   Q     Why did you say that cylinders are not part of
 7           the structure?
 8   A     I'm talking -- they're not going to be fixed
 9           because you're going to raise them up and down.
10   Q     The piston?
11   A     Right.
12   Q     Not the cylinder assembly, though correct?
13   A     Right.
14   Q     So the cylinder assembly would be part of the
15           structure, but not the piston within it?
16   A     Well, it's all going to have the same purpose in
17           terms of it.
18   Q     Do you understand that without the basket, you
19           can pick up the entire IntegriCert device with a
20           crane?
21   A     Yeah, because you've got a picture back here.  I
22           thought we had a minute ago.  Yeah.  Here we go.
23   Q     I'm sorry.  This isn't page numbered.
24   A     Right here (indicating).
25   Q     Five.  So the fifth page of your Exhibit 6 shows
```



Page 77

```
 1          that this entire device can be picked up as one
 2          piece, correct?
 3     A    Right.
 4     Q    So would you agree that the top, the side plates,
 5          the cylinder assemblies, and those bases are all
 6          connected as a single device?
 7     A    No, because the pistons are independent of one
 8          another and the linkages are independent of one
 9          another.
10     Q    The linkages aren't shown in this picture.
11     A    No.  But they're independent of one another.
12     Q    So this is not a single IntegriCert device?
13     A    The beam -- no.  The beam is a part of this.
14          Okay.  What I'm getting at -- you're saying that
15          it's one single structure.  I don't want to
16          confuse to say that it's one structure that works
17          in unison because these cylinders are independent
18          of one another.
19     Q    Right.  But they create a single IntegriCert
20          device, right?
21     A    A configuration.  Because that configuration can
22          change depending upon the angle that you want to
23          set that linkage up to.
24     Q    Right.  But when IntegriCert delivers this device
25          to the field to place it in a basket, it doesn't
```



```
 1            put one cylinder in the basket, then the other

 2            cylinder in the basket, and then the remaining

 3            pieces of the structure.  They take the whole

 4            thing on a crane and drop it in the basket.

 5            Correct?

 6    A       Correct.  But this section --

 7    Q       That's all I asked you.  I understand --

 8    A       Yeah, but I --

 9    Q       I understand.  But that's --

10    A       But I also get to explain my answer.

11    Q       No, not yet, you don't.  I want this to reach a

12            sooner conclusion.  I understand your position.

13            The reason that we started this exercise was so

14            that you could draw the forces on this diagram.

15            And I'd like to get back to that before we get

16            too far afield, which is the first page of

17            Exhibit 6.

18    A       What do you want drawn?

19    Q       I would like it if you would draw where the

20            forces are on the attachment weld.

21    A       On the attachment weld?

22    Q       Yes.

23    A       You're talking about for the pad eyes?

24    Q       Yes.

25    A       Okay.
```



Page 79

1   Q   The pad eyes, yes, that connect -- I mean, the

2       attachment weld that connects the pad eye,

3       please.

4   A   That's this (indicating).

5   Q   Right, that's the pad eye.

6   A   And that's that (indicating).

7   Q   Where are the forces?  In which direction are the

8       forces on the attachment weld?

9   A   You have -- you're pulling on it in this -- do

10      you want the forces on the pad eye or do you want

11      the forces on the weld?

12  Q   On the weld.

13  A   Well, this probably doesn't work.  If we look

14      strictly --

15  Q   I think that's page nine of Exhibit 6.

16  A   Okay.  If we look -- the reason I'm doing this,

17      if you look at the pad eye, okay, the pad eye

18      runs up the structural frame right here

19      (indicating), over like this.  It comes up and

20      over.  And this comes around like this.  Okay?

21  Q   Uh-huh (affirmative response).

22  A   All right.  That's the structure.  When you pick

23      this up, and we're looking at the weld, the weld

24      is right here (indicating).

25  Q   So you drew the pad eye and the basket in red.



Page 80

```
 1   A    Right.

 2   Q    And then you're going to draw the weld in blue.

 3   A    Right.  And what's happening here is you're

 4        putting -- and along that weld, because of the

 5        way this pad eye is configured, okay, I'm not --

 6        you've got a force because of that linkage in

 7        that direction.  So that produces "X" in this

 8        direction and a "Y" in that direction.  That's

 9        pulling on the pad eye, on the center piece of

10        the pad eye.

11             Now, we look at the weld.  Well, as I break

12        the weld off -- as I break this thing off, you

13        can see that it's tied in on the side right here

14        (indicating), okay, because of the way the frame

15        comes around.  And then you also have shear --

16        I've got to do a different color.

17   Q    Here.

18   A    You've got shear along this, on that face.  And

19        this, by the way, is a free-body diagram.  You

20        got shear along that face.  Actually, it's in --

21        sorry about that -- this direction.

22   Q    Shear is in the opposite direction of the force

23        up?

24   A    Well, I know that I've got a force up.  And I

25        know when I look at this -- I'll do it like this.
```



Page 81

1          Okay.  When I'm pulling on it like this, I'm

2          producing a force -- I'm producing an "X"

3          component and I'm producing a "Y" component.  And

4          so this shear is caused by this force.

5     Q    The "Y" force up?

6     A    The "Y" force up on the top side of it.  Okay.

7          You have a -- let's see.  If it's pulling here --

8          yeah.  You've got a shear force because of --

9          since we put it in black, let's put it in black

10         here.  That's caused by a shear force.  And

11         you're breaking this force and the component

12         along here.  So that's the "Y" component.  That's

13         the "X" component.  So part of the shear is

14         picked up by this force here (indicating).  Okay?

15              You have a -- also have a force into this,

16         in this direction, because -- and that's in the

17         "X" direction -- because what you're trying to do

18         is you're trying to pull on that force -- well,

19         this force right here, it's trying to pull that

20         weld off.  So I wind up with an "X" force here, a

21         "Y" force here.  This "Y" and this "X," the "Y"

22         created the shear.  The red created the pullover.

23         And then you've got -- at this point here, you'll

24         have a -- no more colors, huh?  I'll do it in

25         this -- you've got a couple along this or a



Page 82

```
 1              moment.
 2                   So what I wind up with on this, from this
 3              force, I wind up with a shear force, a moment,
 4              and a compressive force.  So acting here, I've
 5              got shear, moment, and tension.
 6    Q    I think we've covered it.  I think it's pretty
 7         clear.  Can you --
 8    A    One qualifier.  The pad eye, the pad eye is
 9         different.  The free-body diagram is different.
10    Q    Right.  Not all pad eyes and welds are going to
11         be exactly that configuration, correct?
12    A    Right.  You may have some in which you have more
13         shear or less shear or one of the other forces.
14    Q    Right.  Can we go back to the first page of this
15         Exhibit 6, please?
16    A    Sure.
17    Q    How are these cylinders attached to the top of
18         the IntegriCert device?
19    A    There's a -- it looks -- if I had the patent --
20    Q    It's in Exhibit 1.  It's in your report, I
21         believe.
22    A    It's like a socket.  I'll do it this way.  You've
23         got the sensor here (indicating).  And you've got
24         a -- and this slides up into it.  And you got a
25         socket here.  And then this assembly, okay, is
```



Page  83

```
 1          tied into the beam.

 2    Q     Is that the load cell assembly?

 3    A     Yes.

 4    Q     And the cylinder is attached at the top to the

 5          load cell assembly.  What is it attached to at

 6          the bottom?

 7    A     It slides over the cylinder.

 8    Q     I'm sorry.  The cylinder is attached to what at

 9          the bottom of the device near the plates?

10    A     They just sit on there.

11    Q     They just sit on the plates.  They're not pinned?

12    A     No.

13    Q     Have you reviewed any deposition testimony in

14          this case?

15    A     No.

16    Q     Have you interviewed any of IntegriCert's --

17    A     You asked me there before.  No.

18    Q     -- employees out in the field to confirm what you

19          believe about the connections of the cylinders?

20    A     Well, you can look at the patent and do that.

21    Q     IntegriCert's employees told me that the

22          cylinders are pinned at the feet.  Do you believe

23          that's incorrect?

24    A     I can't say.  My understanding is they just sit

25          on there.
```



Page 84

1   Q    Okay.  Can we look at the claim chart you did for

2         Claim 1 on page five of your report?

3   A    Yes.

4   Q    So on page five of your report, you have a chart

5         where you compared IntegriCert's load test

6         apparatus to Claim 1 of the 322 Patent.  Is that

7         a fair summary of that chart?

8   A    Yes.

9   Q    And the first element of Claim 1 is an apparatus

10        for testing the weld strength and integrity of an

11        attachment weld and then comprising the

12        following.  On the IntegriCert side of the chart,

13        you seem to agree that IntegriCert is a load test

14        apparatus that applies a force to an attachment

15        weld.  Is that accurate?

16   A    No.  Applies a test force to the container.

17   Q    Okay.  So you do not agree that IntegriCert's

18        device also tests the attachment welds?

19   A    The process applies forces to the pad eyes, but

20        that is secondary to what the -- it's testing the

21        -- and you're reading it.  You're testing --

22        you're applying a test load to the container.

23        Okay.  You're -- what you're doing is the

24        conditions of the -- you're trying to produce the

25        same conditions you're going to have in terms of



1          the container.  So the goal on this is to test

2          the container, not the pad eyes.

3    Q     It necessarily tests the pad eye, correct?

4    A     As a spinoff or as an extra, it will place the

5          loads on the pad eyes.  Okay.  But, if I recall,

6          they are not measured loads.

7    Q     The next element is a framework including a base,

8          top, and side pieces.

9    A     Correct.

10   Q     And we've been through this.  You've identified

11         the base plates, "285," correct?

12   A     Yes.

13   Q     Plates that can be side pieces at "210"?

14   A     Yes.

15   Q     Correct?

16              MR. STAGG:

17                   I'll just object to the form.

18   BY MS. BARNES:

19   Q     A top piece, that's the beam at "110," correct?

20   A     Correct.

21   Q     So we've identified those elements of the

22         framework.  But then you make the conclusion that

23         there's no base uniting the cylinder assemblies,

24         correct?

25   A     There's not.



Page 86

1    Q    Right.  Is the lack of the base uniting the

2         cylinder assemblies the only reason you think

3         that this claim element isn't met?

4    A    Yes.

5    Q    Okay.  Would this IntegriCert device in Exhibit 6

6         function any differently if we connected this

7         base plate all the way across to make it one

8         large base instead of two smaller bases?

9    A    You would be testing -- you would not be testing

10        the basket.

11   Q    Why wouldn't you still be testing the basket if

12        you have one base instead of two?

13   A    Because if you're binding the base, then the two

14        bases tied together onto the basket, you're

15        getting reinforcement from the two bases and,

16        therefore, you're reinforcing the basket.

17   Q    I'm sorry.  I don't follow.  If you have two

18        feet, that places a force on the bottom of the

19        basket when you extend the cylinders up, correct?

20   A    But you said they were tied together.

21   Q    Well, I don't think we're on the same page, so I

22        want to start over.

23   A    All right.

24   Q    There are two bases to the two cylinders in the

25        IntegriCert device, right?



MAGNA

LEGAL SERVICES

Page 87

1   A   Yes.

2   Q   When you extend the cylinders up to tension the

3       cable assemblies, pad eye, and the weld, you

4       necessarily create a downward force on the base

5       of the basket, correct?

6   A   Correct.  And if you've got them connected

7       together, and that was what you had called tied

8       them together, then you're going to have

9       additional structural reinforcement that you

10      wouldn't normally have if they're separate.

11  Q   What will be structurally reinforced by

12      combining --

13  A   You make this a --

14  Q   -- the base into a single base?

15  A   Because now these bases are tied to a single

16      base.  You're adding rigidity to it.

17  Q   Rigidity to the testing device?

18  A   The basket.

19  Q   How does adding rigidity to the base add rigidity

20      to the tested basket?

21  A   Because you're translating it into the basket.

22  Q   Right.  But you already translated into the

23      basket with these beams that it's placed upon.

24      So aren't you essentially just replacing these

25      beams with one large base?



```
 1    A    My understanding is the beams are independent.
 2         And since they're independent like this and
 3         they're not tied together, then you would have
 4         additional structural support if you've got them
 5         tied together.
 6    Q    Do you know what the doctrine of equivalents is?
 7    A    I don't know what it is, exactly.  But from its
 8         description, I have an idea.
 9    Q    Just the name alone can tell you what it is,
10         right?
11    A    Right.
12    Q    Have you done any evaluation to determine if a
13         single base would be equivalent to this two-base
14         setup?
15    A    I can tell you is it, because if you don't tie
16         them together and they're independent, you don't
17         tie them together, okay, you're not increasing --
18         if you don't tie them together, leave them --
19         then you're not getting additional support that
20         you would have if they were tied together.
21    Q    The tying together of the base won't have any
22         effect on the testing of the pad eye and
23         attachment weld, right?
24    A    That's not the purpose because they're not --
25         that's --
```



1   Q   That's not the question I asked you, though.

2       Will unifying the base have any effect on the

3       test of the attachment weld and pad eye?

4   A   It could, for different angles.  I think the

5       angle of this would affect it.  In other words,

6       this (indicating) would be affected by the angle.

7   Q   The base would be affected by the angle of the

8       plate assembly?

9   A   Well, no.  The pad eye would be -- the load on

10      the pad eye because you're changing the angle.

11  Q   How would you change the angle of the test by

12      making the base one single foot?

13  A   Because they're separated.  I can adjust this

14      (indicating).  I can't do that if they're one

15      single foot.

16  Q   No.  On any given test, you wouldn't be able to

17      do that.

18  A   Well, I mean, this --

19  Q   But on this situation where they're already

20      pinned at the top in a single formation, the

21      function will not be any different with respect

22      to the pad eye and the attachment weld if you

23      combine the foot into one, correct?

24  A   It will change it.

25  Q   How?



Page 90

```
 1   A    If I don't have these tied together and I change
 2        the angle on it for -- let's do it this way.  For
 3        a given angle, okay, it will affect it.
 4   Q    If you would leave the angle --
 5   A    And that is --
 6   Q    -- the same, how is that true?
 7   A    Well, because you -- when you're testing this
 8        basket, you're testing -- one of the reasons for
 9        testing a basket is by putting these links at
10        different lengths or different angles because
11        when you pick the basket up a lot of times you're
12        going to pick it up maybe at 40 degrees or 60
13        degrees or whatever.  And so you've got to be
14        able -- remember, we're testing a basket.
15        You've got to be able to just adjust these links
16        to be able to compensate for that.  So if you do
17        that --
18   Q    I understand what you're saying now.
19   A    -- then you're changing the rigidity of the
20        system.
21   Q    Right.  Without changing any angles or length,
22        testing this exact picture as it exists in
23        Exhibit 6, with the same cable assembly, top
24        piece, side pieces, and cylinders, will there be
25        any difference in the functionality of this
```



```
 1          device if these are connected?
 2    A     It will affect the loads as they're distributed
 3          across there because they will not be tied
 4          together.
 5    Q     It will affect the load as it tests the --
 6    A     Watch this.
 7    Q     -- bottom of the container, correct?
 8    A     If I take these two cups, okay, and I tie them
 9          down at the bottom, okay, and I put a load on it,
10          they're going to act one way.  If I take them
11          apart, okay, they're going to act differently.
12    Q     Right.  That hypothetical doesn't work in a
13          situation where they are already on the same base
14          plate.
15    A     So what we want -- what you're asking me is for a
16          specific -- singling out a specific test --
17    Q     Yes.
18    A     -- even though 10,000 others will do what I'm
19          telling you --
20    Q     Yes.  I'm asking you to use a single
21          hypothetical.
22    A     Okay.  Yeah, for a given test, it may be the
23          same.  But that's not what they're testing.  That
24          means that we are changing the test and changing
25          the setup.
```



1  Q    Right.  And I'm asking you to not change the

2       test, not change the setup, and use a single

3       given hypothetical.  And you won't agree because

4       you refuse to --

5  A    Well, I'm refusing --

6  Q    -- take those hypotheticals.

7  A    -- that you're going to get the same result.

8  Q    Okay.  The next element of the claim language

9       that you addressed is "at least one fluid

10      containing cylinder, mounted with the framework,

11      for moving a piston therein inwardly and

12      outwardly as fluid is moved in -- moved out or

13      in, respectively."  Then your analysis for

14      IntegriCert's load test apparatus is that it's an

15      apparatus with two cylinder assemblies each with

16      a cylinder for moving a piston inward and

17      outwardly.

18 A    Right.

19 Q    Right.  But then you make the statement "The

20      cylinder piston independently support the beam

21      assembly and not united with each other by a

22      common base.  They are not mounted with a

23      framework including a base, top, and sides."  Why

24      is the cylinder not mounted with the framework if

25      it's attached at the top?



```
1              MR. STAGG:
2                   Object to the form.
3              THE WITNESS:
4                   One, because I don't believe it's --
5              oh, I know why.  Because I don't believe
6              that the -- that you have a framework with
7              base, top, and sides.
8    BY MS. BARNES:
9    Q    Do you otherwise agree that the cylinder is
10        mounted to the structure if we call it not a
11        framework?
12   A    No.  Because, just like you said, you can pick
13        them up and lift out and put them back in.
14   Q    You can pick up and lift what up and put it back
15        in?
16   A    You can pick up the device out of the basket and
17        set it on the side, or you can pick it up and
18        move it back over.
19   Q    Right.  The basket --
20   A    So when you --
21   Q    -- is not part of the IntegriCert device,
22        correct?
23   A    It is -- the Integri device works with a basket.
24        It doesn't work with single pad eyes.  It's not
25        designed to work with single pad eyes.
```



Page 94

1   Q      Is the cylinder in the IntegriCert device
2          attached at the top of this structure on Exhibit
3          6?
4   A      As a permanent fix or not?
5   Q      Either.
6   A      Well, since it's got to move up and down and
7          you've got to handle the sensor in there, I would
8          say that they're not tied together completely.
9   Q      There is some attachment, like you described
10         earlier, between the cylinder and the load cell?
11  A      Right.
12  Q      So they are attached somehow at the top for any
13         given test?
14  A      Well, they're attached, since you've got a load
15         sensor in there, through at least a sliding
16         connection.
17  Q      The next element is "structure for releaseably or
18         permanently attaching to a pad eye, lifting lug,
19         or other device joined by the attachment weld to
20         another structure."  Do you agree that the cable
21         assemblies that you've identified as "130" are
22         that attachment structure?
23  A      Yes.
24  Q      The last element is "whereby moving fluid into
25         the cylinder causes the piston to move outwardly



```
 1            to tension the pad eye, lifting lug, or other

 2            device to test the integrity of the attachment

 3            weld in a non-destructive manner."  Do you agree

 4            that that happened?

 5   A        In the 322, yes.

 6   Q        Let me know if you need to take a break.  I think

 7            we've been going for a while.  Then I'd like to

 8            move to your analysis of the 447 Patent on page

 9            six.

10   A        Okay.

11   Q        And I believe we've covered whether or not it's a

12            method for testing weld strength and integrity of

13            an attachment weld.  Do you agree that it is?

14   A        Yes.

15   Q        The second element of Claim 14 says "providing

16            the attachment weld joining a pad eye, lifting

17            lug, or other device to another structure."  Do

18            you agree that if IntegriCert uses the device in

19            Exhibit 6, that it has provided an attachment

20            weld joining a pad eye, lifting lug, or other

21            device to another structure?

22   A        Well, it'll use -- it can use either pad eyes or

23            other attachment device.  You can take --

24   Q        Well, I can make it more simple.  Do you agree

25            with what you wrote in this box, that the
```



```
 1          container being tested will include pad eyes or

 2          other attachment points to the container?

 3    A     Yes.

 4    Q     The next element of Claim 14 is "providing a

 5          framework including at least two pieces."  Now,

 6          do you recognize that the framework in Claim 14

 7          has fewer required components than Claim 1 of the

 8          322 Patent?

 9    A     Yes.

10    Q     Do you agree that the framework of the

11          IntegriCert device that we're looking at in

12          Exhibit 6 has at least two pieces?

13    A     Has two pieces, it's not a framework.

14    Q     Why is it not a framework?

15    A     Because of what we -- how we defined these

16          before.  It's not a framework.

17    Q     Okay,  I think at the very beginning of this

18          deposition you told me a framework could be

19          synonymous with a structure, correct?

20    A     Right.

21    Q     And do you agree that this is a structure for

22          load testing?

23    A     Yes.

24    Q     Do you agree that there are at least two pieces

25          to this structure in Exhibit 6?
```



Page 97

```
 1    A     Yes.

 2    Q     The next element is "providing at least one fluid

 3          cylinder, having a first end and a second end,

 4          mounted with the framework to produce a mounted

 5          cylinder within a mounted framework, for moving a

 6          piston therein inwardly and outwardly as fluid is

 7          moved out or in respectively."  I think we should

 8          probably break that up.  Do you agree that the

 9          IntegriCert device has at least one fluid

10          cylinder?

11    A     Yes.

12    Q     Do you agree that that cylinder has a first end

13          and a second end?

14    A     Well, let's back up.  This had -- it does have

15          one, but it's got to have two, as we've got this

16          set up.

17    Q     I agree.  Exhibit 6 -- the device in Exhibit 6

18          has two cylinders, correct?

19    A     Okay.  Fair enough.

20    Q     So it's got at least one, right?

21    A     Yes.

22    Q     And at least one cylinder has a first end and a

23          second end, correct?

24    A     Yes.

25    Q     And at least one of those ends is mounted with
```



Page 98

1          the framework at the -- we discussed it being at

2          the top, correct?

3                    MR. STAGG:

4                         Object to the form.

5                    THE WITNESS:

6                         No.  It says the apparatus has two

7                    cylinder assemblies, each with a cylinder

8                    of its own base and a top beam assembly,

9                    not a top.  It doesn't have a top, as you

10                   called it -- top and bottom.

11    BY MS. BARNES:

12    Q    I'm sorry.  Are you reading your language from

13         the chart?

14    A    Yes.

15    Q    Okay.  The claim language reads having a -- each

16         cylinder having a first end and a second end.

17    A    Uh-huh (affirmative response).

18    Q    Does it have that?

19    A    Are we talking about --

20    Q    I'm reading to you the claim language.

21    A    Okay.

22    Q    I just want you to tell me if it exists or not --

23    A    Yes.

24    Q    -- in the IntegriCert device.

25    A    Yes.



```
 1    Q    So it has at least one cylinder with a first end
 2         and a second end, right?
 3    A    Yes.
 4    Q    That cylinder, is it mounted with the framework?
 5    A    Yes.
 6    Q    Does the cylinder have a piston that moves
 7         inwardly and outwardly as fluid is moved out or
 8         in respectively?
 9    A    Yes.
10    Q    The next element is "providing a first and second
11         attachment apparatus, wherein a pressurized fluid
12         can enter in" --
13    A    What page are you on?
14    Q    Seven.  The next block is fluid attachment to the
15         cylinders.
16    A    Right.
17    Q    And you can't see it in Exhibit 6 --
18    A    No.
19    Q    -- well, on the first page of Exhibit 6.  Do you
20         agree that there are hydraulic hoses and fittings
21         that are attached to these cylinders?
22    A    I'll agree to that, if we can take a break.
23    Q    Yes.  Let me confirm where they are on this
24         picture, though, before we move on because then
25         we can put the whole thing to the side.  That's
```



1          the last page of Exhibit 6.  And it's the device

2          basically laying --

3     A    Yes.

4     Q    -- on its side.  But you agree that there are

5          cylinder fittings?

6     A    Yes.

7     Q    And that would be a hydraulic fluid attachment?

8     A    Yes.

9     Q    Okay.  Now we can take a break.

10              VIDEOGRAPHER:

11                  We are now off the record at 3:27.

12                  (OFF THE RECORD)

13              VIDEOGRAPHER:

14                  We are now on the record.  The time is

15          3:40.

16    BY MS. BARNES:

17    Q    Before we took a break, we were looking at the

18         chart on page six and seven of your report

19         related to Claim 14 of the 447 Patent.  And we've

20         gotten through most of the elements, I believe.

21         I think the last thing that we discussed was the

22         fluid attachment apparatus.  And you agreed that

23         there were hydraulic hoses and fittings that

24         attached to the cylinder assemblies to provide

25         hydraulic fluid, correct?



Page 101

1   A   Correct.

2   Q   So the next element would be "providing an

3       attachment structure for attaching to said pad

4       eye, lifting lug, or other device joined to said

5       another structure by the attachment weld."  Do

6       you agree that the cable assemblies we've been

7       talking about are how the device is attached to

8       the pad eyes?

9   A   You're talking about on Integri?

10  Q   Yes, sir.

11  A   Yes.

12  Q   The next element is "assembling the framework

13      with the mounted cylinder fixedly attached on the

14      mounted framework."

15  A   Where are you?

16  Q   On page seven, the third element from the last --

17  A   Oh, thank you.

18  Q   And we've been using the first page of Exhibit 6

19      to point things out.

20  A   Okay.  Go ahead.

21  Q   Do you agree that the cylinder is mounted to the

22      framework?

23  A   Are you talking about on Integri?

24  Q   Yes.  On the IntegriCert device depicted in

25      Exhibit 6 that we've been using as an example, do



```
 1        you agree that the cylinder is connected --
 2   A    To the structure.
 3   Q    -- to the structure?
 4   A    That was a "yes."
 5   Q    Okay.  I'm sorry.  I didn't hear you.
 6   A    No.  No.  I went, "To the structure."  Go ahead.
 7   Q    The next element is "urging fluid into the
 8        cylinder to cause the piston to move outwardly to
 9        tension the pad eye, lifting lug, or other device
10        joined to said another structure."
11   A    Show me where you are.
12   Q    The second to last element of --
13   A    Okay.  Let's go back up.  The beam assembly 110
14        is not fixedly attached to the mounted framework.
15        There's no framework.
16   Q    I understand your position about the framework.
17   A    Okay.  But that's why I'm saying there's no --
18   Q    Right.  We've discussed that --
19   A    So the -- but I want to make sure --
20   Q    -- significantly.
21   A    -- that we understand that I'm not backing off on
22        that.
23   Q    I understand.
24   A    Okay.
25   Q    We have discussed framework.  But I just wanted
```



1        to confirm that the cylinder is attached to the

2        top of the structure.

3    A   To the beam.

4    Q   The cylinder is attached to the beam?

5    A   The cylinder is ultimately attached to the beam.

6    Q   Okay.

7            MR. STAGG:

8                I object to the form of the -- to the

9            extent that you're -- it doesn't say -- you

10           didn't use the word "fixedly."  And that's

11           what the claim says.

12   BY MS. BARNES:

13   Q   Do you agree that the cylinder is fixedly

14       attached to the beam?

15   A   And we're talking about these cylinders?

16   Q   Yes, sir.

17   A   Okay.  The complaint on this is that the beam

18       assembly is not fixed, attached to the mounted

19       framework.  There is no framework.

20   Q   I understand your position about the framework.

21   A   So for me to say -- for you to say, "Do you agree

22       with that," I can't agree that the cylinders are

23       tied to the beam because -- using the framework

24       or mounted to the framework.  It's not.

25   Q   The cylinder is not attached to the beam?



Page 104

1   A   The cylinder -- the beam assembly is not fixedly

2       attached on the mounted framework because there

3       is no framework.

4   Q   I understand.  I'm asking about the attachment of

5       the cylinder to a structure.  How is the cylinder

6       attached to the top beam?  Do you agree that the

7       cylinder is fastened, secured, or joined?

8   A   Hang on.  Hang on.  Bear with me a minute.  Just

9       a second.

10  Q   Are you trying to find how the cylinder is

11      attached to the top?

12  A   Yes.  In order to give you an answer, I want to

13      verify.

14          MR. STAGG:

15              And while he's doing that, can we go

16          off the record for a second?

17          MS. BARNES:

18              Sure.

19          VIDEOGRAPHER:

20              The time is 3:51.  We are off the

21          record.

22              (OFF THE RECORD)

23          VIDEOGRAPHER:

24              The time is 3:52.  We are back on the

25          record.



Page 105

1   BY MS. BARNES:

2   Q    What I asked you was how the cylinder is

3        connected to the top of the IntegriCert device.

4        And I think you've located it now in the 569

5        Patent, correct?

6   A    Right.

7   Q    Okay.  How are they connected?

8   A    That's what I was looking for.  It fits slidably

9        into the load cell housing.

10  Q    The beam fits slidably into the load cell

11       housing, correct?

12  A    No.

13  Q    What fits slidably into the load cell housing?

14  A    The cylinder.

15  Q    The top of the cylinder?

16  A    Yes.

17  Q    And then it's pinned?

18  A    I didn't say pinned.

19  Q    Well, in your review of the IntegriCert device,

20       have you seen that the device is pinned at the

21       top to --

22  A    Well, there are pins --

23  Q    -- the load cell housing?

24  A    There are pins to move the location.  You had

25       asked me that earlier in the terms of the



Page 106

1       cylinders.

2   Q   So you agree that it's pinned at the top?

3   A   The drawing on mine, "570," yes, it's pinned.

4   Q   The next element of the claim language then is

5       second to last block on page seven of your

6       report, which is Exhibit 1.  On page seven, right

7       here (indicating).

8   A   Okay.

9   Q   The language of the claim is "urging fluid into

10      the cylinder to cause the piston to move

11      outwardly to tension the pad eye, lifting lug, or

12      other device joined to said another structure,

13      thus testing the integrity of the attachment

14      weld."  Do you agree that the cylinders -- well,

15      fluid is urged into the cylinders to cause the

16      piston to move outwardly?

17  A   Yes.

18  Q   When the piston moves outwardly, does it tension

19      the pad eye, lifting lug, or other device joined

20      to said another structure?

21  A   Does it -- repeat it one more time.

22  Q   When the piston moves outwardly, does it tension

23      the pad eye?

24  A   It applies a tension load to the pad eye -- to

25      the top of the pad eye.



Page 107

```
 1   Q    And when the pad eye is tensioned, does it test
 2        the integrity of the attachment weld?
 3   A    We went through this a minute ago.  Not directly.
 4        It's not intended to do that.  It doesn't perform
 5        a test on it, but it does apply a tension load to
 6        it.
 7   Q    So the tension --
 8   A    The tension -- now, look, check this.  It applies
 9        a load to it.
10   Q    To the attachment weld?
11   A    No.  To the pad eye.
12   Q    When a tension load is applied to the pad eye --
13   A    Now you've got me confused.
14   Q    Well, we'll start over.  Once the pad eye is
15        tensioned by moving the piston out --
16   A    I'll agree with that.
17   Q    -- the attachment weld also receives a tension
18        load, correct?
19   A    It's not testing the integrity of the weld.
20   Q    It's testing to see whether the weld fails or
21        not, correct?
22   A    It produces a -- or should be producing a tensile
23        load.
24   Q    And that tensile load tests whether or not the
25        attachment weld will fail, correct?
```



Page 108

```
 1    A    In tension, only.

 2    Q    Okay.  And then the final step, "the testing

 3         technician or test operator can inspect the

 4         attachment weld for any structural damage or

 5         deformation."  IntegriCert performs that last

 6         step, correct?

 7    A    Right.  IntegriCert, they're actually -- well --

 8    Q    Does IntegriCert have a testing technician or

 9         operator inspect --

10    A    Yes.  Yes.

11    Q    -- the attachment weld?

12    A    Yes.

13    Q    The second basic half of your report regards the

14         validity of the 322 and the 447 Patent, correct?

15    A    Right.

16    Q    Do you have any opinions on validity that you

17         didn't include in your report?

18    A    No.

19    Q    Have you given any opinions about why a person of

20         skill in the art would combine any of the

21         references you've provided?

22              MR. STAGG:

23                   Objection to the form.  Except what's

24              in his report.

25              COURT REPORTER:
```



Page 109

```
 1                        Except what?
 2              MR. STAGG:
 3                        Exclusive of what's in his report.   Is
 4              that what you mean?
 5              MS. BARNES:
 6                        No.
 7  BY MS. BARNES:
 8  Q     Do you have any opinions about why a person would
 9        know to combine any of these references together?
10  A     Because if they have any knowledge at all in
11        regard to this, they should be able to recognize
12        -- just what I've said in the report.
13  Q     The first patent that you provided a synopsis of
14        is the Ristow Patent?
15  A     Right.
16  Q     And then you've got a figure from the patent on
17        page 11, right?
18  A     Got it.
19  Q     And this Figure 1 on page 11, what is the test
20        piece?
21  A     The test piece is at the top.
22  Q     Number "6," I think?
23  A     I think so, yes, the beam.
24  Q     So Ristow tests a beam, not a weld, correct?
25  A     It tests a beam, but it -- that's correct.   It
```



Page 110

```
 1        tests loads -- load-bearing members, is what it
 2        does.
 3   Q    And it tests --
 4   A    And -- go ahead.
 5   Q    It tests the beam separate and apart from
 6        whatever final structure that beam is going to be
 7        in, correct?
 8   A    Say that again?
 9   Q    The beam that it tests is not part of a final
10        structure or device, correct?
11   A    It's part of a structure.  So I'm testing it.
12   Q    Have you reviewed what the term "non-
13        destructively" means in terms of the 322 and 447
14        Patent?
15   A    No.
16   Q    Why would someone combine, for example, the
17        Ristow Patent with the Bauer Patent which tests a
18        valve?
19   A    Because it gives you the same concept.  You're
20        using the same concept.  If you look at the
21        Ristow, you're using a -- if you look at "5,"
22        you're using pistons, okay, which are going to
23        move in and out.  Okay.  You've got your beam
24        structure sitting on top, which is "6."  And
25        you've got -- and what you're doing is -- and
```



Page 111

```
 1              you've got plates, pins that you can see in "3."
 2              And what those are doing is providing resistance,
 3              so you're testing the top.  Very similar to what
 4              you're doing here, you're doing with the 322.
 5    Q         So you're testing to see if this load-bearing
 6              member will bend?  Is that the purpose of this
 7              test in Ristow?
 8    A         Well, that's in part.  What they're doing is,
 9              these are used, if I recall, in cranes -- we were
10              talking about the setup -- for cranes and such.
11              And that's why they're using that beam structure.
12              And you've got the cylinders underneath of it.
13              You've got it restricted here and you can run a
14              test on it.  It has -- and if you want to look at
15              it, it has a framework, okay, including a --
16    Q         What makes these side pieces, whereas you were
17              not willing to say that the IntegriCert device
18              had side pieces.
19    A         It's saying -- it says you've got side pieces on
20              them.
21    Q         Well, what makes these side pieces other than
22              just what someone has called them here?
23    A         Well, that sounds like the 322 Patent then.  I'm
24              not trying to be wise, Counselor.
25    Q         Well, I know.  But you can't really have it both
```



Page 112

1         ways.

2    A    No.

3    Q    Either something is a side piece or it's not.

4    A    But that's what I'm saying is, is that this gives

5         you an idea in terms of the 322.  Okay?  It's

6         essentially doing what the 322 is doing.  So if

7         one wants to accept -- if they want to accept the

8         322 and have a framework, okay, then this patent

9         here would bring in the same technology that is

10        currently trying to be used on the 322.

11   Q    Right.  But you agree it doesn't test an

12        attachment weld, correct?

13   A    No.  But you've got the same concepts behind it.

14        You're testing the beam.

15   Q    Well, you agree it does not test an attachment

16        weld, correct?

17   A    Correct.

18   Q    And you have not reviewed whether its testing is

19        non-destructive, correct?

20   A    Wait.  I take it back.  Yes, you do have an

21        attachment weld.  Structural pins and plates to

22        secure the device to be tested for reasonably or

23        permanently attaching to a pad eye, lifting lug,

24        or other device joined by the attachment weld to

25        another structure.  So you do have a weld test.



```
 1   Q    So you have decided that the pins and plates in
 2        the Ristow patent are attachment welds?
 3   A    It's telling you that you've got -- it talks
 4        about using the structure to secure -- these pins
 5        to secure the device to be tested for --
 6        reasonably or permanently attaching to a pad eye.
 7   Q    Is that quote from the patent or is that your
 8        language?
 9   A    I'm reading right off of the patent.
10   Q    No.  You're reading off of your chart.  Did you
11        take this chart from the patent?
12   A    Oh, I see your point.  Let's see.
13             MR. STAGG:
14                 The Ristow patent is on Exhibit F in
15             your report if you want to look at it.
16             THE WITNESS:
17                 Yeah, that's what I was looking for.
18   BY MS. BARNES:
19   Q    The language in the Ristow patent is "these
20        attachments may be constituted by pins and/or
21        apertured plates."  And you would agree that
22        those are not attachment welds, correct?
23   A    No.  But they can be replaced with attachment
24        welds because they're holding a position.
25   Q    So you believe that somebody of skill in the art
```



Page 114

1           would know to replace pins or plates with a weld,

2           so that person would know to create the

3           Scarborough device out of the Ristow patent?

4    A      Yes.

5    Q      Okay.  Have you -- but you haven't considered

6           what makes the Ristow patent non-destructive

7           testing, correct?

8    A      No.  You are testing -- it's talking about

9           carrying load-bearing members to be tested.  And

10          a pad eye would fall into that.

11   Q      That's not the question I asked you.  I asked if

12          you had considered what makes the Ristow patent

13          non-destructive testing.  The final element of

14          the first claim of the 322 Patent --

15   A      That's what I'm looking at.

16   Q      -- says "to test the integrity of the attachment

17          weld in a non-destructive manner."  And I asked

18          what you had done to consider the non-destructive

19          nature of the Ristow patent.

20   A      I haven't done it.  That, I haven't done.

21   Q      Okay.  Have you considered what makes any of the

22          prior art you cited non-destructive testing?

23   A      No.

24   Q      On page 13 of your report, you reference

25          something to Farassat.  If you'll look at the



Page 115

```
 1          first paragraph of text under the chart, the
 2          paragraph begins "Hydraulic cylinders are
 3          commonly..."  Do you see that?
 4    A     Yes.
 5    Q     Then in the third line down, you said "This can
 6          be seen from the use of such cylinders in the
 7          Ristow, Duppong, Salman, and Farassat Patent
 8          cited above."
 9    A     Right.
10    Q     Is that a typo or is there another patent that
11          you intend to rely on?
12    A     No.  That's -- I don't -- no, I don't.
13    Q     You're not aware of what that patent is or --
14    A     No, because it's not included.
15    Q     You relied upon the Duppong patent as part of
16          your report?
17    A     Yes.
18    Q     Are you aware that the court has already rejected
19          the Duppong patent as invalidating either
20          Scarborough patent?
21    A     No.
22    Q     And I'm going to ask the same thing for the Bauer
23          patent.  Are you aware that the court has already
24          considered and rejected that patent?
25    A     No.
```



Page 116

```
 1   Q   Now, you sat here through Mr. Hawkins' testimony,
 2       correct?
 3   A   Correct.
 4   Q   Is there anything that he said that you thought
 5       was incorrect?
 6   A   Yes.
 7   Q   What?
 8   A   He was talking about shear and tensile and
 9       bending stresses and he was absolutely incorrect
10       on it.
11   Q   What did he say that you thought was absolutely
12       incorrect?
13   A   He said that -- I think one of the earlier -- in
14       one of the blocks he was talking about it and he
15       said it had shear, but it didn't have tension or
16       anything else on it.  And it did.  Did that
17       several times.
18   Q   Anything else?
19   A   He tried to indicate that there was -- that you
20       were going to produce multiple types of loading,
21       but they were insignificant, considering the test
22       itself.
23   Q   Anything else?
24   A   No.
25           MS. BARNES:
```



Page 117

```
 1                    Well, I don't have any more questions
 2               for you, but I think Mr. Stagg might.
 3               MR. STAGG:
 4                    Yes, I do.  I have just a few.
 5      EXAMINATION BY MR. STAGG:
 6      Q    While we have the Ristow patent fresh in our
 7           mind, I know it's obviously been some time since
 8           you've looked at it, if you would look at -- it's
 9           Exhibit F.  Pull the patent out, read starting on
10           column two of page -- line 57 to the end.
11               MS. BARNES:
12                    Object to form.
13      BY MR. STAGG:
14      Q    And let me ask you if there's anything in that
15           phrase that talks about -- that would suggest to
16           a person skilled in the art the testing is to be
17           done non-destructively.
18      A    I want to make sure.  We're on page --
19      Q    It will be column two of the Ristow patent, U.S.
20           Patent 3,879,991.
21      A    No, I got that.  I got the Ristow.
22      Q    And you look at column two.
23      A    Got it.
24      Q    And if you look at --
25      A    I see it.
```



Page 118

```
 1   Q     If you look at Figure 1, that's what it's talking

 2         about.

 3                   MS. BARNES:

 4                        Object to form.

 5   BY MR. STAGG:

 6   Q     I would ask you to read from column two, line 57

 7         to the end of the column and tell me if there's

 8         anything in that that would suggest to you that

 9         testing is done non-destructively.

10                   MS. BARNES:

11                        And I'm going to object to form again.

12                   THE WITNESS:

13                        No.  Nothing relative to it.

14   BY MR. STAGG:

15   Q     What about the part where it says --

16   A     You're talking about performing a test operation?

17   Q     -- the applied magnitude of which is indicated

18         with sufficient accuracy?

19                   MS. BARNES:

20                        Object to form to the extent he's

21                   already answered the question.

22                   MR. STAGG:

23                        I understand.  I'm asking him,

24                   specifically, line 65.

25                   THE WITNESS:
```



```
 1                    Nothing in terms of -- okay.  Your
 2              question now?
 3   BY MR. STAGG:
 4   Q    If you, as an ordinary person of skill in the
 5        art, would want to know whether a hanger would
 6        support a load of a given -- support a given
 7        load, would a person of ordinary skill in the art
 8        know to apply that given load to the hanger to
 9        see if it withstood it?
10   A    Yes.
11              MS. BARNES:
12                   Object to form.
13   BY MR. STAGG:
14   Q    Isn't that what line 65 says?
15   A    It is.
16   Q    In other words, this patent is suggesting to a
17        person of ordinary skill in the art that you can
18        apply any load you want, correct?
19   A    Right.
20              MS. BARNES:
21                   Object to form.  He's your witness.
22              You cannot lead him like that.
23              MR. HAWKINS:
24                   I was fixing to say the same thing,
25              and I'm not even an attorney.
```



Page 120

```
 1              MS. BARNES:

 2                   You don't get to make objections.

 3              MR. STAGG:

 4                   He's an expert.

 5              THE WITNESS:

 6                   Which means you basically can test it

 7                   without exceeding its limitations.

 8    BY MR. STAGG:

 9    Q    Correct.  Isn't that -- in this particular case,

10         is that -- what is suggested by that -- those

11         sentences?

12    A    That you would simply use a load appropriately

13         that doesn't exceed it.

14    Q    With regard to the Exhibit G, which is the

15         Duppong Patent, I ask you to refer to column six,

16         line 47 and to Figures 4 and 5 and to Figure 1.

17    A    What do you want; four?

18    Q    Well, look at Figure 1.

19    A    Okay.

20    Q    On page -- on column six, line 53, read into the

21         record the sentence that begins -- the first

22         whole sentence that begins on line 53 of column

23         six.

24    A    "The size and purpose for which the pad eye is to

25         be used will determine the magnitude of the force
```



Page 121

```
 1          required for certification, which force may be up

 2          to about 50,000 pounds.   In the event the pad eye

 3          should break or should be pulled off of the ship

 4          while being tested, the operator of the cab is

 5          protected from the flying parts by bars

 6          surrounding the cab."

 7   Q      All right.   Next paragraph.

 8   A      "When the pad eye test is complete, the hydraulic

 9          fluid is first released from the pull cylinder

10          and then above the -- then the above description

11          procedure is reversed, permitting the operator

12          and assistant to thereafter test all pad eyes on

13          the ship."

14   Q      Is there anything in that paragraph that would

15          suggest to a person of ordinary skill in the art

16          that the pad eyes are tested non-destructively?

17              MS. BARNES:

18                  Object to form.

19              THE WITNESS:

20                  Yes.   Because once you've determined

21              the limitations, the rest of them would be

22              non-destructive -- and could be non-

23              destructive.

24   BY MR. STAGG:

25   Q      In other words, it's non-destructive if the pad
```



Page 122

 1          eye will hold the load of a desired magnitude?

 2    A     Right.

 3               MS. BARNES:

 4                    Object to form.  That's contrary to

 5               the claim construction in this case.

 6               THE WITNESS:

 7                    Even if you have to use one as a

 8               sacrificial lamb.

 9    BY MR. STAGG:

10    Q     Let's go back to your report on pages six and

11          seven for --

12    A     I got it.

13    Q     At the bottom of page six, there is a -- some

14          claim language that reads, "providing at least

15          one fluid cylinder, having a first end and a

16          second end, mounted with the framework to produce

17          a mounted cylinder within a mounted framework."

18    A     Correct.

19    Q     Can you show me on the device on Exhibit --

20               MS. BARNES:

21                    Six.

22    BY MR. STAGG:

23    Q     -- six, where we have a mounted cylinder within a

24          mounted framework?

25    A     You have the basket and the cylinders.



Page 123

```
 1   Q     Where is the framework?

 2   A     There is none.

 3   Q     So it doesn't --

 4   A     And that's what --

 5   Q     So is the cylinder mounted within the framework?

 6   A     No.

 7   Q     If you go down to -- on page seven, in the middle

 8         of the page, there's a limitation that says

 9         "assembling the framework with a mounted cylinder

10         fixedly attached on the mounted framework."

11   A     That's page seven?

12   Q     On page seven in the middle, the limitation --

13   A     I got it.

14   Q     I think we discussed this with regard to Figure 6

15         where you said it was slidably mounted?

16   A     Right.

17   Q     Okay.  So in your definition or your

18         understanding of "fixedly," is "fixedly" and

19         "slidably" synonymous?

20               MS. BARNES:

21                    Object to form.

22               THE WITNESS:

23                    It can be, if you reached the limits.

24   BY MR. STAGG:

25   Q     If you reached the limit of something sliding?
```



1    A    Right.

2    Q    But it's not fixed, one to the other?

3    A    No.

4                MS. BARNES:

5                     Object to form.

6    BY MR. STAGG:

7    Q    Is that correct?

8    A    That's correct.

9    Q    The next --

10   A    What page?

11   Q    On page seven, the next claim limitation down,

12        you testified that the device in Exhibit 6 has a

13        piston that moves outwardly to tension the pad

14        eye.  Is that  --

15   A    That's not correct.

16   Q    What are you --

17               MS. BARNES:

18                    Object to form.

19   BY MR. STAGG:

20   Q    What do you mean?

21   A    It has to be inwardly.  In other words, I've got

22        a -- in terms of -- let me make sure we're --

23        you're talking about the same section I'm

24        thinking of.  This is on page seven, and it's

25        "assembly framework with a mounted cylinder



 1           fixedly attached to the mounted framework."

 2           That?

 3    Q     I'm talking about the --

 4    A     And then the "urging the fluid of the cylinder to

 5           cause the piston to move outwardly to tension the

 6           pad eye"?

 7    Q     Right.  Right.  Is the pad eye in tension only in

 8           Figure 6 when the cylinders move out?

 9    A     Yes.

10    Q     In Figure 6?

11    A     Oh.  You said move outwardly.

12    Q     When those cylinders move outwardly, is the pad

13           eye in tension alone?

14    A     No.

15    Q     You testified earlier that there are going to be

16           components of moment, shear, and tension; is that

17           correct?

18    A     Right.  And --

19    Q     Is that still correct?

20    A     That's correct, because it was on the diagram

21           that I showed, the free-body diagram.

22    Q     So there is a tension component, but it's not

23           solely in tension; is that correct?

24    A     No.  That's correct.

25    Q     So the pad eye is not solely in tension by the



Page 126

```
 1          application of the load --
 2    A     By the cylinders.
 3    Q     -- from the cylinder?
 4    A     No.
 5    Q     I noticed when I was reading your CV that you
 6          taught a course in mechanics of materials.  What
 7          does that involve?
 8    A     Mechanics of materials -- well, actually, there
 9          was  a couple of them.  Mechanics of materials,
10          it's the application of materials looking at
11          stresses, looking at loading.  You're also
12          dealing with different materials.  We had a lab
13          in it.  Well, actually, we had two labs in it,
14          where we actually tested -- we theoretically
15          evaluated pad eyes, whatever it may be out there,
16          and we tied that back to or correlated that back
17          to testing of the pad eyes themselves.
18    Q     How did you test them in that lab?
19    A     We had tensile testers.  We had compression -- we
20          could do compression tests.  We could do tensile
21          tests.  We actually made our own samples of the
22          -- we did a pull test, when I said tension test,
23          to failure.
24    Q     Did that --
25    A     And we brought them to failure.
```



Page 127

```
 1   Q    Did that equipment that you used to do that
 2        testing incorporate hydraulic cylinders?
 3   A    Oh, yeah, and in the machine itself.  You move --
 4        you tension the -- I'm going to say this.  You
 5        tension to pull the tension testers.  That's got
 6        to be hydraulics.  It can't be done any other
 7        way.
 8   Q    And these are courses that you taught?
 9   A    Yes.
10   Q    And then the lab work, did you do the supervision
11        on that work?
12   A    Yes.
13             MR. STAGG:
14                  That's all I have.
15             MS. BARNES:
16                  I have just a couple of follow-up
17             questions for you.
18   RE-EXAMINATION BY MS. BARNES:
19   Q    Mr. Stagg directed you to some sections of the
20        Ristow and Duppong Patents and asked you if they
21        informed you about any non-destructive testing
22        explained in those patents.  What definition of
23        non-destructive testing were you using when you
24        answered those questions?
25   A    I was using that you could perform non-
```



```
 1           destructive testing -- that you could perform

 2           non-destructive testing with the procedures that

 3           they had.

 4    Q      What is your definition of non-destructive

 5           testing that you were relying on when you

 6           answered those questions?

 7    A      When the product -- you can do it two ways,

 8           either -- and I looked at it two ways.  One, you

 9           can test the product with samples and then use

10           that sample to know what your limitations are in

11           terms of non-destructive testing.  Okay.  So now

12           you do a sample and you test the rest of them

13           using that first sample, okay, to tell you what

14           my limits should be.

15    Q      I think you're telling me how to non-

16           destructively test.  And I'm asking you what is

17           non-destructive testing that you used to answer

18           those questions.

19    A      It can be two ways.  It can be where you test one

20           sample and then non-destructive test everything

21           else.  And I'm going to --

22    Q      That first sample to failure?

23    A      Right.

24    Q      Okay.

25    A      Or you can take and run computations and pre-load
```



Page 129

```
 1        it and run the test.

 2   Q    You haven't used the court's definition of non-

 3        destructive in answering Mr. Stagg's questions,

 4        correct?

 5   A    I answered the way I've done non-destructive

 6        testing.

 7   Q    Right.  But you did not use the court's

 8        definition of non-destructive testing when you

 9        answered his questions, correct?

10   A    No.

11   Q    When you answered his questions regarding fixedly

12        attached, what is your definition of "fixedly

13        attached"?

14   A    That it's fixed and it's attached.  It's

15        attaching something that's fixed.

16   Q    Can you use a definition that doesn't use the

17        words?  What about pinned, secured, or fastened,

18        are those fixedly attached?

19   A    Give me the choices again.

20   Q    Pinned, secured, fastened.

21   A    Pinned, yes.  Secured, that cannot necessarily be

22        -- fit into that because it may -- you're saying

23        "secured."  It may not -- it may -- it still may

24        move.

25   Q    Are you aware that the parties agreed that
```



Page 130

```
 1              "fixedly attached" included -- I want to read it
 2              to you so I don't --
 3    A         Okay.
 4    Q         -- misrepresent it to you.  The parties agreed
 5              that "fixedly attached" means fastened, secured,
 6              or joined.  Now, is that the definition you were
 7              using when you answered Mr. Stagg's questions?
 8    A         One of the questions, yes.  And the other
 9              question, no.
10    Q         Which question "yes"?
11    A         I was asked a question whether the cylinders were
12              pinned.  And from what I saw in the diagrams,
13              they were pinned.
14    Q         And if they're pinned, they're fixedly attached,
15              correct?
16    A         Right.
17    Q         What answer did you give that you did not use --
18    A         I don't remember the question.
19    Q         I don't, either.  And we'll go back and look at
20              it when we get our transcript.
21                  MS. BARNES:
22                      Okay.  I don't have any more questions
23              for you.
24                  MR. STAGG:
25                      Me either.  Thank you, Steve.
```



Page 131

1              THE WITNESS:

2                   All right.

3              VIDEOGRAPHER:

4                   The time is 4:29, and we are now off

5         the record.

6         THE WITNESS WAS EXCUSED AT 4:29 P.M.

7                   END OF DEPOSITION

8                        *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 132

1                         REPORTER'S PAGE

2          I, SYLVIA C. MOLBERT, Certified Court Reporter,

3     in and for the State of Louisiana, the officer, as

4     defined in Rule 28 of the Federal Rules of Civil

5     Procedure and/or Article 1434(b) of the Louisiana Code

6     of Civil Procedure, before whom this sworn testimony

7     was taken, do hereby state on the record:

8          That due to the interaction in the spontaneous

9     discourse of this proceeding, dashes (--) have been

10    used to indicate pauses, changes in thought, and/or

11    talkovers; that same is the proper method for a court

12    reporter's transcription of proceeding; that the

13    dashes (--) do not indicate that words or phrases have

14    been left out of this transcript; and that any words

15    and/or names which could not be verified through

16    reference material have been denoted with the phrase

17    "(phonetic)."

18

19

20

21

22

23

24

25



Page 133

```
 1              C-E-R-T-I-F-I-C-A-T-I-O-N
 2        This certification is valid only for a transcript
    accompanied by my original signature and original required
 3   seal on this page.
 4        I, SYLVIA C. MOLBERT, Certified Court Reporter in and
    for the State of Louisiana, as the officer before whom this
 5   testimony was taken, do hereby certify that STEPHEN
    KILLINGSWORTH, to whom oath was administered, after having
 6   been duly sworn by me upon authority of R.S. 37:2554, did
    testify as hereinbefore set forth in the foregoing 132
 7   pages; that this testimony was reported by me in the
    Stenomask reporting method, was prepared and transcribed by
 8   me or under my personal direction and supervision, and is a
    true and correct transcript to the best of my ability and
 9   understanding.
10        That the transcript has been prepared in compliance
    with the transcript format guidelines required by statute or
11   by rules of the Board and that I am informed about the
    complete arrangement, financial or otherwise, with the
12   person or entity making arrangements for deposition
    services; that I have acted in compliance with the
13   prohibition on contractual relationships, as defined by
    Louisiana Code of Civil Procedure Article 1434 and in rules
14   and advisory opinions of the Board; that I have no actual
    knowledge of any prohibited employment or contractual
15   relationship, direct or indirect, between a court reporting
    firm and any party litigant in this matter nor is there any
16   such relationship between myself and a party litigant in
    this matter.
17
          I am not related to counsel or to the parties herein,
18   nor am I otherwise interested in the outcome of this matter.
19        Lafayette, Louisiana, this 30th day of May, 2016.
20
21                        _____
22                        SYLVIA C. MOLBERT, CCR
                          Certificate Number 26003
23
24
25
```



**A**

**ability** 12:4 133:8
**able** 16:20 31:23
  32:2,4 35:10
  42:25 45:4 50:18
  89:16 90:14,15,16
  109:11
**absolutely** 116:9,11
**accept** 112:7,7
**access** 16:16
**accident** 37:17,18
  37:18,23,24 38:1
  38:4,6
**accommodate**
  58:18
**accompanied** 133:2
**accuracy** 118:18
**accurate** 33:14
  84:15
**ACKERMANN**
  2:14
**act** 91:10,11
**acted** 133:12
**acting** 51:9 52:18
  55:16 61:22 65:11
  82:4
**action** 1:5 27:25
  32:8
**actual** 22:17 47:6
  133:14
**add** 87:19
**adding** 11:3 87:16
  87:19
**addition** 37:24
  66:21
**additional** 3:19
  13:13,14 23:10,17
  24:8 35:6,11
  36:16 87:9 88:4
  88:19
**addressed** 38:8
  92:9
**adjust** 89:13 90:15
**adjustment** 75:21
**administered** 133:5

**advance** 32:2,4
**advisory** 133:14
**affect** 89:5 90:3
  91:2,5
**affidavit** 3:15 53:24
**affirmative** 28:6
  79:21 98:17
**afield** 78:16
**ago** 42:19,20 45:2
  76:22 107:3
**agree** 8:6,10 10:1,7
  12:14 28:12 39:21
  40:4 43:2 48:7
  52:2 53:18 54:12
  55:5,7 69:18
  70:13 71:9,20
  72:22 73:23 74:12
  77:4 84:13,17
  92:3 93:9 94:20
  95:3,13,18,24
  96:10,21,24 97:8
  97:12,17 99:20,22
  100:4 101:6,21
  102:1 103:13,21
  103:22 104:6
  106:2,14 107:16
  112:11,15 113:21
**agreed** 4:3 8:6 12:9
  12:17 100:22
  129:25 130:4
**agricultural** 45:16
**ahead** 32:10 101:20
  102:6 110:4
**air** 28:21
**allows** 72:6 74:6
**amended** 54:8
**amendments** 54:23
**amphibious** 44:2
**analysis** 49:21
  92:13 95:8
**analyst** 42:4,15
**anchor** 29:24
**anchoring** 30:6
**and/or** 47:17
  113:20 132:5,10
  132:15

**angle** 60:15,19
  64:10 66:7 72:1,6
  72:13,14 73:6,10
  77:22 89:5,6,7,10
  89:11 90:2,3,4
**angles** 89:4 90:10
  90:21
**answer** 4:19 23:5
  23:12,20 40:2
  78:10 104:12
  128:17 130:17
**answered** 118:21
  127:24 128:6
  129:5,9,11 130:7
**answering** 129:3
**answers** 4:16
**anyway** 67:6
**apart** 91:11 110:5
**apertured** 113:21
**apparatus** 84:6,9
  84:14 92:14,15
  98:6 99:11 100:22
**apparently** 16:12
  18:22
**appearances** 3:2
  5:9
**application** 126:1
  126:10
**applied** 52:14,22
  107:12 118:17
**applies** 84:14,16,19
  106:24 107:8
**apply** 52:15 59:19
  61:23,24 107:5
  119:8,18
**applying** 67:14,15
  84:22
**appreciate** 44:11
  75:2
**appropriate** 4:10
**appropriately**
  120:12
**approximately**
  25:20
**area** 52:16 65:22
**arm** 27:10 31:25

**arrangement**
  133:11
**arrangements**
  133:12
**art** 23:8,11,17,22
  24:12,14,23 25:6
  25:9,13 108:20
  113:25 114:22
  117:16 119:5,7,17
  121:15
**Article** 132:5
  133:13
**asked** 8:1 10:19
  13:6 14:23 16:6
  18:5 20:15 22:6
  49:1 55:7 72:17
  78:7 83:17 89:1
  105:2,25 114:11
  114:11,17 127:20
  130:11
**asking** 9:17 16:11
  19:1 20:25 91:15
  91:20 92:1 104:4
  118:23 128:16
**asks** 24:11
**assemblies** 71:19
  71:20 77:5 85:23
  86:2 87:3 92:15
  94:21 98:7 100:24
  101:6
**assembling** 101:12
  123:9
**assembly** 65:7 71:2
  71:10 72:11,24
  76:1,12,14 82:25
  83:2,5 89:8 90:23
  92:21 98:8 102:13
  103:18 104:1
  124:25
**assignments** 44:18
**assistant** 121:12
**associate** 5:21
**attach** 12:4
**attached** 7:8,13,13
  12:12 82:17 83:4
  83:5,8 92:25 94:2

  94:12,14 99:21
  100:24 101:7,13
  102:14 103:1,4,5
  103:14,18,25
  104:2,6,11 123:10
  125:1 129:12,13
  129:14,18 130:1,5
  130:14
**attaching** 94:18
  101:3 112:23
  113:6 129:15
**attachment** 40:23
  41:8 53:19 54:10
  54:14,25 55:9,13
  66:20,23 69:7
  78:20,21 79:2,8
  84:11,14,18 88:23
  89:3,22 94:9,19
  94:22 95:2,13,16
  95:19,23 96:2
  99:11,14 100:7,22
  101:3,5 104:4
  106:13 107:2,10
  107:17,25 108:4
  108:11 112:12,15
  112:21,24 113:2
  113:22,23 114:16
**attachments** 14:8
  14:10 113:20
**attorney** 119:25
**attorneys** 5:9
**audio** 19:8
**authority** 133:6
**auto** 37:18
**aware** 12:9 17:19
  62:6 115:13,18,23
  129:25
**axes** 61:3
**axis** 61:5,8 62:12
  62:13 66:13,13,14
  66:15
**axle** 51:18
**A-P-P-E-A-R-A-...**
  2:1

**B**



**baby** 48:2,3,13
**back** 31:13 38:19
  38:22 40:2 41:25
  42:19 46:4,23
  68:13,13 74:9
  76:21 78:15 82:14
  93:13,14,18 97:14
  102:13 104:24
  112:20 122:10
  126:16,16 130:19
**background** 14:21
  32:23 49:6,7
**backhoe** 43:20
**backhoes** 43:21
**backing** 102:21
**bad** 41:12 48:17,24
**bar** 70:22,25
**Barnes** 2:4 3:6,9
  5:11,12,25 17:3,9
  17:11,20 18:3,9
  46:12,25 53:5,17
  53:22 54:3 61:14
  63:12,19 64:7
  68:19,22 69:1,6
  69:11,15 73:22
  74:11,25 75:9
  85:18 93:8 98:11
  100:16 103:12
  104:17 105:1
  109:5,7 113:18
  116:25 117:11
  118:3,10,19
  119:11,20 120:1
  121:17 122:3,20
  123:20 124:4,17
  127:15,18 130:21
**bars** 121:5
**base** 7:16,18 8:10
  9:24 10:8,10,13
  10:14,21 70:9,12
  70:15 85:7,11,23
  86:1,7,8,12,13
  87:4,14,14,16,19
  87:25 88:13,21
  89:2,7,12 91:13
  92:22,23 93:7

98:8
**Based** 27:4,5
**bases** 77:5 86:8,14
  86:15,24 87:15
**basic** 108:13
**basically** 44:1
  50:22 100:2 120:6
**basics** 31:12 39:9
**basis** 38:5
**basket** 51:4,5 64:21
  64:22,24,24 65:4
  65:24 67:19,24,25
  70:8 73:7 76:18
  77:25 78:1,2,4
  79:25 86:10,11,14
  86:16,19 87:5,18
  87:20,21,23 90:8
  90:9,11,14 93:16
  93:19,23 122:25
**Bauer** 110:17
  115:22
**beam** 65:13 72:5
  74:7,8,14 75:8,22
  76:5 77:13,13
  83:1 85:19 92:20
  98:8 102:13 103:3
  103:4,5,14,17,23
  103:25 104:1,6
  105:10 109:23,24
  109:25 110:5,6,9
  110:23 111:11
  112:14
**beams** 87:23,25
  88:1
**Bear** 104:8
**becoming** 35:20
**beginning** 1:19 5:2
  96:17
**begins** 115:2
  120:21,22
**belabor** 44:16
**believe** 8:2 13:17
  13:22,25 14:18
  16:19 23:8 24:21
  33:19 50:1,4,8
  55:18 56:12 71:7

82:21 83:19,22
  93:4,5 95:11
  100:20 113:25
**bend** 111:6
**bending** 56:8 116:9
**BERING** 2:5
**best** 45:15 133:8
**better** 65:2 69:17
**big** 45:13
**billing** 25:15 47:8
**binding** 86:13
**bit** 64:19 65:1
**black** 81:9,9
**block** 99:14 106:5
**blocks** 116:14
**blue** 69:23 80:2
**board** 45:25 133:11
  133:14
**boat** 27:15,16,19
**bottom** 7:7,12,12
  7:15,17,18 8:18
  9:5,6,7,7 38:24
  83:6,9 86:18 91:7
  91:9 98:10 122:13
**BOULEVARD**
  2:15
**box** 2:10,15 95:25
**break** 46:15,20
  80:11,12 95:6
  97:8 99:22 100:9
  100:17 121:3
**breaking** 81:11
**breaks** 46:16
**bring** 15:18,23
  112:9
**brought** 15:20,21
  45:19 126:25
**built** 30:15,20
  43:21
**bullet** 36:13 37:4
  38:23 39:7
**bullets** 45:13
**burden** 39:18
**burned** 43:11
**business** 42:17
  45:10

**businesses** 45:18,19
**buy** 72:9 73:1,1,3
**B.S** 32:24

**— C —**

**C** 1:8,15 4:7 132:2
  133:4,21
**cab** 121:4,6
**cable** 65:7 71:1,3,8
  71:10,12 72:11
  76:1 87:3 90:23
  94:20 101:6
**cables** 73:5,6
**cabling** 31:23,24
**calibrating** 58:18
**calibration** 58:23
**call** 31:25 48:21
  50:13 51:12 52:24
  57:14 59:20 72:16
  72:16,24 73:20
  75:13 93:10
**called** 46:4 63:4,5
  75:14,16 87:7
  98:10 111:22
**Calling** 75:15
**camera** 60:24
**capture** 50:22
**care** 48:12 67:4
**career** 37:22 47:20
  47:21 48:18
**carriers** 44:3
**carrying** 114:9
**case** 6:4 8:6 12:7
  15:22 20:14,19,22
  21:9 25:10,13,16
  25:21 35:13 44:23
  48:22,24 53:7,25
  83:14 120:9 122:5
**cases** 11:23 30:16
  31:25 32:14,15,19
  32:20 34:18,20
  35:9 48:6,8
**cause** 1:14 102:8
  106:10,15 125:5
**caused** 81:4,10
**causes** 56:1 94:25

**CCR** 133:21
**cell** 83:2,5 94:10
  105:9,10,13,23
**center** 45:7 46:1
  58:14 64:11 80:9
**certain** 27:22 51:23
**certainly** 73:19
**certificate** 3:25
  14:4,5,6 57:25
  133:22
**certification** 121:1
  133:2
**Certified** 1:16 4:7
  132:2 133:4
**certify** 133:5
**cetera** 19:25
**chain** 38:17
**chance** 17:16 19:5
  21:20
**change** 31:19 77:22
  89:11,24 90:1
  92:1,2
**changes** 132:10
**changing** 11:2,2
  89:10 90:19,21
  91:24,24
**characteristics**
  11:16 37:15
**chart** 12:16 84:1,4
  84:7,12 98:13
  100:18 113:10,11
  115:1
**check** 107:8
**China** 44:3
**Chinese** 44:5
**choices** 129:19
**choose** 72:6
**circle** 65:18
**cited** 114:22 115:8
**Civil** 1:5 4:10 132:4
  132:6 133:13
**claim** 8:11 12:6,16
  12:17,19,23 13:1
  13:11 14:9 15:11
  15:15 50:6 54:7
  54:10,22 55:21,23



55:25 56:4,24
57:7 62:4,6 63:8,8
84:1,2,6,9 86:3
92:8 95:15 96:4,6
96:7 98:15,20
100:19 103:11
106:4,9 114:14
122:5,14 124:11
**claimed** 54:12
**claims** 55:22
**class** 37:9 39:25
**classes** 38:3 40:9
41:1,1,3,9,10
**classified** 7:12
**classroom** 41:17
**clear** 25:3 39:17,22
54:9 82:7
**clearer** 68:15
**client** 5:21 43:8
**clients** 48:20
**closed** 6:19,20,24
7:5,9,10
**Code** 4:10 132:5
133:13
**coefficient** 28:11
**college** 38:3
**Colomb** 1:17 2:9
**color** 80:16
**colors** 81:24
**column** 117:10,19
117:22 118:6,7
120:15,20,22
**combination** 29:7,9
51:21 52:3,19
58:10 67:9 69:16
**combine** 89:23
108:20 109:9
110:16
**combined** 52:24,25
**combining** 87:12
**come** 27:12 30:17
42:23,25 46:5
65:16,19,21 72:14
**comes** 50:12 67:16
67:16 79:19,20
80:15

**coming** 65:13 74:8
**commercial** 38:9
**common** 92:22
**commonly** 115:3
**communications**
20:5
**companies** 37:1
42:22
**company** 37:3
42:15 43:21
**compared** 84:5
**compensate** 90:16
**compensation**
47:15
**compiled** 20:18
25:17
**complaint** 103:17
**complete** 3:20
20:16 22:7 121:8
133:11
**completely** 94:8
**compliance** 133:10
133:12
**complies** 70:19
**component** 81:3,3
81:11,12,13
125:22
**components** 68:1
96:7 125:16
**compression** 52:11
126:19,20
**compressive** 82:4
**comprising** 84:11
**computations**
128:25
**computer** 16:16
**concept** 110:19,20
**concepts** 112:13
**conclusion** 78:12
85:22
**conditions** 84:24,25
**configuration**
77:21,21 82:11
**configured** 80:5
**confirm** 83:18
99:23 103:1

**confuse** 77:16
**confused** 107:13
**conjunction** 31:20
72:5
**connect** 79:1
**connected** 29:17
77:6 86:6 87:6
91:1 102:1 105:3
105:7
**connecting** 64:18
76:4
**connection** 4:13
67:1,1 94:16
**connections** 83:19
**connector** 75:23
76:5
**connects** 79:2
**consider** 114:18
**considered** 62:24
114:5,12,21
115:24
**considering** 116:21
**consists** 31:11
**constituted** 113:20
**construction** 8:11
12:6,16,17,19,24
14:9 15:12,15
42:21 122:5
**constructions** 13:1
**construed** 8:7
**consultant** 37:2
42:7
**Consultants** 42:5
**consulting** 45:6
**contact** 53:2
**contacted** 49:1
**container** 84:16,22
85:1,2 91:7 96:1,2
**containing** 92:10
**contending** 18:16
**context** 6:3,21,22
7:18 8:16
**contingent** 47:16
**continue** 48:14,16
**continuing** 33:11
33:20 34:3 36:25

40:8
**contractual** 133:13
133:14
**contrary** 122:4
**control** 26:9 35:10
40:16 41:4,10
45:20
**conversation** 24:17
**convincing** 39:17
39:23
**copies** 15:8
**copy** 15:21,22
69:12
**COREY** 2:19
**corner** 10:12,18,20
21:2 71:16
**corners** 63:11
**correct** 6:4 8:14,24
9:12,19 12:13
13:21 14:1,2,13
14:14 18:13,18,24
20:10 21:8,10,13
21:14 22:2,22
23:9 25:5 30:22
34:10 35:1,14
41:14 42:8,16
45:8 47:10,11,13
47:14,18,19,20
48:20 49:17,19,20
49:25 50:3 57:7
66:21 69:24 70:2
70:10 72:21 76:1
76:12 77:2 78:5,6
82:11 85:3,9,11
85:15,19,20,24
86:19 87:5,6
89:23 91:7 93:22
96:19 97:18,23
98:2 100:25 101:1
105:5,11 107:18
107:21,25 108:6
108:14 109:24,25
110:7,10 112:12
112:16,17,19
113:22 114:7
116:2,3 119:18

120:9 122:18
124:7,8,15 125:17
125:19,20,23,24
129:4,9 130:15
133:8
**correctly** 49:23
**correlated** 126:16
**correspondence**
20:4,13
**cost** 40:16
**counsel** 4:3,8,17
5:21 16:8 19:20
19:24 20:11,12
133:17
**Counselor** 46:9
111:24
**couple** 30:15 34:9
34:11 35:15 37:4
81:25 126:9
127:16
**course** 34:25 35:17
126:6
**courses** 33:11 34:5
34:15 35:6,11
36:24 39:12,13,17
40:17 127:8
**court** 1:1,16 4:7,24
13:2 17:22 23:4
39:22 68:24
108:25 115:18,23
132:2,11 133:4,15
**court's** 12:19 15:11
15:15 129:2,7
**cover** 9:22 24:4
34:2,13 39:17,25
**covered** 82:6 95:11
**covers** 9:21 33:12
**CO-COUNSEL** 2:7
**crane** 76:20 78:4
**cranes** 38:11 111:9
111:10
**create** 10:22 21:6
51:16 52:20,25
53:2 58:10,11,15
58:16 62:2 77:19
87:4 114:2



created 20:18
21:12 81:22,22
creates 29:3 52:16
59:23
Cross 46:1
crossbar 69:20
cups 91:8
current 3:21 24:19
42:4 43:2,5 44:10
45:6
currently 42:19
47:23 112:10
CV 33:15 126:5
cylinder 12:11
28:13,20,21,21
29:2,7,8,16,22
32:2 56:1 57:18
58:5,7 62:20
65:14,25 69:24
70:9,12,15 76:12
76:14 77:5 78:1,2
83:4,7,8 85:23
86:2 92:10,15,16
92:20,24 93:9
94:1,10,25 97:3,5
97:10,12,22 98:7
98:7,16 99:1,4,6
100:5,24 101:13
101:21 102:1,8
103:1,4,5,13,25
104:1,5,5,7,10
105:2,14,15
106:10 121:9
122:15,17,23
123:5,9 124:25
125:4 126:3
cylinders 26:9 31:8
31:9 64:8,11,15
64:16 65:12 68:6
68:6,11 69:22,24
75:20 76:6 77:17
82:17 83:19,22
86:19,24 87:2
90:24 97:18 99:15
99:21 103:15,22
106:1,14,15

111:12 115:2,6
122:25 125:8,12
126:2 127:2
130:11
C-E-R-T-I-F-I-C...
133:1

——————

**D**

damage 108:4
dashed 60:20
dashes 132:9,13
date 24:16 36:19
dated 18:11
dates 40:10,20
day 1:19 44:4
133:19
days 16:14 44:4
dealing 32:13,13
43:8 44:25 50:25
126:12
dealings 39:2
dealt 26:8 32:19,20
38:21 40:14 41:3
43:9
decide 34:14
decided 113:1
defendant 2:12
5:19 48:13
Defense 40:15
45:12
define 6:16 10:9
defined 10:2 12:4
96:15 132:4
133:13
defining 11:14
definition 6:12 7:16
8:5 11:23 74:22
123:17 127:22
128:4 129:2,8,12
129:16 130:6
deformation 108:5
degree 33:7 61:13
degrees 57:6 59:16
59:18 60:12,13
61:6 90:12,13
delivers 77:24

denoted 132:16
**Department** 40:15
45:12
depended 32:12
depending 28:1,8
52:13 61:23 77:22
depends 6:3,21 8:5
24:11 34:16,17
depicted 7:6,6
101:24
deposition 1:12,13
3:13 4:4,13,20,21
5:3 18:7 19:21
21:21 46:21 63:15
83:13 96:18 131:7
133:12
depth 9:9,11 10:16
72:19,20
describe 45:16
described 24:6 49:9
94:9
description 88:8
121:10
design 36:3,10,21
38:10 39:13 42:4
42:14,21 43:10
57:9,11
designed 26:8,14
29:1 38:12 93:25
designing 34:22
35:2 37:2
designs 46:6
desired 122:1
destructive 41:8,16
41:22 121:23
128:1 129:3
destructively
110:13 128:16
detail 24:9
determination
25:12
determine 12:22
13:7,8,10 88:12
120:25
determined 121:20
developed 36:5

device 22:12,17
26:13,18,22 27:2
28:19 29:1,3,13
31:2 49:9,10,22
50:5,9 52:4 54:11
55:1 56:18 64:12
68:2 69:18 70:20
74:13,19 75:12
76:19 77:1,6,12
77:20,24 82:18
83:9 84:18 86:5
86:25 87:17 91:1
93:16,21,23 94:1
94:19 95:2,17,18
95:21,23 96:11
97:9,17 98:24
100:1 101:4,7,24
102:9 105:3,19,20
106:12,19 110:10
111:17 112:22,24
113:5 114:3
122:19 124:12
devices 26:15 28:12
device's 75:11
diagram 78:14
80:19 82:9 125:20
125:21
diagrams 130:12
dictionaries 6:13
6:14
difference 90:25
different 11:12
34:20 35:13 37:2
38:7 43:14 59:22
68:20 80:16 82:9
82:9 89:4,21
90:10,10 126:12
differently 86:6
91:11
difficulty 76:2
dimension 10:17
dimensional 11:16
direct 133:15
directed 54:24 55:8
127:19
direction 52:7,13

52:13 58:17 61:13
61:15 64:1 79:7
80:7,8,8,21,22
81:16,17 133:8
directions 59:23
65:9,10 66:12
directly 107:3
discourse 132:9
discuss 23:22
discussed 9:25 15:2
24:22 30:4 98:1
100:21 102:18,25
123:14
discussion 19:9
20:1
discussions 8:25
distance 51:10
52:18,21
distinguish 41:11
distributed 91:2
DISTRICT 1:1,2
DIVISION 1:3
dock 29:19
docking 29:4,5,15
30:3,6
doctrine 88:6
document 14:24
16:22 17:13,14
20:16
documents 12:7
13:10,13,14,24
14:16,21 15:18
16:2,7,19 17:7
19:7,12,25 22:20
23:7 44:14
DOHERTY 1:6
doing 31:5 42:20
45:17 58:15 73:4
75:6 79:16 84:23
104:15 110:25
111:2,4,4,8 112:6
112:6
dollars 47:9
Domengeaux 1:17
2:9
dose 28:7



**dove** 36:8
**downward** 87:4
**draw** 64:1 78:14,19
 80:2
**drawing** 3:14 57:23
 58:1 66:4 70:13
 106:3
**drawings** 22:14
 62:24
**drawn** 78:18
**drew** 79:25
**drill** 26:14,24 32:21
**drilling** 26:25
**DRIVE** 2:5
**Driver** 37:13
**drop** 78:4
**drops** 27:22
**due** 132:8
**duly** 5:23 133:6
**Duppong** 115:7,15
 115:19 120:15
 127:20
**DURIO** 2:14
**dynamic** 63:4
**dynamics** 38:1 63:5

**E**

**earlier** 53:25 72:17
 94:10 105:25
 116:13 125:15
**Early** 31:4
**educated** 36:7
**education** 32:22
 33:11,20,25 34:3
 34:14,25 35:17
 36:24,25 38:22
 40:21,25 41:6
**Edwards** 1:17 2:9
**effect** 88:22 89:2
**eight** 40:8
**either** 9:15 15:17
 23:10 27:24 31:16
 36:25 37:1 52:12
 53:13 62:25 94:5
 95:22 112:3
 115:19 128:8

130:19,25
**electric** 35:16,20,25
 36:4
**electrical** 31:18
**element** 84:9 85:7
 86:3 92:8 94:17
 94:24 95:15 96:4
 97:2 99:10 101:2
 101:12,16 102:7
 102:12 106:4
 114:13
**elements** 50:4,8
 85:21 100:20
**Elwood** 2:8 5:14
 46:21
**email** 16:13 20:8
**emails** 19:7 20:4
**embodiment** 62:21
**emphasis** 33:1,7
**employees** 42:10
 83:18,21
**employment** 42:4
 43:2 45:5 133:14
**ends** 97:25
**engagements** 3:21
 43:5 44:10
**engineer** 47:21
**engineering** 32:24
 32:25 33:2 37:13
**Engineers** 42:5
**ensure** 56:18
**enter** 99:12
**entire** 67:24 76:19
 77:1
**entitled** 1:14 8:3
**entity** 133:12
**equipment** 26:6,8
 26:17 28:1 36:3
 37:25,25 38:6,10
 38:14,18,20 41:21
 42:21 46:3 58:19
 127:1
**equivalent** 28:10
 88:13
**equivalents** 88:6
**escape** 34:22 35:3

**essentially** 87:24
 112:6
**estimating** 40:16
**et** 19:25
**evaluated** 45:22
 126:15
**evaluating** 39:14
**evaluation** 47:16
 49:2,3 88:12
**event** 121:2
**evidence** 4:22
 39:23 40:1
**exact** 90:22
**exactly** 82:11 88:7
**EXAMINATION**
 3:5 5:25 117:5
**examined** 5:24
**example** 10:11
 26:11 34:21 46:1
 50:6 101:25
 110:16
**examples** 23:24
 24:1 63:1
**exceed** 120:13
**exceeding** 120:7
**exchanged** 20:8
**excluding** 56:13
**exclusion** 56:5 62:7
**Exclusive** 109:3
**exclusively** 43:3
**Excuse** 46:9
**EXCUSED** 131:6
**exercise** 78:13
**exhibit** 17:21 18:5
 18:7,8 25:4,7
 33:16,16 47:2
 53:6,8,9,23 54:2
 60:2 63:13,14,16
 64:1,2 68:2,23
 69:3,16,16 70:4
 70:16 76:25 78:17
 79:15 82:15,20
 86:5 90:23 94:2
 95:19 96:12,25
 97:17,17 99:17,19
 100:1 101:18,25

106:6 113:14
 117:9 120:14
 122:19 124:12
**EXHIBITS** 3:10
**exist** 9:13 19:6 29:5
 66:20
**exists** 21:7 90:22
 98:22
**EXITS** 46:21
**expect** 35:8
**experience** 25:23
 26:1,12 33:8
 40:24 41:6
**expert** 3:21 5:15
 35:2,12,20,24
 36:20,22 37:7,10
 37:20,22 38:25
 39:4 42:18 43:3,5
 44:18 47:2,20
 48:19 120:4
**expert's** 22:25
**explain** 41:7 68:1
 78:10
**explained** 28:13
 127:22
**extend** 64:8 86:19
 87:2
**extension** 45:16
**extent** 103:9 118:20
**exterior** 29:17
**extra** 85:4
**extreme** 28:3
**eye** 30:20 31:3,17
 31:17 50:24 51:14
 54:17,17 55:1
 56:3,3,10,13
 59:21 60:4,5,7
 64:25 66:2,6,7,11
 66:21,24,25 67:14
 67:15,21 71:4,5,6
 79:2,5,10,17,17
 79:25 80:5,9,10
 82:8,8 85:3 87:3
 88:22 89:3,9,10
 89:22 94:18 95:1
 95:16,20 101:4

102:9 106:11,19
 106:23,24,25
 107:1,11,12,14
 112:23 113:6
 114:10 120:24
 121:2,8 122:1
 124:14 125:6,7,13
 125:25
**eyes** 30:12,17,24
 31:7,7,10 32:5,7
 32:11,12 50:13
 51:3 67:23,25
 78:23 79:1 82:10
 84:19 85:2,5
 93:24,25 95:22
 96:1 101:8 121:12
 121:16 126:15,17

**F**

**F** 1:6 113:14 117:9
**face** 57:23 80:18,20
**facility** 43:11
**fact** 40:17 52:15
 57:8
**fail** 107:25
**failed** 44:3
**fails** 107:20
**failure** 37:25
 126:23,25 128:22
**failures** 38:6 41:23
 46:2
**fair** 44:15 51:20
 84:7 97:19
**Fairly** 26:17
**fall** 114:10
**far** 25:16,21 75:18
 78:16
**Farassat** 114:25
 115:7
**farm** 43:14
**farmers** 45:17
**fastened** 104:7
 129:17,20 130:5
**faulty** 42:23
**Federal** 4:10 132:4
**feedback** 26:20



27:24
**Fees** 47:8
**feet** 7:22,23 70:9
83:22 86:18
**fewer** 96:7
**field** 41:18 77:25
83:18
**fifth** 76:25
**figure** 3:16 109:16
109:19 118:1
120:16,18 123:14
125:8,10
**figures** 62:25
120:16
**file** 3:20 20:16,24
21:7,9,15 22:7
24:22
**filed** 21:8,13
**files** 19:8
**fills** 28:9,22
**final** 108:2 110:6,9
114:13
**financial** 133:11
**find** 26:19 57:12
104:10
**fine** 48:11,15 58:2
60:12 70:14
**finish** 23:5 53:11
**finished** 32:16
60:22
**fire** 34:21 35:2,8
**fires** 28:10,22,23
**firm** 16:7 44:19
45:6 133:15
**first** 16:17 17:23
18:4 19:6 39:7
47:7 57:23 78:16
82:14 84:9 97:3
97:12,22 98:16
99:1,10,19 101:18
109:13 114:14
115:1 120:21
121:9 122:15
128:13,22
**fit** 129:22
**fits** 105:8,10,13

**fittings** 99:20 100:5
100:23
**five** 21:24 22:6 23:7
35:15,15 36:14
38:23 42:19,20
55:23 76:25 84:2
84:4
**fix** 40:11 42:24 94:4
**fixed** 76:8 103:18
124:2 129:14,15
**fixedly** 101:13
102:14 103:10,13
104:1 123:10,18
123:18 125:1
129:11,12,18
130:1,5,14
**fixing** 119:24
**floating** 32:20
**flow** 27:7,8
**fluid** 12:11 30:4
56:1 92:9,12
94:24 97:2,6,9
99:7,11,14 100:7
100:22,25 102:7
106:9,15 121:9
122:15 125:4
**flying** 121:5
**focus** 37:22 38:5
42:17 53:18
**follow** 57:7 86:17
**following** 1:15
84:12
**follows** 5:24
**follow-up** 127:16
**foot** 89:12,15,23
**force** 27:1 28:23
29:3 51:9 52:5,9
52:11,18,19,20,22
55:14,15,16,20
56:7 58:10 59:2,2
59:3,4,16,19,22
60:10 61:15 64:2
64:9,11,17 68:5
80:6,22,24 81:2,4
81:5,6,8,10,11,14
81:15,18,19,20,21

82:3,3,4 84:14,16
86:18 87:4 120:25
121:1
**forces** 31:22 51:21
51:23 52:3,14,16
52:24,25 53:4
55:19 56:5,14
58:16 66:20 78:14
78:20 79:7,8,10
79:11 82:13 84:19
**foregoing** 133:6
**forget** 65:23
**form** 4:18 10:15
41:12,13 64:4
73:16 74:1,21
75:1 85:17 93:2
98:4 103:8 108:23
117:12 118:4,11
118:20 119:12,21
121:18 122:4
123:21 124:5,18
**formalities** 4:12
**format** 133:10
**formation** 89:20
**forms** 9:20
**forth** 15:11 31:13
133:6
**forward** 32:3,4
**four** 33:15,16,19,24
38:23 67:23
120:17
**frame** 63:10 67:16
79:18 80:14
**framework** 6:2,7,9
6:10,19,23 7:4,6
8:2,2,24 9:24
10:11,22 11:9,21
11:22,24 12:1,3
12:10,11 50:19
74:12 75:11 85:7
85:22 92:10,23,24
93:6,11 96:5,6,10
96:13,14,16,18
97:4,5 98:1 99:4
101:12,14,22
102:14,15,16,25

103:19,19,20,23
103:24 104:2,3
111:15 112:8
122:16,17,24
123:1,5,9,10
124:25 125:1
**free-body** 80:19
82:9 125:21
**fresh** 117:6
**front** 18:10 42:1
72:16
**full** 8:4,12 27:6
**full-time** 42:11
**function** 27:6 73:12
86:6 89:21
**functionality** 90:25
**functions** 27:22
**funny** 21:5
**further** 37:4 66:17

---

**G**

**G** 120:14
**gather** 16:20 50:18
**gauge** 31:11,12
**gauges** 31:6,7
**general** 24:7,17
32:22 39:5 40:12
42:14
**generation** 35:16
35:21 36:2,5
**Genesis** 38:24
**getting** 40:19 53:4
68:4 74:4 77:14
86:15 88:19
**give** 26:11 29:24
43:7 48:16,23
63:13 69:12 73:6
75:4 104:12
129:19 130:17
**given** 4:23 6:4
20:18 37:10 44:9
89:16 90:3 91:22
92:3 94:13 108:19
119:6,6,8
**gives** 26:20 56:15
64:19 110:19

112:4
**giving** 73:10
**go** 17:19 20:23 24:8
32:10 33:23 40:2
42:1 46:10 48:23
51:2 62:17 75:18
76:22 82:14
101:20 102:6,13
104:15 110:4
122:10 123:7
130:19
**goal** 85:1
**goes** 10:12 71:3
**going** 5:7 9:16 23:6
23:10,15 27:24
33:6 34:19 42:11
46:9 47:1 48:1
49:10 53:20 57:3
57:12,20 58:7,9,9
58:12,13,23 59:1
59:10,11,17,18,19
60:6,7,13,14,15
60:16,16 61:2,4,9
61:10,11,11,12,18
61:19,24 62:2,3
62:17 63:7,13,21
65:6,8,9,15,16,19
65:21,24 66:8,9
66:17,18 67:19
69:19 72:7,12,14
73:11 76:8,9,16
80:2 82:10 84:25
87:8 90:12 91:10
91:11 92:7 95:7
110:6,22 115:22
116:20 118:11
125:15 127:4
128:21
**good** 14:23 41:12
65:21 69:19
**gotten** 14:11
100:20
**Goudelocke** 2:14
5:21
**graduate** 41:2
**grains** 43:15



**grand** 73:8
**ground** 43:12 52:9
**guess** 47:6
**guidelines** 133:10
**gun** 48:1
**guy** 36:6 37:8

**H**

**H** 2:4
**half** 44:4 108:13
**handle** 94:7
**handles** 53:12
**handling** 38:10,10
38:14,17
**hang** 9:15 64:10
104:8,8
**hanger** 119:5,8
**happen** 58:12
67:13
**happened** 48:25
95:4
**happening** 80:3
**happens** 61:22 67:6
**happy** 44:6
**hard** 68:8 72:8
**hate** 53:1
**Hawkins** 2:20 5:15
14:8,9 23:1 116:1
119:23
**head** 15:5
**hear** 102:5
**heat** 35:9,13
**height** 8:17,19,21
10:16 11:15
**help** 23:4 40:22
41:7 68:12
**hereinbefore** 133:6
**hereto** 4:12
**Hey** 58:23
**HEYMANN** 2:15
**Hicks** 2:19 5:22
**Highway** 37:13
**HILL** 13:4
**hire** 42:12 48:4
**hired** 48:1
**hoisting** 46:2

**hold** 69:7 122:1
**holding** 113:24
**Holly** 2:4 5:12
**horizontal** 50:21
**hoses** 99:20 100:23
**hour** 47:10
**hourly** 47:9
**hours** 25:20 34:4,5
**housing** 69:24
105:9,11,13,23
**HOUSTON** 2:5
**huh** 81:24
**hundred** 47:9
**hurt** 75:16
**hydraulic** 26:3,5
27:9,10,12 28:3
28:21 29:7,22
30:4,5 31:8,9 32:2
36:9,20 43:22,23
99:20 100:7,23,25
115:2 121:8 127:2
**hydraulically** 25:23
26:12
**hydraulics** 26:6,9
26:18 31:21,22
36:22 38:21 127:6
**hypothetical** 91:12
91:21 92:3
**hypotheticals** 92:6

**I**

**idea** 48:23 88:8
112:5
**identified** 18:1,8
53:9 54:2 63:16
69:3 85:10,21
94:21
**identifiers** 68:14
**identifies** 70:12
**identify** 70:15,20
**ignore** 13:4
**ignoring** 13:2
**image** 69:17
**immediately** 42:24
**improve** 45:13,23
**improved** 45:19

**include** 9:24 21:25
24:23 34:7 36:4
56:6 96:1 108:17
**included** 23:11
115:14 130:1
**includes** 22:10 51:6
**including** 4:14 26:3
85:7 92:23 96:5
111:15
**inclusive** 34:6
**incorporate** 127:2
**incorporated** 26:7
27:21
**incorrect** 83:23
116:5,9,12
**increasing** 88:17
**independent** 77:7,8
77:11,17 88:1,2
88:16
**independently** 92:20
**indicate** 116:19
132:10,13
**indicated** 118:17
**indicating** 52:8,17
60:3,14 64:23
65:5,11,22 76:24
79:4,6,19,24
80:14 81:14 82:23
89:6,14 106:7
**indirect** 133:15
**individual** 37:3
67:17,18
**individually** 51:3
67:21
**individuals** 68:2
**industry** 38:8,9
**information** 3:19
16:2 20:17,25
36:16 38:2
**informed** 127:21
133:11
**infringe** 49:17 50:2
**infringement** 40:1
40:5 49:21 69:8
**infringing** 49:13

50:5,9
**inside** 70:1
**insignificant** 116:21
**inspect** 108:3,9
**instances** 29:21
30:19
**Integri** 53:12 93:23
101:9,23
**IntegriCert** 1:8
2:12,19 5:19 19:9
19:16,18,21 20:5
20:9 22:11,17
49:8,10,16,22
50:1,5,8 64:12
70:12 74:19 75:10
75:12 76:19 77:12
77:19,24 82:18
84:12,13 86:5,25
93:21 94:1 95:18
96:11 97:9 98:24
101:24 105:3,19
108:5,7,8 111:17
**IntegriCert's** 24:19
83:16,21 84:5,17
92:14
**integrity** 51:4
56:11 84:10 95:2
95:12 106:13
107:2,19 114:16
**intend** 24:10 35:8
115:11
**intended** 107:4
**intents** 69:21
**interaction** 40:14
132:8
**interested** 133:18
**intermediate** 39:8
39:19
**interrupt** 33:5
**intervening** 10:8,9
10:20,25 11:9
**interview** 19:8 20:1
**interviewed** 83:16
**introduce** 17:23
**invalid** 39:21

**invalidating** 115:19
**invalidity** 39:22
**invoices** 25:15
**involve** 30:6 35:9
126:7
**involved** 34:18,19
44:17
**inward** 92:16
**inwardly** 56:10
92:11 97:6 99:7
124:21
**issue** 43:10,11
44:24 46:11
**issued** 7:20
**issues** 35:10,13
36:8 46:7
**item** 54:15
**items** 6:11
**it'll** 21:3 69:21
95:22
**I-N-D-E-X** 3:1
**i.e** 54:25

**J**

**Jefferson** 1:18 2:9
**jobs** 42:13
**joined** 94:19 101:4
102:10 104:7
106:12,19 112:24
130:6
**joining** 54:25 95:16
95:20
**joint** 12:16
**JOSEPH** 2:4
**jot** 21:1
**JUDGE** 1:6,8
**judgment** 15:6 69:8
**jury** 40:22 41:7

**K**

**keep** 19:15 21:9
50:5,9 71:25
**keeps** 42:11
**Kenny** 2:19 5:22
**Killingsworth** 1:12
1:14 3:11,12,13



3:14,15,15,16,17
3:20 4:6 5:3,23
6:1 47:1 133:5
**kind** 27:1 32:6
34:24 39:12 41:25
49:6,15
**know** 16:9,9 18:2
20:20,21 21:23
23:6,14,19 24:4
24:12 25:20 39:2
44:13 48:8 57:19
59:25 62:21 63:22
80:24,25 88:6,7
93:5 95:6 109:9
111:25 114:1,2
117:7 119:5,8
128:10
**knowledge** 109:10
133:14
**known** 72:13
**K-I-L-L-I-N-G-S...**
5:5

**L**

**L** 4:1
**lab** 126:12,18
127:10
**label** 71:9
**labeled** 66:3
**labs** 126:13
**lack** 86:1
**lacking** 50:9
**Lafayette** 1:3,18
2:10,16 16:5
133:19
**lamb** 122:8
**language** 62:6 92:8
98:12,15,20 106:4
106:9 113:8,19
122:14
**large** 26:17 30:18
38:19 42:13 61:20
86:8 87:25
**launching** 29:24
**law** 1:16 62:16 63:2
**LAWSON** 2:4

**laying** 100:2
**lead** 119:22
**leads** 41:14
**learning** 39:5
**leave** 8:8 88:18
90:4
**left** 132:14
**LEGAL** 1:22
**legs** 26:15,19,24,24
27:23
**lends** 57:9
**length** 8:18,19,22
10:16 11:15 72:19
72:20 90:21
**lengths** 90:10
**let's** 36:12 44:6
46:15 49:21 52:7
53:6,23 60:4 70:3
71:1 75:15 81:7,9
90:2 97:14 102:13
113:12 122:10
**level** 61:19,20
**lift** 64:16 66:9
93:13,14
**lifting** 55:1 94:18
95:1,16,20 101:4
102:9 106:11,19
112:23
**lighting** 37:5,7
**limit** 123:25
**limitation** 123:8,12
124:11
**limitations** 120:7
121:21 128:10
**limits** 123:23
128:14
**line** 55:25 57:17
58:14 59:18,21
60:20 62:20 65:7
115:5 117:10
118:6,24 119:14
120:16,20,22
**link** 66:10,10,11
71:7 76:5
**linkage** 65:5 66:1,3
67:11 68:4 69:20

74:9 75:7,18,19
75:22,25 77:23
80:6
**linkages** 77:8,10
**links** 90:9,15
**list** 3:21 15:1,22
23:7,11 36:9
38:22 40:9 44:7,8
44:9,17
**listed** 13:24 14:3,12
14:16,22 22:20
23:8,18
**listening** 32:18
66:22
**listing** 16:1
**lists** 42:3
**litigant** 133:15,16
**litigation** 3:21 43:6
47:17 49:7
**little** 57:12 59:20
64:19,22 65:1
**LLC** 1:8,17 2:9,12
5:19
**load** 32:5 51:14,15
63:6 65:4,5,11,23
66:12 67:9 72:7
74:9 75:7 83:2,5
84:5,13,22 89:9
91:5,9 92:14
94:10,14 96:22
105:9,10,13,23
106:24 107:5,9,12
107:18,23,24
119:6,7,8,18
120:12 122:1
126:1
**loading** 67:17
116:20 126:11
**loads** 31:9 51:6
85:5,6 91:2 110:1
**load-bearing** 110:1
111:5 114:9
**located** 105:4
**location** 105:24
**long** 48:18
**look** 9:8 11:22

12:23 13:4,6,16
13:23 18:5 33:15
33:18 39:14 40:3
42:3 51:1,11,13
52:8 54:19 55:23
58:2 59:24 60:3
62:15 66:25,25
67:20 68:6 72:15
74:10,24 75:5
79:13,16,17 80:11
80:25 83:20 84:1
107:8 110:20,21
111:14 113:15
114:25 117:8,22
117:24 118:1
120:18 130:19
**looked** 12:6 50:10
50:11 117:8 128:8
**looking** 36:18
41:23,23 54:15,17
56:21,22 63:5
64:20 65:3,12
66:6 67:18,18
72:10,11 74:14
79:23 96:11
100:17 105:8
113:17 114:15
126:10,11
**looks** 9:8 71:2
82:19
**lot** 26:2,2,6,9 37:7
38:9 40:14 41:20
51:12 90:11
**lots** 37:5,11
**Louisiana** 1:2,18
2:10,16 37:17
45:6 132:3,5
133:4,13,19
**lug** 55:1 94:18 95:1
95:17,20 101:4
102:9 106:11,19
112:23

**M**

**machine** 127:3
**machinery** 42:20

**machines** 43:19
**mad** 48:17
**MAGISTRATE**
1:8
**MAGNA** 1:22
**magnitude** 118:17
120:25 122:1
**main** 42:17
**maintenance** 43:9
43:10
**making** 49:15
56:14 89:12
133:12
**manager** 42:12
**manner** 12:5 50:24
95:3 114:17
**manual** 32:8
**manufacturing**
45:10,13,24
**marine** 44:24,25
**mark** 17:21 18:7
53:6,7,23 59:25
60:1 68:23 70:3
**master's** 33:7,9
**match** 70:4
**material** 10:21 38:9
38:10,14 41:13
132:16
**materials** 22:1
126:6,8,9,10,12
**matter** 20:6 73:8
133:15,16,18
**matters** 33:13
**MATTHEWS** 2:4
**ma'am** 42:6
**McCUTCHEON**
2:4
**McGOFFIN** 2:14
**mean** 12:10,23 33:5
38:15 47:5 62:15
73:21 79:1 89:18
109:4 124:20
**meaning** 8:4,8,13
**meanings** 13:11
**means** 12:1 34:22
35:2 56:13 59:19



62:1 65:14 73:10
91:24 110:13
120:6 130:5
**measure** 31:19
**measured** 27:1
85:6
**measurement** 30:4
**measures** 28:10
**measuring** 52:5
**mechanical** 32:24
33:1 47:21
**mechanics** 126:6,8
126:9
**meet** 19:18,20
**meetings** 19:15
24:18 25:18
**member** 111:6
**members** 110:1
114:9
**memos** 19:7
**met** 86:3
**method** 95:12
132:11 133:7
**methods** 41:22
**MICHAEL** 1:8
**middle** 123:7,12
**mill** 43:13
**milling** 43:11
**mind** 117:7
**mine** 106:3
**minute** 16:3 29:24
46:11 76:22 104:8
107:3
**misrepresent** 130:4
**missing** 50:4
**miss-view** 64:20
**mode** 63:4,4
**Molbert** 1:16 4:7
132:2 133:4,21
**mold** 38:24,25 39:2
**moment** 51:8,9,9
51:10,15,16,17,20
51:23 52:2,16,20
52:23,25 53:2,12
56:8 58:11 59:23
62:2,3,7,13 66:19

82:1,3,5 125:16
**moments** 51:7
**mooring** 29:4,5,10
29:11,15,18,19
30:1,6,16,19
**morning** 16:17,22
17:13 18:12,23,25
**motion** 56:19 69:8
**motions** 13:18,19
13:21 15:3,4,6,10
54:1
**mounted** 11:25
12:10 31:14,15
92:10,22,24 93:10
97:4,4,5,25 99:4
101:13,14,21
102:14 103:18,24
104:2 122:16,17
122:17,23,24
123:5,9,10,15
124:25 125:1
**move** 37:16 49:21
56:2 57:16 61:6
65:15 93:18 94:6
94:25 95:8 99:24
102:8 105:24
106:10,16 110:23
125:5,8,11,12
127:3 129:24
**moved** 61:7 92:12
92:12 97:7 99:7
**movement** 29:12
**moves** 65:15,20
99:6 106:18,22
124:13
**moving** 56:1 62:1
92:11,16 94:24
97:5 107:15
**mowing** 43:18
**multiple** 11:20 46:2
116:20
**multi-vehicle** 37:18
**M.S** 32:25

**N**

**N** 4:1

**name** 24:2 88:9
**names** 132:15
**nature** 114:19
**near** 16:16 83:9
**necessarily** 48:21
85:3 87:4 129:21
**need** 8:7 10:18
21:23 34:16 35:6
37:16 46:16 47:12
53:7 95:6
**needed** 36:15 41:21
42:23 63:10
**needs** 34:7
**new** 24:10 33:22
42:25 45:19 46:6
**news** 48:17
**nine** 40:8 54:4
79:15
**NIS** 45:11,15
**non** 41:7 110:12
121:22 127:25
128:15 129:2
**non-destructive**
40:23 41:16,22
95:3 112:19 114:6
114:13,17,18,22
121:22,25 127:21
127:23 128:2,4,11
128:17,20 129:5,8
**non-destructively**
117:17 118:9
121:16
**non-infringement**
64:13
**normally** 87:10
**NOS** 18:8
**note** 21:1
**notes** 19:7,15
**notice** 3:13 4:9
15:20,25 16:1
18:7,10
**noticed** 126:5
**number** 18:1 21:24
22:4,6,9 24:2
42:22 45:1 63:21
68:14 70:17,23

73:21 109:22
133:22
**numbered** 76:23
**numbers** 70:4

**O**

**O** 4:1
**oath** 133:5
**object** 64:4 73:16
74:1,21 75:1,1
85:17 93:2 98:4
103:8 117:12
118:4,11,20
119:12,21 121:18
122:4 123:21
124:5,18
**Objection** 108:23
**objections** 4:17,21
120:2
**observations** 47:16
**obviously** 117:7
**occasions** 30:15
**occupies** 8:23
**occupy** 9:23
**occurred** 18:15
**occurs** 51:23
**offered** 4:22 6:25
7:10,11
**office** 2:10,15 16:25
21:4,5 24:20,23
24:25 33:22 42:12
**officer** 132:3 133:4
**offices** 1:16
**offshore** 26:14
27:16,20 32:14,19
38:11,16,17 46:2
**oh** 16:9 27:12 36:15
40:11,14 53:11
57:24 93:5 101:17
113:12 125:11
127:3
**oil** 27:9,11,11,12
38:8
**okay** 6:16 7:4,13,16
8:25 9:8,24 10:14
10:17 11:3,4,19

13:16 16:19 18:19
19:2,25 20:13
22:8 23:3 25:9
27:20 31:20 33:10
34:11 35:15 37:4
40:4,21 41:9
43:17 44:12 46:13
47:1,24 49:3
50:22 51:19 52:18
52:23,24 54:6,21
55:13,14,15 56:3
57:13 58:2,6,11
58:24,25 60:14,24
61:2,6,19 62:10
63:8,18,24,25
64:16,17 65:3,11
66:5,24 67:15,19
67:21 68:1,5 69:5
69:23 70:5 72:2,8
72:22 74:7 77:14
78:25 79:16,17,20
80:5,14 81:1,6,14
82:25 84:1,17,23
85:5 86:5 88:17
90:3 91:8,9,11,22
92:8 95:10 96:17
97:19 98:15,21
100:9 101:20
102:5,13,17,24
103:6,17 105:7
106:8 108:2
110:22,23 111:15
112:5,8 114:5,21
119:1 120:19
123:17 128:11,13
128:24 130:3,22
**once** 46:5 67:24
107:14 121:20
**ones** 13:2 24:15
**ongoing** 40:13
**open** 4:24 7:8,9,11
**operated** 25:24
26:12
**operation** 118:16
**operations** 28:2
**operator** 108:3,9



121:4,11
**opinion** 6:23
**opinions** 6:6 47:17
  108:16,19 109:8
  133:14
**opposite** 80:22
**order** 12:20 104:12
**ordinary** 8:4,8,12
  25:13 119:4,7,17
  121:15
**oriented** 26:16
**original** 133:2,2
**originally** 45:11
  54:12
**outcome** 47:17
  133:18
**outline** 6:10,16,19
  6:20,24
**outreach** 45:10,15
  45:21
**outwardly** 55:25
  56:2 92:12,17
  94:25 97:6 99:7
  102:8 106:11,16
  106:18,22 124:13
  125:5,11,12
**overall** 57:9,11

---

**P**

**P** 4:1
**pad** 30:12,17,20,24
  31:3,7,7,16,17
  32:5,7,11,12
  50:13,24 51:3,13
  54:16,17,25 56:2
  56:3,10,12 59:21
  60:4,5,6 64:25
  66:2,6,7,11,21,24
  66:25 67:14,15,21
  67:23,25 71:4,5,6
  78:23 79:1,2,5,10
  79:17,17,25 80:5
  80:9,10 82:8,8,10
  84:19 85:2,3,5
  87:3 88:22 89:3,9
  89:10,22 93:24,25

94:18 95:1,16,20
95:22 96:1 101:3
101:8 102:9
106:11,19,23,24
106:25 107:1,11
107:12,14 112:23
113:6 114:10
120:24 121:2,8,12
121:16,25 124:13
125:6,7,12,25
126:15,17
**pads** 31:10
**page** 3:23 13:23
  18:6,10 19:3
  33:15,18,24 35:15
  36:12,13,13 38:23
  39:6,7,7 40:8,13
  42:3 47:3,6,7
  49:24,25 52:2
  54:5,20 55:23
  76:23,25 78:16
  79:15 82:14 84:2
  84:4 86:21 95:8
  99:13,19 100:1,18
  101:16,18 106:5,6
  109:17,19 114:24
  117:10,18 120:20
  122:13 123:7,8,11
  123:12 124:10,11
  124:24 132:1
  133:3
**pages** 122:10 133:7
**paper** 21:2 33:22
  68:9
**paragraph** 54:4,19
  115:1,2 121:7,14
**parallel** 57:16 58:3
  58:4,5,8,13,22,25
  59:1 62:17,18,19
**parking** 37:5,7,11
**part** 4:22 9:3 29:15
  30:8 41:4 43:24
  63:8 74:12,18
  75:10,12,14,15,24
  76:6,14 77:13
  81:13 93:21 110:9

110:11 111:8
115:15 118:15
**particular** 34:18
  51:15 71:2 120:9
**parties** 4:4,12,17
  8:6,11 12:9 42:13
  129:25 130:4
  133:17
**parts** 121:5
**party** 20:2,14 32:12
  133:15,16
**patent** 3:16 7:20
  8:3 10:2 12:23,25
  13:9,12,13 14:3,4
  14:5 24:20 39:8,9
  39:21 44:25 49:9
  49:12,13,16 50:6
  54:8,22 55:18
  57:23 67:4 82:19
  83:20 84:6 95:8
  96:8 100:19 105:5
  108:14 109:13,14
  109:16 110:14,17
  110:17 111:23
  112:8 113:2,7,9
  113:11,14,19
  114:3,6,12,14,19
  115:7,10,13,15,19
  115:20,23,24
  117:6,9,19,20
  119:16 120:15
**patentable** 39:15
  39:15
**patented** 39:14
**patents** 6:22 7:3
  8:16 9:1 23:8 24:1
  24:8 39:13 50:10
  53:18 55:8 62:25
  127:20,22
**pauses** 132:10
**Pedestrian** 37:14
**pen** 64:22
**people** 30:16 31:4
  39:1 47:25 48:3
  48:15,21 51:12
**percent** 43:4 56:14

56:19,24 57:1
59:12 61:10,12
**perform** 107:4
  127:25 128:1
**performing** 118:16
**performs** 108:5
**permanent** 94:4
**permanently** 94:18
  112:23 113:6
**permitting** 121:11
**perpendicular**
  56:22,25 57:4,14
  57:15 58:24,24
  59:12,13 63:11
**person** 22:18 25:12
  108:19 109:8
  114:2 117:16
  119:4,7,17 121:15
  133:12
**personal** 133:8
**phonetic** 132:17
**PHOTOGRAPH**
  3:17
**photographs** 22:19
  22:20
**photos** 22:11 23:1
**phrase** 11:25
  117:15 132:16
**phrases** 132:13
**physically** 7:13
**physics** 62:16 63:2
**pick** 71:25 72:6
  76:19 79:22 90:11
  90:12 93:12,14,16
  93:17
**picked** 77:1 81:14
**picking** 64:19
**picks** 64:17
**picture** 57:13 68:15
  68:21 76:21 77:10
  90:22 99:24
**piece** 7:8 8:15,17
  8:17,20,20 9:6,18
  9:18,20,20 10:10
  10:12,15,18,20,21
  10:25 11:9,10,11

11:13 21:2 58:19
72:9,12,17,18
73:14,19,23 74:2
74:6 75:5 76:3
77:2 80:9 85:19
90:24 109:20,21
112:3
**pieces** 9:25 10:8,9
  11:8,20 12:2,3
  58:3 62:19 68:3
  71:21 78:3 85:8
  85:13 90:24 96:5
  96:12,13,24
  111:16,18,19,21
**pilot** 27:5
**pinned** 83:11,22
  89:20 105:17,18
  105:20 106:2,3
  129:17,20,21
  130:12,13,14
**pins** 105:22,24
  111:1 112:21
  113:1,4,20 114:1
**piston** 29:2,3,16,17
  29:17 56:2 67:16
  76:10,15 92:11,16
  92:20 94:25 97:6
  99:6 102:8 106:10
  106:16,18,22
  107:15 124:13
  125:5
**pistons** 77:7 110:22
**pivot** 71:18,20
**pivotal** 72:24
**place** 6:10 28:19
  29:10 31:17 50:20
  77:25 85:4
**placed** 51:24 87:23
**places** 86:18
**placing** 65:4
**plaintiff** 2:3,7 4:8
  5:13 6:25 7:21
  48:12
**plan** 21:17
**plane** 61:7,25,25
  67:12



**planes** 53:16
**plate** 51:13 70:11
  70:13 71:18,20
  72:20,22,24,25
  73:3,20,24 74:15
  74:15,16,18 75:4
  75:13,13,17,23
  86:7 89:8 91:14
**plates** 51:18 70:15
  77:4 83:9,11
  85:11,13 111:1
  112:21 113:1,21
  114:1
**platforms** 26:25
**please** 33:19 39:6
  40:13 42:3 47:3,6
  48:11 54:19 69:7
  79:3 82:15
**pneumatic** 28:3
  30:5
**point** 5:20 21:15
  36:13 53:2 62:3
  65:15,15,20 81:23
  101:19 113:12
**points** 37:4 38:23
  39:7 96:2
**position** 18:11,14
  18:14 64:13 78:12
  102:16 103:20
  113:24
**positioned** 26:16,19
**possibly** 24:7
**POST** 2:10,15
**pounds** 121:2
**power** 36:5
**PPLC** 2:4
**pre** 41:12
**prefer** 43:7
**preferred** 62:21
**prepare** 19:21,23
**prepared** 133:7,10
**preponderance**
  39:25
**present** 2:18 5:14
  5:19
**president** 42:7

**press** 65:14
**pressure** 26:20,21
  27:6,22
**pressures** 27:5
**pressurized** 99:11
**pretested** 30:8
**pretty** 82:6
**previous** 45:5
  63:14
**pre-load** 128:25
**primarily** 37:25
**primary** 38:5
**prior** 23:8,11,17,22
  24:12,14,23 25:6
  25:9 114:22
**privilege** 75:2
**probably** 33:14
  43:4 68:18 79:13
  97:8
**problem** 42:24 44:6
  46:5
**problems** 39:3 43:1
  43:19,20
**procedure** 4:11
  121:11 132:5,6
  133:13
**procedures** 128:2
**proceeding** 132:9
  132:12
**process** 39:5 41:15
  73:9 84:19
**processes** 45:23,24
**produce** 15:19 19:5
  21:15 44:13,14
  58:8,9 59:1,3,10
  59:11,22 61:17
  62:16 65:6,8 66:8
  84:24 97:4 116:20
  122:16
**produced** 16:23
  23:20,23 42:22
  52:23 57:18 59:4
**produces** 80:7
  107:22
**producing** 21:17
  66:12 81:2,2,3

  107:22
**product** 39:13
  128:7,9
**Productivity** 45:7
  45:25
**products** 37:2 38:7
  38:8 41:24 42:23
  43:14,14
**professional** 33:24
  34:14,24 36:23
  38:22
**program** 45:11,15
  45:22
**programs** 42:25
**prohibited** 133:14
**prohibition** 133:13
**project** 36:17
**projects** 35:22
  36:25 43:18
**proof** 39:18
**proper** 132:11
**proposition** 42:14
**protected** 121:5
**Protection** 39:8,9
**prove** 39:21 40:4
**provide** 24:10,16
  100:24
**provided** 6:23 15:3
  35:24 95:19
  108:21 109:13
**provides** 27:23
  76:4
**providing** 35:12
  42:17 95:15 96:4
  97:2 99:10 101:2
  111:2 122:14
**provisions** 4:9
**pull** 17:16 58:14
  60:4 81:18,19
  117:9 121:9
  126:22 127:5
**pulled** 121:3
**pulling** 52:6 56:19
  59:12 60:6 79:9
  80:9 81:1,7
**pullover** 81:22

**pulls** 27:16
**pure** 55:19 62:11
**purpose** 51:2 75:8
  76:16 88:24 111:6
  120:24
**purposes** 4:8 69:21
**pursuant** 1:15 4:9
**pushing** 52:10,10
**put** 16:23 29:22
  31:9,22 47:25
  50:20 51:14,14,15
  52:5,6 55:10,13
  55:15 60:10 61:2
  63:6,21 67:8,8
  73:7 75:13 78:1
  81:9,9 91:9 93:13
  93:14 99:25
**putting** 31:6,6 32:5
  74:8 80:4 90:9
**p.m** 1:19 131:6

———————
**Q**
**qualifier** 55:10
  82:8
**qualifiers** 53:20
**quality** 40:15 41:3
  41:10 45:20
**quarreling** 21:19
**question** 4:18 8:10
  9:17 10:24 14:24
  17:2,6 23:5,6 41:5
  53:11 73:17 74:1
  74:21 89:1 114:11
  118:21 119:2
  130:9,10,11,18
**questions** 4:16
  34:11 117:1
  127:17,24 128:6
  128:18 129:3,9,11
  130:7,8,22
**quick** 46:15
**quote** 113:7

———————
**R**
**raise** 76:9
**raised** 24:15

**RANDALL** 1:5 2:3
  2:7
**Randy** 2:20 5:13,15
**rate** 47:9
**rates** 27:7,8
**reach** 78:11
**reached** 123:23,25
**read** 12:25 13:9
  16:22 20:23 22:9
  117:9 118:6
  120:20 130:1
**reading** 4:14 54:7
  84:21 98:12,20
  113:9,10 126:5
**reads** 54:23 55:21
  98:15 122:14
**ready** 69:5
**real** 37:22 44:5
  63:3
**really** 28:24 72:4
  111:25
**reason** 50:17 57:13
  58:4 73:4 78:13
  79:16 86:2
**reasonable** 40:7
**reasonably** 112:22
  113:6
**reasons** 90:8
**REBECCA** 1:6
**recall** 15:4,7,10,13
  15:14,15,16,17
  36:18 39:19 54:1
  85:5 111:9
**receive** 16:7,15
  18:12,23
**received** 14:24
  16:11,12,13
**receives** 107:17
**recognize** 96:6
  109:11
**reconstruction**
  37:19,23,24 38:1
  38:4,6
**record** 5:7 17:24
  46:10,19,24 57:19
  68:9 100:11,12,14



104:16,21,22,25
120:21 131:5
132:7
**recordings** 19:7
**records** 25:15,17
**recovered** 28:24
**red** 64:22 79:25
81:22
**redirected** 54:10
**reduction** 4:15
**reexamination** 14:4
14:5,6 24:20 54:9
54:24
**refer** 49:10 120:15
**reference** 13:20
114:24 132:16
**referenced** 34:3
**references** 13:24
14:16,21 23:7
24:12 108:21
109:9
**referencing** 33:20
**referring** 14:19
23:3 76:1
**reflecting** 19:8 20:1
**refresher** 34:17
**refuse** 92:4
**refusing** 92:5
**regard** 38:3 39:16
109:11 120:14
123:14
**regarding** 129:11
**regards** 108:13
**reinforced** 87:11
**reinforcement**
86:15 87:9
**reinforcing** 86:16
**rejected** 115:18,24
**related** 20:14 35:13
36:10 100:19
133:17
**relating** 20:2,6
**relation** 53:25
**relationship** 133:15
133:16
**relationships**

133:13
**relative** 9:1 118:13
**releaseably** 94:17
**released** 121:9
**relied** 13:25 14:13
14:25 20:18 22:21
24:24 25:6 115:15
**rely** 14:15 20:21
22:23 23:10
115:11
**relying** 128:5
**remain** 21:13
**remaining** 78:2
**remember** 45:1
90:14 130:18
**repeat** 106:21
**replace** 114:1
**replaced** 113:23
**replacement** 11:24
**replacing** 87:24
**replied** 22:24
**report** 3:11 6:4
13:15,17,20,23
14:8,9 18:4 19:23
20:2 22:25 23:1
24:10,16 25:4
33:17 44:8 47:3,4
47:6 49:4 50:1
55:22,24 82:20
84:2,4 100:18
106:6 108:13,17
108:24 109:3,12
113:15 114:24
115:16 122:10
**reported** 133:7
**reporter** 1:16 4:8
17:22 23:4 68:24
108:25 132:2
133:4
**reporter's** 3:23,25
132:1,12
**reporting** 133:7,15
**represent** 5:10,12
5:18
**representative** 5:22
19:16

**represented** 60:19
**representing** 5:8
**request** 16:7 17:8
19:6 24:19
**requested** 3:19
23:15,16
**require** 53:3
**required** 96:7
121:1 133:2,10
**research** 21:25
**reserve** 4:17,20
**reservoir** 27:13,14
28:9,22,23
**resistance** 28:4,5
30:5 31:19 111:2
**resistant** 28:15,19
**respect** 89:21
**respectively** 92:13
97:7 99:8
**response** 15:23
28:6 79:21 98:17
**responsible** 41:20
**responsive** 16:20
17:7 19:12
**responsiveness**
4:19
**rest** 121:21 128:12
**restricted** 111:13
**result** 92:7
**resume** 15:21 41:25
47:4
**retrieves** 29:11,13
29:14
**reversed** 121:11
**review** 12:16,19
13:15 14:15 18:25
21:16 23:17 39:9
39:20 50:18
105:19
**reviewed** 13:21
14:13 24:19 64:13
83:13 110:12
112:18
**re-exam** 57:25
**RE-EXAMINAT...**
3:8 127:18

**rig** 26:22 27:17,20
36:11 46:3
**right** 4:20 6:1,7
13:8,20 17:10
18:17,21,25 19:1
21:9 22:6 23:2
25:8 30:21 31:22
34:8,23 37:6 39:6
39:11 44:15 46:3
48:25 49:11 52:16
55:5 56:3 59:3,15
60:7,22 61:15
62:1,21 64:14
65:17,22 66:3,5
66:14 67:23 69:10
69:19 70:24 71:1
71:15,17,18 72:3
73:1,12,13 75:25
76:2,11,13,24
77:3,19,20,24
79:5,18,22,24
80:1,3,13 81:19
82:10,12,14 86:1
86:23,25 87:22
88:10,11,23 90:21
91:12 92:1,18,19
93:19 94:11 96:20
97:20 99:2,16
102:18 105:6
106:6 108:7,15
109:15,17 112:11
113:9 115:9
119:19 121:7
122:2 123:16
124:1 125:7,7,18
128:23 129:7
130:16 131:2
**rights** 4:23
**right-hand** 71:4
**rigidity** 87:16,17,19
87:19 90:19
**rigs** 26:16
**Ristow** 109:14,24
110:17,21 111:7
113:2,14,19 114:3
114:6,12,19 115:7

117:6,19,21
127:20
**road** 36:6
**rod** 29:18
**rope** 29:18,19
**ropes** 29:11
**round** 51:11,18
**Roy** 1:17 2:9
**Rule** 132:4
**rules** 132:4 133:11
133:13
**run** 31:13 111:13
128:25 129:1
**running** 70:22
**runs** 71:6 79:18
**Ryan** 2:14 5:20
**R.S** 133:6

――――――――
### S

**S** 4:1
**sacrificial** 122:8
**safety** 27:21
**Salman** 115:7
**Sam** 5:15
**sample** 128:10,12
128:13,20,22
**samples** 126:21
128:9
**SAMUEL** 2:20
**sat** 116:1
**saw** 16:17 130:12
**saying** 25:2 52:17
55:17 57:5 59:15
62:18 63:7 68:11
72:8 77:14 90:18
102:17 111:19
112:4 129:22
**says** 54:22 56:8,9
56:12,16,17 60:5
60:15 61:8 62:4,7
95:15 98:6 103:11
111:19 114:16
118:15 119:14
123:8
**scale** 28:24
**Scarborough** 1:5



2:3,7,20 5:13,16
53:18 55:7 114:3
115:20
**Scarborough's**
49:17 54:8
**schematics** 22:15
**scheme** 73:8
**scope** 8:4,12 54:9
**seal** 133:3
**searches** 25:10
**second** 95:15 97:3
97:13,23 98:16
99:2,10 102:12
104:9,16 106:5
108:13 122:16
**secondary** 84:20
**section** 7:8,9 33:23
47:8 49:6 78:6
124:23
**sections** 127:19
**secure** 112:22
113:4,5
**secured** 104:7
129:17,20,21,23
130:5
**see** 36:12 40:15,19
44:7 51:24 56:15
71:1 74:4 75:15
80:13 81:7 99:17
107:20 111:1,5
113:12,12 115:3
117:25 119:9
**seeing** 15:10
**seek** 8:11
**seen** 15:14,16 22:17
22:19 24:5 105:20
115:6
**select** 41:14
**self-correcting**
27:25
**sell** 36:6
**sense** 62:2
**senses** 27:23,24
**sensor** 64:17 82:23
94:7,15
**sensors** 26:21

**sentence** 120:21,22
**sentences** 120:11
**separate** 87:10
110:5
**separated** 89:13
**September** 37:5
39:10
**series** 31:13 43:18
**served** 16:8,9,10
**service** 45:17
**services** 1:22 47:15
133:12
**set** 15:11 31:9
67:21 70:7,7
77:23 93:17 97:16
133:6
**setup** 64:9 88:14
91:25 92:2 111:10
**seven** 99:14 100:18
101:16 106:5,6
122:11 123:7,11
123:12 124:11,24
**shackle** 71:3,6
**shear** 51:7 52:12,20
53:12 56:7 60:9
61:16,17,19,22
62:3,8,12 66:18
67:1,13 80:15,18
80:20,22 81:4,8
81:10,13,22 82:3
82:5,13,13 116:8
116:15 125:16
**sheared** 66:15,16
**sheet** 31:14,15
**shells** 45:13
**ship** 30:25 121:3,13
**ships** 26:14,24
32:21
**shoe** 28:10
**shore** 38:11
**shot** 69:19
**show** 39:22 57:12
65:2 102:11
122:19
**showed** 125:21
**showing** 60:24

**shown** 77:10
**shows** 76:25
**side** 8:15,17,20,20
8:24 9:4,5,6,15,17
9:19,20,21,21,22
9:23,25 10:8,11
10:13,14,21 11:1
11:10 43:23,24
55:14 58:3 62:19
71:5,21 72:2,9,12
72:16,17 73:14,23
74:2 75:6,13 77:4
80:13 81:6 84:12
85:8,13 90:24
93:17 99:25 100:4
111:16,18,19,21
112:3
**sides** 7:7,7 48:19
57:14 92:23 93:7
**signature** 133:2
**significantly**
102:20
**signing** 4:14
**similar** 9:17 44:1
111:3
**similarly** 30:1
**simple** 28:25 95:24
**simply** 8:21 39:4
62:25 70:7 72:18
73:10 74:5 76:4
120:12
**single** 60:1 77:6,12
77:15,19 87:14,15
88:13 89:12,15,20
91:20 92:2 93:24
93:25
**singling** 91:16
**sir** 101:10 103:16
**sit** 23:14 38:19 48:9
83:10,11,24
**sits** 9:2,2,3
**sitting** 24:25 60:3
110:24
**situation** 89:19
91:13
**six** 22:4,9 39:7,8

68:25 95:9 100:18
120:15,20,23
122:10,13,21,23
**size** 120:24
**sketches** 22:14
**skill** 25:13 108:20
113:25 119:4,7,17
121:15
**skilled** 117:16
**slidably** 105:8,10
105:13 123:15,19
**slides** 82:24 83:7
**sliding** 94:15
123:25
**slip** 28:4,5,11,15,18
30:5
**slow** 68:8
**small** 31:9 61:18
**smaller** 86:8
**SMATCO** 46:1,4
**SMILEY** 2:19
**socket** 82:22,25
**solar** 35:16,20,24
36:4,5
**solely** 125:23,25
**solve** 43:1 44:6 46:5
**somebody** 42:23
113:25
**sooner** 78:12
**sorry** 14:23 26:5
33:5,16 57:15
68:10 76:23 80:21
83:8 86:17 98:12
102:5
**sounds** 111:23
**source** 20:17
**space** 9:23
**specialized** 38:20
**specific** 26:11
32:25 33:6 40:21
41:6 50:24 91:16
91:16
**specifically** 118:24
**specifics** 45:1
**spent** 25:21
**spinoff** 85:4

**sponsored** 45:14
**spontaneous** 132:8
**springs** 29:8
**squares** 69:23
**stages** 31:4
**Stagg** 2:13,14 3:7
5:17,18 14:11,25
15:2 17:1,5 23:19
24:7,15 25:11,18
44:19 46:14 49:1
64:3 68:17 73:15
73:25 74:20 85:16
93:1 98:3 103:7
104:14 108:22
109:2 113:13
117:2,3,5,13
118:5,14,22 119:3
119:13 120:3,8
121:24 122:9,22
123:24 124:6,19
127:13,19 130:24
**Stagg's** 16:25 129:3
130:7
**standard** 40:1,5
**start** 86:22 107:14
**started** 41:25 78:13
**starting** 117:9
**starts** 33:24
**state** 5:9 132:3,7
133:4
**statement** 49:15
54:7,13 92:19
**statements** 6:6
**STATES** 1:1
**static** 63:3
**statics** 63:4
**stationed** 26:23
**statute** 133:10
**statutes** 4:10
**steel** 36:10,17,20
**Stenomask** 133:7
**step** 108:2,6
**Stephen** 1:12,13
3:11,20 4:6 5:3,23
133:5
**Steve** 130:25



Stevens 2:8 5:14
  17:25 46:21 60:18
  60:23 69:13
stickiest 33:23
stiff 7:14 31:25
STIPULATED 4:3
stipulation 1:15 3:3
stop 46:13
straight 42:11
  57:17,17
straightforward
  63:3
strain 31:6,6,11,12
stranding 46:3
Street 1:18 2:9
strength 84:10
  95:12
stresses 116:9
  126:11
strictly 79:14
structural 33:1
  43:24 51:4 74:24
  75:5 79:18 87:9
  88:4 108:4 112:21
structurally 87:11
structure 7:14 9:2
  10:25 11:3,5,13
  11:14,17,19,20,23
  26:22 36:10,20
  50:19 52:10 55:2
  71:25 72:2 74:18
  74:22 75:15,16,17
  75:19,19,20 76:7
  76:15 77:15,16
  78:3 79:22 93:10
  94:2,17,20,22
  95:17,21 96:19,21
  96:25 101:3,5
  102:2,3,6,10
  103:2 104:5
  106:12,20 110:6
  110:10,11,24
  111:11 112:25
  113:4
structures 32:14,19
  32:20

stupid 48:16
subject 33:13 51:11
submitted 13:15
substantially 62:18
substantive 47:7
substructure 36:11
sufficient 118:18
suggest 117:15
  118:8 121:15
suggested 120:10
suggesting 119:16
Suite 1:18 2:5,9
summary 15:6
  49:25 69:8 84:7
supervision 127:10
  133:8
supply 38:19
support 27:23 88:4
  88:19 92:20 119:6
  119:6
supports 63:9
sure 28:15 42:2
  57:19 63:10 71:11
  82:16 102:19
  104:18 117:18
  124:22
surrounding 121:6
swearing 4:15
sworn 5:24 132:6
  133:6
Sylvia 1:15 4:7
  132:2 133:4,21
synonymous 96:19
  123:19
synopsis 40:3
  109:13
system 29:10,10,14
  29:15 30:3,9,11
  30:16,19 31:18,23
  90:20
systems 26:10
  27:21 29:4,4,6,25
  31:24 32:25

———————
T

T 4:1,1

tab 33:17 59:20
take 11:18 21:20
  31:14 33:11 34:15
  35:7 37:9 46:15
  46:16 47:24 48:6
  48:19,22 59:24
  78:3 91:8,10 92:6
  95:6,23 99:22
  100:9 112:20
  113:11 128:25
taken 1:14 4:7,23
  9:1 22:11 27:25
  34:5,24 35:18
  132:7 133:5
talk 23:21 48:10
talked 21:25 23:19
  24:7
talking 11:5,6 37:8
  57:20 66:23,24
  76:8 78:23 98:19
  101:7,9,23 103:15
  111:10 114:8
  116:8,14 118:1,16
  124:23 125:3
talkovers 132:11
talks 113:3 117:15
tangible 20:17
tanks 38:18
tape 5:2
task 47:24
taught 40:17 41:1,2
  41:9,10,10,11
  126:6 127:8
technical 46:11
technician 108:3,8
Technologies 35:17
technology 112:9
tell 6:1 16:18 32:22
  48:1,3,11,14
  64:15 69:9 88:9
  88:15 98:22 118:7
  128:13
telling 91:19 113:3
  128:15
tensile 50:15,16,23
  51:7 52:5,19

55:20 58:10,17
  59:1,2,3,11,14,16
  62:5,7,12,16 63:6
  64:2,9 66:18
  107:22,24 116:8
  126:19,20
tension 28:13,16,17
  28:18,19 29:23
  52:12 53:12,13,14
  55:4,10,11,14,17
  55:17 56:2,3,6,8,9
  56:10,12,14,17,18
  57:2,3,5,8,18 58:6
  58:7,11 62:4 65:6
  65:8 66:8,14 82:5
  87:2 95:1 102:9
  106:11,18,22,24
  107:5,7,8,12,17
  108:1 116:15
  124:13 125:5,7,13
  125:16,22,23,25
  126:22 127:4,5,5
tensioned 29:16
  107:1,15
tensioning 29:3
term 8:7 12:10
  110:12
terms 12:22 13:11
  26:15 27:23 28:24
  36:16 39:13 50:18
  50:19 62:19 76:17
  84:25 105:25
  110:13 112:5
  119:1 124:22
  128:11
test 30:24 31:2,9,23
  50:15,16,23,23
  51:3 57:3 60:5,7,8
  60:9 67:23 73:7
  84:5,13,16,22
  85:1 89:3,11,16
  91:16,22,24 92:2
  92:14 94:13 95:2
  107:1,5 108:3
  109:19,21 111:7
  111:14 112:11,15

112:25 114:16
  116:21 118:16
  120:6 121:8,12
  126:18,22,22
  128:9,12,16,19,20
  129:1
tested 30:12,13,23
  31:5 32:11 87:20
  96:1 112:22 113:5
  114:9 121:4,16
  126:14
tester 28:4,8,15
testers 126:19
  127:5
testified 124:12
  125:15
testify 5:24 133:6
testimony 4:23
  35:12,24 37:10
  42:18 44:10 83:13
  116:1 132:6 133:5
  133:7
testing 25:24 26:12
  26:15,18 27:20
  28:1 30:6,14,20
  31:5,7,16 40:23
  41:3,8,15,16,16
  45:20,24 50:13,14
  50:15 51:3,4,6,6
  53:19 54:24 55:8
  56:9,11 64:23,23
  64:24 73:11 84:10
  84:20,21 86:9,9
  86:11 87:17 88:22
  90:7,8,9,14,22
  91:23 95:12 96:22
  106:13 107:19,20
  108:2,8 110:11
  111:3,5 112:14,18
  114:7,8,13,22
  117:16 118:9
  126:17 127:2,21
  127:23 128:1,2,5
  128:11,17 129:6,8
tests 50:24 67:6,25
  84:18 85:3 91:5



107:24 109:24,25
110:1,3,5,9,17
126:20,21
**TEXAS** 2:5
**text** 115:1
**thank** 101:17
130:25
theoretically
126:14
**thereof** 4:14,22
**thickness** 9:9,11
**thing** 9:10 20:17
63:9 64:20 72:7
78:4 80:12 99:25
100:21 115:22
119:24
**things** 13:25 14:3
14:12,16 19:5
22:10 29:5 30:3
34:9,12,13 40:12
40:17 43:25 45:21
73:8 101:19
**think** 6:9 7:9,12
8:15 11:12,19,25
12:8 13:18 17:13
23:4,19,23 24:2
25:2 29:21 31:21
33:14 39:19 40:7
44:8,24 45:2 52:1
52:1,2 68:12
69:17 70:23 71:9
72:18 79:15 82:6
82:6 86:2,21 89:4
95:6 96:17 97:7
100:21 105:4
109:22,23 116:13
117:2 123:14
128:15
**thinking** 124:24
**third** 19:3 20:2,14
32:11 34:21 36:9
36:13 42:12
101:16 115:5
**thought** 20:15
44:24 64:21 76:22
116:4,11 132:10

**three** 47:9 49:25
53:15,15 54:20
63:22 67:11
**throw** 20:25
**throws** 29:18
**tie** 30:12 31:18,24
71:18 88:15,17,18
91:8
**tied** 11:20 13:19
66:1 80:13 83:1
86:14,20 87:7,15
88:3,5,20 90:1
91:3 94:8 103:23
126:16
**ties** 29:18 71:6
**tie-up** 29:11
**time** 4:19,21 5:8
16:17,21,23 21:18
31:2 46:18,23
50:7 56:17 59:5
72:8 100:14
104:20,24 106:21
117:7 131:4
**times** 34:5 51:12
90:11 116:17
**today** 5:20 15:8,18
23:16
**told** 18:20 83:21
96:18
**tools** 25:24 26:4,5
**top** 7:7,7 9:10,11,13
9:14,16,25 10:24
11:1,10 15:5
70:20,22,25 75:6
77:4 81:6 82:17
83:4 85:8,19
89:20 90:23 92:23
92:25 93:7 94:2
94:12 98:2,8,9,9
98:10 103:2 104:6
104:11 105:3,15
105:21 106:2,25
109:21 110:24
111:3
**torque** 51:12,16,18
53:1

**tosses** 29:19
**toxic** 38:24,25 39:2
**Traffic** 37:14
**training** 40:22
**transcribed** 133:7
**transcript** 130:20
132:14 133:2,8,10
133:10
**transcription**
132:12
**transferring** 30:25
75:7
**transition** 74:6,7
75:22 76:3,4
**translated** 87:22
**translating** 87:21
**tried** 116:19
**true** 90:6 133:8
**truly** 7:15 60:8
**try** 68:16
**trying** 16:18 21:5
45:12 72:13 81:17
81:18,19 84:24
104:10 111:24
112:10
**tubes** 26:20
**turn** 19:3 31:15
39:6 47:3 54:4
59:23
**turned** 45:14 46:6
**TV** 65:21
**two** 5:2 7:22,23
8:16 18:6 33:12
34:2,4,4 39:7
43:18 44:4 47:3,7
54:5 56:16 57:14
58:3 59:17,22
61:3 62:19 64:10
65:9 66:12 68:5,6
69:21 86:8,12,13
86:15,17,24,24
91:8 92:15 96:5
96:12,13,24 97:15
97:18 98:6 117:10
117:19,22 118:6
126:13 128:7,8,19

**two-base** 88:13
**tying** 54:15 64:25
65:25 66:24 69:20
73:5 88:21
**types** 36:16,23
40:16 43:25 45:20
116:20
**typewriting** 4:16
**typically** 51:17,18
**typo** 115:10

───────────
**U**
───────────
**U** 4:1
**ugly** 48:2,3,13
**Uh-huh** 28:6 79:21
98:17
**ultimately** 103:5
**undergraduate**
41:1
**underneath** 7:14
111:12
**understand** 21:6,19
21:22 25:2 40:22
41:21 47:25 48:12
49:12,22 62:14
76:18 78:7,9,12
90:18 102:16,21
102:23 103:20
104:4 118:23
**understanding**
39:16 83:24 88:1
123:18 133:9
**understood** 36:7
**unifying** 89:2
**unison** 77:17
**united** 1:1 92:21
**uniting** 85:23 86:1
**units** 38:17
**university** 41:2
**unloaded** 44:5
**update** 40:18 47:12
**updated** 34:7
**upward** 56:19,20
64:8
**urged** 106:15
**urging** 102:7 106:9

125:4
**use** 26:3,18 28:9,13
31:2,20 36:17
57:21 68:14 73:20
74:15,15 91:20
92:2 95:22,22
103:10 115:6
120:12 122:7
128:9 129:7,16,16
130:17
**uses** 28:8,9,21 29:7
29:9,10 49:8
95:18
**Usually** 34:16
**utilized** 26:7
**U.S** 117:19

───────────
**V**
───────────
**valid** 133:2
**validity** 39:18
108:14,16
**valve** 110:18
**valves** 26:9
**varies** 27:3
**variety** 33:12,14
34:13 38:7 43:14
**various** 13:19
**vector** 66:12
**Vehicle** 37:14
**vehicular** 38:5
**verified** 132:15
**verify** 104:13
**versa** 49:18
**version** 70:3
**VERSUS** 1:6
**vertical** 50:21
60:10 61:11 66:8
**vessel** 27:21 30:25
36:18 38:18,18
**vessels** 32:21 38:20
**vice** 49:18
**video** 51:10
**VIDEOGRAPH...**
2:19 5:1,6 46:8,17
46:22 100:10,13
104:19,23 131:3



**videotaped** 1:12,13
4:4
**visual** 69:17

---

**W**

**W** 2:13
**Wait** 112:20
**waive** 4:12
**walkway** 28:11
**want** 12:3 22:9 25:3
28:8 34:11 48:10
48:14 50:21 51:12
53:1 57:7,17,19
58:5,6 59:25 60:5
60:8 61:6 62:4
63:6 65:3 66:25
66:25 67:20,20
71:11 72:1,7 73:6
77:15,22 78:11,18
79:10,10 86:22
91:15 98:22
102:19 104:12
111:14 112:7
113:15 117:18
119:5,18 120:17
130:1
**wanted** 16:2 36:4,7
36:17 39:2 63:22
102:25
**wants** 112:7
**wasn't** 16:5 32:17
**watch** 52:4,22 91:6
**way** 6:25 7:20 10:4
11:18 44:16 45:15
51:25 57:2,5 58:6
60:17 73:2,7 80:5
80:14,19 82:22
86:7 90:2 91:10
127:7 129:5
**ways** 112:1 128:7,8
128:19
**Webster** 6:15,16
**weekend** 15:21
16:4,5,12,15
18:20,22
**weld** 40:23 41:8,11

52:8,8 53:19
54:11,11,14,16,18
54:25,25 55:9,13
55:14,14 56:11,21
56:22,25 57:3,4,6
58:16 60:5,8,8,10
61:22 66:20,23
67:2,3,5,7,8,8
78:20,21 79:2,8
79:11,12,23,23
80:2,4,11,12
81:20 84:10,11,15
87:3 88:23 89:3
89:22 94:19 95:3
95:12,13,16,20
101:5 106:14
107:2,10,17,19,20
107:25 108:4,11
109:24 112:12,16
112:21,24,25
114:1,17
**welding** 41:9,13,15
43:24 45:24 46:6
**welds** 30:7,8,11,23
31:3 41:12,12,19
41:20,23 82:10
84:18 113:2,22,24
**went** 17:12 44:3
45:22 102:6 107:3
**weren't** 16:20
32:16
**WESTERN** 1:2
**we'll** 17:19,21 18:6
53:7 60:12 68:23
73:20 107:14
130:19
**we're** 5:7 38:7
46:18 47:1 49:9
50:25 52:1 60:13
60:24 61:4,5
64:20,23,23 69:19
79:23 86:21 90:14
96:11 103:15
117:18 124:22
**we've** 11:5 24:17
30:16 33:22 68:9

75:14 82:6 85:10
85:21 95:7,11
97:15 100:19
101:6,18,25
102:18
**wide** 34:13
**width** 8:18,19,21
9:9,11 10:16
11:15 72:19,20
**William** 2:13 5:18
**willing** 111:17
**winches** 38:16,16
38:19
**wind** 71:15 81:20
82:2,3
**wire** 31:14
**wires** 31:13
**wise** 111:24
**wish** 50:13
**withstood** 119:9
**witness** 4:15 5:4
37:20 43:3 47:20
48:19 53:10 60:21
61:1 63:17 64:5
69:4 70:19 73:18
74:3,23 75:3 93:3
98:5 113:16
118:12,25 119:21
120:5 121:19
122:6 123:22
131:1,6
**wondered** 40:12
**word** 11:3,12
103:10
**words** 59:24 89:5
119:16 121:25
124:21 129:17
132:13,14
**work** 7:3,4 25:18
25:18 26:3 28:7
30:1 36:3 42:13
43:21,22,23 50:11
61:4,9 69:21
79:13 91:12 93:24
93:25 127:10,11
**workbooks** 21:25

22:5
**worked** 25:11 26:7
35:22 36:15 37:1
37:3 42:21 46:4
**working** 61:4,5
67:10 71:4
**works** 77:16 93:23
**worry** 60:9
**wouldn't** 48:18
71:22 73:20 86:11
87:10 89:16
**Wright** 1:17 2:9
**wrote** 95:25
**www.MagnaLS.c...**
1:23

---

**X**

**X** 53:16 61:2 66:13
66:14 67:9 80:7
81:2,13,17,20,21

---

**Y**

**Y** 53:16 61:3,5
66:13,14 67:9
80:8 81:3,5,6,12
81:21,21,21
**yeah** 18:4 44:24
63:2 65:19 69:25
71:11,12 76:21,22
78:8 81:8 91:22
113:17 127:3
**year** 33:11
**years** 26:2 33:12
34:2,19,20 38:12
42:19,20 45:2

---

**Z**

**Z** 53:16 67:9

---

**$**

**$300.00** 47:9

---

**1**

**1** 3:11 18:1,5,8 25:4
25:7 33:16 47:2
50:6 54:7,10,22

55:23,25 61:21
82:20 84:2,6,9
96:7 106:6 109:19
118:1 120:16,18
**1-INTEGRICERT**
3:16
**1:10** 1:19
**1:12** 5:8
**10,000** 91:18
**100** 56:14,19,24
57:1 59:12
**11** 54:19 63:14
109:17,19
**110** 70:23,25 85:19
102:13
**117** 3:7
**120** 66:3 70:3
**127** 3:9
**13** 114:24
**130** 71:9,13 76:1
94:21
**132** 3:23 133:6
**133** 3:25
**14** 95:15 96:4,6
100:19
**1434** 133:13
**1434(b)** 132:5
**15** 38:12
**18** 3:12,13

---

**2**

**2** 3:2,13 13:23
17:21 18:7,8
61:21
**2:04** 46:18
**2:16** 46:23
**20** 38:12
**2000** 2:5
**2007** 39:10
**2009** 37:5
**2016** 1:19 18:11,16
133:19
**21** 3:20
**210** 73:21 74:16,17
85:13
**22** 13:23



**220** 2:15
**23rd** 1:19
**233-0300** 2:16
**233-3033** 2:11
**26003** 133:22
**28** 132:4
**285** 70:18 85:11

---
**3**
**3** 3:14 53:8,9 111:1
**3,879,991** 117:20
**3-D** 53:14 67:10,11
**3:27** 100:11
**3:40** 100:15
**3:51** 104:20
**3:52** 104:24
**30** 33:11,12 34:2,4
  34:5
**30th** 133:19
**322** 6:22 8:3 14:3
  50:6,10,12,12,18
  54:8,22 55:18,25
  57:22 84:6 95:5
  96:8 108:14
  110:13 111:4,23
  112:5,6,8,10
  114:14
**337** 2:11,16
**355-4200** 2:6
**3668** 2:10
**37:2554** 133:6

---
**4**
**4** 3:3,15 53:23 54:2
  120:16
**4:29** 131:4,6
**40** 90:12
**44** 3:21
**447** 6:22 8:3 14:4
  55:18 95:8 100:19
  108:14 110:13
**47** 120:16

---
**5**
**5** 3:6,16 63:13,16
  64:1,2 68:2 69:16

---

70:4 110:21
  120:16
**50,000** 121:2
**500** 1:18 2:9
**51308** 2:15
**53** 3:14 120:20,22
**54** 3:15
**55** 55:25
**556** 1:17 2:9
**569** 3:16 14:5 49:9
  50:11,15,16 51:1
  51:1 105:4
**57** 117:10 118:6
**570** 106:3

---
**6**
**6** 3:17 18:11 69:3
  69:16 70:16 76:25
  78:17 79:15 82:15
  86:5 90:23 94:3
  95:19 96:12,25
  97:17,17 99:17,19
  100:1 101:18,25
  109:22 110:24
  123:14 124:12
  125:8,10
**6th** 18:16
**6:12-CV-00396** 1:5
**60** 90:12
**624-6221** 1:23
**63** 3:16
**65** 118:24 119:14
**69** 3:17

---
**7**
**700** 2:5
**70502** 2:10
**70505** 2:16
**713** 2:6
**77057** 2:5

---
**8**
**866** 1:23
**89** 59:16,18 60:12
  60:13 61:6,10
**89-degree** 60:19

---
**9**
**90** 57:6
**95** 43:4



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE/OPELOUSAS DIVISION

| | | |
|---|---|---|
| RANDALL SCARBOROUGH | * | CIVIL ACTION NO.: 6:12-CV-00396 |
|     Plaintiff | * | |
| | * | |
| | * | |
| VERSUS | * | |
| | * | |
| | * | |
| INTEGRICERT, LLC | * | MAGISTRATE JUDGE |
|     Defendant | * | PATRICK J. HANNA |
| | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**EXPERT REPORT OF STEPHEN KILLINGSWORTH**
**ON INFRINGEMENT OF U.S. PATENT No. 6,848,322 & No. 7,284,447**
**March 10, 2016**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



Stephen A. Killingsworth
Design Analyst: Engineers & Consultant, LLC
P.O. Box 81519
Lafayette, Louisiana 70598
337.981.1002
killsak@design-analyst.com

Page 1 of 22



DEPOSITION EXHIBIT
KILLINGSWORTH
1

## Introduction

Mr. William W. Stagg with *Durio, McGoffin, Stagg & Ackermann,* on behalf of Defendant, IntegriCert, L.L.C., hereinafter called IntegriCert, has requested my engineering opinions regarding IntegriCert's potential infringement of Plaintiff, Randall L. Scarborough's U.S. Patent Nos. 6,848,322 and 7,284,447, hereinafter singularly called the '322 Patent and the '447 Patent or collectively called the '322 and '447 Patents.

The observations and opinions which follow are based on currently available data and are believed to be reasonable when taken in that context. However, acquisition of other information not currently available may result in revisions as necessary to reflect the impact of such information. I reserve the right to supplement this report after I have received and reviewed information which is developed through any source.

## Qualifications as a Witness

I am a registered professional mechanical engineer and have served as a mechanical engineer for over 40 years in a position of responsibility. My responsibilities have included structural and mechanical design of mechanical devices, machine designs, design and development of products and systems, and application of standards, specifications and regulations.

I have been recognized as an expert in State and Federal courts as a mechanical engineer with the above experience. A copy of my *curriculum vitae* is attached as Exhibit A.

I expect to testify as a mechanical engineer with expertise as described in the <u>Qualifications as a Witness</u> section of this report.

## Fees and Billing

Hourly rate is $300 per hour for all services. I have not submitted an invoice as of the time of this report. Compensation for my services is not contingent upon my evaluations, observations and/or opinions or the outcome of the litigation.

## Documents and References

'322 Patent and Reexamination Certificate, Exhibit B;
'447 Patent and Reexamination Certificate, Exhibit C;
U.S. 7,240,569 hereinafter called '569 Patent and Reexamination Certificate, Exhibit D;
Expert Report of Samuel P. Hawkins, including attachments and/or exhibits, Exhibit E; and
U.S. Patent Nos. 3,879,991 to Ristow et al. ("Ristow"), 4,736,633 to Duppong et al. ("Duppong"), 6,398,188 to Salman ("Salman"), 3,718,039 to Bacon ("Bacon"), and 5,548,997 to Bauer ("Bauer"), attached as Exhibits F, G, H, I, and J, respectively.

## Background

Plaintiff, Randall L. Scarborough, hereinafter called Scarborough, has two patents, the '322 Patent and the '447 Patent. Each patent is for an "Apparatus and Method for Testing Weld Integrity". The '322 Patent was issued on February 1, 2005 and '447 Patent was issued on October 23, 2007. The '322 Patent and '447 Patent discloses an apparatus relates to non-

destructive testing of weld integrity and strength in the attachment weld of pad eyes and other lifting lugs.

IntegriCert uses a device described in its patent, U.S. Patent No. 7,240,569, hereinafter called the IntegriCert device.  The IntegriCert device is for a "Load Test Apparatus for Shipping Containers".  The IntegriCert device was issued on July 10, 2007.  The IntegriCert device discloses an apparatus for load testing of structures that are lifted or suspended by one or more cables or chains, collectively referred to as "Shipping containers". The test apparatus applies a load to the lifting points of the containers, known as pad eyes, and simulates the application of loads present in the container when it is lifted or suspended.

On February 10, 2012, Scarborough filed a complaint for patent infringement accusing IntegriCert of infringing one or more claims of the '322 Patent and '447 Patent.

## Infringement Analysis of the IntegriCert Device
## Described in the '569 Patent in Light of the '322 Patent

In reviewing the '322 Patent, Claim 1 recites as an element "a framework including a base, top and side pieces." The framework including a base, top and side pieces is essential to the apparatus described in the '322 Patent as claimed.  Claim 1 states an intent to test the weld integrity of a pad eye by a tension load by moving a cylinder piston outwardly.  In order to load the pad eye in tension by an outwardly moving cylinder piston, the framework must be comprised of connectable components, i.e. the base, top and side pieces that form a symmetrical framework (frame).

The requirement of a symmetrical framework is described and reinforced in the embodiment depicted in Fig. 3 and Fig. 3a and in the '332 Patent at Col. 6, lines 21-27. "Preferably, the two footings **9** are substantially horizontally and symmetrically centered on each side of the pad eye **19**.  This said placement, of the two footings **9**, is assured through the substantially symmetric connection of the right and left cylinders **5** to the bridge plate **1**.  This said position insures that the testing apparatus will provide an approximately equal upward force on the pad eye **19**."



Figure 3                           Figure 3a

Since the purpose of the apparatus is to test the integrity of welds under a tensile load, the forces (load) and direction of the forces (loads) applied to the pad eye to create the testing load is critical in order to maintain the validity and accuracy of the test results. As an example, if the tensile forces (loads) created by the cylinders are not applied equally between the cylinders, the resultant force applied to the pad eye will create a combination of tensile, bending and/or shear forces instead of a pure tensile load. If the loads created by the cylinders produce other than a pure tensile load, the test results will not accurately reflect the true tensile force on the pad eye and will essentially be worthless in determining the maximum tensile load applied to the pad eye. Without the benefit of a framework with interconnected components, i.e. top (bridge plate), and a base joining the side pieces together completing the frame, there can be no satisfactory assurance that a pure tensile load is achieved with the device described in Claim 1.

The framework (frame) ensures that the connectable components, including the base, top (bridge plate), sides and cylinders are symmetrical to each other, which is essential to the function of the apparatus described in Claim 1 in the '322 Patent. Further, to ensure that the cylinders create and equal distributed loads, the cylinders must be attached at the top and bottom or base of the framework (frame). The framework (frame) limits the number of pad eyes that the apparatus can test at a time to one.

As shown in Figure 1 of the '569 Patent, the IntegriCert device does not require or use "a framework including a base, top and side pieces", the IntegriCert device or test apparatus simulates loads present in the container and the loads to the lifting points of the containers, known as pad eyes when it is lifted or suspended.



**Fig. 1**

Unlike the 'er322 Patent, the '569 Patent device does not include or use a framework (frame) to apply loads to the lifting points of the containers, known as pad eyes, and simulates the application of loads present in the container when it is lifted or suspended.  The '569 device utilizes independent cylinder assemblies.

| '322 Patent, Claim 1 | IntegriCert's  Load Test Apparatus |
|---|---|
| 1. An apparatus for testing the weld strength and integrity of an attachment weld, comprising: | A load test apparatus (100) that applies the test load to the container to simulate the loading conditions applied to the container when it is lifted or suspended. '569 Patent, Col. 1, lines 23-26 |
| a framework including a base, top, and side pieces; and | Apparatus (100) has two cylinder assemblies (120) each with a cylinder (250) with its own base plate (285) and  a top beam assembly (110). **There is no "base" uniting the cylinder assemblies (120) and the top assembly into a framework.  The '569 device utilizes independent cylinder assemblies.** |
| at least one fluid containing cylinder, mounted with the framework, for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively; | Apparatus (100) has two cylinder assemblies (120) each with a cylinder (250) for moving a piston inward and outwardly. **The cylinder piston independently support the beam assembly and not united with each other by a common base.  They are not "mounted" with a framework including a base, top, and sides.** |
| structure for releaseably or permanently attaching to a pad eye, lifting lug or other device joined by the attachment weld to another structure; | Apparatus (100) has two Pivotal Plate Assemblies 210 with Cable Assembly 130 for attachment to the pad eyes of a container to test them simultaneously. |
| whereby moving fluid into the cylinder causes the piston to move outwardly to tension the pad eye, lifting lug or other device to test the integrity of the attachment weld in a non destructive manner. | The container and its components including pad eyes are tested to verify a specified container load capacity. |

I am  of the opinion that the '569 device does not have each and every element of Claim 1 of the '322 Patent.  Because I understand that  each and every element or an equivalent must be present in a claim in order for infringement to occur, I am of the opinion that Claim 1 is not infringed by the '569 device described in the '569 Patent.

My review of the remaining Claims 2-21 of the '322 Patent shows that each of these claims includes (or depends upon a claim that includes) "a framework including a base, top, and side pieces."  The '569 device does not have a "a framework including a base, top, and side pieces", therefore, I am of the opinion that Claims 2-21 of the '322 Patent are not infringed by the '569 device described in the '569 Patent.

**Infringement Analysis of the IntegriCert Device**
**Described in the '569 Patent in Light of the '447 Patent**

**Analysis of Claims 1-13**
Claim 1 of the '447 Patent recites as an element "a base including a clamp."  Because I understand that each and every element or an equivalent must be present in a claim in order for infringement to occur, I am of the opinion that Claim1 is not infringed by the '569 device described in the '569 Patent because the '569 device has neither a base or a clamp. The bottom of the cylinder assemblies 120 simply rest upon the container bottom.

My review of the remaining Claims 2-13 of the '447 Patent shows that each of these claims includes (or depends upon a claim that includes) "a base including a clamp."   The '569 device does not utilize "a base including a clamp" , therefore, I am of the opinion that Claims 2-13 of the '447 Patent are not infringed by the '569 device described in the '569 Patent.

**Analysis of Claims 14-26**

| Claim 14, '447 Patent | IntegriCert's  Load Test Apparatus |
|---|---|
| **14.** A method for testing weld strength and integrity of an attachment weld, comprising the steps of: | A load test apparatus (100) that applies the test load to the container to simulate the loading conditions applied to the container when it is lifted or suspended. '569 Patent, Col. 1, lines 23-26 |
| providing *the attachment weld joining* a pad eye, lifting lug, or other device *to another structure;* | Container being tested by the '569 device will include pad eyes or other attachment points to the container. |
| providing a framework including at least two pieces; | **Apparatus (100) has two cylinder assemblies (120) each with a cylinder (250) with its own base plate (285) and are  independent of the top beam assembly (110).   There is no framework.** |
| providing at least one fluid cylinder, having a first end and a second end, mounted with the framework *to produce a mounted cylinder within a mounted framework,* for moving a | **Apparatus (100) has two cylinder assemblies (120) each with a cylinder (250) with its own base plate (285) and  a** |

| | |
|---|---|
| piston therein inwardly and outwardly as fluid is moved out or in respectively; | **top horizontal beam assembly (110).** **Each cylinder 250 of the cylinder assemblies (120) is positioned below the top beam assembly.  There is no framework within which a cylinder 250 is mounted.  The horizontal beam assembly (110) fits slidably upon the cylinder pistons. The cylinders do not have "first and second ends, mounted with the framework to produce a mounted cylinder within a mounted framework." The bottom of the cylinder assemblies 120 simply rest upon the container bottom.** |
| providing a first and second attachment apparatus, wherein a pressurized fluid can enter in or exhaust from said *at least one fluid cylinder;* | |
| providing an attachment structure for attaching to said *pad eye, lifting lug or other device joined to said another structure by the attachment weld; and* | The cable assemblies 130 are attached to included pad eyes or other attachment points on the container. |
| assembling the framework with the mounted cylinder fixedly attached on the mounted framework; | **The beam assembly 110 is not fixedly attached on the mounted framework. There is no framework as recited. The beam assembly is positioned upon intervening load cells upon the pistons of the cylinders. They are not fixedly attached.** |
| urging fluid into the cylinder *to cause* the piston to move outwardly to tension the pad eye, *lifting lug or other device joined to said another structure,* thus testing the integrity of the *attachment* weld, and | |
| whereby *a* testing technician or test operator can inspect the *attachment weld* any structural damage or deformation. | |

I am  of the opinion that the '569 device does not have each and every element of Claim 14 of the '447 Patent.  Because I understand that  each and every element or an equivalent must be present in a claim in order for infringement to occur, I am of the opinion that Claim 14 is not infringed by the '569 device described in the '569 Patent because there is no "framework" as recited, the cylinders do not have "first and second ends, mounted with the framework to produce a mounted cylinder within a mounted framework", and the beam assembly 110 is not fixedly attached on a mounted framework.

My review of Claims 15-26 of the '447 Patent shows that each of these claims includes (or depends upon a claim that includes) all of the elements of Claim 14.  Because the '569 device

Page 7 of 22

has no "framework" as recited, or cylinders with "first and second ends, mounted with the framework to produce a mounted cylinder within a mounted framework", and because the beam assembly 110 is not fixedly attached on a mounted framework,  I am of the opinion that Claims 15-26 of the '447 Patent are not infringed by the '569 device described in the '569 Patent.

**Analysis of Claims 27-28**

| Claim 27, '447 Patent | IntegriCert's  Load Test Apparatus |
|---|---|
| **27.** A method for testing strength and integrity of an attachment weld with a single cylinder apparatus comprising the steps of: | A load test apparatus (100) that applies the test load to the container to simulate the loading conditions applied to the container when it is lifted or suspended. '569 Patent, Col. 1, lines 23-26. **It is not a single cylinder apparatus.** |
| providing at least one test piece *comprising a pad eye and the attachment weld joining the pad eye to another structure;* | Container being tested by the '569 device will include pad eyes or other attachment points to the container. |
| providing a framework including at least two pieces; | **Apparatus (100) has two cylinder assemblies (120) each with a cylinder (250) with its own base plate (285) and are  independent of the top beam assembly (110).   There is no framework.** |
| mounting said single cylinder *apparatus* to the framework, said *single* cylinder *apparatus* having a first end, a second end, and a piston therein, wherein said piston moves inwardly and outwardly as fluid is moved out of or into said *single* cylinder *apparatus* respectively; | **Apparatus (100) has two cylinder assemblies (120) each with a cylinder (250) with its own base plate (285) and  a top horizontal beam assembly (110).**<br><br>**Each cylinder 250 of the cylinder assemblies (120) is positioned below the top beam assembly.  There is no framework within which a cylinder 250 is mounted.  The horizontal beam assembly (110) fits slidably upon the cylinder pistons. The cylinders do not have "first and second ends, mounted with the framework to produce a mounted cylinder within a mounted framework." The bottom of the cylinder assemblies 120 simply rest upon the container bottom.** |
| mounting said framework about said at least one test piece; | |

| | |
|---|---|
| assembling the framework with said *single* cylinder *apparatus* fixedly attached at one end of said *single* cylinder *apparatus* to said *at least one* test piece; | The cable assemblies 130 are attached to included pad eyes or other attachment points on the container. |
| retracting *a cylinder shaft of the single cylinder apparatus,* thereby exerting a force substantially perpendicular to a plane formed between said *pad eye of the at least one* test piece and a base and in a direction away from said *pad eye of said at least one* test piece; | **The beam assembly 110 is not fixedly attached on the mounted framework. There is no framework as recited. The beam assembly is positioned upon intervening load cells upon the pistons of the cylinders. They are not fixedly attached.** |
| increasing said substantially perpendicular force by increasing the pressure of the fluid in the cylinder; | |
| increasing pressure until a pre-calculated, required pressure is reached; and | |
| inspecting the *at least one* test piece for damage or deformation. | |

I am of the opinion that the '569 device does not have each and every element of Claim 27 of the '447 Patent.  Because I understand that  each and every element or an equivalent must be present in a claim in order for infringement to occur, I am of the opinion that Claim 14 is not infringed by the '569 device described in the '569 Patent because the '569 device does not have a framework, does not use a single cylinder, and does not have cylinders with "first and second ends, mounted with the framework to produce a mounted cylinder within a mounted framework."

My review of Claim 28 of the '447 Patent shows that it includes or depends upon Claim 27.  The '569 device does not have all of the elements of Claim 28 as it does not have a framework, does not use a single cylinder, and does not have cylinders with "first and second ends, mounted with the framework to produce a mounted cylinder within a mounted framework", therefore, I am of the opinion that Claim 28 of the '447 Patent is not infringed by the '569 device described in the '569 Patent.

## PRIOR PUBLICATIONS FULLY DISCLOSE
## THE CLAIMS OF THE '332 AND '447 PATENTS

I have also been asked to review the '332 and the '447 patents and to evaluate their claims in light of the devices described Ristow, Duppong, Salman, Bacon, and Bauer.  The issue date of each of these patent publications appears to be prior to the filing dates of the '332 and the '447 patents.

I have concluded that Claims 1, 7, and 9, 10, and 12 of the '322 Patent and Claim 14, 30, and 31 of the '447 Patent are fully described and disclosed in the aforementioned prior patent and would be obvious to a person of skill in the art to which the subject matter pertains at the time of the inventions  described in the '332 and the '447 patents were made.

Because the devices recited in these claims are not new or novel and are obvious variations of well-known devices, I am of the opinion that Claims 1, 7, and 9, 10, and 12 of the '322 Patent and Claim 14, 30, and 31 of the '447 Patent are invalid.

### Analysis of the '322 Patent In View of Prior Publications

The Abstract of Ristow describes an apparatus for "the load testing of load bearing members" that has  "a base frame, a stand connected to the base frame and a carrier beam secured to the stand for movement with respect to the latter. The base frame and the carrier beam are provided with mounting attachments to which the load carrying member to be tested is secured. There is further provided a power mechanism connected between the carrier beam and the stand for urging the carrier beam to change its distance from the base frame, whereby the load bearing member is placed under the test load."

Ristow "comprises a rectangular base frame 1, a collapsible stand 8 pivotally attached to the base  frame 1, two collapsible support bars 2, connecting an upper portion of the stand 8 with the frame I, a carrier beam 6 and a pair of hydraulic or pneumatic cylinders 5, by means of which the beam 6 is supported on the top of the stand 8. Each support bar 2 is pivotally attached by its upper end 4 to the stand 8 and is shackled to the base frame 1 by means of a removable screw connection 13. The apparatus also includes a pressure  generating source such as a manual pumping station 7 connected to the power cylinders 5 by means of a pressure fluid conduit 10. The station 7 is provided with a pressure gauge 7a to indicate the force applied to the power cylinders 5. The apparatus further has a plurality of mounting attachments to which the device to be tested is secured. These attachments may be constituted by pins 3 and/or apertured plates 9." (Col. 2, lines 24 – 41)

Figs. 1 and 3 of Ristow showing the Ristow device is reproduced below:



FIG.1

**Top**

**Side piece**

**Control Means**

**Base**

FIG.3

| '332 PATENT – CLAIM 1 | RISTOW |
|---|---|
| 1. An apparatus for testing the weld strength and integrity **of an attachment weld,** comprising: | A load test apparatus for testing loading bearing members (Abstract) |
| a framework including a base, top, and side pieces; and | Framework, i.e. **stand 8**, including a base, i.e. **base frame (1)**, top, i.e. **carrier beam (6)**, and side pieces, i.e. **support bars (2)**, pieces. (Ristow, Fig. 1, Col. 2, lines 24-30) |
| at least one fluid containing cylinder, mounted with the framework, for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively; | **Cylinders (5)** for moving a piston inwardly and outwardly as fluid is moved out or in respectively. (Ristow, Fig. 1, Col. 2, lines 33-38) |
| structure for releaseably or permanently attaching to a pad eye, lifting lug or other device joined by the attachment weld to | Structure, **(pins (3) and plates (9)** to secure to the device to be tested, for releaseably or permanently attaching to a pad eye, lifting lug |

| another structure; | or other device joined by the attachment weld to another structure. (Ristow, Fig. 1, Col. 2, lines 38-46) |
|---|---|
| whereby moving fluid into the cylinder causes the piston to move outwardly to tension the pad eye, lifting lug or other device to test the integrity of the attachment weld in a non destructive manner. | The **carrier beam 6 is urged to change its distance from the base frame 1 by pressurizing the power cylinders 5 via the pressure source 7.** In this manner the test hanger is placed under tension (load),  the applied  magnitude  of  which  is  indirectly indicated  with  sufficient  accuracy  by  the pressure gauge 7a. (Ristow, Col. 2, 62-67.) |

As noted in Ristow at Col. 3, lines 1 – 13:

> The described apparatus may be regarded as a base structure with which, it is to be understood, by means of a further variation in the base frame and by the provision of further mounting attachments, complex load bearing members of any design may be load tested.

> Also, because of the versatility of the apparatus, its use is not limited to load bearing members, but it may find application in the testing of devices in other fields, such as roof trusses, conveyor devices and the like. it is to be further understood that instead of the fluid pressure means 5, 7, 10, any other force generating and force applying mechanism may be used to urge the carrier beam 6 to vary its distance from the base frame 1.

It is common practice and well known to attach components of structures, including loading load bearing members of structures, by welds, bolts, and rivets. Pad eyes are load bearing members because pad eyes are used as anchor points for the attachment of lifting lines, guy wires, anchor lines, support rods, and the like.  A person of ordinary skill in the art of design or construction structural systems would understand that load bearing members are routinely attached to another structure by attachment welds.

From this analysis, I am of the opinion that the device described in Ristow discloses each and every element recited in Claim 1 of the '332 patent.

| '332 PATENT – CLAIM 7 | RISTOW |
|---|---|
| 7. The apparatus of claim 1, wherein the cylinder further comprises: | |
| a first end and a second end; | See **cylinders (5)** resting on frame below carrier beam (6).  Ristow, Fig. 1. |
| a substantially cylindrical piston carried in said cylinder for movement therein along | **cylinders (5)** placed substantially perpendicular to the (pins (3) and plates (9) to |

| | |
|---|---|
| an axis, of said cylinder, being substantially perpendicular to a plane formed between *said* pad eye, lifting lug *or other device* and *the attachment* weld attaching said pad eye, lifting lug *or other device* to *said another structure;* | secure to the device to be tested. Ristow, Fig. 1. |
| first and second pressurized fluid attachment means; | Feature inherent in any double acting hydraulic cylinder |
| wherein said first pressurized fluid attachment means is disposed axially between said cylinder first end and said piston; | Feature inherent in any hydraulic cylinder **including cylinders (5)** of Ristow. |
| wherein pressurized fluid enters said cylinder through said first attachment means or second attachment means. | Feature inherent in any double acting hydraulic cylinder |

Hydraulic cylinders are commonly used by equipment and machine designers as mechanisms to generate movement and apply a pulling or pushing force. This can be seen from the use of such cylinders in the Ristow, Duppong, Salman, and Farassat patents cited above. A hydraulic cylinder operates by introducing fluid below the cylinder piston to forceably extend a piston rod and above a cylinder piston to forceably retract a cylinder piston rod. Removing the fluid pressure from above are below the cylinder would allow those movements to be reversed.

Claim 7 describes a double acting hydraulic cylinder. Double acting cylinders are well known by equipment and machine designers for applying loads in a desired direction. One example of such is U.S. Patent 5,548,997 to Bauer (Exhibit E, Fig. 10). A force is applied depending upon the point of entry of the fluid into the cylinder, i.e., above or below a cylinder piston. For example, fluid pressure introduced in the cylinder at a point below a piston would extend the piston to produce a pushing force and fluid pressure introduced in the cylinder at above a piston would retract the piston to produce a pulling force. Equipment and machine designers routinely select these cylinders depending upon their needs and the direction in which forces are to be applied. See Bauer, Fig. 10.



FIG. 10

I am of the opinion that a person skilled in the art would appreciate and understand that either a single or a double acting cylinder could be utilized to extend or outwardly move a cylinder piston to apply the tension force suggest in Claim 1 and Claim 7 of the '322 patent.

| '332 PATENT – CLAIM 9 | BAUER |
|---|---|
| 9. The apparatus in Claim 1, further including: | |
| a control means for allowing pressurized fluid to be alternately supplied to and exhausted from said cylinder in a manner that the internal piston will move in an axial  direction away from said first end of said cylinder, toward the second end of said cylinder, when the pressurized fluid enters through said first pressurized fluid attachment means, and that the said internal piston will move in an axial direction away from said second end of said cylinder toward the first end of said cylinder, when the pressurized fluid enters through said second pressurized fluid attachment means. | Solenoid operated valves SOY A , SOY B, SOY C, pump PMP fluid lines 116 and 119, and computer 113 control movement of fluid into the cylinder 104 to move the cylinder upward and downward.  **See Bauer Fig. 10, Col. 5, lines 18-49.** |

I am of the opinion that a person skilled in the art would appreciate and understand that the cylinders and control system of Bauer may be used as the cylinders and control system of Ristow or the control system of Bauer may be substituted for the control system of Ristow to

extend or outwardly move a cylinder piston in a desired direction to apply the tension force suggest in Claim 1 and Claim 9 of the '322 patent.

| '332 PATENT – CLAIM 12 | RISTOW |
|---|---|
| 9. The apparatus in Claim 1, further including: | |
| said mounted cylinder will exert a force substantially perpendicular to a plane formed between the pad eye, lifting lug or other device and said attachment weld attaching said pad eye, lifting lug or other device creating a substantially perpendicular force away from said pad  eye, lifting lug or other device subjecting said attachment weld to a tension load. | **The carrier beam 6 is urged to change its distance from the base frame 1 by pressurizing the power cylinders 5 via the pressure source 7.** The cylinders 5 are perpendicular to the pins (3) the attachment means for device to be tested.  In this manner the load may be applied to the device to be tested perpendicular to an attachment weld. **Fig. 1 and Fig. 3.** |

It is common and well known by designers of machines and equipment that an external load applied to a device including a pad eye will be in tension, shear, compression or a combination of shear and tension or shear and compression depending upon the orientation of the applied load.  The cylinders 5 of Ristow are mounted perpendicular to the carrier plate 6 and attachment pins 3.  It is inherent in Ristow that the cylinders 5 would exert a force substantially perpendicular to a plane formed between the pad eye, lifting lug or other device and an attachment weld attaching said pad eye, lifting lug or other device to another structure as recited in Claim 12.

I am of the opinion that a person skilled in the art would appreciate and understand that the cylinders of Ristow may be oriented to exert a force substantially perpendicular to a plane formed between the pad eye, lifting lug or other device and an attachment weld attaching said pad eye, lifting lug or other device to another structure as recited in Claim 12.  Such feature is inherent to the device described in Ristow.

I am also of the opinion that a person of ordinary skill in the art of designing machines and equipment, including load testing equipment, would find it obvious to utilize double acting cylinders such as those of **Bauer** with the device disclosed in **Ristow** to produce the device recited in Claims 1, 7, 9, and 12 of the '322 patent.  Such a person would be motivated to do so in order to apply testing loads in opposite directions, upward and downward, to increase the usefulness of the testing device and the type of load testing that may be performed.  A person of ordinary skill in the art of designing machines and equipment, including load testing equipment, would be motivated to orient the cylinders perpendicular to an attachment weld (or in any other direction) because such designer would want to load test a device in a manner that would simulate the anticipated loads which the device will be required to support of withstand, including a tension load.

Duppong  discloses the use of a hydraulic cylinder to, among other thigs, load test a pad eye non-destructively.  As noted in Duppong:

When the multipurpose vehicle is used to test and certify padeyes 26 or 26a, the test pull cylinder 278 or 218a (FIGS. 1and 4A) is pivotally attached to the outer end or intermediate portion of the upper arm 24 and to one end of a cable 294 or 294a, respectively. At this time the cable is slack and its other end is connected to the padeyes 26 or 26a being tested. The pull cylinder 278 or 278a is preferably elevated to lie in the horizontal plane of the padeye being tested, as indicated in FIG. 1; or if desired, may be moved to a higher or lower elevation than the padeye being tested.  **(Duppong, Col. 6, lines 33 – 43)**

⁂ hydraulic fluid is directed into the pull cylinder to provide the desired testing force to the particular padeye being tested. The size and purpose for which the padeye is to be used will determine the magnitude of force required for certification, which force may be up to about 50,000 pounds. In the event the padeyes should break, or should be pulled off the ship, while being tested, the operator in the cab 74 is protected from flying parts by bars 740 surrounding the cab 74. **(Duppong, Col. 6, lines 50 – 58)**

When the padeye test is completed, the hydraulic fluid is first released from the pull cylinder 278, and then the above described procedure is reversed permitting the operator and an assistant to thereafter test all padeyes on the ship. **(Duppong, Col. 6, lines 59 – 63)**



## Duppong, Fig. 1 and Fig.

I am also of the opinion that a person of ordinary skill in the art of designing machines and equipment, including load testing equipment, would find it obvious to utilize the device disclosed in **Ristow** to provide tension load testing for pad eyes, as disclosed in Duppong, as recited in Claims 1, 7, 9, and 12 of the '322 patent. Such a person would be motived to do so because attachment welds are common connectors for pad eyes and other devices and because equipment, including load testing equipment, incorporating hydraulic cylinders to produce a load or force, such as that of Ristow and Duppong, is commonly found and readily available.

Salman discloses the use of a hydraulic cylinder 60 incorporated into a framework including a base 20, top 70, and side pieces with an attachment structure 40 to apply a pulling

load to a device attached to another structure, in this case a post embedded in the ground. Salmon also discloses applying the pulling force vertically along the axis of the post B without a lateral component which might shift the post B to one side or the other. See Salmon, Col. 5, lines 63-65.



Fig. 2

Salman does not specifically disclose a pad eye or other device attached to another structure by an attachment weld. Duppong discloses attachment of the cylinder to a pad eye to test the pad eye non-destructively.

Similarly, Bacon, as shown below in Fig. 3, discloses testing in attachment weld of a container bail ear E welded to a container B, i.e. a pail. As noted in Bacon:

> In the manufacture of pails having bail ears affixed by welding to the pail bodies, it is essential that the ears be tested to determine whether they are affixed to the bail body securely enough to prevent separation from the pail body when a full pail is lifted by its bail. **Bacon, Col. 1, lines 6-10.**

Page 17 of 22

It is, accordingly, the primary object of our invention to provide a novel testing apparatus whereby bail ears can be tested non-destructively to determine their resistance to predetermined pressures. **Bacon, Col. 1, lines 17-20.**



**Bacon**

I am of the opinion that a person of ordinary skill in the art of designing machines and equipment, including load testing equipment, would find it obvious to utilize the device disclosed in **Salman** to provide tension load testing for pad eyes, as disclosed in Duppong, or the attachment welds of lifting ears, as disclosed in Bacon, as recited in Claims 1, 7, 9, and 12 of the '322 patent.  Such a person would be motived to do so because  attachment welds are common connectors for pad eyes and other devices and because equipment, including load testing equipment, incorporating hydraulic cylinders to produce a load or force, such as that of Salman and Duppong, is commonly found and readily available.

### Analysis of the '447Patent In View of Prior Publications

The analysis provided above regarding Ristow, Bauer, Duppong, Bacon, and Salman with respect to the claims of the '322 patent are also relevant to the Claims of the '447 patent.

| CLAIM 14, '447 PATENT | RISTOW |
| --- | --- |
| **14.** A method for testing weld strength and integrity of an attachment weld, comprising the | Ristow discloses a device and method to perform load testing.  **Ristow, Col. 2, lines 56-** |

| steps of: | 67. |
|---|---|
| providing *the attachment weld joining* a pad eye, lifting lug, or other device *to another structure;* | For performing the load testing operation, the hanger to be tested (not shown) is secured by its head to the mounting attachment 3 carried by the beam 6.  **Ristow, Col. 2, lines 56-58.** |
| providing a framework including at least two pieces; | Framework (**Ristow, Fig. 1**) including a base, i.e., **base frame (1)**, top, i.e., **carrier beam (6)**, and side pieces, i.e., **support bars (2)**. |
| providing at least one fluid cylinder, having a first end and a second end, mounted with the framework *to produce a mounted cylinder within a mounted framework,* for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively; | **Cylinders (5)** for moving a piston inwardly and outwardly as fluid is moved out or in respectively. First end of cylinder 5 is mounted on upper portion of stand 8 and the second end is mounted to carrier beam 6. (**Ristow, Fig. 1; Col. 2, lines 62-67**) |
| providing a first and second attachment apparatus, wherein a pressurized fluid can enter in or exhaust from said *at least one fluid cylinder;* | Fluid conduit 10. (Ristow, Fig. 1, Col. 2, lines 34-38.) Inherent in hydraulic cylinders. |
| providing an attachment structure for attaching to said *pad eye, lifting lug or other device joined to said another structure by the attachment weld; and* | The apparatus further has a plurality of mounting attachments to which the device to be tested is secured. These attachments may be constituted by **pins 3** and/or **apertured plates 9. Ristow, Fig. 1, Col. 2, Col. 2, lines 38-42.** |
| assembling the framework with the mounted cylinder fixedly attached on the mounted framework; | The apparatus comprises a rectangular base frame 1, a collapsible stand 8 pivotally attached to the base frame 1, two collapsible support bars 2, connecting an upper portion of the stand 8 with the frame I, a carrier beam 6 and a pair of hydraulic or pneumatic cylinders 5, by means of which the beam 6 is supported on the top of the stand 8. (**Ristow Fig. 1; Col. 2, lines 24-31.**) |
| urging fluid into the cylinder *to cause* the piston to move outwardly to tension the pad eye, *lifting lug or other device joined to said another structure,* thus testing the integrity of the *attachment* weld, and | The carrier beam 6 is urged to change its distance from the base frame 1, 12 by pressurizing the power cylinders 5 via the pressure source 7. In this manner the test hanger is placed under tension (load ), the applied magnitude of which is indirectly indicated with sufficient accuracy by the pressure gauge 7a. (**Ristow Fig. 1; Col. 2, lines 24-31.**) |

| whereby *a* testing technician or test operator can inspect the *attachment weld* any structural damage or deformation. | Inherent feature in any load testing apparatus. |
|---|---|

It is common practice and well known to attach components of structures, including loading load bearing members of structures, by welds, bolts, and rivets. Pad eyes are load bearing members because pad eyes are used as anchor points for the attachment of lifting lines, guy wires, anchor lines, support rods, and the like. A person of ordinary skill in the art of design or construction structural systems would understand that load bearing members are routinely attached to another structure by attachment welds.

From this analysis, I am of the opinion that the device described in Ristow discloses each and every element recited in Claim 14 of the '447 patent.

| '447 PATENT – CLAIM 30 | DUPPONG |
|---|---|
| **30.** A method for non-destructively testing the strength and integrity of a test piece having first and second parts, which comprises: | A load test apparatus for testing loading bearing members (Abstract) |
| anchoring the first part of the test piece; | See attached padeye 26 or 26a. Duppong, Figs. 1 and 4A) |
| attaching a piston from a hydraulic cylinder to the second part of the test piece; | When the multipurpose vehicle is used to test and certify padeyes 26 or 26a, the test pull cylinder 278 or 218a (FIGS. 1and 4A) is pivotally attached to the outer end or intermediate portion of the upper arm 24 and to one end of a cable 294 or 294a, respectively. **At this time the cable is slack and its other end is connected to the padeyes 26 or 26a being tested.** The pull cylinder 278 or 278a is preferably elevated to lie in the horizontal plane of the padeye being tested, as indicated in FIG. 1; or if desired, may be moved to a higher or lower elevation than the padeye being tested. **(Duppong, Col. 6, lines 33 – 43)** |
| moving the piston to put the test piece under tension, wherein the load produced under the tension is below the rated strength of the test piece; | ∗∗∗ hydraulic fluid is directed into the pull cylinder to provide the desired testing force to the particular padeye being tested. **(Duppong, Col. 6, lines 50 – 58)** |
| And inspecting the test piece for damage. | Inherent in load testing |

| '447PATENT – CLAIM 31 | DUPPONG |
|---|---|
| **31.** The method according to claim **30,** wherein said test piece is a pad eye. | See attached padeye 26 or 26a. Duppong, Figs. 1 and 4A; Col. 6.lines 33-43, lines 50-58) |

From this analysis, I am of the opinion that the device described in **Duppong** discloses each and every element recited in Claims 30 and 31of the '447 patent.

It should be noted that **Bauer**, at Col. 6, lines 55-65 disclose sending a technician to the field with the Bauer load simulator for testing and inspection and the use of double action cylinder as noted in **Bauer.  (Bauer Fig. 10, Col. 5, lines 18-49)**

Duppong also discloses the use of double acting cylinder for the pull cylinders 278 as shown in Fig. 13 and described at Col. 6, lines 64 – Col. 7, lines 60.



I am also of the opinion that a person skilled in the art would appreciate and understand and that it would be obvious to such person that the device of **Ristow** may be used to test pad eyes and lifting ears as disclosed in **Duppong** and **Bacon** to produce the device recited in Claim 14 of the '447 patent.  Such a person would be motived to do so because  attachment welds are common connectors for pad eyes and other devices and because equipment, including load testing equipment such as that of **Ristow** and **Duppong**, incorporating hydraulic cylinders to produce a load or force are commonly found and readily available.

I am also of the opinion that a person skilled in the art would appreciate and understand and that it would be obvious to such person to employ double acting hydraulic cylinders such as those of **Bauer** and **Duppong.**  Such a person would be motivated to do so in order to apply testing loads in opposite directions, upward and downward, to release the loads applied by the cylinders, all to increase the usefulness of the testing device and the type of load testing that may be performed.  Such a person would also be motived to inspect the pad eye or device being tested as described by **Bauer** for visual indication of failure which is also inherent loading testing any device.



# Tab A

**EXHIBIT A**

# Stephen A. Killingsworth

| | |
|---|---|
| **Address** | **Telephone** |
| **Mailing** | **Business**  (337) 981-1002 |
|   P.O. Box 81519 | **Facsimile**  (337) 235-0200 |
|   Lafayette, LA 70598 | **Cellular**  (337) 849-7555 |
| **Physical** | |
|   1904 W. Pinhook Road | |
|   Suite 106A | |
|   Lafayette, LA  70508 | |
| **e-mail** | |
|   killsak@design-analyst.com | |

**Industrial Experience**

1977 – Current
*DESIGN ANALYSTS: ENGINEERS AND CONSULTANTS, L.L.C.*, Lafayette, LA.
**Consultant and President**
- Product development and analysis of industrial and oilfield machinery and structures.   Responsibilities included design and analysis of the machinery and structures as well as accident reconstruction and investigations of equipment failure and safety.

1994 –1997 (Retired)
*LOUISIANA PRODUCTIVITY CENTER (LPC), UNIVERSITY OF SOUTHWESTERN LOUISIANA*, Lafayette, LA.
**Program Manager and Associate Director**
- Responsible for coordinating all center activities.  Additional duties included **Managing Director**, *TIS-EC/EDI Division, LPC*.  Responsible for coordinating manufacturing and all information system activities for LPC, including the overseeing of statewide network program and the implementation of electronic commerce and electronic data interchange for Louisiana businesses.  Duties included management of DLA Procurement Technical Assistance Network Program, product modeling and simulation, production, cost estimating, marketing and budgets, and software development, evaluation, testing and implementation.

1994 – 1996
*SMATCO-CROSS*, Houma, LA.
**Design Engineer and Analyst**
- Product development and design of marine deck equipment for offshore and marine industry.  Responsible for design (conceptual and detail), analysis (performance, structural, mechanical and safety) and construction.

1987 – 1994
*LOUISIANA PRODUCTIVITY CENTER, UNIVERSITY OF SOUTHWESTERN LOUISIANA*, Lafayette, LA.
**Director**

- Responsible for coordinating all of the center activities, including DLA Procurement Program, all client contact with the center for procurement, manufacturing and product development.  This included areas of new product development and manufacturing, patenting, product modeling, prototyping and simulation, metal and plastic manufacturing and production, marketing and budgets. Directed efforts toward software programs that are evaluated and beta tested by the engineering staff.

1985 – 1986
*KORI CORPORATION*, Lafayette, LA.
**Engineering Manager**

- Product development and design of amphibious excavator undercarriages and amphibious personnel carrier for construction and geophysical industry.  Responsibility included management of the engineering and drafting department.

1983 – 1986
*JOHN WILEY & SONS, INC.* and *McGRAW-HILL BOOK COMPANY*, New York, NY.
**Consultant**

- Reviewed engineering, mathematics, and computer related textbooks for authors and publishers.

1982 – 1984
*SEA\*MAC MARINE PRODUCTS, DIVISION OF HARVEY-LYNCH, INC.,* Houston, TX.
**Consultant and Technical Director**

- Product development and analysis of material handling equipment for the geophysical and diving industry. Responsibilities included management of the engineering/drafting and estimating sections.

1979 – 1981
*TBW INDUSTRIES, PEDESTAL CRANE, INC., DIVISION*, Lafayette, LA.
**Engineering Manager/Director**

- Responsible for product development and design of cranes for offshore and marine industry.  Responsibilities included management of the engineering, drafting, and estimating department as well as the development of a computer-aided engineering analysis software and the establishment of a drafting, estimating and inventory systems.

1975 – 1977
*TEAM ENGINEERING AND MANUFACTURING, INC.,*
Lafayette, LA.
**Design Engineer and Vice-President of Engineering**

- Responsible for product development and design of material handling equipment for offshore and marine industry.  Responsibilities included design, analysis and construction.

1974 – 1975
*TBW INDUSTRIES, SMATCO DIVISION*, Houma, LA.
**Design and Project Engineer**

- Responsible for product development and design of marine deck equipment for offshore and marine industry. Responsibilities included design, analysis and construction.

1973 – 1974
*SEAWAYS INTERNATIONAL, INC.,* Lafayette, LA.
**Consultant**

- Design and analysis of offshore platforms and support equipment.

**Teaching Experience - University**

1973 – 1987*
*MECHANICAL ENGINEERING DEPARTMENT, UNIVERSITY OF SOUTHWESTERN LOUISIANA*, Lafayette, LA.
**Assistant Professor**

- Held positions of Graduate Assistant and Instructor until promoted to Assistant Professor in 1977.  Taught a wide variety of engineering and mechanical engineering courses on all levels of undergraduate and graduate studies, including Introduction to Engineering, Mechanics of Materials, Statics, Engineering Methods and Analysis, Thermodynamics, Engineering Economics, Dynamics, Engineering, Data Analysis, Thermal Engineering, Mechanical Engineering Design, Instruments and Measurements, Thermal Fluids, Manufacturing Processes (Basic and Advanced), Advanced Engineering Projects, Advanced Mechanics of Materials, Robotics, Computer-Aided Design, Advanced Computer-Aided Design, Computer-Aided Manufacturing and Advanced Computer-Aided Manufacturing.

*Continue to retain tenured faculty position as Assistant Professor in Mechanical Engineering Department.  However, assignment and duties were changed to the Director, Louisiana Productivity Center, University of Southwestern Louisiana in 1987.

1974 – 1975
*NICHOLLS STATE UNIVERSITY*, Thibodaux, LA.
**Instructor**
- Taught undergraduate engineering courses including Mechanics of Materials, Statics, Thermodynamics, Dynamics, and Mechanical Engineering Design.

| | |
|---|---|
| **Teaching Experience - Seminars** | "What You Need to Know About Accident Reconstruction (But Are Afraid to Ask on Cross)", **Louisiana Association of Defense Counsel, New Orleans Defense Lawyers' Seminar,** New Orleans, Louisiana, December 12, 1997 |
| | "What You Need to Know About Accident Reconstruction (But Are Afraid to Ask on Cross)", **Louisiana Association of Defense Counsel, Shreveport Defense Lawyers' Seminar,** Shreveport, Louisiana, January 30, 1998 |
| **Professional License** | **Professional Engineer, Mechanical Engineering,** State of Louisiana, 1977- Current |
| **Professional Affiliations** | American Society of Mechanical Engineers<br>Society of Automotive Engineers<br>National Society of Professional Engineers<br>Louisiana Engineering Society<br>ASM International – The Materials Information Society<br>American Welding Society<br>American Society Agricultural Engineers<br>American Society Naval Engineers<br>Society of Naval Architects and Marine Engineers<br>American Society for Quality |
| **Education** | **Master of Science Degree, Engineering Systems (Mechanical and Structural Engineering)**<br>1974, UNIVERSITY OF SOUTHWESTERN LOUISIANA, Lafayette, LA.<br><br>**Bachelor of Science Degree, Mechanical Engineering**<br>1972, UNIVERSITY OF SOUTHWESTERN LOUISIANA, Lafayette, LA. |
| **Professional Education** | - Basic Wind Loads ASCE 7-10, October, 2011<br>- Life Safety Code, NFPA 101, September, 2011<br>- Fire! Designing Means of Escape, September, 2011<br>- Mechanical Design: Heating, Ventilating, and Air-Conditioning, September, 2011<br>- Ethical Decision Making for Engineers No. 5, September, 2011<br>- Petroleum: Drill Rig Selection, September, 2011<br>- Petroleum MMS Case Studies – Offshore Oil & Gas Safety Alerts, September, 2011<br>- OSHA Safety: Drilling, September, 2011 |

- Renewable Energy Generation, September, 2011
- Energy Conversion Systems, September, 2011
- Hydraulic Steel Structure Design, September, 2011
- Worksite Safety: OSHA Cranes & Other Hoist, September, 2009
- Solar Electric Generation: Technologies, September, 2009
- Metal Bar Gratings: Types & Applications, September, 2009
- Parking Lots -- Lighting, September, 2009
- OSHA Safety:  Introduction to Powered Industrial Trucks, September, 2009
- OSHA Safety: Stairways and Ladders, September, 2009
- Battery Applications, September, 2009
- Highway Engineering: Driver, Pedestrian, Vehicle & Traffic Characteristics, September, 2009
- Biomechanics: Understanding Barrier-Free Design, September, 2009
- Worksite Safety: OSHA Fall Protection, September, 2009
- Renewable Sources of Energy: Wind Power, September, 2009
- Green Design:  Introduction to Sustainable Design Materials and Resources, September, 2009
- Ethical Decision Making for Engineers: Case Set 4, September, 2009
- Occupancy Sensors Part 1 – The Technologies, September, 2009
- Occupancy Sensors Part 2 – Applications, September, 2009
- OSHA Tools – Hand and Power, October, 2007
- Telecommunications Fundamentals, October, 2007
- Safety: Machine Operation, September, 2007
- OSHA Fatal Accidents & Prevention, September, 2007
- Ethical Decision Making for Engineers No. 3, September, 2007
- Clean Energy: Recycled Energy Technologies, September, 2007
- Sustainable Design – A Primer, September, 2007
- The Genesis of Toxic Mold, September, 2007
- Finance & Accounting for Non-Financial Manager, September, 2007
- Financial Management 4: Accounting & Cash, September, 2007
- Hurricane: Wind vs. Water Determination, September, 2007

- Patent Protection: An Intermediate Review, September, 2007
- Patent Protection: Basics, September, 2007
- Wireless Networking, September, 2007
- Safety – An Introduction, September, 2007
- ADA Guidelines: Accessible Routes, September, 2005
- ADA Guidelines: Recreation Facilities, September, 2005
- ADA Guidelines: General Site and Building Elements, September, 2005
- Concrete: Fundamentals: An Introduction, September, 2005
- Concrete 1: Evaluation and Causes of Damage, September, 2005
- Prestressed Concrete - Introduction, September, 2005
- Interior Codes 1: Overview of Codes & Standards, September, 2005
- Interior Codes 2: Occupancy Classifications & Loads, September, 2005
- Interior Codes 3: Construction Types & Building Sizes, September, 2005
- Interior Codes 4: Means of Egress, September, 2005
- Parking Lots – Parking Geometrics, September, 2005
- Parking Lots – Surface Lot Functional Design, September, 2005
- Parking Lots – Traffic Impact & Site Access, September, 2005
- Petroleum: Oil and Gas Drilling Technologies, September, 2005
- Preventing and Investigating Accidents, September, 2005
- Preventative Maintenance, September, 2005
- Safety: Material Handling, September, 2005
- Pumping Stations – Part 1, Basic Concepts, September, 2005
- Heavy Construction Equipment Basics – Earthmoving & Excavating, September, 2005
- Ethical Decision Making for Engineers No. 2, September, 2005
- Failure Investigation & Forensic Engineering, July, 2003
- Ethical Decision Making for Engineers, July, 2003
- Finite Element Analysis, July, 2003
- Heavy Construction Equipment-Lifting, July, 2003
- Personal Protective Equipment, July, 2003

- OSHA Tools – Hand and Power, July, 2003
- GIS: Basics, July, 2003
- Material Considerations in Steel – Brittle Fracture, July, 2003
- The Theory of Measurements, July, 2003
- Lighting Calculations, July, 2003
- Fuel Cell Power Systems, July, 2003
- Basic Concepts of Photogrammetry, July, 2003
- Hydraulic Accumulators, July, 2003
- PC Networking for Design Professionals. July, 2003
- AutoCAD/Land Desktop – Plotting, July, 2003
- PC Crash and Accident Reconstruction Workshop, December, 2001
- Industrial Noise Control, February, 2001
- Introduction to Photovoltaics, February, 2001
- OSHA Signs, Signals & Barricades, February, 2001
- Parameter Cost Estimating, February, 2001
- ADA Accessibility Guidelines for Buildings and Facilities, February, 2001
- OSHA Welding and Cutting, January, 2001
- OSHA Cranes, Derricks, Hoist, Elevators & Conveyors, January, 2001
- OSHA Steel Erection, January, 2001
- General Overview of Post-Tensioned Concrete Design, January, 2001
- Understanding the American with Disabilities Act, January, 2001
- Forklift Safety for Construction, J.J. Keller & Associates, January, 2001
- Coaching the Lift Truck Operator, Train-the-Trainer, National Safety Council, October, 2000
- Ergonomics, 4th Annual Joint Engineering Conference, February, 2000
- Trenchless Technology, 4th Annual Joint Engineering Conference, February, 2000
- Water Hammer – Cause & Prevention, 4th Annual Joint Engineering Conference, February, 2000
- Valves A-Z, Selection the Right Valve, 4th Annual Joint Engineering Conference, February, 2000
- Summary of Casing Handling Systems, 4th Annual Joint Engineering Conference, February, 2000
- Ethics, 4th Annual Joint Engineering Conference, February, 2000
- Professional Liability, 4th Annual Joint Engineering Conference, February, 2000
- Lien Law, 4th Annual Joint Engineering Conference, February, 2000

- AutoCAD 2000, 4th Annual Joint Engineering Conference, February, 2000
- ISO 9000 Quality Standards
- Implementing ISO 9000 Series Quality Standards
- Defense Contract Administration Services Management TQM – Level 1
- Defense Contract Administration Services Management TQM – Level 2
- Certified Quality Engineer
- Defense Contract Administration Services Region Packaging
- Defense Contract Administration Services Management Quality Assurance Workshop
- Quality Assurance Implementation and Manual Development
- Quality Control Workshop
- Society of Manufacturing Engineers Total Quality Management
- Quality Assurance, Mil-I-45208A
- Quality Assurance, Mil-I-9858
- Department of Defense Focus of TQM (Association of Government Marketing Assistance Specialist
- Basics of Military Packaging
- Preservation, Coating & Testing
- Cost and Price Analysis
- Cost Accounting Standards, Quality Process & Implementation
- Cost Estimating for Engineers
- Society of Manufacturing Engineers Manufacturing Cost Estimating
- CNC Programming Level 1
- CNC Programming Level 2
- CNC Programming Level 3
- Micro-Measurements, Testing and Implementation
- Automation Engineering Hydraulics
- System PC Technical Analysis
- Implementing Electronic Data Interchange Initiative
- Business with Government and Prime Contractors through Electronic Data Interchange
- Contracting with Electronic Commerce/Electronic Data Interchange
- Department of Defense - Electronic Commerce/Electronic Data Interchange
- IBM Digital Systems
- Acquisition Reform
- FASA
- Department of Defense's Responding to a Request for Proposal
- Small Business Contracting Issues
- Small Purchase Seminar
- AGMAS Cooperative Agreement Performance and Evaluation

- AGMAS PTA Program Development
  - Defining Role of PTA Center & Staff
  - Setting Appropriate Program Goals
  - Income, In-Kind Requirements & Payments
  - Developing Staff Training Plan

January 1, 2015



# Tab B

# EXHIBIT B



US006848322B2

(12) **United States Patent**

Scarborough

(10) Patent No.: **US 6,848,322 B2**

(45) Date of Patent: **Feb. 1, 2005**

(54) **APPARATUS AND METHOD FOR TESTING WELD INTEGRITY**

(75) Inventor: **Randall L. Scarborough**, Carencrow, LA (US)

(73) Assignee: **S & H Fabrication, Inc.**, Scott, LA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/365,105**

(22) Filed: **Feb. 12, 2003**

(65) **Prior Publication Data**

US 2004/0154408 A1 Aug. 12, 2004

(51) **Int. Cl.**[7] ............................................... **G01N 3/20**
(52) **U.S. Cl.** ......................................................... **73/850**
(58) **Field of Search** .......................... 73/850, 816, 820, 73/837

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 2,424,177 | A | * | 7/1947 | Lawshe et al. | ............... 73/828 |
| 3,142,980 | A | * | 8/1964 | Anderson | .................... 73/834 |
| 3,548,646 | A | * | 12/1970 | Holman | ...................... 73/795 |
| 3,942,368 | A | * | 3/1976 | Hoyt | ............................ 73/842 |
| 3,994,158 | A | * | 11/1976 | Weinhold | ..................... 73/798 |
| 4,249,062 | A | * | 2/1981 | Hozumi et al. | ........ 219/124.34 |
| 4,478,086 | A | * | 10/1984 | Gram | ........................... 73/781 |
| 4,520,655 | A | * | 6/1985 | Owens | .......................... 73/46 |
| 4,610,166 | A | * | 9/1986 | Elder et al. | ................... 73/818 |
| 5,212,654 | A | * | 5/1993 | Deuar | ................. ........ 702/43 |

* cited by examiner

*Primary Examiner*—Max Noori
(74) *Attorney, Agent, or Firm*—The Matthews Firm

(57) **ABSTRACT**

An apparatus and method for testing weld integrity is disclosed which is portable, self-contained, adaptable for field use in most locations, and can verify the integrity of attachment welds. The testing apparatus includes a cylinder or cylinders, attachable to the desired object to be tested on one end and to a cross bar on the other end, support beam or beams which, along with the cylinder or cylinders, support the test apparatus, a supply for pressurized fluid, and a control manifold for flow direction and pressure measurement. The pressurized fluid moves the cylinder shaft creating a load on the test piece. As the fluid pressure increases the cylinder shafts extract or retract and exert a required load on the test piece. The test piece is then inspected for breakage or damage such as deformation or attachment weld cracking.

**21 Claims, 13 Drawing Sheets**





**FIG. 1**



**FIG. 1A**

Case 6:12-cv-00396-PJH   Document 186-8   Filed 06/13/16   Page 187 of 364 PageID #:  5857



FIG. 2



*FIG. 3*



**FIG. 3A**



*FIG. 4*

Case 6:12-cv-00396-PJH   Document 186-8   Filed 06/13/16   Page 191 of 364 PageID #: 5861



**FIG. 5**

Case 6:12-cv-00396-PJH Document 186-8 Filed 06/13/16 Page 192 of 364 PageID #: 5862



*FIG. 6*

Case 6:12-cv-00396-PJH Document 186-8 Filed 06/13/16 Page 193 of 364 PageID #: 5863



*FIG. 7*

Case 6:12-cv-00396-PJH   Document 186-8   Filed 06/13/16   Page 194 of 364 PageID #:  5864



*FIG. 8*



*FIG. 8A*



FIG. 9



**FIG. 9A**

**1**

# APPARATUS AND METHOD FOR TESTING WELD INTEGRITY

## AREA OF TECHNOLOGY

The present apparatus relates, generally, to non-destructive testing of weld integrity and strength in the attachment weld of pad eyes and other lifting lugs.

## BACKGROUND OF INVENTION

Presently, the weld integrity of pad eye or other lifting lug welds are only tested by x-rays or liquid penetrant. This testing is at best random and cannot insure the safety or reliability of the pad eyes especially after many cycles. The failure of the pad eyes can cause equipment damage and destruction as well as compromise the safety of workers and by-standers. In particular, when drill string piping is off loaded, from a barge or supply boat, the failure of the pad eyes does cause the loss of human life due to the extreme weight of the pipe and its uncontrolled fall.

Pad eyes and lifting lugs are primarily used as an attachment point for any rigging employed to hoist, transport, or secure heavy equipment. These pad eyes are typically welded either to the equipment or to some device on which the equipment is transported on. The strength of these welds cannot be easily tested after they have been manufactured. Usually, the only indication of weakness is discovered upon the complete failure of the attachment weld.

Currently, there are similar approaches to the present device disclosed in other patents. However, there is no prior art for the method or apparatus for testing the pad eye welds. U.S. Pat. No. 4,676,110 discloses a fatigue testing apparatus. However, this apparatus utilizes a method of destructive testing which would render the pad eye useless. Other prior art for pull testing is disclosed in U.S. Pat. Nos. 5,844,142 and 5,918,284. However, these systems are not portable, are not for larger loads, and are only intended for testing the products during manufacturing. These systems are also used to test the strength for one time use only products, such as surgical suture and needles. The pad eye welds must withstand a vast number of loading cycles, with a varied amount of load, throughout their useful life.

There are other prior art testing tools such as disclosed in U.S. Pat. No. 6,186,011 B1 which tests the failure modes of spot welds on sheet metal. Another testing tool disclosed in U.S. Pat. No. 6,216,531 B1, tests the shear strength of adhesive bonded materials. However, both of these inventions are based on pre-manufacture testing, do not consider cyclic loading over the useful life of the product, and cannot be adapted for portability. These testing tools also cannot be adapted to perform testing of finished products or to test the weld integrity before each use.

It is thus a desire to have a testing apparatus which is portable and can quickly and accurately check the integrity of a pad eye and its attachment weld before each field use. The desired apparatus should be portable, self-contained, easily transportable, and environmentally safe in order to test the pad eye welds at almost any location. This testing device should be capable of being hydraulically operated as well as by other available pressurized fluid sources. This device could consist of one or multiple pressurized fluid cylinders depending on the required test loads and the configuration of the apparatus. The effective area of the cylinder piston and the pressure applied to the cylinder would determine the capacity of the apparatus. The fluid pressure is preferably supplied by a hand pump for currently

**2**

optimum portability; however, other types of pumps could be utilized. A flow manifold would be needed to control the flow direction as well as measure the pressure applied to the cylinder(s). One end of the cylinder(s) would be attached to the same base as is the pad eye or attached to its own base plate. The other end is attached to a cross bar, bridge plate, or similarly functioning member. The cross bar, bridge plate, or similarly functioning member could be further supported by either cylinders or support beams.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a further understanding of the nature of the present device, reference should be had to the following detailed description, taken in conjunction with the accompanying drawings, in which like elements are given the same or analogous reference numbers and wherein:

FIG. 1 is a front view assembly drawing of a preferred form of the testing apparatus 20.

FIG. 1A is another embodiment of FIG. 1 illustrating the option of attachment, of the present apparatus, to the device to be tested, by clamps.

FIG. 2 is a view of FIG. 1 in its disassembled state.

FIG. 3 is a front view assembly drawing of an additional embodiment of the testing apparatus.

FIG. 3A is another embodiment of FIG. 3 illustrating the option of attachment, of the present apparatus, to the device to be tested, by clamps.

FIG. 4 is a front view of a FIG. 3 in its disassembled state.

FIG. 5 is a pictorial view of the hand pump.

FIG. 6 is a pictorial view of the flow control manifold.

FIG. 7 is a simplified cross sectional representation of the cylinder depicted in FIGS. 1, 2, 3, and 4.

FIG. 8 is a front view assembly drawing of an alternative embodiment of the testing apparatus.

FIG. 8A is another embodiment of FIG. 8 illustrating the option of attachment, of the present apparatus, to the device to be tested, by clamps.

FIG. 9 is a front view assembly drawing of another alternative embodiment of the testing apparatus.

FIG. 9A is another embodiment of FIG. 9 illustrating the option of attachment, of the present apparatus, to the device to be tested, by clamps.

## DETAILED DESCRIPTION OF AN EMBODIMENT OF THE PRESENT APPARATUS

### First Embodiment (FIG. 1 and FIG. 2)

FIG. 1 is an assembly drawing of the present device. FIG. 2 shows the individual components of the testing apparatus 20 which includes the cylinder 5, two bridge plates 1, two support beams 3, one being the right side beam and one being the left side beam, two footings 9 comprised of a right side footing and a left side footing, and two attachment plates 17.

It should be appreciated that the footings 9 and the attachment plates 17 are an illustrative method of attaching the apparatus to the pad eye 19 or lifting lug. Other ways of attachment, which provide adequate support and connection can be employed without departing from the scope thereof. The test apparatus can be mounted to a base plate 37 in order to provide support for the test apparatus, it can be used without the base plate 37 and attached via clamps 38 or other suitable method directly to the base support structure to which the pad eye 19, the lifting lug, or other lifting connection is attached to.

US 6,848,322 B2

3

As shown in FIG. 1 and FIG. 2, the cylinder 5 is comprised of a shaft 13 on the topside of the cylinder, an upper 7 and lower 7A cylinder fitting, and a bottom adaptor 8. The internal portion of the cylinder, FIG. 7, is not known to those in the art and typically consists of one or more pistons 53 and o-rings or seals. The said piston 53 is attached to the shaft 13 and will typically move upward, extending the cylinder shaft 13 as pressure is applied through the lower cylinder fitting 7A. When the pressurized fluid is applied through the upper cylinder fitting 7, the piston moves downward and the cylinder shaft 13 retracts. Both the cylinder shaft 13 and the bottom adaptor 15 are adapted to allow connection to a mating part preferably utilizing a pin connection. It should be appreciated that although the present device contemplates primarily pinned connections, other methods of attachment can also be used. Examples of such attachment include, but are not limited to: various threaded fasteners, taper pins, welding, and the like. The figures illustratively show two types of pins 39, 41. However, these pins 39, 41 can be interchanged as well as be substituted by a variety of other attachment methods as mentioned above. The cylinder shaft 13 is sandwiched between and connected, by a pin 41, to the two bridge plates 1. The bottom adaptor 15 is connected by a pin 41 and sandwiched between the attachment plates 17. For the preferred embodiment of the present apparatus, pressure containing hoses are connected to the upper 7 and lower 7A cylinder fittings.

Each of the two bridge plates 1 are preferably substantially identical flat rectangular bars made of steel or a material with similar strength properties. These said bridge plates 1 have a plurality of holes 23 which are used for the fixed connections between the two bridge plates 1 and the cylinder shaft 13 and the two support beams 3. It should be appreciated that the hole 23 diameter and consequently the diameter of the pin 41 vary in size depending on the load which will be tested and are typically sized by calculation based on the maximum load contemplated. Preferably, there is a plurality of holes 23 located on the right and left lengthwise ends of the bridge plate 1 and also located substantially symmetrically around the lengthwise and widthwise centers of the said bridge plate 1. Preferably, said holes 23, located on the right and left lengthwise ends, should be substantially symmetrically located at each end of the bridge plates. Preferably, said holes 23, at each end of said bridge plate 1, are substantially symmetrically located with respect to said bridge plate 1 and each other. The holes 23 located approximately midway of both the lengthwise and widthwise centers of said bridge plates 1 are preferably substantially symmetrically located at said midway point. The multiple holes 23 are used for allowing vertical and horizontal adjustment of the test apparatus. The cylinder shaft 13 is preferably fixedly attached at substantially the lengthwise midpoint of the bridge plate 1 by pin 41. The two bridge plates 1 are fixedly attached at opposing ends, left and right side, and to the outside face of the two support beams 3 by pin 41.

The two support beams 3 are preferably hollow rectangular beams made of steel or a material with similar strength properties. These said support beams 3 have a plurality of holes 23 on all four faces of the rectangular beam which are used for the fixed connections between the two support beams 3 and the two bridge plates 1 and the two footings 9. It should be appreciated that the hole 23 diameter and consequently the diameter of the pin 41 vary in size depending on the load which will be tested and are typically sized by calculation based on the maximum load contemplated.

4

Preferably, the holes 23, on each face of the support beams 3, are substantially centered lengthwise on each face of the support beam 3 and are substantially symmetrically spaced from the top of said support beam 3. The multiple holes 23 are used for allowing vertical and horizontal adjustment of the testing apparatus. The bottom end of the two support beams 3 has a hole on each of the four faces. Preferably, the said holes 23 are substantially symmetrically located on the lengthwise center line of each face of the said support beam 3. As described above and shown in FIG. 1, the support beams 3 are fixedly attached near the top end of said support beam 3 sandwiched between the two bridge plates 1 and fixedly attached preferably utilizing the pin 41. The bottom end, of each said support beam 3, is preferably fixedly attached to the two footings 9 by pin 41.

The two footings 9 are preferably comprised of a steel, or a material with similar strength properties, channel bar. Preferably, the two channel sides have matching holes 23 on each face. Preferably, said hole diameters are substantially symmetrically centered relative to the said channel bar height and substantially symmetrically spaced between the respective holes centers on each channel wall face. The two footings 9 will preferably be attached by welding to the test apparatus base plate 37 or attached by clamps to the pad eye base plate 21. Preferably, the two footings 9 are substantially horizontally and symmetrically centered on each side of the pad eye 19. This said placement, of the two footings 9, is assured through the substantially symmetric connection of the support beams 3 to bridge plate 1. This said positioning insures that the testing apparatus will provide an approximately equal upward force on the pad eye 19.

The two attachment plates 17 are comprised of two substantially identical pieces of flat steel, or a material with similar strength properties, bar. The said attachment plates 17 have a plurality of holes 23. The hole 23 diameters are substantially centered along the lengthwise centerline of the flat face of the attachment plates 17. The said holes 23 are further substantially symmetrically located at opposing lengthwise ends of the said attachment plates 17. The adjustment plate 17 is fixedly attached on the upper end, by pin 41, to the end of the bottom adaptor 15. The said bottom adaptor 15 is fixedly attached, by pin 41, pinned between the two attachment plates 17. The lower end of said attachment plates 17 is attached to the pad eye 19 by pin 39. The pad eye 19 is sandwiched between the two attachment plates.

An alternative embodiment of this structure, shown in FIGS. 8 and 8A, could be an A-frame wherein the cylinder is attached to a crossbar or the apex of the A-frame.
Second Embodiment (FIG. 3 and FIG. 4)

FIG. 3 is an assembly drawing of an additional embodiment of the present apparatus. FIG. 4 shows the individual components of said additional embodiment 30 which is preferably comprised of the two cylinders 5, one being the right side cylinder and one being the left side cylinder, two bridge plates 1, the support beam 47, and two footings 9 comprised of a right side footing and a left side footing.

It should be appreciated that the footings 9 and the attachment plates 17 are an illustrative method of attaching the apparatus to the pad eye 19 or lifting lug. Other ways of attachment, which provide adequate support and connection can be employed without departing from the scope thereof. The test apparatus can be mounted to a base plate 37 in order to provide support for the test apparatus, it can be used without the base plate 37 and attached via clamps 38 or other suitable method directly to the base support structure to which the pad eye 19, lifting lug, or other lifting connection is attached to.

**5**

As shown in FIG. 3, FIG. 3A, and FIG. 4, the two cylinders 5 are comprised of similar components as the cylinder 5 for the single cylinder apparatus. It should be appreciated that since the actual cylinder size may change according to the required load the components may also 5 change in size. Both the cylinder shaft 13 and the bottom adaptor 15 are adapted to allow connection to mating parts preferably utilizing a pin connection. The cylinder shaft 13, of the right side cylinder 5 is fixedly attached by a pin 41 to the right end and in between the two bridge plates 1. The 10 cylinder shaft 13, of the left side cylinder 5, is fixedly attached by a pin 41 to the left end and in between the bridge plates 1. The bottom adaptor 15, of the right cylinder 5, is fixedly attached, by a pin 41 to the right side footing 9. The bottom adaptor 15, of the left cylinder 5, is fixedly attached, 15 by a pin 41 to the left side footing 9. It should be noted and appreciated by those in the art that the figures illustratively show two types of pins 39, 41. However, these pins 39, 41 can be interchanged as well as be substituted by a variety of other attachment methods as mentioned above. Both the 20 right side and left side cylinders 5 are each fitted with two cylinder fittings 7 and 7A For the preferred utilization of the present device, pressure containing hoses are connected to the two cylinder fittings 7 and 7A on each cylinder 5.

Each of the two bridge plates 1 are preferably substan- 25 tially identical flat rectangular bars made of steel or a material with similar strength properties. These said bridge plates have a plurality of holes 23 which are used for the fixed connections between the two bridge plates 1 and the cylinder shafts 13, of both cylinders 5, and the support beam 30 47. It should be appreciated that the hole 23 diameter and consequently the diameter of the pin 41 vary in size depending on the load which will be tested and are typically sized by calculation based on the maximum load contemplated. Preferably, there are a plurality of holes 23 located on the 35 right and left lengthwise ends of the bridge plate 1 and also located substantially symmetrically around the lengthwise and widthwise centers of the said bridge plates 1. Preferably, the said holes 23, located on the right and left lengthwise ends, should be substantially symmetrically located at each 40 end of the bridge plates 1. Preferably, said holes 23, at each end of said bridge plate 1, are substantially symmetrically located with respect to said bridge plate 1 and each other. The said holes 23 located approximately midway of both the lengthwise and widthwise centers of said bridge plates 1 are 45 preferably substantially symmetrically located at said midway point. The multiple holes 23 are used for allowing vertical and horizontal adjustment of the test apparatus.

The support beam 47 is preferably a fabricated hollow rectangular beam, having a top side and a bottom side, in 50 which two opposing bottom sides extend, in the lengthwise direction, beyond the other two opposing sides. The said opposing extended sides form a channel at the bottom end of the said support beam 47. The support beam 47 has a plurality of holes 23 on all four faces of the rectangular beam 55 which are used for the fixed connections between the support beam 47 and the two bridge plates 1 and the two footings 9. It should be appreciated that the hole 23 diameter and consequently the diameter of the pin 41 vary in size depending on the load which will be tested and are typically 60 sized by calculation based on the maximum load contemplated. Preferably, said holes 23, on each face of the support beam 47 are substantially centered lengthwise on each face of the support beam 47 and are preferably substantially symmetrically spaced from the top of said support beam 47. 65 The multiple holes 23 are used for allowing vertical and horizontal adjustment of the testing apparatus. As shown in

**6**

FIG. 4 and described above, the bottom channeled end of the support beam 47 has a hole on each face of the channel portion. These hole diameters are substantially symmetrically located in the center of each face of the said support beam bottom channel. As described above and shown in FIG. 3, the support beam 47 is fixedly attached near the top end of the beam sandwiched between the two bridge plates 1 preferably utilizing the pin 41. The bottom-channeled end of the support beam 47 is set over the pad eye 19. The said bottom channeled end of the support beam 47 is fixedly attached, preferably by pin 39, to the pad eye 19.

The two footings 9 are preferably comprised of a steel, or a material with similar strength properties, channel bar. Preferably, the two channel sides have matching holes 23 on each face. Preferably said hole diameters are substantially symmetrically centered relative to the said channel bar height and substantially symmetrically spaced between the respective hole centers on each channel wall face. The two footings 9 will preferably be attached by welding to the test apparatus base plate 37 or attached by clamps to the pad eye base plate 21. Preferably, the two footings 9 are substantially horizontally and symmetrically centered on each side of the pad eye 19. This said placement, of the two footings 9, is assured through the substantially symmetric connection of the right and left cylinders 5 to the bridge plate 1. This said positioning insures that the testing apparatus will provide an approximately equal upward force on the pad eye 19.

It should be understood that the frame could be modified in many aspects to achieve the substantially same function and substantially same result of the present device. For instance, the bridge plate 1 could be curved, angled, have additional members attached thereto, and the like. The structure and frame could be further modified using springs or other mechanisms to exert a tensioning force on the pad eye or lifting lug attachment weld.

Operating Apparatus (FIG. 5 and FIG. 6)

Preferably, as shown in FIG. 5, the hand pump 40 is basically comprised of a reservoir 59, a carrying handle 57, a pump 61, the pumping handle 71, and a reservoir cap 69. It should be appreciated that although FIG. 5 shows a small typical hand pump, many varieties and combinations of pumps and fluid reservoirs or accumulators could be used to actuate this test apparatus. For the present device, a small hand pump is well suited for portability. If an adaptation of this apparatus were, for example, to be used in an industrial setting the pump may be otherwise powered, may be stationary, have larger reservoirs, use accumulators, use different fluids, or a multitude of different adaptations. For the present contemplated usage of this device, the cylinder shaft 13 is preferably actuated by a hand pump 40. The hand pump 40 is connected to the flow control manifold 50 by pressure containing hoses. The pump 61 is operated through the use of the pump handle 71.

As shown in FIG. 6, the flow control manifold 50 is comprised of a manifold 83, a pressure gauge 73, a directional valve 77, a directional lever 79, and a carrying handle 75. The direction of actuation and flow is preferably controlled by a directional valve 77. The directional valve 77 is further controlled by the rotational directional lever 79. Preferably the said directional lever can only be turned approximately ninety degrees in one direction and then approximately ninety degrees in the opposite direction. It should be appreciated, as with the hand pump above, that this is a typical manifold selected for the presently contemplated use of this device. However, as this apparatus is adapted for any variety of locations, the type, size, and configuration of the flow control manifold, including the

**7**

type and configuration of the directional valve **77**, as well as even the method of flow control itself may require substantial change. The flow control manifold **50** is preferably connected to the upper **7** and lower **7A** cylinder fittings by means of pressure containing hoses. The flow control manifold **50** controls the direction of flow either into the lower cylinder fitting **7A**, causing the cylinder shaft **13** to extend, or into the upper cylinder fitting **7** causing the cylinder shaft **13** to retract. The flow control manifold **50** also measures the pressure of the fluid. This pressure is shown on the said pressure gauge but is also available to be displayed on a variety of recorders, computers, controllers, and the like.

In use, the present device can be transported in the disassembled condition to any location where some pad eye or lifting lug will be utilized or requires testing. One possible criterion for selecting a particular embodiment may be the required test load.

In use, prior to selecting the proper embodiment of the present device, the desired test load must be known. Typically, this value will be approximately 1.5 times greater than the rated load capacity of the pad eye or lifting lug. If such a rated load is not readily accessible, the test value would be approximately 1.5 times the weight that will be supported by the pad eye or lifting lug. It should be understood that the said multiplying factor of 1.5 is only a preferred safety factor; therefore, the value can vary depending on a user's experience or preference and should not be used as a limiting factor of the scope of the claimed apparatus. After determining the said load test value, the proper testing apparatus will be comprised of the correct size and number of cylinders **5** which can generate the required test load. The required test load is generated by the cylinder **5** and is produced by the combination of the pressure, produced by the hand pump **40** and measured by the manifold pressure gauge **73**, acting over the effective area of the cylinder. The effective area of the cylinder is calculated based on the diameter of the piston **53** within the cylinder **5**. As is known to those in the art, the effective area of the piston **53** can be obtained from the cylinder manufacturer. As is also well known to those in the art, the said effective area is multiplied by the pressure to predetermine the produced test load. After determining the test load as described above, selecting the cylinder size, as described above, and determining the required pressure to produce the said test load, as described above, the hand pump **40** is used to produce the required pressure.

In use, the test apparatus is assembled as shown in FIGS. 1, 1A, 3, or 3A and discussed above. The apparatus is then connected to the pad eye **19**, lifting lug, or other device to be tested. The connection, as shown in FIGS. 1 and 1A can include the use of attachment plates **17**. In addition, a pressure containing hose is connected to each of the cylinder fittings **7** and **7A** on the cylinders **5**. The other end of each pressure containing hose is connected to the flow control manifold **50**. The preferred embodiment utilizes "quick connect" connectors for the pressure containing fittings, however, other types of pressure containing fittings may be utilized. Preferably, the cylinder fittings **7** and **7A**, the manifold fittings **81**, and the pump fittings **73** are all male "quick connect" pressure containing fittings. Each pressure containing hose is preferably comprised of some length of hydraulic quality hose with a female "quick connect" fitting on each end. The pressure containing hose will have a pressure rating which exceeds the pressure required for the testing. Another set of the above described pressure containing hoses is connected between the flow control manifold **50** and the hand pump **40**. It should be understood that

**8**

the exact sequence and location of connection of the pressure containing hoses may vary depending on the version of the testing apparatus as well as the type and model of pump and flow control manifold. After the pressure containing hoses have been connected the pressurized system, comprised of the hoses and associated fittings, the hand pump **40**, the flow control manifold **50**, and the cylinders **5**, is known to those in the art as a closed system. Therefore, any air, contained in the closed pressurized system must be removed. The said air removal is known as system bleeding to those in the art. The preferred method of bleeding the system is through as combination of moving the pressurized fluid through the pressurized system, which forces any air through the system and into the reservoir. After this is performed, the entire system is filled only with the pressurized fluid. The movement of the fluid is accomplished by alternately moving the pump handle **71** in an upwardly and downwardly motion. This said movement of the pump handle **71** causes the pump to push fluid through one of the hoses, through the flow control manifold **50**, and into the lower cylinder fitting **7A**. This causes the said fluid to flow underneath the piston **53** and begin forcing the piston **53** in an upwardly direction. As the piston **53** begins to rise, the fluid, resting above the piston **53** begins to be forced out of the upper cylinder fitting **7**, through the pressure containing hose, connected to the upper cylinder fitting **7**, through the flow control manifold **50**, through the pump **61**, and into the reservoir **59**. This described flow and the accompanied rise of the piston **53** causes the cylinder shaft **13** to extract.

Turning the directional lever **79** ninety degrees from the position described in the above paragraph will cause the fluid to flow into the upper cylinder fitting **7** when the pump **61** is actuated by the moving the pump handle **71** in alternating upwardly and downwardly directions as described above. The said pump handle **71** movement causes the pump to push fluid through one of the hoses, through the flow control manifold **50**, and into the upper cylinder fitting **7**. This causes the said fluid to flow above the piston **53** and begin forcing the piston **53** in a downwardly direction. As the piston **53** begins to move in the said downward direction, the fluid, resting below the piston **53** begins to be forced out of the lower cylinder fitting **7A**, through the pressure containing hose connected to the lower cylinder fitting **7A**, through the flow control manifold **50**, through the hand pump **40**, and into the reservoir **59**. This described flow of the fluid and the accompanied downward movement of the piston **53** causes the cylinder shaft **13** to retract.

In use, the single cylinder version of the present device produces an upward force on the pad eye or lifting lug when the cylinder shaft **13** retracts. Therefore, the directional lever **79** shall me moved into the position which causes the fluid to flow into the upper cylinder fitting **7**.

In use, the double cylinder version of the present device produces an upward force on the pad eye or lifting lug when the cylinder shaft **13** extracts. Therefore, the directional lever **79** shall me moved into the position which causes the fluid to flow into the lower cylinder fitting **7A**.

In use, the pressure gauge **73** will indicate the system pressure. As the pump handle **71** is moved, as described above, the pressure, indicated on the pressure gauge will increase. When the indicated pressure is approximately the same as the calculated pressure corresponding to the required test load, as described above, then the proper test load has been applied. It should be understood that this paragraph describes the operation regardless of the direction of fluid flow or the position of the directional valve handle **79**.

US 6,848,322 B2

**9**

In use, after the test is completed, the directional valve **79** should be turned ninety degrees, and the pump **61** should be actuated by the pump handle **71**, as previously described, until the system pressure, as indicated by the gauge or other monitoring device, is completely relieved.

It should be appreciated that the directional lever **79** does not actually control flow but rather moves the directional valve **77** into a position that changes the flow direction. The detailed workings of the directional valve **77** is well known to those skilled in the art.

Those who are skilled in the art will readily perceive how to modify the present apparatus still further. For example, most of the illustrated connections utilize pins, however, it should be recognized that other methods of connection may be utilized, such as threaded connectors or if the unit will be modified for permanent installation as opposed to portable, the connections could be welded. Further, the frames or structures, of this apparatus, do not need to be comprised of substantially vertical and horizontal members. These members could be curved, angled, or joined in a manner to provide the substantially same function and substantially same result in testing the pad eye or other lifting lug attachment welds. FIGS. **8** and **9** illustrate two such modifications where the alternative embodiment consists of an A-frame structure and FIG. **8** illustrates a bridge plate or cross bar being used with the A-frame. FIGS. **8**A and **9**A show an alternative embodiment using clamps **38** for attachment to the base support structure to which the pad eye **19**, the lifting lug, or other lifting connection is attached to. Additionally, there are other means of providing pressure to actuate the cylinders, other configurations for the pump equipment and associated hoses, as well as additional measuring and measurement recording devices which can all be used within and in conjunction with the present device. Further, other pressurized fluids can be used to actuate the cylinders. In addition, the subject matter of the present device would not be considered limited to a particular material of construction. Therefore, many materials of construction are contemplated by the present apparatus including but not limited to various metals or combinations of metals. As many possible embodiments maybe made of the present apparatus without departing from the scope thereof, it is to be understood that all matter herein set forth or shown in the accompanying drawings is to be interpreted as illustrative and not in a limiting sense.

What is claimed is:

**1.** An apparatus for testing the weld strength and integrity of an weld, comprising:

a framework including a base, top, and side pieces;

at least one fluid containing cylinder, mounted with the framework, for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively; and

structure for releaseably or permanently attaching to a pad eye or any device to be tested;

whereby moving fluid into the cylinder causes the piston to move outwardly to tension the pad eye to testing the integrity of the welding in a non destructive manner.

**2.** The apparatus in claim **1**, whereby moving fluid into the cylinder causes the piston to move inwardly to tension the pad eye then thereby testing the integrity of the weld.

**3.** The apparatus in claim **1**, further including:

a support beam having a top and bottom end; and

a bridge plate or cross bar, having a left and right end, fixedly attached, on said left and right ends and near the center, to and supported by said beam or the cylinder.

**4.** The bridge plate or cross bar of claim **3**, wherein said bridge plate can be comprised of two substantially identical

**10**

plates wherein said cylinder shaft or support beams are fixedly attached and sandwiched between said bridge plates.

**5.** The apparatus in claim **3**, wherein said bridge plate or cross bar can be curved.

**6.** The apparatus in claim **3**, wherein said bridge plate or cross bar can be angled.

**7.** The apparatus of claim **1**, wherein the cylinder further comprises:

a first end and a second end;

a substantially cylindrical piston carried in said cylinder for movement therein along an axis, of said cylinder, being substantially perpendicular to a plane formed between a pad eye or other lifting lug being tested and a weld attaching said pad eye or lifting lug to a base;

a shaft, having a first end and a second end, the first end fixedly attached to said internal piston and said second end is fixedly attached to said bridge plate or cross bar; and

first and second pressurized fluid attachment means;

wherein said first pressurized fluid attachment means is disposed axially between said cylinder first end and said piston;

wherein said second pressurized fluid attachment means is disposed axially between said cylinder second end and said piston; and

wherein pressurized fluid enters said cylinder through said first attachment means or second attachment means.

**8.** The apparatus of claim **7**, wherein said cylinder comprises:

said second end of said shaft is fixedly attached to said pad eye or other device to be tested.

**9.** The apparatus in claim **1**, further including:

a control means for allowing pressurized fluid to be alternately supplied to and exhausted from said cylinder in a manner that the internal piston will move in an axial direction away from said first end of said cylinder, toward the second end of said cylinder, when the pressurized fluid enters through said first pressurized fluid attachment means, and that the said internal piston will move in an axial direction away from said second end of said cylinder toward the first end of said cylinder, when the pressurized fluid enters through said second pressurized fluid attachment means.

**10.** The apparatus in claim **9**, wherein:

the cylinder shaft will extend when said internal piston moves in an axial direction away from said first end of said cylinder toward the second end of said cylinder, causing said mounted cylinder to exert a force substantially perpendicular to a plane formed between a pad eye or other lifting lug being tested and a weld attaching said pad eye or lifting lug.

**11.** The apparatus of claim **9**, wherein:

the cylinder shaft will retract when said internal piston moves in an axial direction away from said second end of said cylinder toward said first end of said cylinder, causing said mounted cylinder to exert a force substantially perpendicular to a plane formed between a pad eye or other lifting lug being tested and a weld attaching said pad eye or lifting lug.

**12.** The apparatus in claim **1**, wherein said mounted cylinder will exert a force substantially perpendicular to a plane formed between a pad eye or other lifting lug being tested and a weld attaching said pad eye or lifting lug creating a substantially perpendicular force away from said pad eye or other device being tested subjecting said attachment weld to a tension load.

US 6,848,322 B2

11

13. A method for testing weld strength and integrity of an attachment weld when desired comprising the steps of:

identifying a desired test piece wherein said test piece comprises a pad eye, lifting lug, or other device being tested;

providing a framework including a base, top and side pieces;

providing at least one fluid cylinder, having a first end and a second end, mounted with the framework, for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively;

providing a first and second attachment means, wherein a pressurized fluid can enter in or exhaust from said cylinder;

providing an attachment structure for attaching externally to said test piece; and

assembling the framework with the mounted cylinder fixedly attached at the first end of said cylinder externally to said test piece;

whereby urging fluid into the cylinder causes the piston to move outwardly to tension the pad eye thus testing the integrity of the weld,

whereby said testing is nondestructive; and

whereby the testing technician or test operator can inspect the tested device and the weld for any structural damage or deformation.

14. The method as in claim 13, whereby urging fluid into the cylinder causes the piston to move inwardly to tension the test piece thus testing the integrity of the weld.

15. The method as in claim 13, wherein said framework is assembled at the location of the device to be tested.

16. The method as in claim 13, wherein the calculation of the required cylinder test pressure comprises the steps of:

determining a required test load based on the weight to be supported, by the test piece;

determining an effective area of the cylinder piston; and

dividing said test load by the effective area of the cylinder piston.

17. The method as in claim 13, wherein:

urging pressurized fluid is accomplished by a pumping device; and

said urging of said pressurized fluid causes the cylinder piston to move in an axial direction away from said first end of said cylinder toward said second end of said cylinder, thereby causing the cylinder shaft to extract or causes the cylinder piston to move in an axial direction away from said second end of said cylinder toward said first end of said cylinder thereby causing the cylinder shaft to retract.

18. The method in claim 17, wherein:

said cylinder piston moves in an axial direction away from said first end of said cylinder toward said second end of said cylinder when said pressurized fluid enters said cylinder through said first attachment means and the piston moves in an axial direction away from said second end of said cylinder toward said first end of said cylinder, when said pressurized fluid enters said cylinder through said second attachment means; and

the entry, through said first attachment means or said second attachment means, of said pressurized fluid into said cylinder is controlled by a flow control manifold and a directional valve.

19. The method in claim 13 wherein the fluid pressure, in said cylinder, is determined at the control manifold and monitored by a pressure gauge.

12

20. A method for testing weld strength and integrity of an attachment weld when desired with a single cylinder apparatus comprising the steps of:

identifying a desired test piece wherein said test piece comprises a pad eye, lifting lug, or other device being tested;

providing a framework including a base, top and side pieces;

providing at least one fluid cylinder, mounted with the framework, for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively;

providing an attachment structure for attaching external to said test piece;

assembling the framework with the mounted cylinder fixedly attached at the first end of said cylinder external to said test piece;

retracting the cylinder shaft thereby exerting a force substantially perpendicular to a plane formed between a pad eye or other lifting lug being tested and a weld attaching said pad eye or lifting lug to a base and away from said test piece;

increasing said substantially perpendicular force by increasing the pressure of the pressurized fluid in the cylinder;

increasing said pressure until the calculated required pressure is reached; and

inspecting the test piece and its attachment weld for any structural damage or deformation;

whereby increasing said substantially perpendicular force by increasing the pressure of the pressurized fluid in the cylinder is non-destructive in nature.

21. A method for testing weld strength and integrity of an attachment weld when desired with a multiple cylinder apparatus comprising the steps of:

identifying a desired test piece wherein said test piece comprises a pad eye, lifting lug, or other device being tested;

providing a framework including a base, top and side pieces;

providing a plurality of fluid cylinders, each with a first and second end, mounted with the framework, for moving a piston therein, each said cylinder inwardly and outwardly as fluid is moved out or in respectively;

providing an attachment structure for attaching externally to said test piece;

assembling the framework with the mounted cylinders fixedly attached at the first end of said cylinders to said base and at said second end to a bridge plate or cross bar;

extracting the cylinder shafts thereby exerting a force substantially perpendicular to and toward the bridge plate or cross bar;

transferring said force from said bridge plate or cross bar to a support beam which is attached externally to the test piece;

transferring said force from said support beam to said test piece;

increasing said force by increasing the pressure of the pressurized fluid in the cylinder;

increasing the pressure until the calculated required pressure is reached; and

inspecting the test piece and its attachment weld for any structural damage or deformation;

whereby increasing said force by increasing the pressure of the pressurized fluid in the cylinder is non-destructive in nature.

*   *   *   *   *

US006848322C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10455th)

# United States Patent
## Scarborough

(10) **Number:**  **US 6,848,322 C1**

(45) **Certificate Issued:**  **Dec. 24, 2014**

(54) **APPARATUS AND METHOD FOR TESTING WELD INTEGRITY**

(75) Inventor: **Randall L. Scarborough**, Carencrow, LA (US)

(73) Assignee: **Randall L. Scarborough**, Carencro, LA (US)

**Reexamination Request:**
No. 90/012,840, Aug. 7, 2013

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **6,848,322** |
| Issued: | **Feb. 1, 2005** |
| Appl. No.: | **10/365,105** |
| Filed: | **Feb. 12, 2003** |

(51) **Int. Cl.**
  *G01N 3/20*  (2006.01)

(52) **U.S. Cl.**
  USPC .................................................... 73/850

(58) **Field of Classification Search**
  None
  See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,840, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Tuan H Nguyen

(57) **ABSTRACT**

An apparatus and method for testing weld integrity is disclosed which is portable, self-contained, adaptable for field use in most locations, and can verify the integrity of attachment welds. The testing apparatus includes a cylinder or cylinders, attachable to the desired object to be tested on one end and to a cross bar on the other end, support beam or beams which, along with the cylinder or cylinders, support the test apparatus, a supply for pressurized fluid, and a control manifold for flow direction and pressure measurement. The pressurized fluid moves the cylinder shaft creating a load on the test piece. As the fluid pressure increases the cylinder shafts extract or retract and exert a required load on the test piece. The test piece is then inspected for breakage or damage such as deformation or attachment weld cracking.



US 6,848,322 C1

**1**

# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims 1, 2, 7, 8, 10-17 and 20-21 are determined to be patentable as amended.

Claims 3-6, 9, 18 and 19, dependent on an amended claim, are determined to be patentable.

1. An apparatus for testing the weld strength and integrity of an *attachment* weld, comprising:

a framework including a base, top, and side pieces;
at least one fluid containing cylinder, mounted with the framework, for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively; and
structure for releaseably or permanently attaching to a pad eye, *lifting lug* or [any] *other* device [to be tested] *joined by the attachment weld to another structure*;
whereby moving fluid into the cylinder causes the piston to move outwardly to tension the pad eye, *lifting lug or other device* to [testing] *test* the integrity of the [weld-ing] *attachment weld* in a [non destructive] *non-destructive* manner.

2. The apparatus in claim 1, whereby moving fluid into the cylinder causes the piston to move inwardly to tension the pad eye [then], *lifting lug or other device,* thereby testing the integrity of the *attachment* weld.

7. The apparatus of claim 1, wherein the cylinder further comprises:

a first end and a second end;
a substantially cylindrical piston carried in said cylinder for movement therein along an axis, of said cylinder, being substantially perpendicular to a plane formed between [a] *said* pad eye [or other], lifting lug [being tested] *or other device* and [a] *the attachment* weld attaching said pad eye [or], lifting lug *or other device* to [a base] *said another structure*;
a shaft, having a first end and a second end, the first end fixedly attached to said internal piston and said second end is fixedly attached to said bridge plate or cross bar; and
first and second pressurized fluid attachment means;
wherein said first pressurized fluid attachment means is disposed axially between said cylinder first end and said piston;
wherein said second pressurized fluid attachment means is disposed axially between said cylinder second end and said piston; and
wherein pressurized fluid enters said cylinder through said first attachment means or second attachment means.

8. The apparatus of claim 7, wherein said cylinder comprises:

said second end of said shaft is fixedly attached to said pad eye, *lifting lug,* or other device [to be tested].

**2**

10. The apparatus in claim 9, wherein:
the cylinder shaft will extend when said internal piston moves in an axial direction away from said first end of said cylinder toward the second end of said cylinder, causing said mounted cylinder to exert a force substantially perpendicular to a plane formed between a *the* pad eye [lifting lug being tested], *lifting lug or other device* and a *the attachment* weld attaching said pad eye [or], lifting lug *or other device to said another structure*.

11. The apparatus of claim 9, wherein:
the cylinder shaft will [refract] *retract* when said internal piston moves in an axial direction away from said second end of said cylinder toward said first end of said cylinder, causing said mounted cylinder to exert a force substantially perpendicular to a plane formed between [a] *said* pad eye, *lifting lug or other* [lifting lug being tested] *device* and a *the attachment* weld attaching said pad eye, *lifting lug* or [lifting lug] *other device to said another structure*.

12. The apparatus in claim 1, wherein said mounted cylinder will exert a force substantially perpendicular to a plane formed between [a] *the* pad eye, *lifting lug* or other device [lifting lug being tested] and [a] *said attachment* weld attaching said pad eye, *lifting lug* or other device [lifting lug] creating a substantially perpendicular force away from said pad eye, *lifting lug* or other device [being tested] subjecting said attachment weld to a tension load.

13. A method for testing the weld strength and integrity of an attachment weld when desired comprising the steps of:
identifying a desired [test piece wherein said test piece comprises] *attachment weld joining* a pad eye, lifting lug, or other device [being tested] *to another structure*;
providing a framework including a base, top and side pieces;
providing at least one fluid cylinder, having a first end and a second end, mounted with the framework, for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively;
providing a first and second attachment means, wherein a pressurized fluid can enter in or exhaust from said cylinder;
providing an attachment structure for attaching externally to said [test piece] *pad eye, lifting lug or other device joined to said another structure by the attachment weld*; and
assembling the framework with the mounted cylinder fixedly attached at the first end of said cylinder externally to said [test piece] *pad eye, lifting lug or other device joined to said another structure*;
[whereby] urging fluid into the cylinder *to* causes the piston to move outwardly to tension the pad eye, *lifting lug or other device joined to said another structure* thus testing the integrity of the *attachment* weld;
whereby said testing is nondestructive; and
whereby [the] *a* testing technician or test operator can inspect the tested [device and the weld] *attachment weld and the pad eye, lifting lug or other device joined to another structure* for any structural damage or deformation.

14. The method as in claim 13, whereby urging fluid into the cylinder causes the piston to move inwardly to tension the [test piece] *pad eye, lifting lug or other device* thus testing the integrity of the weld.

15. The method as in claim 13, wherein said framework is assembled at the location of the [device] *weld* to be tested.

16. The method as in claim 13, wherein the calculation of the required cylinder test pressure comprises the steps of:

US 6,848,322 C1

**3**

determining a required test load based on the weight to be supported, by the [test piece] *weld, pad eye, lifting lug or other device joined to the another structure by the weld to be tested*;

determining an effective area of the cylinder piston; and dividing said test load by the effective area of the cylinder piston.

**17**. The method as in claim **13**, wherein:

urging pressurized fluid is accomplished by a pumping device; and

said urging of said pressurized fluid causes the cylinder piston to move in an axial direction away from said first end of said cylinder toward said second end of said cylinder, thereby causing the cylinder shaft to extract or [causes] *causing* the cylinder piston to move in an axial direction away from said second end of said cylinder toward said first end of said cylinder thereby causing the cylinder shaft to retract.

**20**. A method for testing weld strength and integrity of an attachment weld when desired with a single cylinder apparatus comprising the steps of:

identifying a desired test piece wherein said test piece comprises *the attachment weld joining* a pad eye, lifting lug, or other device [being tested] *to another structure*;

providing a framework including a base, top and side pieces;

providing at least one fluid cylinder, mounted with the framework, for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively;

providing an attachment structure for attaching external to said test piece;

assembling the framework with the mounted cylinder fixedly attached at the first end of said cylinder external to said test piece;

retracting the cylinder shaft thereby exerting a force substantially perpendicular to a plane formed between [a pad eye or other lifting lug being tested and a weld attaching said pad eye or lifting lug to a base and away from said test piece] *the attachment weld and the pad eye, lifting lug or other device joined to said another structure by the attachment weld*;

increasing said substantially perpendicular force by increasing the pressure of the pressurized fluid in the cylinder;

increasing said pressure until the calculated required pressure is reached; and

**4**

inspecting the test piece [and its attachment weld] for any structural damage or deformation;

whereby increasing said substantially perpendicular force by increasing the pressure of the pressurized fluid in the cylinder is non-destructive in nature.

**21**. A method for testing weld strength and integrity of an attachment weld when desired with a multiple cylinder apparatus comprising the steps of:

identifying a [desired test piece wherein said test piece comprises] *weld joining* a pad eye, lifting lug, or other device [being tested] *to another structure*;

providing a framework including a base, top and side pieces;

providing a plurality of fluid cylinders, each with a first and second end, mounted with the framework, for moving a piston therein, each said cylinder inwardly and outwardly as fluid is moved out or in respectively;

providing an attachment structure for attaching externally to said [test piece] *pad eye, lifting lug, or other device joined to said another structure by the weld*;

assembling the framework with the mounted cylinders fixedly attached at the first end of said cylinders to said base and at said second end to a bridge plate or cross bar;

extracting the cylinder shafts thereby exerting a force substantially perpendicular to and toward the bridge plate or cross bar;

transferring said force from said bridge plate or cross bar to a support beam which is attached externally to the [test piece;] *pad eye, lifting lug, or other device joined to another structure by the weld*;

transferring said force from said support beam to said [test piece;] *pad eye, lifting lug, or other device joined to another structure by the weld*;

increasing said force by increasing the pressure of the pressurized fluid in the cylinder;

increasing the pressure until the calculated required pressure is reached; and

inspecting the [test piece] *pad eye, lifting lug, or other device* and its attachment weld for any structural damage or deformation;

whereby increasing said force by increasing the pressure of the pressurized fluid in the cylinder is non-destructive in nature.

\* \* \* \* \*



# Tab C

**EXHIBIT C**



US007284447B2

(12) **United States Patent**　　(10) **Patent No.:**　**US 7,284,447 B2**
Scarborough　　(45) **Date of Patent:**　***Oct. 23, 2007**

(54) **APPARATUS AND METHOD FOR TESTING WELD INTEGRITY**

(75) Inventor: **Randall L. Scarborough**, Carencrow, LA (US)

(73) Assignee: **S & H Fabrication, Inc.**, Scott, LA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/047,127**

(22) Filed: **Jan. 31, 2005**

(65) **Prior Publication Data**

US 2005/0204826 A1　　Sep. 22, 2005

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/365,105, filed on Feb. 12, 2003, now Pat. No. 6,848,322.

(51) **Int. Cl.**
　*G01N 3/20*　　(2006.01)
(52) **U.S. Cl.** ...................................... **73/850**
(58) **Field of Classification Search** ............... 73/809, 73/850
　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,020,680 | A | * | 5/1977 | Mehdizadeh et al ......... 73/86 |
| 4,502,338 | A | * | 3/1985 | Smith et al ................. 73/819 |
| 4,676,110 | A | * | 6/1987 | Hodo et al .................... 73/809 |
| 4,864,866 | A | * | 9/1989 | Hardy et al. .................. 73/831 |
| 5,380,393 | A | * | 1/1995 | Drabarek et al. .......... 156/358 |

* cited by examiner

*Primary Examiner*—Max Noori
(74) *Attorney, Agent, or Firm*—The Matthews Firm

(57)　　**ABSTRACT**

An apparatus and method for testing weld integrity is disclosed which is portable, self-contained, adaptable for field use in most locations, and can verify the integrity of attachment welds. The testing apparatus includes a cylinder or cylinders, attachable to the desired object to be tested on one end and to a cross bar on the other end, support beam or beams which, along with the cylinder or cylinders, support the test apparatus, a supply for pressurized fluid, and a control manifold for flow direction and pressure measurement. The pressurized fluid moves the cylinder shaft creating a load on the test piece. As the fluid pressure increases, the cylinder shafts extend or retract and exert a required load on the test piece. The test piece is then inspected for breakage or damage such as deformation or attachment weld cracking.

**31 Claims, 19 Drawing Sheets**





**FIG. 1**



**FIG. 1A**



**FIG. 2**



**FIG. 3**



**FIG. 3A**



*FIG. 4*

Case 6:12-cv-00396-PJH   Document 186-8   Filed 06/13/16   Page 215 of 364 PageID #:  5885



**FIG. 5**

Case 6:12-cv-00396-PJH   Document 186-8   Filed 06/13/16   Page 216 of 364 PageID #:  5886



**FIG. 6**



*FIG. 7*



*FIG. 8*



**FIG. 8A**



FIG. 9



**FIG. 9A**



**FIG. 10**



**FIG. 10A**



**FIG. 11**

Case 6:12-cv-00396-PJH   Document 186-8   Filed 06/13/16   Page 225 of 364 PageID #:  5895



**FIG. 12**



**FIG. 13**



**FIG. 14**

US 7,284,447 B2

1

## APPARATUS AND METHOD FOR TESTING WELD INTEGRITY

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of prior application Ser. No. 10/365,105, filed Feb. 12, 2003 now U.S. Pat. No. 6,848,322.

### FIELD OF THE INVENTION

The present apparatus relates, generally, to non-destructive testing of weld integrity and strength in the attachment weld of pad eyes and other lifting lugs.

### DESCRIPTION OF THE RELATED ART

Presently, the weld integrity of pad eye or other lifting lug welds are only tested by x-rays or liquid penetrant. This testing is at best random and cannot insure the safety or reliability of the pad eyes especially after many cycles. The failure of the pad eyes can cause equipment damage and destruction as well as compromise the safety of workers and by-standers. In particular, when drill string piping is off loaded, from a barge or supply boat, the failure of the pad eyes does cause the loss of human life due to the extreme weight of the pipe and its uncontrolled fall.

Pad eyes and lifting lugs are primarily used as an attachment point for any rigging employed to hoist, transport, or secure heavy equipment. These pad eyes are typically welded either to the equipment or to some device on which the equipment is transported. The strength of these welds cannot be easily tested after they have been manufactured. Usually, the only indication of weakness is discovered upon the complete failure of the attachment weld.

Currently, there are similar approaches to the present device disclosed in other patents. However, there is no prior art for the method or apparatus for testing the pad eye welds. U.S. Pat. No. 4,676,110 issued to James Hodo, et al., discloses a fatigue testing apparatus. However, this apparatus utilizes a method of destructive testing which would render the pad eye useless. Other prior art for pull testing is disclosed in U.S. Pat. Nos. 5,844,142 and 5,918,284, both issued to John Blanch, et al. However, these systems are not portable, are not for larger loads, and are only intended for testing the products during manufacturing. These systems are also used to test the strength for one-time use only products, such as surgical sutures and needles. The pad eye welds must withstand a vast number of loading cycles, with a varied amount of loads, throughout their useful life.

There are other prior art testing tools such as disclosed in U.S. Pat. No. 6,186,011 B1, issued to Pey Min Wung, et al., which tests the failure modes of spot welds on sheet metal. Another testing tool disclosed in U.S. Pat. No. 6,216,531 B1, issued to Joe Zhou, tests the shear strength of adhesive bonded materials. However, both of these inventions are based on pre-manufacture testing, do not consider cyclic loading over the useful life of the product, and cannot be adapted for portability. These testing tools also cannot be adapted to perform testing of finished products or to test the weld integrity before each use.

It is thus a desire to have a testing apparatus which is portable and can quickly and accurately check the integrity of a pad eye and its attachment weld before each field use. The desired apparatus should be portable, self-contained, easily transportable, and environmentally safe in order to

2

test the pad eye welds at almost any location. This testing device should be capable of being hydraulically operated as well as by other available pressurized fluid sources. This device could consist of one or multiple pressurized fluid cylinders depending on the required test loads and the configuration of the apparatus. The effective area of the cylinder piston and the pressure applied to the cylinder would determine the capacity of the apparatus. The fluid pressure is preferably supplied by a hand pump for currently optimum portability; however, other types of pumps could be utilized. A flow manifold would be needed to control the flow direction as well as measure the pressure applied to the cylinder(s). One end of the cylinder(s) would be attached to the same base as is the pad eye or attached to its own base plate. The other end is attached to a cross bar, bridge plate, or similarly functioning member. The cross bar, bridge plate, or similarly functioning member could be further supported by either cylinders or support beams.

### BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING

For a further understanding of the nature of the present device, reference should be had to the following detailed description, taken in conjunction with the accompanying drawings, in which like elements are given the same or analogous reference numbers and wherein:

FIG. 1 is a front view assembly drawing of a preferred form of the testing apparatus 20.

FIG. 1A is another embodiment of FIG. 1 illustrating the option of attachment, of the present apparatus, to the device to be tested, by clamps.

FIG. 2 is a view of FIG. 1 in its disassembled state.

FIG. 3 is a front view assembly drawing of an additional embodiment of the testing apparatus.

FIG. 3A is another embodiment of FIG. 3 illustrating the option of attachment, of the present apparatus, to the device to be tested, by clamps.

FIG. 4 is a front view of FIG. 3 in its disassembled state.

FIG. 5 is a pictorial view of the hand pump.

FIG. 6 is a pictorial view of the flow control manifold.

FIG. 7 is a simplified cross sectional representation of the cylinder depicted in FIGS. 1, 2, 3, and 4.

FIG. 8 is a front view assembly drawing of an alternative embodiment of the testing apparatus.

FIG. 8A is another embodiment of FIG. 8 illustrating the option of attachment, of the present apparatus, to the device to be tested, by clamps.

FIG. 9 is a front view assembly drawing of another alternative embodiment of the testing apparatus.

FIG. 9A is another embodiment of FIG. 9 illustrating the option of attachment, of the present apparatus, to the device to be tested, by clamps.

FIGS. 10 and 10A show a front elevation view of a dual load tester of the invention.

FIG. 11 is a perspective view of a bar load tester of the invention.

FIG. 12 is a perspective view of a beam load tester of the invention.

FIG. 13 is a perspective view of a post load tester of the invention.

FIG. 14 is a front elevation view of a basket load tester of the invention.

US 7,284,447 B2

3

## DETAILED DESCRIPTION OF EMBODIMENTS OF THE INVENTION

FIG. 1 is an assembly drawing of the present device. FIG. 2 shows the individual components of the testing apparatus 20 which preferably includes the cylinder 5, two bridge plates 1, two support beams 3, one being the right side beam and one being the left side beam, two footings 9 comprised of a right side footing and a left side footing, and two attachment plates 17, FIG. 2.

It should be appreciated that the footings 9 and the attachment plates 17 are an illustrative method of attaching the apparatus to the pad eye 19 or lifting lug. Other ways of attachment which provide adequate support and connection can be employed without departing from the scope thereof. The test apparatus can be mounted to a base plate 37 in order to provide support for the test apparatus. As seen in FIG. 1A, it can also be used without the base plate 37 and attached via clamps 38 or other conventional method directly to the base support structure to which the pad eye 19, the lifting lug, or other lifting connection it is attached to.

As shown in FIG. 1 and FIG. 2, the cylinder 5 is comprised of a shaft 13 on the topside of the cylinder, an upper 7 and lower 7A cylinder fitting, and a bottom adaptor 15. The internal portion of the cylinder, FIG. 7, is well known to those in the art and typically consists of one or more pistons 53 and o-rings or seals 53A. The said piston 53 is attached to the shaft 13 and will typically move upward, extending the cylinder shaft 13 as pressure is applied through the lower cylinder fitting 7A. When the pressurized fluid is applied through the upper cylinder fitting 7, the piston moves downward and the cylinder shaft 13 retracts. Both the cylinder shaft 13 and the bottom adaptor 15 are adapted to allow connection to a mating part preferably utilizing a pin connection. It should be appreciated that although the present device contemplates primarily pinned connections, other methods of attachment can also be used. Examples of such attachment include, but are not limited to: various threaded fasteners, taper pins, welding, and the like. The figures illustratively show two types of pins 39, 41. However, these pins 39, 41 can be interchanged as well as be substituted by a variety of other attachment methods as mentioned above. The cylinder shaft 13 is sandwiched between and connected, by a pin 39, to the two bridge plates 1. The bottom adaptor 15 is connected by a pin 39 and sandwiched between the attachment plates 17. For the preferred embodiment of the present apparatus, pressure containing hoses are connected to the upper 7 and lower 7A cylinder fittings.

Each of the two bridge plates 1 is preferably substantially identical flat rectangular bars made of steel or a material with similar strength properties. These said bridge plates 1 have a plurality of apertures 23 which are used for the fixed connections between the two bridge plates 1 and the cylinder shaft 13 and the two support beams 3. It should be appreciated that the hole 23 diameter and consequently the diameter of the pin 39 varies in size depending on the load which will be tested and are typically sized by calculation based on the maximum load contemplated. Preferably, there is a plurality of apertures 23 located on the right and left lengthwise ends of the bridge plate 1 and also located substantially symmetrically around the lengthwise and widthwise centers of the said bridge plate 1. Preferably, said apertures 23, located on the right and left lengthwise ends, should be substantially symmetrically located at each end of the bridge plates. Preferably, said apertures 23, at each end of said bridge plate 1, are substantially symmetrically

4

located with respect to said bridge plate 1 and each other. The apertures 23 located approximately midway of both the lengthwise and widthwise centers of said bridge plates 1 are preferably substantially symmetrically located at said midway point. The multiple apertures 23 are used for allowing vertical and horizontal adjustment of the test apparatus. The cylinder shaft 13 is preferably fixedly attached at substantially the lengthwise midpoint of the bridge plate 1 by pin 39. The two bridge plates 1 are fixedly attached at opposing ends, left and right side, and to the outside face of the two support beams 3 by pin 39.

The two support beams 3 are preferably hollow rectangular beams made of steel or a material with similar strength properties. These said support beams 3 have a plurality of apertures 23 on all four faces of the rectangular beam which are used for the fixed connections between the two support beams 3 and the two bridge plates 1 and the two footings 9. It should be appreciated that the hole 23 diameter and consequently the diameter of the pin 39 varies in size depending on the load which will be tested and are typically sized by calculation based on the maximum load contemplated. Preferably, the apertures 23, on each face of the support beams 3, are substantially centered lengthwise on each face of the support beam 3 and are substantially symmetrically spaced from the top of said support beam 3. The multiple apertures 23 are used for allowing vertical and horizontal adjustment of the testing apparatus. The bottom end of the two support beams 3 has a hole on each of the four faces. Preferably, the said apertures 23 are substantially symmetrically located on the lengthwise centerline of each face of the said support beam 3. As described above and shown in FIG. 1, the support beams 3 are fixedly attached near the top end of said support beam 3 sandwiched between the two bridge plates 1 and fixedly attached preferably utilizing the pin 39. The bottom end, of each said support beam 3, is preferably fixedly attached to the two footings 9 by pin 39.

The two footings 9 are preferably comprised of a steel, or a material with similar strength properties, channel bar. Preferably, the two channel sides have matching apertures 23 on each face. Preferably, said hole diameters are substantially symmetrically centered relative to the said channel bar height and substantially symmetrically spaced between the respective apertures centers on each channel wall face. The two footings 9 will preferably be attached by welding to the test apparatus base plate 37 or attached by clamps to the pad eye base plate 21. Preferably, the two footings 9 are substantially horizontally and symmetrically centered on each side of the pad eye 19. This said placement, of the two footings 9, is assured through the substantially symmetric connection of the support beams 3 to bridge plate 1. This said positioning insures that the testing apparatus will provide an approximately equal upward force on the pad eye 19.

The two attachment plates 17 are comprised of two substantially identical pieces of flat steel, or a material with similar strength properties, bar. The attachment plates 17 have a plurality of apertures 23. The hole 23 diameters are substantially centered along the lengthwise centerline of the flat face of the attachment plates 17. The said apertures 23 are further substantially symmetrically located at opposing lengthwise ends of the said attachment plates 17. The attachment plate 17 is fixedly attached on the upper end, by pin 39, to the end of the bottom adaptor 15. The said bottom adaptor 15 is fixedly attached, by pin 39, pinned between the two attachment plates 17. The lower end of said attachment plates 17 is attached to the pad eye 19 by pin 39. The pad eye 19 is sandwiched between the two attachment plates.

US 7,284,447 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

An alternative embodiment of this structure, shown in FIGS. 8 and 8A, could be an A-frame wherein the cylinder is attached to a crossbar or the apex of the A-frame.

FIG. 3 is an assembly drawing of an additional embodiment of the present apparatus.

FIG. 4 shows the individual components of said additional embodiment 30 which is preferably comprised of the two cylinders 5, one being the right side cylinder and one being the left side cylinder, two bridge plates 1, the support beam 47, and two footings 9 comprised of a right side footing and a left side footing.

It should be appreciated that the footings 9 and the attachment plates 17 are an illustrative method of attaching the apparatus to the pad eye 19 or lifting lug. Other ways of attachment which provide adequate support and connection can be employed without departing from the scope thereof. The test apparatus can be mounted to a base plate 37 in order to provide support for the test apparatus, it can be used without the base plate 37 and attached via clamps 38 or other suitable method directly to the base support structure to which the pad eye 19, lifting lug, or other lifting connection is attached.

As shown in FIG. 3, FIG. 3A, and FIG. 4, the two cylinders 5 are comprised of similar components as the cylinder 5 for the single cylinder apparatus. It should be appreciated that since the actual cylinder size may change according to the required load the components may also change in size. Both the cylinder shaft 13 and the bottom adaptor 15 are adapted to allow connection to mating parts preferably utilizing a pin connection. The cylinder shaft 13, of the right side cylinder 5 is fixedly attached by a pin 39 to the right end and in between the two bridge plates 1. The cylinder shaft 13, of the left side cylinder 5, is fixedly attached by a pin 39 to the left end and in between the bridge plates 1. The bottom adaptor 15, of the right cylinder 5, is fixedly attached, by a pin 39 to the right side footing 9. The bottom adaptor 15, of the left cylinder 5, is fixedly attached, by a pin 39 to the left side footing 9. It should be noted and appreciated by those in the art that the figures illustratively show two types of pins 39, 41. However, these pins 39, 41 can be interchanged as well as be substituted by a variety of other attachment methods as mentioned above. Both the right side and left side cylinders 5 are each fitted with two cylinder fittings 7 and 7a. For the preferred utilization of the present device, pressure containing hoses are connected to the two cylinder fittings 7 and 7A on each cylinder 5.

Each of the two bridge plates 1 are preferably substantially identical flat rectangular bars made of steel or a material with similar strength properties. These said bridge plates have a plurality of apertures 23 which are used for the fixed connections between the two bridge plates 1 and the cylinder shafts 13, of both cylinders 5, and the support beam 47. It should be appreciated that the hole 23 diameter and consequently the diameter of the pin 39 varies in size depending on the load which will be tested and are typically sized by calculation based on the maximum load contemplated. Preferably, there are a plurality of apertures 23 located on the right and left lengthwise ends of the bridge plate 1 and also located substantially symmetrically around the lengthwise and widthwise centers of the said bridge plates 1. Preferably, the said apertures 23, located on the right and left lengthwise ends, should be substantially symmetrically located at each end of the bridge plates 1. Preferably, said apertures 23, at each end of said bridge plate 1, are substantially symmetrically located with respect to said bridge plate 1 and each other. The said apertures 23 located approximately midway of both the lengthwise and widthwise centers of said bridge

plates 1 are preferably substantially symmetrically located at said midway point. The multiple apertures 23 are used for allowing vertical and horizontal adjustment of the test apparatus.

The support beam 47 is preferably a fabricated hollow rectangular beam, having a top side and a bottom side, in which two opposing bottom sides extend, in the lengthwise direction, beyond the other two opposing sides. The said opposing extended sides form a channel at the bottom end of the said support beam 47. The support beam 47 has a plurality of apertures 23 on all four faces of the rectangular beam which are used for the fixed connections between the support beam 47 and the two bridge plates 1 and the two footings 9. It should be appreciated that the hole 23 diameter and consequently the diameter of the pin 39 varies in size depending on the load which will be tested and are typically sized by calculation based on the maximum load contemplated. Preferably, said apertures 23, on each face of the support beam 47 are substantially centered lengthwise on each face of the support beam 47 and are preferably substantially symmetrically spaced from the top of said support beam 47. The multiple apertures 23 are used for allowing vertical and horizontal adjustment of the testing apparatus. As shown in FIG. 4 and described above, the bottom channeled end of the support beam 47 has a hole on each face of the channel portion. These hole diameters are substantially symmetrically located in the center of each face of the said support beam bottom channel. As described above and shown in FIG. 3, the support beam 47 is fixedly attached near the top end of the beam sandwiched between the two bridge plates 1 preferably utilizing the pin 39. The bottom-channeled end of the support beam 47 is set over the pad eye 19. The said bottom channeled end of the support beam 47 is fixedly attached, preferably by pin 39, to the pad eye 19.

The two footings 9 are preferably comprised of a steel, or a material with similar strength properties, channel bar. Preferably, the two channel sides have matching apertures 23 on each face. Preferably said hole diameters are substantially symmetrically centered relative to the said channel bar height and substantially symmetrically spaced between the respective hole centers on each channel wall face. The two footings 9 will preferably be attached by welding to the test apparatus base plate 37 or attached by clamps to the pad eye base plate (not shown). Preferably, the two footings 9 are substantially horizontally and symmetrically centered on each side of the pad eye 19. This said placement, of the two footings 9, is assured through the substantially symmetric connection of the right and left cylinders 5 to the bridge plates 1. This said positioning insures that the testing apparatus will provide an approximately equal upward force on the pad eye 19.

FIG. 10 illustrates an alternate embodiment of the invention, a dual load tester 107. Dual load tester 107 permits the simultaneous load testing of two connecting members, such as pad eyes 19 or lifting lugs. Referring to FIG. 10, dual load tester 107 includes opposing arms 108. The first ends 92 of arms 108 are connected by pins 39 to pad eyes 19. The second ends of arms 108 are pivotally connected by pin 39. Brackets 90 are preferably releasably attached to the insides of arms 108 and are adjustable along the lengths or arms 108. A hydraulic cylinder 5 having a retractable and cylinder shaft 13 is mounted between brackets 90. The hydraulic fluid is supplied to cylinder 5 through hoses 67 attached to cylinder fittings 7 and 7a. A hydraulic pump, flow control manifold, and directional valve (not here illustrated) may be used to increase the hydraulic pressure on, and to move a piston in, cylinder 94 so as to urge arms 108 apart.

US 7,284,447 B2

7

FIG. 10a is substantially similar to FIG. 10 except that the first end of arms 108 is attached to the pad eye 19 by the use of a tension cable 292, which can be but is not limited to a steel or other high tensile strength cable. Tension cable 292 can be attached to arm 108 via a pin 339 through an O-loop arrangement of cable, or any other means conventional in the art. It should be noted that cable 292 can be a plurality of cables. Tension cable 292 can be attached to pad eye 19 via a pin 239 through an O-loop arrangement of cable, or any other means conventional in the art.

It should be appreciated that one skilled in the art would recognize that the pistons utilized in all embodiments of this invention could be attached to the pad eye, lug, or test piece via the use of alternate attachment means, such as but not limited to, cables or tension wires. It should also be appreciated that one skilled in the art would recognize that cables or tension wires could be utilized in attaching pistons to a variety of frameworks including, but not limited to, support columns, bridge plates, cross bars, mounted framework, arms, brackets, or footing. It should also be appreciated that one skilled in the art would recognize that cables or tension wires could be utilized in attaching the test piece to a variety of frameworks or bridges including, but not limited to, support columns, bridge plates, cross bars, mounted framework, arms, brackets, or footing.

FIG. 11 illustrates an alternative embodiment of the invention, a bar load tester 109. Bar load tester 109 permits load testing of a pad eye 19 or lifting lug mounted on a bar 114. Frame 111 of bar load tester 109 includes a base 115, bridge plates 112, and a support column 113. Support column 113 has a spaced apart plurality of apertures 123. Base 115 is preferably immovably supported by bar 114. Hydraulic cylinders 5 preferably have lower ends releasably attached to base 115 and cylinder shafts 13 on their upper ends being releasably attached to bridge plates 112. As its hydraulic fluid pressure in cylinders 5 increases, their shafts extend so as to move bridge plates 112 and support column 113 upward and away from base 115, as previously described with respect to the foregoing described embodiments of the invention. A lever arm 116 is substantially supported on one end preferably by support column 113. Flange 118 on lever arm 116 is temporarily pinned to pad eye 19 on bar 114. Post 120 supported by bar 114 provides additional support to lever arm 116 when needed.

FIG. 12 illustrates an alternative embodiment of the invention, a beam load tester 122. Beam load tester 122 permits load testing of a pad eye 19 or lifting lug installed on a beam 126. Base 128 of beam load tester 122 is clamped to beam 126 and supports the lower ends of hydraulic cylinders 5 in a conventional fashion. The cylinder shafts 13 are connected at their upper ends to bracket 132 by preferably a bar pin 98. Bracket 132 is also temporarily pinned to pad eye 19 by a pin 39.

FIG. 13 illustrates an alternative embodiment of the invention, a post load tester 134. Post load tester 134 advantageously permits load testing of a pad eye 19 or lifting lug installed on a post 138. Base 101 of load tester 134 is attached to post 138 by, but is not limited to, clamps 102 and supports the lower ends of hydraulic cylinders 5. Lower end of cylinders 5 is attached to base 101 by, but is not limited to, pin 99. The shafts 13 of cylinders 5 are connected at their upper ends to bracket 100 by, but not limited to, pins 98. Bracket 100 is also temporarily pinned 39 to pad eye 19.

FIG. 14 illustrates an alternative embodiment of the invention, a basket load tester 148. Basket load tester 148 permits load testing of a pad eye 19 or lifting lug installed on a basket or beam 152. Load tester 148 includes opposing

8

arms 154 and 156 pivotally connected near their centers by pin 41. The connection at pin 41 permits rotational movement between arms 154 and 156 in scissor-like fashion. The connection pin 41 holds the arms 154 and 156 in substantially an "X" formation. Lower end 158 of arm 156 has a spaced apart plurality of apertures 223 and is temporarily pinned to a pad eye 19 or lift lug on basket or beam 152. Lower end 160 of arm 154 is temporarily anchored to basket or beam 152. The upper ends 162 and 164 of arms 154 and 156, respectfully, are releasably connected by hydraulic cylinder 5 and shaft of cylinder 13 in a conventional manner.

It should be understood that the frames in these embodiments could be modified in many aspects to achieve the substantially same function and substantially same result of the present device. For instance, the bridge plate 1 could be curved, angled, have additional members attached thereto, and the like. The structure and frame could be further modified using springs or other mechanisms to exert a tensioning force on the pad eye or lifting lug attachment weld.

Operating Apparatus

Preferably, as shown in FIG. 5, the hand pump 40 is basically comprised of a reservoir 59, a carrying handle 57, a pump 61, the pumping handle 71, a pump inlet 65, a pump outlet 63, fittings 82, hoses 67 and a reservoir cap 69. It should be appreciated that although FIG. 5 shows a small typical hand pump, many varieties and combinations of pumps and fluid reservoirs or accumulators could be used to actuate this test apparatus. For the present device, a small hand pump is well suited for portability. If an adaptation of this apparatus were, for example, to be used in an industrial setting the pump may be otherwise powered, may be stationary, have larger reservoirs, use accumulators, use different fluids, or a multitude of different adaptations. For the present contemplated usage of this device, the cylinder shaft 13 is preferably actuated by a hand pump 40. The hand pump 40 is connected to the flow control manifold 50 (FIG. 6) by pressure containing hoses. The pump 61 is operated through the use of the pump handle 71.

As shown in FIG. 6, the flow control manifold 50 is comprised of a manifold 83, fittings 81, a pressure gauge 73, a directional valve 77, a directional lever 79, and a carrying handle 75. The direction of actuation and flow is preferably controlled by a directional valve 77. The directional valve 77 is further controlled by the rotational directional lever 79. Preferably the said directional lever can only be turned approximately ninety degrees in one direction and then approximately ninety degrees in the opposite direction. It should be appreciated, as with the hand pump above, that this is a typical manifold selected for the presently contemplated use of this device. However, as this apparatus is adapted for any variety of locations, the type, size, and configuration of the flow control manifold, including the type and configuration of the directional valve 77, as well as even the method of flow control itself may require substantial change. The flow control manifold 50 is preferably connected to the upper 7 and lower 7A cylinder fittings by means of pressure containing hoses 67. The flow control manifold 50 controls the direction of flow either into the lower cylinder fitting 7A, causing the cylinder shaft 13 to extend, or into the upper cylinder fitting 7 causing the cylinder shaft 13 to retract. The flow control manifold 50 also measures the pressure of the fluid. This pressure is shown on the mounted gauge but is also available to be displayed on a variety of recorders, computers, controllers, and the like.

US 7,284,447 B2

9

In use, the present device can be transported in the disassembled condition to any location where some pad eye or lifting lug will be utilized or requires testing. One possible criterion for selecting a particular embodiment may be the required test load.

In use, prior to selecting the proper embodiment of the present device, the desired test load must be known. Typically, this value will be approximately 1.5 times greater than the rated load capacity of the pad eye or lifting lug. If such a rated load is not readily accessible, the test value would be approximately 1.5 times the weight that will be supported by the pad eye or lifting lug. It should be understood that the said multiplying factor of 1.5 is only a preferred safety factor; therefore, the value can vary depending on a user's experience or preference and should not be used as a limiting factor of the scope of the claimed apparatus. After determining the said load test value, the proper testing apparatus will be comprised of the correct size and number of cylinders 5 which can generate the required test load. The required test load is generated by the cylinder 5 and is produced by the combination of the pressure, produced by the hand pump 40 and measured by the manifold pressure gauge 73, acting over the effective area of the cylinder. The effective area of the cylinder is calculated based on the diameter of the piston 53 within the cylinder 5. As is known to those in the art, the effective area of the piston 53 can be obtained from the cylinder manufacturer. As is also well known to those in the art, the said effective area is multiplied by the pressure to predetermine the produced test load. After determining the test load as described above, selecting the cylinder size, as described above, and determining the required pressure to produce the said test load, as described above, the hand pump 40 is used to produce the required pressure.

In use, the test apparatus is assembled as shown in FIGS. 1, 1A, 3, or 3A and discussed above. The apparatus is then connected to the pad eye 19, lifting lug, or other device to be tested. The connection, as shown in FIGS. 1 and 1A can include the use of attachment plates 17. In addition, a pressure containing hose 67 is connected to each of the cylinder fittings 7 and 7A on the cylinders 5. The other end of each pressure containing hose is connected to the flow control manifold 50. The preferred embodiment utilizes "quick connect" connectors for the pressure containing fittings, however, other types of pressure containing fittings may be utilized. Preferably, the cylinder fittings 7 and 7A, the manifold fittings 81, and the pump fittings are all male "quick connect" pressure containing fittings. Each pressure containing hose is preferably comprised of some length of hydraulic quality hose with a female "quick connect" fitting on each end. The pressure containing hose will have a pressure rating which exceeds the pressure required for the testing. Another set of the above described pressure containing hoses is connected between the flow control manifold 50 and the hand pump 40. It should be understood that the exact sequence and location of connection of the pressure containing hoses may vary depending on the version of the testing apparatus as well as the type and model of pump and flow control manifold. After the pressure containing hoses have been connected, the pressurized system, comprised of the hoses and associated fittings, the hand pump 40, the flow control manifold 50, and the cylinders 5, is known to those in the art as a closed system. Therefore, any air, contained in the closed pressurized system must be removed. The said air removal is known as system bleeding to those in the art. The preferred method of bleeding the system is by moving the pressurized fluid through the

10

pressurized system, which forces any air through the system and into the reservoir. After this is performed, the entire system is filled only with the pressurized fluid. The movement of the fluid is accomplished by alternately moving the pump handle 71 in an upwardly and downwardly motion. This said movement of the pump handle 71 causes the pump to push fluid through one of the hoses, through the flow control manifold 50, and into the lower cylinder fitting 7A. This causes the said fluid to flow underneath the piston 53 and begin forcing the piston 53 in an upwardly direction. As the piston 53 begins to rise, the fluid, resting above the piston 53 begins to be forced out of the upper cylinder fitting 7, through the pressure containing hose, connected to the upper cylinder fitting 7, through the flow control manifold 50, through the pump 61, and into the reservoir 59. This described flow and the accompanied rise of the piston 53 causes the cylinder shaft 13 to extend.

Turning the directional lever 79 ninety degrees from the position described in the above paragraph will cause the fluid to flow into the upper cylinder fitting 7 when the pump 61 is actuated by the moving the pump handle 71 in alternating upwardly and downwardly directions as described above. The said pump handle 71 movement causes the pump to push fluid through one of the hoses, through the flow control manifold 50, and into the upper cylinder fitting 7. This causes the said fluid to flow above the piston 53 and begin forcing the piston 53 in a downwardly direction. As the piston 53 begins to move in the said downward direction, the fluid, resting below the piston 53 begins to be forced out of the lower cylinder fitting 7A, through the pressure containing hose connected to the lower cylinder fitting 7A, through the flow control manifold 50, through the hand pump 40, and into the reservoir 59. This described flow of the fluid and the accompanied downward movement of the piston 53 causes the cylinder shaft 13 to retract.

In use, the single cylinder version of the present device produces an upward force on the pad eye or lifting lug when the cylinder shaft 13 retracts. Therefore, the directional lever 79 shall be moved into the position which causes the fluid to flow into the upper cylinder fitting 7.

In use, the double cylinder version of the present device produces an upward force on the pad eye or lifting lug when the cylinder shaft 13 extends. Therefore, the directional lever 79 shall be moved into the position which causes the fluid to flow into the lower cylinder fitting 7A.

In use, the pressure gauge 73 will indicate the system pressure. As the pump handle 71 is moved, as described above, the pressure, indicated on the pressure gauge will increase. When the indicated pressure is approximately the same as the calculated pressure corresponding to the required test load, as described above, then the proper test load has been applied. It should be understood that this paragraph describes the operation regardless of the direction of fluid flow or the position of the directional valve handle 79.

In use, after the test is completed, the directional valve 79 should be turned ninety degrees, and the pump 61 should be actuated by the pump handle 71, as previously described, until the system pressure, as indicated by the gauge or other monitoring device, is completely relieved.

It should be appreciated that the directional lever 79 does not actually control flow but rather moves the directional valve 77 into a position that changes the flow direction. The detailed workings of the directional valve 77 are well known to those skilled in the art.

Those who are skilled in the art will readily perceive how to modify the present apparatus still further. For example,

US 7,284,447 B2

11

most of the illustrated connections utilize pins, however, it should be recognized that other methods of connection may be utilized, such as threaded connectors or if the unit will be modified for permanent installation as opposed to portable, the connections could be welded. Further, the frames or structures, of this apparatus, do not need to be comprised of substantially vertical and horizontal members. These members could be curved, angled, or joined in a manner to provide the substantially same function and substantially same result in testing the pad eye or other lifting lug attachment welds. FIGS. **8** and **9** illustrate two such modifications where the alternative embodiment consists of an A-frame structure and FIG. **8** illustrates a bridge plate or cross bar being used with the A-frame. FIGS. **8A** and **9A** show an alternative embodiment using clamps **38** for attachment to the base support structure to which the pad eye **19**, the lifting lug, or other lifting connection it is attached to. Additionally, there are other means of providing pressure to actuate the cylinders, other configurations for the pump equipment and associated hoses, as well as additional measuring and measurement recording devices which can be used within and in conjunction with the present device. Further, other pressurized fluids can be used to actuate the cylinders. In addition, the subject matter of the present device would not be considered limited to a particular material of construction. Therefore, many materials of construction are contemplated by the present apparatus including but not limited to various metals or combinations of metals. As many possible embodiments may be made of the present apparatus without departing from the scope thereof, it is to be understood that all matter herein set forth or shown in the accompanying drawings is to be interpreted as illustrative and not in a limiting sense.

FIG. **10** illustrates how dual load tester **107** is used to simultaneously load test two pad eyes **19**, the lifting lug, or other lifting connection it is attached to. First ends **92** of arms **109** are attached to the pad eyes **19**, the lifting lug, or other lifting connection it is attached to. Hydraulic pressure in cylinder **5** is then increased to extend its shaft, thus urging arms **108** apart and applying tension force to the pad eyes **19**, the lifting lug, or other lifting connection it is attached to. A pressure gauge on the flow control manifold (not here shown) is used to monitor the hydraulic pressure as it is increased. The force applied to pad eyes **19**, the lifting lug, or other lifting connection it is attached to by arms **108** is readily calculated by the use of pressure gauge **73**.

In FIG. **11**, the strength and integrity of pad eye **19**, the lifting lug, or other lifting connection it is attached to is tested by bar load tester **109** as follows. Cylinders **5** are hydraulically actuated to urge bridge plates **112** and support column **113** away from beam **114**. Lever arm **116** is thus urged upward by support column **113**, applying a tension force to pad eye **19**, the lifting lug, or other lifting connection it is attached to through flange **118**. The force applied to pad eyes **19**, the lifting lug, or other lifting connection it is attached to by lever arm **116** is readily calculated by the use of pressure gauge **73**.

In FIG. **12**, the strength and integrity of pad eye **19**, the lifting lug, or other lifting connection it is attached to is tested by beam load tester **122** as follows. Cylinders **5** are hydraulically actuated by application of hydraulic fluid fed into cylinders **5** by connections **7** and **7a** as needed to extend their shafts **13** so as to urge bracket **132** upward, applying a shearing force to the weld connection between pad eye **19** the lifting lug, or other lifting connection it is attached to and beam **126**. The force applied to pad eyes **19**, the lifting lugs,

12

or other lifting connection it is attached to by bracket **132** is readily calculated by the use of pressure gauge **73**.

In FIG. **13**, the strength and integrity of pad eye **19** the lifting lug, or other lifting connection it is attached to are tested by post load tester **134** as follows. Cylinders **5** are hydraulically actuated to extend their shafts so as to urge bracket **100** upward, applying a shearing force to the weld connection between pad eye **19** the lifting lug, or other lifting connection it is attached to and post **138**. The force applied to pad eyes **19** the lifting lugs, or other lifting connection it is attached to by bracket **100** is readily calculated by the use of pressure gauge **73**.

In FIG. **14**, the strength and integrity of pad eye **19** or lifting lug is tested by basket load tester **148** as follows. Cylinder **5** is hydraulically actuated to extend its shaft **13** so as to urge apart the upper ends **162** and **164**, and the lower ends **158** and **160**, of arms **154** and **156**, respectfully. This action applies a tension force to pad eye **19** or lifting lugs through lower end **158** of arm **154**. The force applied to pad eye **19** the lifting lugs, or other lifting connection it is attached to by arm **154** is readily calculated by the use of pressure gauge **73**.

It may be seen from the preceding description that a new and improved pad eye testing apparatus and method has been provided. Although very specific examples have been described and disclosed, the invention of the instant application is considered to comprise and is intended to comprise any equivalent structure and may be constructed in many different ways to function and operate in the general manner as explained hereinbefore. Accordingly, it is noted that the embodiment of the new and improved pad eye testing apparatus and method described herein in detail for exemplary purposes is of course subject to many different variations in structure, design, application and methodology. Because many varying and different embodiments may be made within the scope of the inventive concept(s) herein taught, and because many modifications may be made in the embodiment herein detailed in accordance with the descriptive requirements of the law, it is to be understood that the details herein are to be interpreted as illustrative and not in a limiting sense.

What is claimed is:

1. An apparatus for non-destructively testing the weld strength and integrity of at least one weld when desired comprising:

a framework including at least two pieces;

at least one fluid containing cylinder, for moving a piston therein inwardly and outwardly as fluid is moved out of or into the cylinder, respectively;

an attachment structure for attaching to a pad eye or any device to be tested;

a base;

said base including a clamp;

said at least one fluid containing cylinder attached to said clamp;

at least one bracket; and

said at least one bracket being releasably attached to said pad eye;

whereby moving fluid into said at least one fluid cylinder causes said piston to move outwardly, thereby pushing the bracket upward, thereby creating tension on the pad eye, thereby testing the integrity of the weld

2. The apparatus of claim **1** further including;

at least two opposing arms;

said arms being attached substantially medially to each other in the shape of an "X";

said arms having upper ends and lower ends;

US 7,284,447 B2

13

at least one base;

at least one of said lower ends of said arms being attached to said pad eye;

at least one of said lower ends of said arms being attached to said base;

at least one fluid containing cylinder;

said fluid containing cylinder being attached between said upper ends of said arms;

whereby moving fluid into said at least one fluid cylinder causes said piston to move outwardly, thereby pushing the arm outward in a reverse-scissoring motion, thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**3.** The apparatus in claim **1**, further including:

a plurality of arms having top and bottom ends;

said arms being held via at least one hinge on the top ends;

said arms being releasably connected to at least one pad eye at said bottom end of each arm;

said arms being connected to at least one other arm via a fluid containing cylinder;

whereby moving fluid into the cylinder causes the piston to move outwardly to create tension on the pad eye, thereby testing the integrity of the weld.

**4.** The apparatus in claim **3**, wherein said arms can be curved.

**5.** The apparatus in claim **3**, wherein said arms can be angled.

**6.** The apparatus of claim **1**, wherein the cylinder further comprises:

a first end and a second end;

a substantially cylindrical piston carried in said cylinder for movement therein along an axis, of said cylinder, being substantially perpendicular to a plane formed between a pad eye or any device to be tested and a weld attaching said pad eye or the device to be tested to a base;

a shaft, having a first end and a second end, the first end fixedly attached to said internal piston and said second end is fixedly attached to at least one of said arms; and first and second pressurized fluid attachment apparatus;

wherein said first pressurized fluid attachment apparatus is disposed axially between said cylinder first end and said piston;

wherein said second pressurized fluid attachment apparatus is disposed axially between said cylinder second end and said piston; and

wherein pressurized fluid enters said cylinder through said first attachment apparatus or said second attachment apparatus.

**7.** The apparatus of claim **6**, wherein said cylinder comprises:

said second end of said shaft is fixedly attached to at least one of said arms.

**8.** The apparatus in claim **1**, further including:

a support column with a bottom and top end;

a support bar which is releasably attached to said pad eye;

said support bar being releasably attached to said support column;

a bridge plate or cross bar;

said support column being releasably attached to said bridge plate or column;

at least two fluid containing cylinders;

said cylinders being attached to said bridge plate or cross bar;

a base;

said cylinders also being attached to the base;

14

whereby moving fluid into the cylinder causes the piston to move outwardly,

thereby pushing the bridge plate and support column upward, this will also cause said bar to move upward thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**9.** The apparatus of claim **8** whereby;

moving fluid into the cylinder causes the piston to move downwardly, thereby

pulling the bridge plate and support column downward, this will also said bar to move downward thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**10.** The apparatus of claim **1** whereby;

moving fluid into said at least one fluid cylinder causes said piston to move

inwardly, thereby pulling the bracket downward, thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**11.** The apparatus of claim **1** whereby,

said clamp is attached to a beam.

**12.** The apparatus of claim **1** whereby,

said clamp is attached to a pole.

**13.** The apparatus of claim **2** whereby;

moving fluid into said at least one fluid cylinder causes said piston to move

inwardly, thereby pulling the arm outward in a scissoring motion, thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**14.** A method for testing weld strength and integrity of an attachment weld when desired comprising the steps of:

providing a desired test piece wherein said test piece comprises a pad eye,

lifting lug, or other device being tested;

providing a framework including at least two pieces;

providing at least one fluid cylinder, having a first end and a second end,

mounted with the framework, for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively;

providing a first and second attachment apparatus, wherein a pressurized fluid

can enter in or exhaust from said cylinder;

providing an attachment structure for attaching to said test piece;

providing said mounted framework; and

assembling the framework with the mounted cylinder fixedly attached on the

mounted framework;

whereby urging fluid into the cylinder causes the piston to move outwardly to

tension the pad eye thus testing the integrity of the weld, and

whereby the testing technician or test operator can inspect the tested device

and the weld for any structural damage or deformation.

**15.** The method as in claim **14**, whereby urging fluid into the cylinder causes the piston to move inwardly to tension the test piece thus testing the integrity of the weld.

**16.** The method as in claim **14**, further providing said mounted framework with;

a plurality of arms having top and bottom ends;

attaching said arms via at least one hinge on the top ends;

releasably connecting said arms to at least one pad eye at said bottom end of

each arm;

US 7,284,447 B2

15 16

releasably connecting said arms to at least one other arm via a fluid containing cylinder;

moving fluid into the cylinder to cause the piston to move outwardly to create tension on the pad eye, thereby testing the integrity of the weld.

**17.** The method of claim **16** whereby;

moving fluid into the cylinder to cause the piston to move inwardly to create

tension on the pad eye, thereby testing the integrity of the weld.

**18.** The method as in claim **14**, further providing said mounted framework with;

a support column with a bottom and top end;

releasably attaching a support bar to said pad eye;

releasably attaching said support bar to said support column;

providing a bridge plate or cross bar;

releasably attaching said support column to said bridge plate or cross bar;

providing at least two fluid containing cylinders;

attaching said cylinders to said bridge plate or column;

providing a base;

attaching said cylinders to said base;

moving fluid into the cylinder causing said piston to move outwardly, thereby

pushing the bridge plate and support column upward, also causing said bar to move upward thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**19.** The method of claim **18** whereby;

moving fluid into the cylinder causes the piston to move downwardly, thereby

pulling the bridge plate and support column downward, also causing said bar to move downward thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**20.** The method of claim **14**, further providing;

a base;

attaching a clamp to said base;

attaching at least one fluid containing cylinder to said clamp;

providing at least one bracket;

releasably attaching said at least one bracket to said pad eye;

moving fluid into said at least one fluid cylinder causing said piston to move

outwardly, thereby pushing the bracket upward, thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**21.** The method of claim **20** whereby;

moving fluid into said at least one fluid cylinder causes said piston to move

inwardly, thereby pulling the bracket downward, thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**22.** The method of claim **20** providing,

attaching said clamp to a beam.

**23.** The method of claim **20** providing,

attaching said clamp to a pole.

**24.** The method of claim **14**, further including;

providing at least two opposing arms;

attaching said arms substantially medially to each other in the shape of an "X";

providing said arms with upper ends and lower ends;

providing at least one base;

attaching at least one of said lower ends of said arms to said pad eye;

attaching at least one of said lower ends of said arms to said base;

providing at least one fluid containing cylinder;

attaching said fluid containing cylinder between said upper ends of said arms;

moving fluid into said at least one fluid cylinder causing said piston to move

outwardly, thereby pushing the arm outward in a reverse-scissoring motion, thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**25.** The method of claim **24** whereby;

moving fluid into said at least one fluid cylinder causing said piston to move

inwardly, thereby pulling the arm outward in a scissoring motion, thereby creating tension on the pad eye, thereby testing the integrity of the weld.

**26.** The method as in claim **14**, further including calculating a required cylinder test pressure, comprising the steps of;

determining a required test load based on the weight to be supported by the

test piece;

determining an effective area of the cylinder piston;

dividing said test load by the effective area of the cylinder piston;

assembling the framework with the mounted cylinder fixedly attached at the

first end of said cylinder to said test piece;

retracting the cylinder shaft thereby exerting a force substantially

perpendicular to a plane formed between a pad eye or other lifting lug being tested and a weld attaching said pad eye or lifting lug to a base and away from said test piece;

increasing said substantially perpendicular force by increasing the pressure of

the pressurized fluid in the cylinder;

increasing said pressure until the calculated required pressure is reached; and

inspecting the test piece and its attachment weld for any structural damage or deformation.

**27.** A method for testing the strength and integrity of an attachment weld when

desired with a single cylinder apparatus comprising the steps of:

providing at least one desired test piece;

providing a framework including at least two pieces;

mounting said single cylinder to the framework, said cylinder having a first

end, a second end, and a piston therein, wherein said piston moves inwardly and outwardly as fluid is moved out of or into said cylinder respectively;

mounting said framework about said at least one desired test piece;

assembling the framework with said at least one mounted cylinder fixedly attached at one end of said cylinder to said desired test piece;

retracting the cylinder shaft thereby exerting a force substantially

perpendicular to a plane formed between said desired test piece, being tested, and a base and in a direction away from said test piece;

US 7,284,447 B2

17

increasing said substantially perpendicular force by increasing the pressure of the fluid in the cylinder;

increasing said pressure until a pre-calculated required pressure is reached; and

inspecting the test piece for damage or deformation.

**28.** The method as in claim **27** wherein said test piece comprises pad eye, lifting lug, or other device to be tested.

**29.** A method for non-destructively testing strength and integrity of a structure with a multiple cylinder test apparatus comprising the steps of:

providing at least one desired test piece;

providing a framework including at least two pieces; wherein said base may be a part of said desired test piece;

mounting a plurality of fluid cylinders to the framework, said plurality of fluid cylinders each having a first end, a second end, and a piston therein, wherein said pistons each moving inwardly and outwardly as fluid is moved out of or into said plurality of fluid cylinders respectively;

mounting said framework about said at least one desired test piece;

assembling the framework with said plurality of fluid cylinders each fixedly attached at said first end of each said plurality of fluid cylinders to said base and at said second end to a cross bar;

extending the cylinder shafts thereby exerting a force substantially

18

perpendicular to and toward said cross bar;

transferring said force from said cross bar to a support beam which is attached to said desired test piece;

transferring said force from said support beam to said desired test piece;

increasing said force by increasing the pressure of the fluid in the cylinder;

increasing the pressure until a pre-calculated required pressure is reached, wherein said pre-calculated required pressure produces a force which is below the rated strength of the test piece; and

inspecting the test piece for damage or deformation.

**30.** A method for non-destructively testing the strength and integrity of a test piece having first and second parts, which comprises:

anchoring the first part of the test piece;

attaching a piston from a hydraulic cylinder to the second part of the test piece;

moving the piston to put the test piece under tension, wherein the load produced under the tension is below the rated strength of the test piece; and

inspecting the test piece for damage.

**31.** The method according to claim **30**, wherein said test piece is a pad eye.

* * * * *

US007284447C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10473rd)

# United States Patent
## Scarborough

(10) **Number:** US 7,284,447 C1
(45) **Certificate Issued:** *Jan. 13, 2015

(54) **APPARATUS AND METHOD FOR TESTING WELD INTEGRITY**

(75) Inventor: **Randall L. Scarborough**, Carencrow, LA (US)

(73) Assignee: **Randall L. Scarborough**, Carencro, LA (US)

**Reexamination Request:**
No. 90/012,842, Apr. 15, 2013

**Reexamination Certificate for:**
Patent No.: 7,284,447
Issued: Oct. 23, 2007
Appl. No.: 11/047,127
Filed: Jan. 31, 2005

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/365,105, filed on Feb. 12, 2003, now Pat. No. 6,848,322.

(51) **Int. Cl.**
*G01N 3/20* (2006.01)

(52) **U.S. Cl.**
USPC ............................................................ **73/850**

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,842, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Tuan H Nguyen

(57) **ABSTRACT**

An apparatus and method for testing weld integrity is disclosed which is portable, self-contained, adaptable for field use in most locations, and can verify the integrity of attachment welds. The testing apparatus includes a cylinder or cylinders, attachable to the desired object to be tested on one end and to a cross bar on the other end, support beam or beams which, along with the cylinder or cylinders, support the test apparatus, a supply for pressurized fluid, and a control manifold for flow direction and pressure measurement. The pressurized fluid moves the cylinder shaft creating a load on the test piece. As the fluid pressure increases, the cylinder shafts extend or retract and exert a required load on the test piece. The test piece is then inspected for breakage or damage such as deformation or attachment weld cracking.



US 7,284,447 C1

1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claim 29 is cancelled.

Claims 1, 14, 15 and 27 are determined to be patentable as
amended.

Claims 2-13, 16-26, 28 and 30-31 were not reexamined.

1. An apparatus for non-destructively testing [the] weld
strength and integrity of at least one *attachment* weld [when
desired], comprising:

a framework including at least two pieces;

at least one fluid containing cylinder, for moving a piston
therein inwardly and outwardly as fluid is moved out of
or into the *at least one fluid containing* cylinder, respec-
tively;

an attachment structure for attaching to a pad eye or [any]
*other* device [to be tested] *joined by the at least one
attachment weld to another structure*;

a base;

said base including a clamp;

said at least one fluid containing cylinder attached to said
clamp;

at least one bracket; and

said at least one bracket being releasably attached to said
pad eye *or other device*;

whereby moving fluid into said at least one fluid cylinder
causes said piston to move outwardly, thereby pushing
the *at least one* bracket upward, thereby creating tension
on the pad eye[,] *or other device*, thereby testing the
integrity of the *at least one attachment* weld.

14. A method for testing weld strength and integrity of an
attachment weld [when desired] comprising the steps of:

providing [a desired test piece wherein said test piece com-
prises] *the attachment weld joining* a pad eye, lifting lug,
or other device [being tested] *to another structure*;

providing a framework including at least two pieces;

providing at least one fluid cylinder, having a first end and
a second end, mounted with the framework *to produce a
mounted cylinder within a mounted framework*, for
moving a piston therein inwardly and outwardly as fluid
is moved out or in respectively;

2

providing a first and second attachment apparatus, wherein
a pressurized fluid can enter in or exhaust from said *at
least one fluid* cylinder;

providing an attachment structure for attaching to said [test
piece] *pad eye, lifting lug or other device joined to said
another structure by the attachment weld; and*

[providing said mounted framework; and]

assembling the framework with the mounted cylinder fix-
edly attached on the mounted framework;

[whereby] urging fluid into the cylinder [causes] *to cause*
the piston to move outwardly to tension the pad eye,
*lifting lug or other device joined to said another struc-
ture,* thus testing the integrity of the *attachment* weld,
and

whereby [the] *a* testing technician or test operator can
inspect the [tested device and the weld] *attachment weld*
for any structural damage or deformation.

15. The method as in claim 14, whereby *the* urging fluid
into the *at least one fluid* cylinder causes the piston to move
inwardly to tension the [test piece] *pad eye, lifting lug or other
device,* thus testing the integrity of the *attachment* weld.

27. A method for testing [the] strength and integrity of an
attachment weld [when desired] *with a single cylinder appa-
ratus* comprising the steps of:

providing at least one [desired] test piece *comprising a pad
eye and the attachment weld joining the pad eye to
another structure*;

providing a framework including at least two pieces;

mounting said single cylinder *apparatus* to the framework,
said *single* cylinder *apparatus* having a first end, a sec-
ond end, and a piston therein, wherein said piston moves
inwardly and outwardly as fluid is moved out of or into
said *single* cylinder *apparatus* respectively;

mounting said framework about said at least one [desired]
test piece;

assembling the framework with said [at least one mounted]
*single* cylinder *apparatus* fixedly attached at one end of
said *single* cylinder *apparatus* to said [desired] *at least
one* test piece;

retracting [the] *a* cylinder shaft *of the single cylinder appa-
ratus,* thereby exerting a force substantially perpendicu-
lar to a plane formed between said [desired] *pad eye of
the at least one* test piece[, being tested,] and a base and
in a direction away from said *pad eye of said at least one*
test piece;

increasing said substantially perpendicular force by
increasing the pressure of the fluid in the cylinder;

increasing [said] *the* pressure until a pre-calculated, required
pressure is reached; and

inspecting the *at least one* test piece for damage or defor-
mation.

\*   \*   \*   \*   \*



# Tab D

# EXHIBIT D

US007240569B2

(12) **United States Patent**
Foley et al.

(10) Patent No.: **US 7,240,569 B2**
(45) Date of Patent: **Jul. 10, 2007**

(54) **LOAD TEST APPARATUS FOR SHIPPING CONTAINERS**

(75) Inventors: **Lawrence E. Foley**, Lafayette, LA (US); **Paul Justin**, Youngsville, LA (US); **Gregory Smith**, Lafayette, LA (US)

(73) Assignee: **IntegrCert, LLC**, New Iberia, LA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/241,302**

(22) Filed: **Sep. 28, 2005**

(65) **Prior Publication Data**

US 2006/0065059 A1     Mar. 30, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/614,303, filed on Sep 28, 2004.

(51) **Int. Cl.**
*G01D 7/00* (2006.01)
(52) **U.S. Cl.** ........................................ **73/862.041**
(58) **Field of Classification Search** .......... 73/862.393, 73/862.392, 862.381, 862.391, 862.041
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,848,322 B2 | 2/2005 | Scarborough |
| 6,935,196 B1 * | 8/2005 | Tumlin ................... 73/862.393 |

* cited by examiner

*Primary Examiner*—Jewel Thompson
(74) *Attorney, Agent, or Firm*—William W. Stagg

(57) **ABSTRACT**

Load test apparatus for shipping containers comprising a horizontal beam (**200**), the beam having pivotal plate assemblies (**210**) attached to lifting eyes (**330**) or other feature of a container by cables (**130**) or similar means, extending from the pivotal plates to the lifting eyes. The pivotal plates rotate about a horizontal pin (**430**) permitting the pivotal plates to become axially aligned with the cables. The Horizontal beam is forced vertically upward by a plurality of force generating means such as hydraulic cylinders (**120**). The force of the force generating means is applied through a point common to the longitudinal axis of the horizontal beam and the axis of the horizontal pin, thereby eliminating moment loads within components of the assembly. The opposite vertically downward reaction force is applied to the bottom of the container and simulates the force applied by the weight of the typical contents of the container when it is in use.

**18 Claims, 6 Drawing Sheets**





FIG. 1



FIG. 2

FIG. 3

FIG. 4



FIG. 5

FIG. 6



FIG. 7A

FIG. 7B



FIG. 8



FIG. 9A          FIG. 9B



FIG. 9C

Case 6:12-cv-00396-PJH   Document 186-8   Filed 06/13/16   Page 246 of 364 PageID #: 5916



FIG. 10

US 7,240,569 B2

**1**

## LOAD TEST APPARATUS FOR SHIPPING CONTAINERS

This application claims priority to U.S. Provisional Application Ser. No. 60/614,303 for Load Test Apparatus for Shipping Containers filed Sep. 28, 2004 by the above referenced Applicants, the entire contents of which are hereby incorporated by reference.

### FEDERALLY SPONSORED RESEARCH

Not Applicable

### SEQUENCE LISTING OR PROGRAM

Not Applicable

### BACKGROUND

1. Field of Invention

This invention relates to the load testing of structures that are lifted or suspended by one or more cables or chains, collectively referred to as "Shipping containers". The test apparatus applies a load to the lifting points of the containers, known as pad eyes, and simulates the application of loads present in the container when it is lifted or suspended.

2. Background

Shipping containers are designed, manufactured and tested in compliance with one or more specifications published by governmental and private organizations. These specifications require that the container be load tested to a multiple of the rated load of the container. The most popular method used to apply the test load is to fill the container with heavy objects such as concrete, steel, water, etc. This method is time consuming, expensive, and of questionable accuracy.

A second method is to use a hydraulic ram to apply a load to a cable attached to one or more pad eyes, where the reaction of this load is applied to the container near the pad eye being tested. This method applies the load only to the pad eye and not to the entire structure of the container. Therefore, this method does not simulate the actual loads applied the contents of the container when it is in use.

A third method is to use a single telescopic mast to apply a load to cables attached to two or more of the pad eyes. The reaction of this load is applied to the bottom of the structure, more closely simulating the loads applied by the contents of the container when it is in use. This method works well for smaller containers whose length and width are nearly equal, i.e., the container is nearly square. However, it is common for containers to have a large aspect ratio, where the length is several times the width, i.e., the containers are long and narrow.

Containers of large aspect ratios present at least two significant problems to the single telescopic mast method of application of the test load. First, the apparatus must be tall enough to allow the cables to form an angle of not less than 45 degrees with the horizontal. Such a test apparatus must be heavy enough not to fail by buckling when the test loads are applied and, because of the height and weight requirements, the apparatus presents a safety hazard to personnel setting up and operating the apparatus. The second problem with the single telescopic mast method is that the load is applied to a relatively small area at the center of the container unless large, heavy beams are used to distribute the load along the base of the container.

**2**

Considerations

A safe and efficient test apparatus for shipping containers should be compact, and easily set-up for testing. It should have a low weight-to-strength ratio, that is, it should be as light-weight as possible while being strong enough to apply and withstand the required loads. Members subject to compressive loads should be as short as possible to increase the resistance of the member to failure or excessive deformation due to buckling. It should reliably apply the test load to the lifting eyes and to the bottom of the container in such a manner so as to accurately simulate the magnitude and direction of an actual load typical to said container. The test load should be evenly distributed among the lifting eyes of the container. The design should provide a means to accurately measure the applied load and minimize the factors that contribute to measurement errors. Such factors include improper set-up resulting in improper alignment of components, improper angle between the cables and a horizontal plane, application of extraneous loads and moments to the load measuring members, and improper distribution of the reaction load to the structure of the container.

Objects and Advantages

Several objects and advantages of the present invention are:

(a) to provide a test apparatus that maximizes safety to personnel while setting up and operating the apparatus, specifically by attaining a low weight-to-strength ratio while maximizing the factor of safety of the apparatus against failure;

(b) to provide a test apparatus that reduces the weight-to-strength ratio by eliminating the application of moment loads to members of the test apparatus;

(c) to provide a test apparatus that resists failure and excessive deformation due to buckling, specifically by providing a plurality of load application members such as hydraulic cylinders;

(d) to provide a test apparatus that applies the test load to the container in a manner so as to accurately simulate the typical loading conditions applied to the container during use, specifically by applying and distributing said test loads so as to induce stresses within various members of the container; and,

(e) to provide a test apparatus that accurately measures the applied test load, specifically by reducing extraneous components of the applied and reaction loads and by minimizing deformation of members of the test apparatus.

### SUMMARY

In accordance with the present invention a load test apparatus for shipping containers is comprised of a plurality of hydraulic cylinders or other force generating means to apply an upward force to a structure that applies and evenly distributes said load to lifting eyes of the container to be tested. A pivotal plate assembly is attached to each force generating means and eliminates the application of moment loads to the structure.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an isometric view of Load Test Apparatus of Applicants' invention.

FIG. 2 is an isometric view of the Beam Assembly of the Apparatus shown in FIG. 1.

FIG. 3 is an isometric view of the Pivotal Plate of the Beam Assembly shown in FIG. 2.

US 7,240,569 B2

3

FIG. **4** is an isometric view of the Beam Housing of the Beam Assembly shown in FIG. **2**.

FIG. **5** is a top view of the Apparatus shown in FIG. **1**.

FIG. **6** shows a partial section view cut a Section **6** of FIG. **5**.

FIG. **7A** shows a section view cut at Section **7** of FIG. **5** showing the Pivotal Plate Assembly and the Adjustment Pin of the Load Test Apparatus Assembly of FIG. **1**.

FIG. **7B** shows the same section view as FIG. **7A**, with the exception that the Adjustment Pin is in its Retracted Position.

FIG. **8** shows a Cable Assembly **130** in detail.

FIGS. **9A** and **9B** show an end view and front view, respectively, of the attachment of the Pivotal Plate Assemblies to the Basket.

FIG. **9C** shows an enlarged detail of FIG. **9B**.

FIG. **10** shows a typical prior art load test apparatus.

DETAILED DESCRIPTION OF THE INVENTION

In the reference drawings, numerals referencing assemblies are underlined.

Referring now to the drawings and more particularly to FIG. **1**, there is shown an isometric view of Load Test Apparatus Assembly **100** of the present invention. The Load Test Apparatus Assembly **100** is comprised of a horizontal Beam Assembly **110**, which is supported by two vertical lifting means, such as Cylinder Assemblies **120**. Cylinder Assembly **120** is comprised of a Stationary Cylinder **250**, a coaxial Piston Rod **260** extending vertically upward from the top of Stationary Cylinder **250**, and a horizontal Base Plate **285** attached to the bottom surface of Stationary Cylinder **250**. Four Cable Assemblies **130** connect the Beam Assembly **110** to four Lifting Eyes **330** of a typical Basket **160**. Cylinder Assemblies **120** are pressurized by a Hydraulic Pump Assembly **150**. Cylinder Assemblies **120** are connected to the Hydraulic Pump Assembly by hoses. The hoses are omitted from the drawings for clarity. The upward force produced by Cylinder Assemblies **120** is displayed by a Load Indicator **140**.

The Basket **160** has a vertical centroidal axis **390**, a central vertical longitudinal plane **360**, and a central vertical transverse plane **370**. The Basket **160** is not a component of the present invention. It is included in the drawings to more clearly show the operation of the present invention.

FIG. **2** shows the Beam Assembly **110** which is comprised of a Beam **200**, and two Pivotal Plate Assemblies **210**. Beam **200** has a series of horizontal Adjustment Holes **230** bored transverse to a longitudinal Axis **220** of Beam **200** and perpendicular to the sides of Beam **200**. Each Pivotal Plate Assembly **210** is comprised of a Pivotal Plate **410** and a Beam Housing **420**. Pivotal Plate **410** is pivotally attached to Beam Housing **420** and to Beam **200** by an Adjustment Pin **430**. Adjustment Pin **430** has a longitudinal axis **435**.

Referring to FIG. **3**, Pivotal Plate **410** is comprised of a Wing Plate **412** and an Adjustment Pin Housing **725**. Wing Plate **412** has a central rectangular thru-hole **515** and a series of cable attachment thru-holes **510** displaced from the bottom of Plate **412**. The longitudinal axis **730** of Adjustment Pin Housing **725** is horizontal and is coincident with the centroid **460** of rectangular thru-hole **515**. Pivotal Plate **410** has a central plane **480** parallel to the face of Pivotal Plate **410** and coincident with Centroid **460** of rectangular thru-hole **515**.

Referring to FIG. **4**, the Beam Housing **420** is comprised of a horizontal Top Plate **550**, two vertical Side Plates **560**,

4

and a horizontal Bottom Plate **570**. A Load Cell Housing **440** extends vertically downward from the bottom Plate **570**. Top Plate **550**, Side Plates **560**, and Bottom Plate **570** are fixedly attached together so as to form a horizontal, rectangular Beam Housing Opening **490** whose dimensions are slightly larger than the outside cross-section dimensions of Beam **200**, i.e., Beam **200** can fit through the Beam Housing Opening **590**. A transverse thru-hole **580** is bored through both Side Plates **560** such that the axis **585** of thru-hole **580** is horizontal and is coincident with and perpendicular to the horizontal axis **590** of Beam Housing Opening **490**. Bottom Plate **570** has a bottom surface **575**. Load Cell Housing has a vertical longitudinal axis **445**.

FIG. **5** shows a top view of the Load Test Apparatus Assembly **100** showing a top view of the Beam Assembly **110**. FIG. **5** is included solely to describe the location of Section **6** depicted in FIG. **6** and Section **7** depicted in FIGS. **7A** and **7B**.

FIG. **6** shows a partial section view through the Beam **200**, Beam Housing **420** and the Piston Rod **260** of the Load Test Apparatus Assembly **100**. Beam **200** fits within the Beam Housing Opening **490** of the Beam Housing **420** such that each Pivotal Plate Assembly **210** fits slidably onto Beam **200**. A compression Load Cell **450**, shown in cross-section, is sandwiched between the top surface **280** of the Piston Rod **260** and the bottom surface **575** of Bottom Plate **570**. Piston Rod **260** fits slidably within Load Cell Housing **440**.

Load Cell **450** may be electronic, hydraulic, or other type of compressive load cell. Load Cell **450** is connected to Load Indicator **140**. This connection may be by electrical cable, radio-telepathy, or other means. The Load Cell **450** and the associated Load Indicator are standard components. The specifics of the type of Load Cell **450** and the type of Load Indicator **140** are not pertinent to the present invention. The connection between the Load Cell **450** and the Load Indicator **140** is omitted from the figures for clarity.

FIG. **7A** shows a section view cut at Section **7** of FIG. **5** showing the Pivotal Plate Assembly **210** and the Adjustment Pin **430** of the Load Test Apparatus Assembly **100**. FIG. **7B** shows the same section view as FIG. **7A**, with the exception that the Adjustment Pin **430** is in its Retracted Position **630**. The Piston Rod **260** and the Load Cell **450** are omitted from FIGS. **7A** and **7B** for clarity. The Adjustment Pin **430** has an Extended Position **640** and a Retracted Position **630** (seen in FIG. **7B**).

In the Extended Position **640**, each Adjustment Pin **430** is centered within its respective Adjustment Pin Housing **725** such that it engages both the Beam Housing **420** of the Pivotal Plate Assembly **210** and the Beam **200**. Specifically, the Adjustment Pin **430** is disposed within Adjustment Pin Housing **725**, thru-holes **580** of the Beam Housing **420**, and a selected thru-hole **230** of the Beam **200**. Thus, when the Adjustment Pin **430** is in the Extended Position **640**, the respective Pivotal Plate Assembly **210** is restrained from sliding axially along Beam **200**, and Pivotal Plate **410** is free to rotate about the Adjustment Pin **430**.

In the Retracted Position **630**, the Adjustment Pin **430** is disposed axially within Adjustment Pin Housing **725** such that it continues to engage the Adjustment Pin Housing **725** and one thru-hole **580** of Beam Housing **420**, but it does not engage Beam **200**. Thus, when the Adjustment Pin **430** is in the Retracted Position **630**, the respective Pivotal Plate Assembly **210** is free to slide axially along Beam **200**, while the Pivotal Plate **410** is still pivotally attached to the Beam Housing **420**.

FIG. **8** shows a Cable Assembly **130** in detail. Each Cable Assembly **130** is comprised of a steel Cable **290** with a

US 7,240,569 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

Clevis 300 attached to each end. The Cable Assemblies 130 are of equal length. Cable 290 has a longitudinal axis 295. Cable Assemblies 130 and Clevises 300 are standard components commonly used for lifting objects. The operation of Clevis 300 is known to anyone skilled in the art of millwright.

FIGS. 9A and 9B show an end view and front view, respectively, of the attachment of the Pivotal Plate Assemblies 210 to the Basket 160. A Cable Assembly 130 extends from and between a selected Thru-Hole 510 in Wing Plate 412 of the Pivotal Plate 410 to a respective Lifting Eye 330 on the Basket 160 by means of the Clevises 300. An Angle A1 between the Cable Assembly 130 and a horizontal plane is projected onto the Transverse Plane 370 of Basket 160. The projected Angle A1 is determined by which Thru-Hole 510 of Pivotal Plate 410 is selected. An Angle A2 between Cable Assembly 130 and a horizontal plane is projected onto the Longitudinal Plane 360 of Basket 160. Each Cylinder Assembly 120 is displaced a distance D1 from a respective end of Basket 160. The projected Angle A2 is determined by the distance D1. Common practice dictates that angles A1 and A2 must be greater than or equal to 45 degrees.

FIG. 9C shows an enlarged detail of FIG. 9B. In this view, Adjustment Pin 430, its axis 435, and plane 480 are perpendicular to the plane of the drawing. It can be seen that Axis 435 of Adjustment Pin 430, Axis 220 of Beam 200 and Axis 445 of Load Cell Cylinder 440 all intersect at a common point 455. Pivotal Plate 410 rotates freely about Adjustment Pin 430, thereby allowing the central Plane 480 of Pivotal Plate 410 to become coincident with Axis 295 of Cable Assembly 130. Plane 480 of Pivotal Plate 410 is coincident with Axis 435 of Adjustment Pin 430. Axis 295 of Cable Assembly 130 represents the line of action of the force transferred by Cable Assembly 130. This force is transmitted from Adjustment Pin 430, through Plate 410, through Cable Assembly 130 to Lifting Eye 330. Axis 445 of Load Cell Housing 440 represents the line of action of the upward vertical force provided by the hydraulic Cylinder Assembly 120. This force is transmitted from the Piston Rod 260 of Hydraulic Cylinder Assembly 120, through Load Cell 450, and through Bearing Housing 420 to Adjustment Pin 430. Axis 220 of Beam 200 represents the line of action of the resultant of these two forces, specifically a tensile load transmitted from Adjustment Pin 430 to Beam 200. From the preceding description, it is seen that all of the described forces are transmitted through Adjustment Pin 430.

The intersection of the lines of action of the forces referred to above is significant because the forces do not impart moment loads on any of the members. In general, stresses from moment loads are considerably greater than stresses from tensile loads. By eliminating moment loads, the members may be considerably lighter than if moment loads were present. Reduction of the weight and size of a load test apparatus significantly increases the safety of operation.

FIG. 10 shows a general embodiment of the prior art. For purposes of the current discussion, the vertical lifting means, such as a hydraulic cylinder, is referred to as a column 900. A load test apparatus comprising a single force generating means, such as a single cylinder assembly, i.e., a load test apparatus comprising a single column, requires that the column extend upward from the bottom of the basket to the point of convergence 910 of each of the cable assemblies 920. This point of convergence 910 may be a considerable distance above the basket. For a projected horizontal angle of 45 degrees between Cable Assemblies 920 and the central transverse plane of Basket 160, the height of a single column

must be at least one half of the longest dimension of the basket. Thus it is seen that the single column cylinder assembly must be considerably longer than the columns of the Load Test Apparatus 100 of the present invention.

Vertical members included in compression, generally known as columns, have a property known as a "slenderness ratio". In simple terms, the slenderness ratio is a relationship between the column's least radius of gyration and its length. The slenderness ratio of a column determines if the column is more likely to fail due to buckling rather than due to compressive axial stress. A column with a high slenderness ratio, i.e., a long, slender column, will fail due to a buckling load, known as the critical load for that column. In order to safely withstand a given load, such as the load to be applied to a basket 160 by a Load Test Apparatus, a longer column must have a larger radius of gyration than a shorter column. A longer column must therefore be larger and heavier than a shorter column designed to withstand the same load as that applied to the longer column.

Referring again to FIG. 10, it is seen that if each of the cables 920 are not exactly the same length, a side load will be induced at the top of the column 900. Similarly, a side load will be induced if the column 900 is not positioned exactly at the center of the Basket 160, i.e., not directly beneath the point of convergence of the cables. The presence of even relatively small side loads applied to the top of a long column significantly reduces the capability of the column to safely withstand a vertical load. Several factors, including human error on the part of the operator, make it inevitable that extraneous side loads will be applied to any load test apparatus. The Load Test Apparatus 100 of the present invention is more capable of safely withstanding the effects of side loads than that of the apparatus shown in FIG. 10.

OPERATION

In operation, the Load Test Apparatus Assembly 100 of applicant's invention is lowered into the Basket 160 and positioned such that Axis 220 of the Beam 200 is coincident with the Longitudinal Plane 360 of the Basket 160, i.e., the Beam 200 is centered within the Basket 160. The Adjustment Pin 430 of each Pivotal Plate Assembly 210 is moved axially to the Retracted Position 630, as shown in FIG. 7B. Each Pivotal Plate Assembly 210 is moved axially along Beam 200 such that each Pivotal Plate Assembly 210 is equidistant from the Transverse Plane 370 of Basket 160 and a distance D1 from the end of Basket 160. A first Clevis 30 of a first Cable Assembly 130 is attached to a first Lifting Eye 330. The second Clevis 300 of the first Cable Assembly 130 is attached to a selected Hole 510 of a Pivotal Plate 410. As described above, the selection of Hole 510 determines the size of the projected Angle A1. Projected Angle A1 must be no less than 45 degrees from a horizontal plane. Conversely, it is desirable that the selected Hole 510 be as near to Longitudinal Plate 360 (that is, as near to the Beam 200) as possible in order to minimize the stresses within Pivotal Plate 410. The Hole 510 is therefore selected such that it is as near to the Beam 200 as possible while still allowing projected Angle A1 to be equal to or greater than 45 degrees. The remaining three Cable Assemblies 130 are attached to the remaining Lifting Eyes 330 and to Holes 510 in the same relative position as the first Hole 510 selected as described above. Thus, the connections of the Cables 130 to the Pivotal Plates 410 will be symmetrical about both the Longitudinal Plane 360 and the Transverse Plate 370

US 7,240,569 B2

7

8

After all four Cable Assemblies 130 are attached to the four Lifting Eyes, the Pivotal Plate Assemblies 210 are then attached to the Beam 200. The procedure for positioning and attaching a first Pivotal Plate Assembly 210 to Beam 200 is described below. The second Pivotal Plate Assembly 210 is the attached in a similar manner such that the position if the two Pivotal Plate Assemblies 210 is symmetrical about the Transverse Plane 370.

The Pivotal Plate Assembly 210 is attached to Beam 200 by inserting the Adjustment Pin 430 through a selected Adjustment Hole 230 in Beam 200. As described above, the projected Angle A2 must be no less than 45 degrees from a horizontal plane. Distance D1, from the end of the Basket 160 to the Cylinder Assembly 120, determines the magnitude of Angle A2. An Adjustment Hole 230 is selected such that Angle A2 is equal to or greater than 45 degrees. After selection of the appropriate Adjustment Hole 230, the Pivotal Plate Assembly 210 is moved axially along Beam 200 until the Alignment Pin 430 is coaxially aligned with the selected Adjustment Hole 230. The Adjustment Pin 430 is moved axially within the Adjustment Pin Housing 725 until it is in the Extended Position 640 as shown in FIG. 7A.

Hydraulic hoses are connected to the Hydraulic Pump Assembly 150 and the Hydraulic Cylinder Assemblies 120. The Load Cell 450 is electrically connected to the Load Indicator 140. This electrical connection may be made either by using wires or by radio-telepathy.

The Hydraulic Pump Assembly 150 is activated to energize the Hydraulic Cylinder Assemblies 120 so that the desired testing load is applied by the Hydraulic Cylinder Assemblies 120 to the Beam Assembly 110, as measured by Load Cell 450 and displayed by Load Indicator 140. This test load may be held for some amount of time as required by the governing standard or procedure.

After the test load has been applied to the basket for the required amount of time, the Hydraulic Cylinder Assemblies 120 are de-energized, the Cable Assemblies 130 are removed from the Lifting Eyes 330 of the Basket 160, the Hydraulic Hoses are removed from the Hydraulic Cylinder Assemblies 120, the Load Cell 450 is disconnected from the Load Indicator 140, and the Load Test Apparatus 100 is removed from the Basket 160.

The foregoing description is merely an illustration of the principles of the Load Test Apparatus of Applicants' invention. Since numerous modifications and changes will readily occur to those skilled in the art, the description is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents are intended to fall within the scope of the invention.

We claim:

1. A container load test apparatus comprising:
   (a) a horizontal beam having a longitudinal axis and a transverse axis,
   (b) two beam supports,
   (c) means for slidably positioning said beam supports at a desired location along said longitudinal axis of said horizontal beam,
   (d) a cable attachment plate pivotally attached to each of said beam supports whereby said cable attachment plate pivots about said transverse axis of said horizontal beam,
   (e) a plurality of cables extending from a container to each said cable attachment plate, and
   (f) means for applying a desired load to said beam supports and thereby to said container through said plurality of cables.

2. The apparatus as recited in claim 1 wherein said beam supports include vertically orientated hydraulic cylinders.

3. The apparatus as recited in claim 2 wherein each said cable of said plurality of cables has a first and second end and a clevis mounted to said cable at each of said cable ends.

4. The apparatus as recited in claim 3 wherein said cable attachment plate has a plurality of cable attachments holes for selective attachment of said clevis of one of said cable ends to said cable attachment plate.

5. The apparatus as recited in claim 4 wherein each said cable with said attached devises are of the same length.

6. The apparatus as recited in claim 5, wherein said horizontal beam has a plurality of horizontally positioned adjustment holes bored transverse to the longitudinal axis and of said horizontal beam and wherein said means for slidably positioning said beam supports at a desired location along said longitudinal axis of said horizontal beam includes:
   (a) a beam housing having an opening for slidably receiving said horizontal beam, said beam housing having a transverse bore selectively coinciding with a selected said adjustment hole of said horizontal beam, and
   (b) a beam support pin for engaging said transverse bore of said beam housing and said selected adjustment hole of said horizontal beam whereby said horizontal beam and said beam housing are held in place at said selected adjustment hole of said horizontal beam.

7. The apparatus as recited in claim 6, wherein said cable attachment plate pivotally attached to each of said beam supports is pivotally attached to said beam supports by said beam support pin.

8. The apparatus as recited in claim 7, wherein said vertically orientated hydraulic cylinders having horizontally oriented base plates for supporting said hydraulic cylinders on the floor of said container.

9. The apparatus as recited in claim 8, wherein said beam support pin may be adjusted to allow said beam support to slide axially along said longitudinal axis of said horizontal beam, while said cable attachment plate is still pivotally attached to said beam support.

10. The apparatus as recited in claim 9, further comprising:
   (a) means for pressurizing said hydraulic cylinders and thereby apply desired loads to said containers from said cables;
   (b) a load indicator; and
   (c) a load cell positioned on each said beam support for measuring the load transmitted to the beams supports and transmitting a signal reflecting the measured loads to said load indicator.

11. A container load test apparatus comprising:
   (a) a horizontal beam;
   (b) two beam supports;
   (c) means for slidably positioning said beam supports along the longitudinally axis of said horizontal beam;
   (d) a vertical lifting support attached to each of said beam supports for applying a desired lifting load to said horizontal beam; and
   (e) at least two cable assemblies adapted to pivotally connect each said beam support to the lifting eyes of a typical basket container.

12. The apparatus as recited in claim 11 wherein each said vertical lifting support includes:
   (a) stationary cylinder;
   (b) a coaxial piston rod extending vertically upward from the top of said stationary cylinder;

US 7,240,569 B2

9

(c) a horizontal base plate attached to the base of said stationary cylinder; and

(d) a pump assembly for pressurizing and depressurizing said cylinder and thereby extending and retracting said piston rod from said stationary cylinder.

**13**. The apparatus as recited in claim **12** further comprising a load cell for measuring the load applied to said beam supports by said piston rods and a load indicator for receiving a signal from the load cell displaying said applied load.

**14**. The apparatus as recited in claim **13** wherein said horizontal beam has a plurality of horizontally positioned adjustment holes bored transverse to the longitudinal axis and of said horizontal beam and wherein said means for slidably positioning said beam supports at a desired location along said longitudinal axis of said horizontal beam includes:

(a) a beam housing having an opening for slidably receiving said horizontal beam, said beam housing having a transverse bore selectively coinciding with a selected said adjustment hole of said horizontal beam, and

(b) a beam support pin for engaging said transverse bore of said beam housing and said selected adjustment hole of said horizontal beam whereby said horizontal beam and said beam housing are held in place at said selected adjustment hole of said horizontal beam.

10

**15**. The apparatus as recited in claim **14** further comprising a cable attachment plate pivotally attached to each said beam support by said beam support pin.

**16**. The apparatus as recited in claim **15** wherein each said cable attachment plate has a plurality of cable attachments holes for selective attachment of cable assemblies to said cable attachment plate.

**17**. The apparatus as recited in claim **16**, wherein said beam support pin may be adjusted to allow said beam support to slide axially along said longitudinal axis of said horizontal beam, while said cable attachment plate is still pivotally attached to said beam support.

**18**. The apparatus as recited in claim **17**, wherein the line of action from the force transmitted from said piston rods through said load cell and through said beam housing is transmitted to said beam support pin and then through said attachment plate to said cable assemblies to said lifting eyes of said container so that the resultant of these forces is transmitted to the horizontal beam through said beam support pin with substantially no moment loads applied on any of these elements.

\* \* \* \* \*

US007240569C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (6977th)

# United States Patent
Foley et al.

(10) **Number:** US 7,240,569 C1
(45) **Certificate Issued:** Aug. 4, 2009

(54) **LOAD TEST APPARATUS FOR SHIPPING CONTAINERS**

(75) Inventors: **Lawrence E. Foley**, Lafayette, LA (US); **Paul Justin**, Youngsville, LA (US); **Gregory Smith**, Lafayette, LA (US)

(73) Assignee: **Integrecert, L.L.C.**, New Iberia, LA (US)

Reexamination Request:
No. 90/009,197, Jun. 19, 2008

Reexamination Certificate for:
Patent No.     7,240,569
Issued:         Jul. 10, 2007
Appl. No.:      11/241,302
Filed:          Sep. 28, 2005

Related U.S. Application Data

(60) Provisional application No. 60/614,303, filed on Sep. 28, 2004

(51) **Int. Cl.**
*G01D 7/00*          (2006.01)

(52) **U.S. Cl.** ................................................ **73/862.41**

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56)              **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,848,322 | B2 | 2/2005 | Scarborough |
| 6,935,196 | B1 | 8/2005 | Tumlin |
| 7,155,987 | B1 | 1/2007 | Tumlin |

*Primary Examiner*—Sharon Payne

(57)              **ABSTRACT**

Load test apparatus for shipping containers comprising a horizontal beam (**200**), the beam having pivotal plate assemblies (**210**) attached to lifting eyes (**330**) or other feature of a container by cables (**130**) or similar means, extending from the pivotal plates to the lifting eyes. The pivotal plates rotate about a horizontal pin (**430**) permitting the pivotal plates to become axially aligned with the cables. The horizontal beam is forced vertically upward by a plurality of force generating means such as hydraulic cylinders (**120**). The force of the force generating means is applied through a point common to the longitudinal axis of the horizontal beam and the axis of the horizontal pin, thereby eliminating moment loads within components of the assembly. The opposite vertically downward reaction force is applied to the bottom of the container and simulates the force applied by the weight of the typical contents of the container when it is in use.



US 7,240,569 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets **[ ]** appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 1–18 is confirmed.

New claims 19–27 are added and determined to be patent-
able.

*19. A container load test apparatus comprising:*

*(a) a horizontal beam having a longitudinal axis and a
transverse axis;*

*(b) two beam supports;*

*(c) means for slidably positioning said beam supports at a
desired location along said longitudinal axis of said
horizontal beam;*

*(d) a cable attachment plate pivotally attached to each of
said beam supports whereby said cable attachment
plate pivots about said transverse axis of said horizon-
tal beam;*

*(e) a plurality of cables extending from a container to
each said cable attachment plate; and*

*(f) means for applying a desired load to said beam and
thereby to said container through said plurality of
cables, wherein the line of action from said applied
load to said beam supports is transmitted from said
beam supports through said cable attachment plate to
said cables and said container so that the resultant of
these forces is transmitted through said horizontal
beam with substantially no moment loads applied on
any of these elements.*

*20. A container load test apparatus comprising:*

*(a) a horizontal beam;*

*(b) two beam supports;*

*(c) means for slidably positioning said beam supports
along the longitudinal axis of said horizontal beam;*

*(d) a vertical lifting support attached to each said beam
support for applying a desired lifting load to each said
beam support;*

*(e) at least two cable assemblies adapted to pivotally con-
nect each said beam support to the lifting eyes of a
typical basket container; and*

*(f) a cable attachment plate pivotally attached to each
said beam support, each said cable attachment plate*

**2**

*having at least two cable assemblies pivotally attached
to said cable attachment plate.*

*21. The apparatus as recited in claim 20 wherein said
horizontal beam has a plurality of horizontally positioned
adjustment holes bored transverse to the longitudinal axis of
said horizontal beam and wherein said means for slidably
positioning said beam supports at a desired location along
said longitudinal axis of said horizontal beam includes:*

*(a) a beam housing having an opening for slidably receiv-
ing said horizontal beam, said beam housing having a
transverse bore selectively coinciding with a selected
said adjustment hole of said horizontal beam, and*

*(b) a beam support pin for engaging said transverse bore
of said beam housing and said selected adjustment hole
of said horizontal beam whereby said horizontal beam
and said beam housing are held in place at said
selected adjustment hole of said horizontal beam.*

*22. The apparatus as recited in claim 21 wherein each
said cable attachment plate is pivotally attached to each said
beam support by said beam support pin.*

*23. The apparatus as recited in claim 22 wherein each
said cable attachment plate has a plurality of cable attach-
ments holes for selective attachment of said cable assem-
blies to said cable attachment plate.*

*24. The apparatus as recited in claim 23, wherein said
beam support pin may be adjusted to allow said beam sup-
port to slide axially along said longitudinal axis of said hori-
zontal beam, while said cable attachment plate is still pivot-
ally attached to said beam support.*

*25. The apparatus as recited in claim 24, wherein the line
of action from the force transmitted from said vertical lift
support through said beam housing is transmitted to said
beam support pin and then through said cable attachment
plate to said cable assemblies to a desired cable attachment
end point so that the resultant of these forces is transmitted
to the horizontal beam through said beam support pin with
substantially no bending moment loads applied on any of
these elements.*

*26. The apparatus as recited in claim 25 wherein each
said vertical lifting support includes:*

*(a) stationary cylinder;*

*(b) a coaxial piston rod extending vertically upward from
the top of said stationary cylinder;*

*(c) a horizontal base plate attached to the base of said
stationary cylinder; and*

*(d) a pump assembly for pressurizing and depressurizing
said cylinder and thereby extending and retracting said
piston rod from said stationary cylinder.*

*27. The apparatus as recited in claim 26 further compris-
ing a load cell for measuring the load applied to said beam
supports by said piston rods and a load indicator for receiv-
ing a signal from the load cell displaying said applied load.*

\*    \*    \*    \*    \*



# Tab E

**EXHIBIT E**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| RANDALL SCARBOROUGH | § | Civil Action No. 6:12-cv-00396-PJH |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Magistrate Judge Patrick J. Hanna |
| INTEGRICERT, LLC | § | |
| Defendant. | § | JURY TRIAL DEMANDED |
| | § | |

---

### EXPERT REPORT OF SAMUEL P. HAWKINS

---

Samuel P. Hawkins
425 Rue Novembre
Lafayette, Louisiana 70583
(337) 334-7633
sam@drillingllc.com

February 11, 2016

I.   **INTRODUCTION**
     **A. Assignment and Qualifications**

I have previously consulted as a technical expert for Plaintiff Randall Scarborough and have now been retained by Matthews, Lawson, McCutcheon & Joseph, PLLC, as a technical expert to provide an opinion regarding Defendant IntegriCert, LLC's infringement of U.S. Patent Nos. 6,848,322 and 7,284,447.This report is based upon information supplied to me as of the date of this report and summarized in Exhibit A. I reserve the right to update or amend my report, as appropriate, if any additional or different information is discovered.

My *curriculum vitae* is attached at Exhibit B. I have been involved in the technical aspects of the design and use of oilfield tools and equipment since 1977.  Throughout my career, I have invented dozens of mechanical devices and apparatuses used in the oil and gas industry from valves to complete machines, including an apparatus employing hydraulic cylinders to pull oilfield tubulars. I am named as an inventor on at least twenty-five U.S. Patents. I have served as an expert witness in patent infringement litigation and have testified in court during *Markman* proceedings; however, I have not testified at trial or by deposition within the last four years and have not authored any publications within the last ten years.

My compensation for my study and testimony in this case is in no way contingent upon my opinions or the outcome of the litigation. I am being compensated at a rate of $250 per hour for my time spent researching and writing my expert report, as well as for any travel or deposition time.

**B. Summary of Opinions**

This report addresses IntegriCert's infringement of both U.S. Patent No. 6,848,322 ("the '322 Patent) and U.S. Patent No. 7,284,447 ("the '447 Patent).  I have determined that IntegriCert's load testing devices and methods infringe Claims 1, 7, and 9, 10, and 12 of the '322 Patent and Claim 14 of the '447 Patent. Based upon 35 U.S.C. § 282 and the Court's Order on Plaintiff's Motion for Partial Summary Judgment of Validity[1], with which I agree, the patents in suit are valid, and I have therefore not provided an opinion on validity.

II.   **FACTS AND DATA CONSIDERED**

Attached at Exhibit A is a list of documents and information that I have considered in preparing this report. Selected pages or excerpts from those documents and information may be used as exhibits at trial. Additionally, I may prepare graphical or demonstrative trial exhibits based upon the documents and information considered and/or my analysis thereof.

My infringement evaluation is based upon my education, training, knowledge and experience with mechanical tools as well as a review of the documentary evidence listed in Exhibit B, including the relevant deposition transcripts. My opinions are also based upon industry standards and usages of certain hardware and related terminology. I am familiar with

---

[1] Doc. 150, Reasons for Ruling on Plaintiff's Motion for Summary Judgment on Validity.

this particular field and the standards and specifications for the use of mechanical devices in this field, including at the relevant time period between the filing of the patents-in-suit to the present.

My expert opinions, as well as the bases for those opinions are explained throughout this report and the accompanying exhibits.

### III.   BACKGROUND

U.S. Patent No. 6,848,322 was issued on February 1, 2005 and titled, "Apparatus and Method for Testing Weld Integrity." U.S. Patent No. 7,284,447 was then issued on October 23, 2007 with the same title. Both patents disclose Scarborough's inventions for the non-destructive testing of attachment welds which are used to attach lifting points to structures to be lifted. The patented devices and methods are used for testing large cargo or shipping containers, oilfield or offshore drilling equipment, baskets and skids. IntegriCert performs load testing services by using hydraulic cylinders to simulate the expected load on a container and to apply a test force to a container's lifting points. Following application of the test force, the pad eye and welding are examined for any defects or deformities.

IntegriCert's device, and the method of using that device, is advertised on its website in a video that shows the structure and function of the accused machine:



IntegriCert has also confirmed through discovery responses and deposition testimony that its accused devices are built in accordance with IntegriCert's patent, U.S. Patent No. 7,240,569 ("the '569 Patent" or "IntegriCert's patent"). Figure 1 of the '569 Patent shows the general structure of IntegriCert's device:



The same device is shown in IntegriCert's internal drawings, and its structure was confirmed by IntegriCert's employees[2]:



I have reviewed IntegriCert's video and patent, as well as documents and testimony confirming the structure and function of IntegriCert's load testing device and have compared them to the device and methods claimed in both the '322 Patent and the '447 Patent as previously construed by the Court.

---

[2] See Jarrod Segura testimony at Page 30-31 regarding Exhibit 12.

4

## IV.   INFRINGEMENT ANALYSIS

35 U.S. C. § 271(a) provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Scarborough has asserted a claim for infringement by IntegriCert of both the '322 Patent and the '447 Patent.

### A.  The '322 Patent

The '322 Patent includes both apparatus claims (1-12) and method claims (13-21). Claims 1, 13, 20 and 21 are independent claims, while the remaining claims are dependent. It is my understanding that the parties have agreed to a number of definitions of claim terms that were initially disputed[3] and that the Court has determined the definitions of certain terms in the claims that were not agreed[4]. I have used those constructions to evaluate infringement. Terms that have not been construed by the Court are assumed to have their plain and ordinary meaning as understood by a person of ordinary skill in the art[5].  I have compared the '322 Patent's claims to IntegriCert's device based upon the agreed constructions and those issued by the Court and have concluded that IntegriCert apparatus includes each and every element of Claims 1, 7, 9, 10 and 12 and therefore infringes the '322 Patent under 35 U.S.C. § 271(a). If the Court should modify any of the constructions, I will amend or supplement my report to address those changes.

Claim 1 of the '322 Patent claims an apparatus for testing weld strength and integrity of an attachment weld, including at least (1) a framework including a base, top, and side pieces; (2) a fluid cylinder with a movable piston, mounted with the framework, and (3) a structure for attaching to a pad eye or lifting lug such that moving fluid into the cylinder causes the piston to move outwardly, tensioning the pad eye or lifting lug, which tests the integrity of the attachment weld. Because the tested pad eye and structure are not deconstructed for the testing and are not destroyed by the test, the testing is non-destructive. IntegriCert's load testing device literally contains each of the required elements of Claim 1 as shown in the infringement chart below.  The elements of Claim 1 are also shown in Exhibit 8 to Scarborough's Motion for Summary Judgment on Infringement and are illustrated by the charts and figures in Scarborough's Memorandum in Support, particularly at pages 12-14. I have reviewed the color-coded figures therein and agree with their contents.

Claims 2-12 are dependent upon Claim 1 and therefore require each and every element of Claim 1 in addition to its own added limitations. IntegriCert literally infringes dependent Claims 7, 9, 10 and 12. Because the claims are literally infringed, I have not evaluated infringement under the doctrine of equivalents except where specifically noted. However, I reserve the right to

---

[3] Doc. No. 78.

[4] Doc. No. 153.

[5] *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir.) *cert. denied,* 135 S. Ct. 719, 190 L. Ed. 2d 463 (2014) (citing *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed.Cir.2005)(en banc)).

address the equivalents of any elements of Claims 1, 7, 9, 11 and 12, on an element-by-element basis, if they are found to not be literally present in those claims.

| '322 Patent, Claim 1 | Claim Construction | Infringement Analysis |
|---|---|---|
| 1. An apparatus for testing the weld strength and integrity of an **attachment weld**, comprising: | **attachment weld:** weld which attaches lifting points referred to as pad eyes or lifting lugs to other structures which are to be lifted. Doc. No. 153 at 38. | The IntegriCert device tests the integrity of the welds attaching pad eyes or other lifting points to a structure to be lifted by simulating the loading conditions applied to the container when it is lifted or suspended. IntegriCert's '569 Patent; Doc. 163 at 13 (IntegriCert's infringement analysis). The attachment weld is the weld attaching a pad eye (330) or other lifting lug to a structure to be lifted (160). The '569 Patent at Fig. 1 |
| **a framework including a base, top, and side pieces;** | Not addressed by the Court's claim construction proceedings—subject to ordinary meaning. *Johnson Worldwide Assocs., v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). | The IntegriCert device, as shown in Fig. 1 of the '569 Patent, has a framework that includes (or comprises) at least a base (285 cylinder base plate), top (110 top beam assembly), and side pieces (210 pivotal plate assemblies and/or 120 cylinder assemblies are part of the outer edges of the frame) that are united together to form the structure of the device. The '569 Patent at Fig. 1. IntegriCert's employee, Jarrod Segura[6] confirmed the presence of a base (or "foot attachment"), a top (or "spread bar") and side pieces (or "pivot plates"). "In use, the base plates 285 ... of the IntegriCert device simply rest on the floor of the container." Doc. 163 at 15.<br><br>If not literally found to be "side pieces," it is my opinion that the pivot plates in the IntegriCert device are equivalent to side pieces because they perform the same function, in |

---

[6] Mr. Segura testified that his position is District Manager of IntegriCert's New Iberia region, while the president of IntegriCert described Mr. Segura as the Operations Manager. Nonetheless, Mr. Segura testified that he is familiar with IntegriCert's load testing device.

| | | |
|---|---|---|
| | | the same way and with the same result as the claimed side pieces. Any difference between the claimed "side pieces" and IntegriCert's "pivot plates" is insubstantial. |
| at least one fluid containing **cylinder, mounted with the framework**, for moving a piston therein **inwardly** and **outwardly** as fluid is moved out or in respectively; and | **inwardly**: into the cylinder. Doc. No. 78 at 1. **outwardly**: within and toward the shaft end of the cylinder. Doc. No. 78 at 2.  **cylinder, mounted with the framework**: Not addressed by the Court's claim construction proceedings—subject to ordinary meaning. | The IntegriCert device, as shown in Fig. 1 of the '569 Patent, has at least one hydraulic cylinder (250) fitted within the cylinder assembly (120) and united with the cylinder base plate (285) at one end and the pivotal plate assemblies and top beam at the other end. Doc. 163 at 13, Fig. 1. Jarrod Segura, confirmed the presence of the cylinder, as element 2 in the Exhibit 12 drawing, mounted with the framework and having a piston able to move inwardly from the cylinder as fluid is moved out and vice-versa. Jarrod Segura transcript at 32.  The cylinder is contained in a cylinder housing with an attached base plate at one end and the load cell housing at the opposite end. *Id.* at 32-33.  The hydraulic cylinder moves a piston (260) inwardly and outwardly as fluid is moved in or out, respectively.  "The IntegriCert device has at least one hydraulic cylinder fixedly mounted within the framework." Scarborough Statement of Facts at ¶ 17 (uncontested). |

| structure for releaseably or permanently attaching to a **pad eye**, **lifting lug** or other device joined by the attachment weld to another structure; | **attachment structure for releaseably or permanently attaching:** pinned connections, threaded fasteners, taper pins, welding, cable assemblies, footings and attachment plates, clamps and any equivalents thereto. Doc. No. 153 at 27.<br><br>**pad eye:** an attachment point welded to a structure to be lifted, through which a line or pin can be placed. Doc. No. 153 at 16.<br><br>**lifting lug:** an attachment point welded to a structure to be lifted. *Id.* | The IntegriCert device employs cable assemblies to attach the device to the pad eyes or other lifting lugs on the structure to be tested." Doc. 163 at 14 (device includes "Cable Assembly 130 for attachment to the pad eyes"); see also Jarrod Segura Testimony at 38-39 (attachment by "wire rope slings and shackles"). |
| whereby moving fluid into the cylinder causes the piston to move outwardly to **tension the pad eye**, lifting lug or other device **to test the integrity of the attachment weld** in a **non destructive** manner. | **tension the pad eye:** apply a tensioning or pulling force on the pad eye or test piece. Doc. No. 78 at 3.<br><br>**test the integrity of the weld:** challenging the soundness of the welding or weld. Doc. No. 153 at 34.<br><br>**non-destructively:** wherein the test piece is not inherently damaged or destroyed through removal or disassembly for testing and therefore remained intact and usable following testing. Doc. No. 153 at 19. | Moving fluid into the hydraulic cylinder causes the piston to move outwardly, applying a pulling force on the pad eye to test the integrity of the attachment weld.  IntegriCert's website admits that its device can "test more than just the pad eyes" by "simulating the weight in the container while applying force to the pad eyes." Segura Exhibit 11. Doc. 163 at 14 ("The container and its components including pad eyes are tested to verify a specified container load capacity").<br><br>The attachment weld is tested in place and is not inherently destroyed, making the test non-destructive. |

| *'322 Patent, Claim 7* | *Claim Construction* | *Infringement Analysis* |
| --- | --- | --- |
| 7. The apparatus in Claim 1, wherein the cylinder further comprises: | | See above regarding Claim 1. |
| a first end and a second end; | | The cylinder is labeled 250 on Figure 1 of the '569 patent and is contained within the cylinder assembly (120). |

|  |  | The cylinder has a first end and a second end. |
|---|---|---|
| a substantially cylindrical piston carried in said cylinder for movement therein along an axis, of said cylinder, being substantially perpendicular to a plane formed between said pad eye, lifting lug, or other device and the attachment weld attaching said pad eye, lifting lug or other device to said another structure; |  | The cylinder contains a substantially cylindrical piston which moves along the shared axis with the cylinder. The axis of movement is in a direction perpendicular to the plane formed between the pad eye (330) and the attachment weld joining the pad eye to the structure. For example in the '569 Patent, the cylinder/piston axis is in a vertical direction while the plane between the pad eye and weld is in a horizontal direction. |
| a shaft, having a first and a second end, the first end fixedly attached to said internal piston and said second end is fixedly attached to said bridge plate or cross bar; and | | The cylinder shaft is connected to the load cell housing on the cross bar (110) at the second end and is connected at the first end to the piston, within the cylinder housing. |
| first and second pressurized fluid attachment means; | | The IntegriCert device includes cylinder fittings to attach hydraulic hoses to the cylinders. *See* Segura deposition at 34 and 54. |
| wherein said first pressurized fluid attachment means is disposed axially between said cylinder first end and said piston; | | The drawing at Exhibit 12 shows the placement of the fluid attachment points on the cylinder housing. The first attachment point is between the first end of the cylinder and the piston. Segura deposition at 34 regarding Exhibit 12. |
| wherein said second pressurized fluid attachment means is disposed axially between said cylinder second end and said piston; and | | The second attachment point is between the second end of the cylinder and the piston. *Id.* |

| | | |
|---|---|---|
| wherein pressurized fluid enters said cylinder through said first attachment means or second attachment means. | | Pressurized fluid enters (and exits) the cylinder through said first and second fluid attachment means. |

| '322 Patent, Claim 9 | Claim Construction | Infringement Analysis |
|---|---|---|
| 9. The apparatus in Claim 1, further including: | | See above regarding Claim 1. |
| a control means for allowing pressurized fluid to be alternately supplied to and exhausted from said cylinder in a manner that the internal piston will move in an axial direction away from said first end of said cylinder, toward the second end of said cylinder, when the pressurized fluid enters through said first pressurized fluid attachment means, and that the said internal piston will move in an axial direction away from said second end of said cylinder toward the first end of said cylinder, when the pressurized fluid enters through said second pressurized fluid attachment means. | | The IntegriCert device includes a control mechanism for supplying fluid to and from the hydraulic cylinders in its load testing device. The fluid is supplied to the cylinders through a first and second set of hoses and cylinder fittings. The internal piston will move away from the first end (base end) of the cylinder, toward the second end (top beam end) of the cylinder, when fluid is supplied to the cylinder's first fluid attachment means. Conversely, the piston will move away from the second end of the cylinder and toward the first end of the cylinder when fluid is supplied to the second fluid attachment means. All movement of the piston is in an axial direction. |

10

| '322 Patent, Claim 10 | Claim Construction | Infringement Analysis |
|---|---|---|
| 10. The apparatus in Claim 9, wherein: | | See above regarding Claim 9. |
| the cylinder shaft will extend when said internal piston moves in an axial direction away from said first end of said cylinder toward the second end of said cylinder, causing said mounted cylinder to exert a force substantially perpendicular to a plane formed between the pad eye, lifting lug or other device and the attachment weld attaching said pad eye, lifting lug or other device to said another structure. | | The internal piston will force the cylinder shaft to extend when the piston moves away from the first end of the cylinder, toward the second end of the cylinder, causing the mounted cylinder to exert a force substantially perpendicular to a plane formed between the pad eye and the attachment weld. For example, as shown in the '569 Patent, the cylinder/piston axis and the associated force are in a vertical direction while the plane between the pad eye and weld is in a horizontal direction. |

| '322 Patent, Claim 12 | Claim Construction | Infringement Analysis |
|---|---|---|
| 12. The apparatus in Claim 1, wherein: | | See above regarding Claim 1. |
| said mounted cylinder will exert a force substantially perpendicular to a plane formed between the pad eye, lifting lug or other device and said attachment weld attaching said pad eye, lifting lug or other device creating a substantially perpendicular force away from said pad eye, lifting lug or other device subjecting said attachment weld to a tension load. | | The internal piston will force the cylinder shaft to extend away from the first end of the cylinder, toward the second end of the cylinder, pushing the top beam upward, exerting a force substantially perpendicular to a plane formed between the pad eye and the attachment weld.

For example, as shown in the '569 Patent, the cylinder/piston axis and the associated force are in a vertical direction while the plane between the pad eye and weld is in a horizontal direction. |

11

I have reviewed IntegriCert's non-infringement positions related to the claims of the '322 Patent, including in IntegriCert's Opposition to Plaintiff's Motion for Summary Judgment of Infringement (Doc. No. 163) and IntegriCert's PowerPoint Presentation offered at the Summary Judgment hearing. IntegriCert's analysis is based upon constructions that are not included with the Court's issued claim construction order (Doc. 153) and are not included in the parties' agreed terms (Doc. 78). I explained above that terms are left to their plain and ordinary meanings when they have not been construed by the Court or by agreement. In my opinion, IntegriCert's non-infringement position is based upon readings of the terms, "framework," "base," "sides pieces," and "mounted with," that are contrary to the ordinary meanings of those terms as they would be used by a person of ordinary skill in the art. For example, IntegriCert has attempted to define "a framework," as "a structure of parts fitted and united together," and uses that construction to argue that "there is no 'base' uniting the cylinder assemblies (120) and the top assembly into a framework." Doc. 163 at 12-13. IntegriCert has added, without support from the specification or the ordinary meanings, a requirement that the base be directly connected to the sides, which are then directly connected to the top assembly. *Id.* There no support in the '322 Patent or its associated prosecution history for IntegriCert's position that the "base" must be immediately connected to "side pieces," which are immediately connected to a "top," without any intervening structure. A person of ordinary skill in the art would understand a "framework" to be simply the support structure of the device—not the picture frame that IntegriCert advocates—and would understand the "base" to be the bottom support and the "side pieces" to be structure found on the sides of the device. Those elements are found in IntegriCert's device regardless of the names IntegriCert applies to the individual components of its device.

## B.  The '447 Patent

The '447 Patent also includes both apparatus claims (1-13) and method claims (14-28[7] and 30-31). Claims 1, 14, 27 and 30 are independent claims, while the remaining claims are dependent. As explained above, I have used the constructions agreed upon by the parties and set forth by the Court to evaluate infringement of the '447 Patent and have given any terms that have not been construed by the Court their plain and ordinary meaning as understood by a person of ordinary skill in the art.  I have compared the '447 Patent's claims to IntegriCert's method of using the device described above and as shown in Exhibit 9 to Scarborough's Motion for Summary Judgment on Infringement and as illustrated by the charts and figures in Scarborough's Memorandum in Support, particularly at pages 14-16. I have reviewed the color-coded figures therein and agree with their contents.  I have concluded that IntegriCert's method includes each and every element of Claim 14 and therefore infringes the '447 Patent under 35 U.S.C. § 271(a). Because the claims are literally infringed, I have not evaluated infringement under the doctrine of equivalents. However, I reserve the right to address the equivalents of any elements of Claim 14, on an element-by-element basis, if they are found to not be literally present in those claims. If the Court should modify any of the constructions, I will amend or supplement my report to address those changes.

---

[7] Claim 29 was cancelled during reexamination.

| '447 Patent, Claim 14 | Claim Construction | IntegriCert's load testing method |
|---|---|---|
| 14. A method for testing weld strength and integrity of an **attachment weld**, comprising the steps of: | **attachment weld:** weld which attaches lifting points referred to as pad eyes or lifting lugs to other structures which are to be lifted. Doc. No. 153 at 38. | The IntegriCert device tests the integrity of the welds attaching pad eyes to a structure to be lifted. The IntegriCert device is a "load test apparatus (100) that applies" a test load. Doc. 163 at 20 (IntegriCert infringement analysis). |
| providing the attachment weld joining a **pad eye, lifting lug**, or other device to another structure; | **pad eye:** an attachment point welded to a structure to be lifted, through which a line or pin can be placed. Doc. No. 153 at 16.<br><br>**lifting lug:** an attachment point welded to a structure to be lifted. Id. | IntegriCert uses its load test apparatus to test structures (160) on which a pad eye (330), lifting lug or other device has been attached by an attachment weld. '569 Patent at Fig. 1.<br><br>IntegriCert's website admits that its device can "test more than just the pad eyes" by "simulating the weight in the container while applying force to the pad eyes." Segura Exhibit 11; Doc. 163 at 14 ("The container and its components including pad eyes are tested to verify a specified container load capacity"). |
| providing a **framework including at least two pieces**; | **framework including at least two pieces:** not addressed by the Court's claim construction proceedings—subject to ordinary meaning. *Johnson Worldwide Assocs., v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). | IntegriCert's load testing device includes a framework with at least two pieces, such as a top beam assembly (110), side pieces (shown at 45˚ angle between 100 and 130) and base (285). '569 Patent at Fig. 1. The framework may also include the "two cylinder assemblies (120) each with a cylinder (250) with its own base plate (285)." Doc. 163 at 21. |
| providing at least one fluid cylinder, having a first end and a second end, **mounted with the framework to produce a mounted cylinder within a mounted framework**, for moving a piston | **inwardly:** into the cylinder. Doc. No. 78 at 1.<br><br>**outwardly:** within and toward the shaft end of the cylinder. Doc. No. 78 at 2.<br><br>**mounted with the framework to produce a mounted cylinder** | The device includes two cylinder assemblies (120) each with a cylinder (250) with its own base plate (285) and a top beam assembly (110). Each cylinder is fixed within those assemblies and fixed to at least the base of the framework and to the load cell assembly on the top beam |

| | | |
|---|---|---|
| therein **inwardly and outwardly** as fluid is moved out or in respectively; | **within a mounted framework:** not addressed by the Court's claim construction proceedings—subject to ordinary meaning. *Johnson Worldwide Assocs., v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). | assembly, i.e., with the framework. Doc. 163 at 21.<br><br>The hydraulic cylinder moves a piston (260) inwardly and outwardly as fluid is moved in or out, respectively. |
| providing a first and second **attachment apparatus**, wherein a pressurized fluid can enter in or exhaust from said at least one fluid cylinder; | **fluid attachment apparatus:** pressure containing hoses, pressure containing fittings, cylinder fittings, manifold fittings and pump fittings, as well as any equivalents thereto. Doc. No. 153 at 23. | The IntegriCert load testing device includes hoses and cylinder fittings for attaching pressurized fluid to the cylinders. *See* Segura Deposition at 34 and 54. |
| **providing an attachment structure for attaching** to said **pad eye, lifting lug** or other device joined to said another structure by the attachment weld; and | **attachment structure for attaching:** pinned connections, threaded fasteners, taper pins, welding, cable assemblies, footings and attachment plates, clamps and any equivalents thereto. Doc. No. 153 at 27. | The IntegriCert device has cable assemblies as attachment points (130) for attaching to the pad eyes (330) joined to the structure to be lifted (160) by attachment welds. The IntegriCert device employs cable assemblies (130) to attach the device to the pad eyes (330) or other lifting lugs on the structure to be tested. Doc. 163 at 14 (device includes "Cable Assembly 130 for attachment to the pad eyes"); *see also* Jarrod Segura Testimony at 38-39 (attachment by "wire rope slings and shackles"). |
| assembling the framework with the **mounted cylinder fixedly attached on the mounted framework;** | **fixedly attached**: agreed as "fastened, secured or joined." Doc. 78 at 2.<br><br>**mounted cylinder fixedly attached on the mounted framework**: agreed as "no construction required." *Id.* at 4. | The IntegriCert device is assembled with the cylinders (120 and 250) fixedly mounted on the framework (285, 110, 100). The '569 Patent at Fig. 1; *see also* Segura Deposition at 32-33 (cylinders attached to base and to load cell housing on top beam assembly). |

14

| | | |
|---|---|---|
| urging fluid into the cylinder to cause the piston to move outwardly to **tension the pad eye**, lifting lug or other device joined to said another structure, thus **testing the integrity of the attachment weld**, and | **tension the pad eye:** apply a tensioning or pulling force on the pad eye or test piece. No. 78 at 3.<br><br>**testing the integrity of the weld:** challenging the soundness of the welding or weld. Doc. No. 153 at 34. | Fluid is moved into the cylinder (250), causing the piston (260) to move outwardly, applying a pulling force (tension) on the pad eye (330) to test the integrity of the attachment weld between the pad eye and structure. |
| whereby a testing technician or test operator can inspect the attachment weld for any structural damage or deformation. | | After the load is placed on the structure, the attachment weld and associated pad eye or lifting lug is visually examined for any defects or deformities. *See* Segura Depo. at 40-42 and Exhibit 13. |

I have reviewed IntegriCert's non-infringement positions related to the '447 Patent, including in IntegriCert's Opposition to Plaintiff's Motion for Summary Judgment of Infringement (Doc. No. 163), IntegriCert's PowerPoint Presentation offered at the Summary Judgment hearing, and in IntegriCert's October 31, 2011 "Draft Infringement Analysis." As with IntegriCert's non-infringement position regarding the '322 Patent, IntegriCert's non-infringement position regarding the '447 Patent is based upon an incorrect reading of the claim terms. The "framework" claimed in the '447 Patent is broader than the framework claimed in the '322 Patent. Claim 14 of the '447 Patent requires only a "framework including at least two pieces," whereas Claim 1 of the '322 Patent requires a "framework including a base, top, and side pieces." Despite the broadly claimed "framework" in Claim 14, IntegriCert argues that its device does not include a framework to which a cylinder is mounted. Doc. 163 at 21. In my opinion, a person of ordinary skill in the art would find the IntegriCert device to include a framework with at least two pieces and would find that the hydraulic cylinders are mounted to the framework. In the IntegriCert device, the cylinders are mounted at the base and at the load cell assembly at the top of the device. *See* Segura Depo.; Doc. 163 at 13 and 21; and October 31, 2011 "Draft Infringement Analysis" at 6 ("the top of the hydraulic cylinders are connected to the horizontal beam").

**C. Conclusion**

Based upon my analysis of the IntegriCert device and method, through documents, drawings and deposition testimony, it is my opinion that IntegriCert infringes at least one claim of each of the Scarborough patents. The infringement analysis herein may require modification if IntegriCert produces additional documents showing a different design or configuration, if the Court orders an amended claim construction, or if an opinion on the doctrine of equivalents becomes necessary. I reserve the right to amend, revise or supplement this report and/or any of the conclusions contained herein should it become necessary.

15



# Tab F

# United States Patent [19]

## Ristow et al.

[11]  **3,879,991**

[45]  **Apr. 29, 1975**

[54]  **APPARATUS FOR TESTING LOAD BEARING MEMBERS**

[75]  Inventors: **Ulrich Ristow**, Neu-Isenburg; **Alfred Schneider**, Bremen, both of Germany

[73]  Assignees: **Licentia Patent-Verwaltungs-G.m.b.H.**, Frankfurt am Main; **Ingenieurburo Schneider & Sudhop**, Bremen, both of Germany

[22]  Filed:  **Aug. 24, 1973**

[21]  Appl. No.: **391,054**

[30]      **Foreign Application Priority Data**

Aug. 25, 1972   Germany............ .......... 2241976
Aug. 25, 1972   Germany... . ............ ... .... 7131565

[52]  **U.S. Cl.**............ ............................ **73/95; 73/103**
[51]  **Int. Cl.**............................................. **G01n 3/08**
[58]  **Field of Search** ................ 73/95, 97, 103, 95.5

[56]      **References Cited**

UNITED STATES PATENTS

2,884,986   5/1959   Heldenbrand ...... .. ........ ... 73/97 X
2,893,240   7/1959   Able ...................................... ... 73/95
3,171,277   3/1965   Gloor................................. ...... 73/103
3,286,515   11/1966   Bendl................................. 73/103 X

*Primary Examiner*—Jerry W. Myracle
*Attorney, Agent, or Firm*—Spencer & Kaye

[57]      **ABSTRACT**

For the load testing of load bearing members there is provided an apparatus which has a base frame, a stand connected to the base frame and a carrier beam secured to the stand for movement with respect to the latter. The base frame and the carrier beam are provided with mounting attachments to which the load carrying member to be tested is secured. There is further provided a power mechanism connected between the carrier beam and the stand for urging the carrier beam to change its distance from the base frame, whereby the load bearing member is placed under the test load.

**5 Claims, 3 Drawing Figures**



Case 6:12-cv-00396-PJH   Document 186-8   Filed 06/13/16   Page 272 of 364 PageID #:  5942

**FIG.1**



**FIG.3**

Case 6:12-cv-00396-PJH   Document 186-8   Filed 06/13/16   Page 273 of 364 PageID #:  5943



FIG. 2

3,879,991

1

## APPARATUS FOR TESTING LOAD BEARING MEMBERS

### BACKGROUND OF THE INVENTION

Load carrying and load receiving members of the type used for example, in the field of conveyance, such as chains, cables, crane hooks, hangers, girders and the like, have to be periodically submitted to legally prescribed load tests in order to ensure the safety of their operation.

The testing of hangers or girders of complex structure involves time consuming and expensive measures since these load bearing members have to be tested in an assembled condition and, if possible, at the site of their use.

Load tests of the afore-outlined load receiving and load carrying members have heretofore been performed with the aid of determined weights usually constituted by rail bundles, iron blocks or concrete slabs.

In addition to the shipment back and forth of the very substantial weights, lengthy preparations are needed for performing the tests. Thus, in most cases, additional mechanisms have to be provided to ensure a uniform loading of the member to be tested. The attachment and the subsequent removal of the weights is very time-consuming, and is not in a reasonable and economically justified proportion to the duration of the testing operation proper. Thus, for example, the labor involved in the attachment and removal of a test load of 150 tons in connection with the testing of a 120-ton hanger takes approximately 4 days, whereas the testing process proper requires only 2 hours.

If simple load bearing members, such as chains, cables, tie rods and the like, are to be tested, there are for example, stretcher stands required which, because of their bulky structure, are generally not transportable and are not adapted to test large hangers in an assembled condition.

### SUMMARY OF THE INVENTION

It is an object of the invention to provide an apparatus for testing load carrying and load receiving members in assembled condition without the use of test weights and crane apparatuses to thus avoid the above-discussed disadvantages involved therein.

This object, and others become apparent as the specification progresses, is accomplished by the invention, according to which, briefly stated, there is provided an apparatus which has a base frame, a stand connected to the base frame and a carrier beam secured to the stand for movement with respect to the latter. The base frame and the carrier beam are provided with mounting attachments to which the load carrying member to be tested is secured. There is further provided a power mechanism connected between the carrier beam and the stand for urging the carrier beam to change its distance from the base frame, whereby the load bearing member is placed under the test load.

The apparatus is designed to be readily collapsible to permit its easy transportation to and from the location of use.

The advantage of the apparatus according to the invention resides particularly in the fact that most load bearing members that are used in practice can be tested therewith without major preparation and without the use of weights or additional hoisting equipment. The testing can be accomplished in a substantially shorter

2

period of time and with substantially less work input than it has been possible heretofore. Also, the tests can be effected without endangering the environment in any manner.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a preferred embodiment of the invention in an operational position.

FIG. 2 is a side elevational view of the same embodiment mounted on a truck in a shipping condition.

FIG. 3 shows a section view of the carrier beam with holding means for additional mounting attachments.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

Turning now to FIG. 1, the preferred embodiment illustrated therein is adapted for testing suspensions having two, three, or four arms.

Thus, as it may be also observed in FIG. 1, the stand assembly formed of components 2, 8 is connected, at several spaced locations, to the base frame 1 and constitutes, in the erected position, a rigid, bridge-like structure.

The apparatus comprises a rectangular base frame 1, a collapsible stand 8 pivotally attached to the base frame 1, two collapsible support bars 2, connecting an upper portion of the stand 8 with the frame 1, a carrier beam 6 and a pair of hydraulic or pneumatic cylinders 5, by means of which the beam 6 is supported on the top of the stand 8. Each support bar 2 is pivotally attached by its upper end 4 to the stand 8 and is shackled to the base frame 1 by means of a removable screw connection 13. The apparatus also includes a pressure generating source such as a manual pumping station 7 connected to the power cylinders 5 by means of a pressure fluid conduit 10. The station 7 is provided with a pressure gauge 7a to indicate the force applied to the power cylinders 5. The apparatus further has a plurality of mounting attachments to which the device to be tested is secured. These attachments may be constituted by pins 3 and/or apertured plates 9. In the embodiment illustrated, one set of attachments 3 is affixed to the underside of the carrier beam 6, while several sets of attachments 3, 9 are secured to various locations of the rectangular base frame 1. In case the apparatus is also to be used for testing three-arm hangers then, to the rectangular base frame 1, laterally outwardly extending auxiliary frames 12 are attached, the outer ends of which are connected with an upper portion of the stand 8 by auxiliary support rods 11. Each auxiliary support rod 11 is pivotally connected to the stand 8 and the associated auxiliary frame 12. It is thus seen that by virtue of the auxiliary components 11 and 12, the outline of the base frame is variable. Frames 12 are also provided with mounting attachments 9.

For performing the load testing operation, the hanger to be tested (not shown) is secured by its head to the mounting attachment 3 carried by the beam 6. The other end or ends are secured to one or more mounting attachments 3 and/or 9 disposed on the base frame 1, 12.

Thereafter, the carrier beam 6 is urged to change its distance from the base frame 1, 12 by pressurizing the power cylinders 5 via the pressure source 7. In this manner the test hanger is placed under tension (load), the applied magnitude of which is indirectly indicated with sufficient accuracy by the pressure gauge 7a.

3,879,991

**3**

The described apparatus may be regarded as a base structure with which, it is to be understood, by means of a further variation in the base frame and by the provision of further mounting attachments, complex load bearing members of any design may be load tested. Also, because of the versatility of the apparatus, its use is not limited to load bearing members, but it may find application in the testing of devices in other fields, such as roof trusses, conveyor devices and the like. It is to be further understood that instead of the fluid pressure means 5, 7, 10, any other force generating and force applying mechanism may be used to urge the carrier beam 6 to vary its distance from the base frame 1.

Turning now to FIG. 2, the apparatus according to the invention is shown there on a truck in its collapsed, shipping condition into which it has been pivoted after removing the screw connections 13 and one of the pivots on each auxiliary support 11.

It is to be further understood and shown in FIG. 3 that for adapting the apparatus for various testing objects the beam 6 is provided with some holding means 3a which permit the addition of more attachments 3. It is thus seen that the disposition of the attachments 3 is variable on the beam 6.

It will be understood that the above description of the present invention is susceptible to various modifications, changes and adaptations, and the same are intended to be comprehended within the meaning and range of equivalents of the appended claims.

We claim:

1. An apparatus for the load testing of load bearing members, comprising in combination:

a. a base frame having a variable outline;

b. a plurality of spaced first mounting attachment means carried by said base frame for selectively receiving an end of diverse load bearing members to be tested;

c. a bridge-like stand assembly connected to said base frame at a plurality of locations spaced from one another;

d. a carrier beam displaceably secured to said stand assembly at a distance from said base frame at least

**4**

at two spaced locations on said stand for movement with respect to said base frame to vary the distance between said beam and said base frame;

e. a plurality of spaced second mounting attachment means carried by said beam for selectively receiving an end of diverse load bearing members to be tested;

f. power means connected between said beam and said stand for urging said beam to change its distance from said base frame, whereby the load bearing test member secured to at least one of said first mounting attachment means and to at least one of said second mounting attachment means is placed under a test load; and

g. means for setting the force exerted by said power means to obtain a determined test load.

2. An apparatus as defined in claim 1, said power means including fluid pressure-operated power cylinders constituting the sole support of said carrier beam on said stand assembly.

3. An apparatus as defined in claim 1, including auxiliary base frame components carrying additional first mounting attachment means and means for removably securing said auxiliary base frame components to said base frame to vary the outline thereof and to vary the number of said first mounting attachment means.

4. An apparatus as defined in claim 1, including means pivotally attaching one end of said stand assembly to said base frame whereby said apparatus is collapsible into an inoperative condition; said stand assembly including support bar means pivotally attached thereto at locations remote from the pivotal connection between said base frame and said stand; and means for releasably connecting said support bar means to said base frame for immobilizing said stand assembly with respect to said base frame in the operational condition of said apparatus.

5. An apparatus as defined in claim 1, further including means for varying the disposition of said second mounting attachment means on said carrier beam.

\* \* \* \* \*



# Tab G

**EXHIBIT G**

# United States Patent [19]

## Duppong et al.

[11] **Patent Number:** 4,736,633

[45] **Date of Patent:** Apr. 12, 1988

[54] **MULTIPURPOSE LIFTING AND PULLING VEHICLE**

[75] Inventors: **Denis E. Duppong; Richard L. Brandt; David M. Mick; Leland M. Rieck,** all of Cedar Rapids, Iowa

[73] Assignee: **FMC Corporation,** Chicago, Ill.

[21] Appl. No.: **843,541**

[22] Filed: **Mar. 25, 1986**

[51] Int. Cl.⁴ .............................................. G01N 3/08
[52] U.S. Cl. .................................... 73/837; 73/826
[58] Field of Search ................. 73/826, 827, 834, 835, 73/862.52, 837; 340/984, 52 H, 685; 212/255, 259, 188, 189; 414/739, 735

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,780,068 | 2/1957 | Grimes | 73/826 |
| 3,586,841 | 6/1971 | Griffin | 73/769 |
| 3,595,072 | 7/1971 | Richards | 73/826 |
| 3,631,995 | 1/1972 | Jones et al. | 414/739 |
| 3,759,094 | 9/1973 | Al | 340/984 |
| 3,796,332 | 3/1974 | Kawamura | 414/739 |
| 4,005,895 | 2/1977 | Cullings | 414/739 |
| 4,212,006 | 7/1980 | Cakebread et al. | 340/685 |
| 4,275,902 | 6/1981 | Teja | 212/189 |
| 4,374,473 | 2/1983 | Brockman | 73/158 |
| 4,486,116 | 12/1984 | Howard | 73/862.48 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 974623 | 9/1975 | Canada | 340/685 |
| 0008484 | 1/1983 | Japan | 73/116 |

### OTHER PUBLICATIONS

FMC Link Belt LS–7400A Crawler Hydraulic Excavator Brochure Illustrating a Crawler Excavator—8 pages.

*Primary Examiner*—Stewart J. Levy
*Assistant Examiner*—Robert R. Raevis
*Attorney, Agent, or Firm*—Raymond E. Parks; Alan J. Moore; Richard B. Megley

[57] **ABSTRACT**

The multipurpose vehicle of the present invention is designed to operate in and around dry docks and wharfs and its capable of lifting and moving propellers from propeller shafts within areas confined by a ship's rudder and to carry the propeller to an area away from the ship to be lifted to the wharf by crane. The propellers may weigh as much as 75,000 pounds and be 23 feet in diameter. The vehicle may also be used to accurately position keel blocks and haul blocks weighing up to 25,000 pounds in positions to support a ship. The vehicle may be lifted by crane out of dry dock to test padeyes for safety and certification by applying up to a 50,000 pound pulling force to the payeyes. The vehicle's upper arm can be extended to about 40 feet high or can be lowered to a level permitting the vehicle to pull or carry articles into buildings on the wharf.

5 Claims, 8 Drawing Sheets





FIG_1

FIG_2





FIG_3



FIG_6

FIG_6A

FIG_7

FIG_8





**FIG_11**



**FIG_12**





**1**

## MULTIPURPOSE LIFTING AND PULLING VEHICLE

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a multipurpose lifting, pushing and pulling vehicle, and more particularly relates to a maneuverable ship-repair and testing vehicle capable of working both on wharfs and dry docks for testing and repairing maritime equipment.

2. Description of the Prior Art

Modified cable cranes mounted on wheels and having shortened booms have been used in dry docks for projects such as removing and installing heavy propellers from large naval and merchant vessels and moving heavy objects to different locations. However, these known vehicles are awkward to handle due to their relatively poor maneuverability, especially with loads, and due to their substantial minimum height, which height prevents them from entering normal buildings after being lifted from the dry dock and placed on the wharf.

### SUMMARY OF THE INVENTION

The multipurpose lifting, pushing and pulling vehicle is self-propelled and is specifically designed for use in dry docks and on adjacent wharfs for performing functions such as: moving 25,000 pound keel blocks and hull blocks between patterns identified on the floor of the dry docks and storage against the walls of the dry dock; removing and installing propellers weighing up to about 75,000 pounds and having a diameter of about 23 feet on ships including aircraft carriers; testing the strength of padeyes up to about 50,000 pounds for required periodic certification; moving heavy loads into and out of buildings on the wharf; attaching encapsulated life boats to the sides of ships; and many other functions including lifting, pushing outwardly and/or downwardly, winching loads from place to place and moving or pulling heavy loads into buildings on the wharf.

The multipurpose vehicle includes tracks or tread members on an axle frame or lower works which supports a rotating platform or upper works for pivotal movement about a vertical axis. A boom is pivoted to the rotating platform and to an upper arm about horizontal axes, which boom and upper arm are independently pivoted about their horizontal axes by independently controlled hydraulic cylinders for performing precisely controlled lifting and/or pulling functions in confined areas such as pulling large propellers from their shafts without damaging adjacent rudders or the like. Accessories such as swivels, hydraulically actuated grapples and hydraulically actuated padeye testing cylinders may be attached at two different locations to the upper arm for performing specific functions. Outriggers and pontoons are mounted on the front of the lower works for extending the tip over point of the vehicle forward a sufficient amount to prevent tip over of the vehicle when a 50,000 pound horizontal pulling force is applied at the upper end of the arm when the arm and boom are fully raised thus eliminating the need to extend the length of the tracks.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagrammatic section through a dry dock with the gates open and a ship floating therein above partially layed keel blocks and hull blocks positioned to

**2**

support the ship when the dry dock is emptied, the multipurpose vehicle being shown on the wharf testing padeyes for certification.

FIG. 2 is a diagrammatic perspective illustrating the vehicle moving keel blocks and hull blocks between storage positions adjacent the walls of a dry dock to patterns identified on the floor of the dry dock when emptied.

FIG. 3 is a perspective of a fragment of a dry dock illustrating the vehicle removing a propeller from the ship with the propeller being immediately adjacent a rudder, said perspective also illustrating the load line of a crane on the dock for moving the vehicle and other objects between the dry dock and the wharf.

FIG. 4 is a side elevation of the multipurpose vehicle of the present invention illustrating the boom and upper arm in several operative positions.

FIG. 4A is a side elevation of a fragment of the upper arm shown connected to a test pull cylinder.

FIG. 5 is a front elevation of the vehicle.

FIG. 6 is a perspective of an angle gauge for indicating the relative angles between the longitudinal axis of the boom and the upper arm.

FIG. 6A is a perspective illustrating a boom to frame angle indicator.

FIG. 7 is a side elevation of a grapple, certain parts being broken away.

FIG. 8 is an enlarged elevation with parts cut away and other parts in central section illustrating components of the swivel joint which supports the grapple.

FIG. 9 is an enlarged view in perspective illustrating a hydraulically actuated grapple lifting a keel block, certain parts of the block and grapple being cut away.

FIG. 10 is an enlarged operational view in perspective illustrating a propeller being connected to the upper arm by a swivel joint and eye bolt, portions of the propeller being cut away.

FIG. 11 is an operational view of the vehicle with its winch lifting a load.

FIG. 12 is an elevation of a load indicator which displays forces applied by the test pull cylinder.

FIG. 13 is a hydraulic diagram illustrating a simplified hydraulic circuit.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

Prior to describing the multipurpose vehicle **20** of the present invention it will be helpful in understanding the invention by describing the preferred environment in which the vehicle is to be used.

The multipurpose vehicle **20** (FIGS. 1–3) is specifically designed for lifting, pulling, pushing and carrying heavy objects used in the ship building and ship repairing industry. However, it will be understood that the vehicle is adaptable to perform similar functions in other industries. The boom **22** and upper arm **24** of the vehicle are capable of reaching to a height of about 40 feet and to a horizontal distance of about 34 feet and may be pivoted b 360° about a vertical axis A (FIG. 4).

In FIG. 1, the multipurpose vehicle **20** is shown, in two positions in a certification test, connected to padeyes **26,26a** that are secured to a ship **28** for applying up to about 50,000 pounds testing force against the padeyes. The vehicle **20** is supported on a wharf **30** and the ship is shown floating in a dry dock **32** with its keel **33** above concrete keel blocks **34** and its hull above hull blocks **34a** each of which may weigh up to about 25,000

4,736,633

## 3

pounds. A fragment of a building 35 is shown on the wharf within which the vehicle may be used.

In FIG. 2 the dry dock 32 has been pumped dry and the multipurpose vehicle 20 is shown carrying a keel block 34 from storage against the walls 38 of the dry dock to a keel pattern 40 identified on the floor of the dry dock 32. It will be understood that most keel blocks and hull blocks are the same size but certain blocks 34b are contoured to match the shape of the keel or hull. Planks 36 are disposed between the stacked blocks, and steel lugs 41 (FIG. 9) are embedded in the concrete blocks.

In FIG. 3, the vehicle 20 is in the dry dock 32 alongside a rudder 42 and is shown connected to a propeller 44 of the ship 28 for pulling the propeller from the shaft 46. The load line 48 of a crane (not shown) that is supported on the wharf 30 is illustrated in position to receive the propeller 44 and lift it to the wharf. The crane is also used to lower the multipurpose vehicle 20 into the dry dock and to lift it out of the dry dock for use on the wharf.

The multipurpose vehicle 20 (FIGS. 4 and 5) comprises a pair of tracks 60,62 complete with conventional hydraulic motors and drives (not shown) which are connected to an axle frame 64 which has the lower half of a turn table bearing 66 secured thereto and concentric with axis A. The upper half of the turntable bearing 66 is secured to the rotating platform 68 of an upper works 70. The upper works includes an engine 72, which drives several conventional pumps (not shown) that provide hydraulic power to drive hydraulic motors (not shown) which drive the tracks 60,62 in either direction, rotate the upper works 70 about the axis A in either direction, and provides power to several hydraulic cylinders employed on the vehicle. A counterweight 73 is removably attached to the rear end of the upper works 70. Conventional operator controls and conventional hydraulic and electrical controls are provided for performing the above functions. The conventional controls are located in a cab 74 secured to the upper works 70 and may be controlled by an operator when seated in the cab to perform the above standard functions.

The components of the multipurpose vehicle 20 as thus far described are substantially the same as those used in Assignee's LS-7400A crawler hydraulic excavator and are conventional in the art.

The boom 22 (FIGS. 4 and 5) is pivotally supported on the upper works 70 by pivot pin 82 for pivotal movement about a first horizontal axis A2 through an arc of about 80° between a horizontal and a near vertical position illustrated in solid lines in FIG. 4. A pair of spaced hydraulic boom cylinders 84 are connected to the upper works 70 by pins 86 (FIG. 4), and to brackets 88 (FIG. 5) welded to the sides of the boom, by pins 90. The upper arm 24 is pivotally connected to the boom by a second horizontal pin 94 for rotation about a second horizontal axis A3. A second hydraulic cylinder 96 is pivotally connected between lugs 98 on the underside of the boom 22 and lugs defined by side walls 100 of the upper arm 24 by pins 102 and 104, respectively. The upper arm 24 may be pivoted between its illustrated uppermost position in FIG. 4 downwardly approximately 84°. Conventional hydraulic controls in the cab 74 may be used by the operator to selectively pivot the boom 22 and upper arm 24 between their several operative positions.

FIG. 6 illustrates an upper arm angle indicator 108. The indicator 108 includes an arcuate plate 110 rigid

## 4

with an arm 112 that is adjustably secured to a bracket 114 welded to the upper arm 24. A pointer 116 is secured to the boom 22 and is illustrated at a 0° position which indicates that the longitudinal axis of the arm 24 is at 90° to the longitudinal axis of the boom 22.

FIG. 6A illustrates a boom to frame angle indicator 117 which includes an arcuate scaled plate 118 bolted to a bracket 118a that is welded to the left side of the boom 22. A pointer 119 is bolted to a bracket 119a that is secured to the left boom support 119b on the upper works 70. When the boom is in the horizontal position illustrated in FIG. 6A, the pointer 119 is opposite the 0° reading on the scale plate 118. It will be noted that the boom may be elevated from its horizontal position approximately 84°. It will be understood that the operator refers to incab capacity plates to determine allowable machine lifting capacities and operating procedures.

An outrigger assembly 120 (FIGS. 4 and 5) is connected to the forward end of the axle frame 64 by four pins 122 (only two being shown). A pair of hydraulic jacks 124 are rigidly secured to a transverse beam 126 at the front end of the assembly 120 and are selectively raised or lowered by the operator by operating conventional controls on the outrigger assembly for directing hydraulic fluid in the selected direction to the jacks 124 through a conventional circuit to be described hereinafter. A bearing plate 128 is preferably positioned below each jack and the surfaces upon which the vehicle is supported for distributing the force applied by the jacks over a wide area. The outrigger jacks are used only when forces acting on the vehicle tend to tip the vehicle over such as might occur when testing padeyes or the like as indicated in FIG. 1. When performing other functions, the pins 122 (FIG. 4) may be withdrawn and the outrigger assembly 120 may be removed from the vehicle 20.

As best shown in FIGS. 7 and 9, a grapple 130 includes and is connected to the upper arm 24 of the vehicle by a hydraulically powered swivel joint 132 having its upper portion connected to the arm 24 by a crosshead 133 and pivot pins 134,134a. The grapple 130 includes angle tongs 138,140 pivotally connected together intermediate their ends by a pivot pin 142. The tongs 138,140 each include a stiffening plate 138a,140a, respectively, which are shown partially cut away. The upper ends of the grapple tong 138 is pivotally connected to the swivel joint 132 by a generally U-shaped support arm 144 by pairs of pivot pins 146, and an upper pin 148; and the upper ends of the tong 140 is pivotally connected to the swivel joint 132 by a U-shaped support arm 150 by a pair of pins 152, and an upper pin 154. One end of a first hydraulic cylinder 156 is connected by a pivot pin 158 to a lug 160 welded to the upper portion of the tong 140, and has its upper end pivotally supported by the pivot pin 148. Similarly, one end of a second hydraulic cylinder 162 is connected by a pivot pin 164 to a lug 166 welded to the upper portion of the tong 138; and has its upper end pivotally supported by the pivot pin 154. Thus, extension of the cylinders 156,162 will move the lower portion of the tongs 138,140 together, and retraction of the cylinders will move the tongs away from each other.

In order to firmly grip the keel blocks 34, or other articles, a block engaging shoe 168 (FIG. 7) is pivotally connected to the lower end of each tong 138,140. Each shoe includes a rubber article engaging pad 170 and wood backup members 172 that are bolted to a steel mounting body 174 of the associated tongs 138,140.

4,736,633

5

As illustrated in FIG. 8, the swivel joint 132 comprises an upper portion in the form of a yoke 180. A hydraulic motor 184 is bolted to the yoke and drives a spur gear 186 which drives an internal ring gear 188. A spindle 190 is rigidly secured to the yoke 180, projects downwardly therefrom, and is concentric with the ring gear 188. The ring gear is bolted to a first outer bearing support 192 which is rigidly secured to end plates 194,196 that are shown rotated 90° as compared to FIG. 7. A second outer bearing support 198 and a rotary union support 200 are likewise rigidly secured to said end plates 194,196. A pair of anti-friction bearings 202,204 are received about the spindle 190 within the bearing supports 192,198, respectively. A nut 206 is screwed on the spindle 190 and supports the end plates 194,196 and all members supported thereon from downward-movement relative to the yoke 180. An adjusting lock washer 208 fitted in a keyway (not shown) and capscrew 210 locks the nut 206 to the spindle in position to support the end plates 194,196 and all rotatable portions of the grapple 132 (FIG. 7) which rotate about the spindle in response to being driven by the hydraulic motor 184.

A rotary union 220 includes a sleeve 222 rigidly secured to the union support 200 and includes ports 224,226 which are connected to the cylinder 162 and ports 228,230 which are connected to the cylinder 156 by hoses 232,234 and 236,238 respectively. The ports 224 and 228 are connected to the upper end of cylinders 162,156; and the ports 226,230 are connected to the lower ends of cylinders 162,156 by the above hoses. A spindle extension 237 is rotatably received within the sleeve 222 and has its upper end counterbored to receive the lower end of the spindle 190 which is rigidly secured thereto by a pair (only one being shown) of long capscrews 239 which extend through a closure plate 240. A first annular passage 242 in the spindle extension communicates with the ports 224,228 and with a bore 244 in the spindle extension 237. The bore 244 communicates with a bore 246 which extends through the spindle 190 and is connected to a hydraulic circuit to be described hereinafter. The ports 226,230 communicate with the second annular passage 250, with a bore 252 in the spindle extension 237, and with a bore 253 which extends through the spindle 190 and is connected to the hydraulic circuit as will be described. A plurality of annular grooves are formed in the spindle extension 237 and receive conventional fluid seals 254 and 256, or packing 258 for providing fluid seals between the spindle 190, sleeve 222 and the spindle extension 237. Also, a needle bearing 260 and a ball bearing 262, which ball bearing is held in place by a snap ring 264, are disposed between the sleeve 222 and the spindle extension 237.

FIG. 9 illustrates the grapple 130 lifting a keel block 34, which block is formed from concrete having steel lugs 41 included therein and projecting out both sides thereof. Planks 36 are disposed between adjacent layers of blocks as best shown in FIGS. 2 and 9. When gripping a keel block 34, which may weigh up to 25,000 pounds, the hydraulic cylinders 156,162 (FIG. 9) apply sufficient force against the keel block 34 and below the lugs 41 to support the keel block. The operator may actuate several controls including controls for driving the vehicle 20, rotating the upper works 70 (FIG. 4) about axis A; raising or lowering the boom 22 and upper arm 24 and pivoting the grapple 130 about a vertical

6

axis in order to place the keel block 34 in the desired location.

FIG. 10 illustrates the propeller 44 connected to the upper arm 24 by a swivel joint 276 that is connected to arm 24 by the pivot pin 134a, and to an eyebolt 280 by shackles 282 or drop cables (not shown). The eyebolt is screwed into a threaded hole 283 in the hub of the propeller, which hole is normally closed by a plug (not shown). The multipurpose vehicle will handle propellers that are 23 feet in diameter and weigh up to about 75,000 pounds.

As shown in FIGS. 5 and 11, a winch 284 powered by a hydraulic motor 285 is mounted on the upper works 70 and includes a wire rope 286 which may be used to pull articles along the vehicle supporting surface, or may be trained around a sheave 288 secured to the swivel 276 and be connected to a load L to be lifted.

FIG. 12 illustrates an indicator and warning device 290 for the test pull cylinder 278 (FIGS. 1 and 4A). The device 290 indicates the pull force in pounds and provides an audible and visual warning when the pull force of stroke of the cylinder 278 exceeds preset limits, which warning may be utilized to alert an operator of excessive pressure in the test pull cylinder 278, as may occur, for example, when the wake of a ship acts upon a floating vessel to which the test pull cylinder is connected.

As illustrated in FIGS. 1 and 4A, the test pull cylinder 278 is selectively and normally connected to the free end of the upper arm 24, but may be connected to an intermediate position on the arm 24 as indicated by the swivel joint 276a (FIG. 4).

When the multipurpose vehicle is used to test and certify padeyes 26 or 26a, the test pull cylinder 278 or 278a (FIGS. 1 and 4A) is pivotally attached to the outer end or intermediate portion of the upper arm 24 and to one end of a cable 294 or 294a, respectively. At this time the cable is slack and its other end is connected to the padeyes 26 or 26a being tested. The pull cylinder 278 or 278a is preferably elevated to lie in the horizontal plane of the padeye being tested, as indicated in FIG. 1; or if desired, may be moved to a higher or lower elevation than the padeye being tested. The multipurpose vehicle 20 is then driven in reverse until all slack is removed from the cable at which time the vehicle's conventional brakes are applied to prevent movement of the vehicle relative to its supporting surface 30. The outrigger jacks 124 (FIGS. 4 and 5) are then lowered against the supporting surface to prevent the crane from being tipped over, and hydraulic fluid is directed into the pull cylinder to provide the desired testing force to the particular padeye being tested. The size and purpose for which the padeye is to be used will determine the magnitude of force required for certification, which force may be up to about 50,000 pounds. In the event the padeyes should break, or should be pulled off the ship, while being tested, the operator in the cab 74 is protected from flying parts by bars 74a surrounding the cab 74.

When the padeye test is completed, the hydraulic fluid is first released from the pull cylinder 278, and then the above described procedure is reversed permitting the operator and an assistant to thereafter test all padeyes on the ship.

A simplified hydraulic circuit 300 (FIG. 13) is provided for manually controlling the operation of the boom cylinders 84 which raise and lower the boom 22, the upper arm cylinder 96 which raises and lowers the upper arm 24, the jacks 124, the pull cylinder 278 on the

4,736,633

7

upper arm 24, the hydraulic motor 184 and hydraulic cylinders 156,162 which operate the grapple 130, and the winch motor 285.

The hydraulic circuit 300 includes a pump P driven by the vehicle engine 72. The pump receives fluid from a tank T and returns the fluid to tank T if the pressure in the high pressure line HP exceeds a predetermined amount by opening a spring loaded pilot operated relief valve 302. A low pressure line LP returns fluid to tank T from the several cylinders and motors.

A plurality of manually operated valves V1-V8 are each connected to the high pressure and low pressure lines HP and LP, respectively. Each valve is normally held in a closed flow blocking position by springs 304,306, and includes a parallel passage position and a cross passage position.

In order to rotate the grapple 130 in one direction, the valve V1 is electrically moved into its parallel passage position, and to rotate the grapple in the opposite direction valve V1 is moved into its cross passage position 20 and is returned to the neutral position when the desired angular position is reached.

The grapple tong cylinders 162,156 are opened by shifting valve V2 into its parallel passage position, and are closed by moving valve V2 into its cross passage position. The test pull cylinder 278 for testing the padeye is retracted to apply a pulling force against the padeyes by shifting valve V3 into its parallel passage position at which time the tensioning force is displayed on a pressure gauge 308, and/or by the test pull indicator warning device 290 (FIG. 12). The valve V3 is held in its parallel passage position when the desired testing force is reached. The oil is relieved across relief valve RV1, which is setable from operator's station, and returns to tank. This allows for cylinder extension and re-traction during pull testing, to compensate for ship movement. The piston in the cylinder is extended by moving the valve to its cross passage position.

The boom 22 is elevated by cylinders 84 in response to shifting valve V4 into its parallel passage position, and is lowered by moving the valve V4 into its cross passage position.

The upper arm 24 is raised by cylinder 96 in response to shifting the valve V5 to its parallel passage position and is lowered by moving to positioning the valve V5 45 in its cross passage position.

The two manual outrigger jacks 124 are independently raised by shifting the valves V6 and V7 to the parallel passage positions, and are lowered to their operative vehicle stabilizing positions by independently 50 shifting the valves V6 and V7 to their cross passage positions.

The winch motor 285 rotates the winch 284 in one direction by shifting valve V8 to its parallel passage position, and is rotated in the opposite direction by 55 shifting the valve V8 into its cross passage position.

It will be understood that certain protective circuits, check valves, and other conventional hydraulic cir-cuitry have been omitted from the illustrated hydraulic circuit 300 for simplicity.

From the foregoing description it is apparent that the multipurpose vehicle of the present invention is highly maneuverable and is capable of performing many jobs including pulling and replacing ship propellers from confined areas, testing padeyes for periodic certification 65 and for lifting many types of loads such as keel blocks weighing up to 25,000 pounds. The vehicle may operate within a dry dock or may be lifted out of the dry dock

8

and be used on a wharf. Also, the vehicle's boom and upper arm may be pivoted downwardly to an elevation no higher than its cab and thus may pull or carry articles into buildings on the wharf. Furthermore, the winch may be used to pull articles along the vehicle's support-ing surface, or may be trained over a sheave connected to the upper arm for lifting and transferring articles to different loca- tions.

Although the best mode contemplated for carrying out the present invention has been herein shown and described, it will be apparent that modification and variation may be made without departing from what is regarded to be the subject matter of the invention.

What is claimed is:

1. An endless track driven vehicle for tension testing an article to withstand a predetermined force, compris-ing:

  a pair of endless tracks supporting the vehicle on a surface;

  a boom pivotally supported on said vehicle for piv-otal movement about a first horizontal axis;

  an upper arm pivotally supported on said boom for pivotal movement about a second horizontal axis;

  a flexible connector;

  a hydraulic cylinder;

  said flexible connector and hydraulic cylinder being connected between the upper arm and the article being tested;

  first power means for moving said arm and said boom to a height for supporting said cylinder at the same elevation as that of the article being tested;

  second power means for driving the tracks of the vehicle and moving the vehicle away from the article being tested until substantially all slack is removed from said flexible connector;

  first valve means for directing hydraulic pressure to said hydraulic cylinder;

  second valve means for maintaining a selected pres-sure within said cylinder for applying said prede-termined force to said article;

  means defining an outrigger assembly connected to one end of said vehicle;

  a pair of jacks on said outrigger assembly and dis-posed between said vehicle and the surface, said jacks being disposed above said surface until sub-stantially all of said slack is removed from the flexi-ble connector and is thereafter urged downwardly against said surface for preventing tip over of the vehicle when applying said predetermined force to the article; and

  wherein said predetermined test force is up to about 50,000 pounds, and

  wherein said hydraulic cylinder may be raised to a height of about 40 feet above said surface, and

  wherein the article is a padeye rigidly secured to a ship when in dry dock.

2. A method of tension testing an article to a predeter-mined force with the aid of an operator controlled vehi-cle having ground-engaging drive and associated brakes and pivotally supporting a boom and an upper pivot arm about horizontal axes with a flexible connector and hydraulic cylinder connected between the upper arm and the article being tested; said method comprising the steps of:

  moving said cylinder to substantially the same eleva-tion as that of the article being tested;

4,736,633

9

driving the vehicle away from the article being tested until substantially all slack is removed from said flexible connector;

applying said brakes;

directing a predetermined constant pressure to said hydraulic cylinder for applying said predetermined force to said article; and

wherein said article is a padeye secured to a floating ship moored to a wharf; and additionally comprising the steps of:

detecting pressures from said cylinder in excess of said constant pressure caused by said ship being moved excessively by the wake of a passing vessel; and

10

alerting the operator to said excessive pressure.

3. The tension testing method according to claim 2 wherein the vehicle includes an outrigger assembly on one end of the vehicle with outrigger jacks thereon, and additionally comprising the step of lowering the outrigger jacks against the wharf after said slack has been removed from the flexible connector for preventing tip-over of the vehicle when applying said predetermined force to the article.

4. The tension testing method according to claim 3 wherein said predetermined force is up to about 50,000 pounds.

5. The tension testing method according to claim 4 wherein said flexible connector is a wire rope.

* * * * *



# Tab H

EXHIBIT H

US006398188B1

(12) **United States Patent**
Salman

(10) Patent No.: **US 6,398,188 B1**
(45) Date of Patent: **Jun. 4, 2002**

(54) **POST PULLER**

(76) Inventor: **Mark T. Salman**, 1710 Harrod La., Greensboro, NC (US) 27410

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 7 days.

(21) Appl. No.: **09/725,891**

(22) Filed: **Nov. 30, 2000**

(51) Int. Cl.[7] ............................................... **E21B 19/00**
(52) U.S. Cl. ...................................................... **254/30**
(58) Field of Search ............................ 254/29–31, 132, 254/89 H, 93 H, 93 R

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,952,131 A | * | 9/1960 | Lyroudias .................... 254/30 |
| 3,358,967 A | * | 12/1967 | Harmon ....................... 254/30 |
| 3,526,387 A | | 9/1970 | Fleming |
| 3,647,185 A | * | 3/1972 | Phibbs ........................ 254/30 |
| 4,244,560 A | | 1/1981 | Hawkins |
| 4,327,534 A | * | 5/1982 | Mastalski et al. ............. 254/30 |
| 4,422,621 A | | 12/1983 | Ekern |

| | | |
|---|---|---|
| 4,706,935 A | 11/1987 | Thompson |
| 4,746,096 A | 5/1988 | Donnell et al. |
| 5,011,117 A | 4/1991 | Youngblood et al. |
| 5,368,277 A | 11/1994 | Moss |
| 5,492,437 A | 2/1996 | Ortiz |
| D372,177 S | 7/1996 | Hansen |

* cited by examiner

*Primary Examiner*—Robert C. Watson
(74) *Attorney, Agent, or Firm*—Richard C. Litman

(57) **ABSTRACT**

The post puller has an H-shaped base including a pair of parallel legs and a crossbeam normal to the legs, the crossbeam being offset from the midpoint of the legs and defining a shallow channel and a deep channel. A pair of rectangular blocks attached to the legs and crossbeam in the deep channel provide platforms on which a pair of single action hydraulic cylinders are mounted, and define a recess which straddles the post to be pulled. A cross member is pivotally mounted to each cylinder rod. A chain is suspended from the midpoint of the cross member. The chain may be wrapped directly around the post, or a post gripping structure may be attached to the free end of the chain. A pair of wheels may be mounted to the base for portability.

**20 Claims, 5 Drawing Sheets**





*Fig. 1*



*Fig. 2*



**Fig.  3**



*Fig. 4*



*Fig. 5*

US 6,398,188 B1

1

# POST PULLER

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a post puller for pulling a post or a post anchor from the ground.

### 2. Description of the Related Art

Several devices are supported by one or more posts driven into the ground. Such devices include signs, mail boxes, fences, and the like. The post may be a one-piece post with the load carrying portion driven directly into the ground, or a two piece post with a post anchor driven into the ground, and the upper or load carrying portion of the post being driven or bolted to the post anchor. For purposes of the present application, the term "post" will be used to refer to either the one-piece or two piece post assembly, and to either a post or post anchor. From time to time it may become necessary to remove or relocate the post. It then becomes necessary to remove the post and/or the post anchor.

It is sometimes possible to remove the post manually. This process is labor intensive, and may require striking the post from several different directions with a sledge hammer to loosen the ground about the post, and then leaning over and grabbing the post and yanking the post out of the ground. Not only is the process labor intensive, but the post may become damaged so that it cannot be reused, and the laborer can sustain a back injury in the process.

In order to obviate these problems, several machines or mechanical devices have been developed. U.S. Design Pat. No. 372,177, issued Jul. 30, 1996 to S.C. Hansen, shows a mechanical post puller with a single support post having a roller offset from the top of the post and what appears to be a ratchet mechanism with a C-shaped arm for gripping a post at the bottom of the support post.

Several devices are adapted for use with a tractor, front end loader, or other vehicle with a hydraulic system. U.S. Pat. No. 3,526,387, issued Sep. 1, 1970 to H. B. Fleming, describes a post puller having a metal plate base with a flared opening for straddling a post, a pair of uprights pivotally mounted on opposites side of the flared opening, a single hydraulic cylinder, pivotally mounted to the base and connected to a vehicle hydraulic system, a lever arm connected between the cylinder ram and the two uprights, and a chain with a post gripping fixture depending from the lever arm. U.S. Pat. No. 4,244,560, issued Jan. 13, 1981 to W. H. Hawkins, discloses a tree puller attached to a front end loader with a bifurcated wedging member for cutting into a tree trunk, a pair of parallel ground engaging members, each having a hydraulic cylinder mounted thereon with the cylinder rods being attached to an elevatable frame, the wedging member also be attached to the elevatable frame, so that the wedging member cuts into a tree trunk and the cylinder rods are extended to lift the tree out of the ground. U.S. Pat. No. 4,706,935, issued Nov. 17, 1987 to G. L. Thompson, teaches a post puller attached to a tractor three-point hitch, the puller including a stationary gripping plate and a pivotally mounted arcuate gripper, both grippers having teeth for clamping and gripping a post or tree therebetween.

Still other patents are primary concerned with the problem of post slippage in the post puller, several such patents

2

dealing with T-shaped fence posts. U.S. Pat. No. 4,422,621, issued Dec. 27, 1983 to P. B. Ekern, shows a puller for pulling ranch fence posts having lugs extending from the flange of a T-shaped post, the puller having a pair of plated connected by a cross member, the plates having a slot defined therein for receiving a pin which lodges against a fence post lug. A chain is attached to the plates and the post is pulled by a hydraulic cylinder or jack. U.S. Pat. No. 5,011,117, issued Apr. 30, 1991 to Youngblood et al., describes a post puller having a plate with a hole in it so that the plate fits around the post. A chain pulls one side of the plate so that the plate tilts and grips the side of the post to pull it out.

U.S. Pat. No. 5,368,277, issued Nov. 29, 1994 to F. Moss, discloses a device for pulling a T-shaped fence post having bracket and a clevis which fits over the post and is pivotally attached to the bracket. A ring is placed through the bracket and a chain is looped through the ring. A lever is placed through the chain and braced against the ground to pull the post.

A more remote device having some features in common with the present invention is an apparatus for driving a pipe or other: elongated member horizontally through the ground, as described in U.S. Pat. No. 4,746,096, issued May 24, 1988 to Donnell et al. The apparatus uses a rectangular frame with a pair of parallel hydraulic cylinders having rods attached to a tray by a cradle bar. The tray has a plurality of pairs of spaced apart gussets which support a moveable end plate which is placed at an end of a pipe to be driven horizontally into the ground, the pipe being disposed between the hydraulic cylinders. The cylinders are extended to move the tray and pull the end plate against the pipe for the stroke distance of the rods, the end plate is moved forward in the tray, and the process is repeated to drive the pipe into the ground in stages. Optionally, jaws may be attached to the tray for gripping the pipe below collars placed on the pipe to pull the pipe out as the cylinder rods retract.

Another device for a dissimilar purpose but having some features in common with the present invention is a device for lifting the foundation of dwellings, buildings and other structures, described in U.S. Pat. No. 5,492,437, issued Feb. 20, 1996 to L. P. Ortiz. The device has a pier guide tube attached to a support plate which fits under a foundation footing and has two parallel hydraulic cylinders pivotally attached to the guide tube. The cylinder rams are pivotally attached to an articulating bar having a pier compression means between the two rams. A pier is placed into the guide tube and connected to the compression means. One or more piers are driven into the ground until they reach bedrock, after which further retraction of the rams raises the structure. The pier is then permanently affixed to the foundation and the hydraulic cylinders are detached.

There are several problems associated with the post pullers known in the art. Several of the devices are expensive or heavy devices which require attachment to a vehicle for operation. Many manual pullers require that the operator complete the operation in a bent position to extract the post, resulting in back strain and related back injuries. Many puller devices apply a load from the side of the post or utilize a pulling force with a large lateral component relative to the

US 6,398,188 B1

3

axis of the post, making the post difficult to extract. Consequently there is a need for a lightweight, portable, relatively inexpensive post puller which applies a pulling force primarily along the axis of the post.

None of the above inventions and patents, taken either singularly or in combination, is seen to describe the instant invention as claimed. Thus a post puller solving the aforementioned problems is desired.

## SUMMARY OF THE INVENTION

The post puller has an H-shaped base including a pair of parallel legs and a crossbeam normal to the legs, the crossbeam being offset from the midpoint of the legs and defining a shallow channel and a deep channel. A pair of rectangular blocks attached to the legs and crossbeam in the deep channel provide platforms on which a pair of single action hydraulic cylinders are mounted, and define a recess which straddles the post to be pulled. A cross member is pivotally mounted to each cylinder rod. A chain is suspended from the midpoint of the cross member. The chain may be wrapped directly around the post, or a post gripping structure may be attached to the free end of the chain. A pair of wheels may be mounted to the base for portability.

The base assembly is preferably made from aluminum. The entire post puller assembly is lightweight, permitting the post puller to be easily transported on the optional wheels by hand, without the need for a vehicle to transport the puller. The post puller is a self-contained unit, and does not require attachment to a vehicle hydraulic system. In use, each cylinder may be raised individually to rock the post enough to loosen the ground surrounding the post, and then the cylinders may be raised simultaneously to pull the post straight up from the ground. Therefore the unit is more efficient, directing the pulling force along the axis of the post during final extraction of the post.

Accordingly, it is a principal object of the invention to provide a portable post puller for pulling sign posts, mail box posts, fence posts, and the like.

It is another object of the invention to provide a post puller capable of exerting a pulling force directly on the axis of the post.

It is a further object of the invention to provide a post puller with a pair of hydraulic cylinders which may be operated, independently in order to pull a post vertically even on sloping ground.

Still another object of the invention is to provide a post puller with a cross member which may pivot on either side of the post in order to loosen the post before pulling the post vertically from the ground.

It is an object of the invention to provide improved elements and arrangements thereof for the purposes described which is inexpensive, dependable and fully effective in accomplishing its intended purposes.

These and other objects of the present invention will become readily apparent upon further review of the following specification and drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an environmental, perspective view of a post puller according to the present invention.

4

FIG. 2 is a front view of a post puller according to the present invention.

FIG. 3 is a plan view of a post puller according to the present invention.

FIG. 4 is a side view of a post puller according to the present invention.

FIG. 5 is an environmental view of a post puller according to the present invention removing a post from sloping ground, the wheels being omitted.

Similar reference characters denote corresponding features consistently throughout the attached drawings.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention is a post puller, referenced generally as 10 in the drawings, for pulling posts and post anchors from the ground. As shown in FIG. 1, the post puller 10 is transported to the post site, the base 20 is seated on the ground A with the legs 22 of the base 20 straddling the post B, the hoist chain 40 is suspended directly above the post B, the free end of the chain 40 is attached to the post B, and the post B is pulled from the ground by operation of a pair of hydraulic cylinders 60.

As shown in FIGS. 1–4, the post puller 10 has a base 20 which includes a pair of parallel legs 22 joined by a crossbeam 24 normal to the legs 22 defining a generally H-shaped base 20. As seen most clearly in FIG. 3, the crossbeam 24 does not bisect the legs, but is offset towards the rear of the base 20 to define a deep channel 26 at the front of the base 20 and a shallow channel 28 at the rears of the base 20. A pair of flat, box shaped platforms 30 are attached to the base 20 at the junction of the legs 22 and the crossbeam 24 on opposite sides of the deep channel 26 and define a recess 32. The legs 22 and crossbeam 24 may be made from square tubing which is joined by welding, but in a preferred embodiment is made in one piece by casting, forging, molding, or by other metal forming processes. In a preferred embodiment, the base 20 is made from a lightweight aluminum alloy, such as 356-T6.

The puller 10 has a pair of single action hydraulic cylinders 60 mounted on the platforms 30 so that the two cylinders 60 are disposed on opposite sides of the recess 32. Each cylinder 60 has a base 62 which is fixedly attached to a platform 30 so that the cylinder 60 does not pivot about its mounting point, an extensible rod 64A and 64B, respectively, with a piston (not shown) slidably disposed within the cylinder 60, and a pump handle 66 for pumping hydraulic fluid through a one-way valve (not shown). The rods 64A and 64B are retracted by releasing the one-way valve. The internal construction of the cylinders 60 is conventional and well known, and will not be further described herein. It will be noted that each hydraulic cylinder 60 is a self-contained unit, requires no connection to an external hydraulic system, and that each hydraulic cylinder 60 is independently operated and actuated by its pump handle 66.

The free end of each rod 64A and 64B is pivotally attached to opposite ends of a cross member 70 by bolts 78A and 78B, respectively, or other type of pivot pin. Cross member 70 is formed by a pair of parallel plates 72 main-

US 6,398,188 B1

5                                                                                    6

tained in spaced apart relation by at least one, and preferably a plurality of, bolts 74 which extend through spacer sleeves 76, including a center bolt 74A which bisects the distance between the end bolts 78A and 78B and the free ends of rods 64A and 64B. Cross member 70 is positioned so that center bolt 74A is disposed directly above the center of recess 32 when the base 20 is resting on a horizontal surface.

Hoist chain 40 is attached to the center bolt 74A so that chain 40 is aligned with recess 32. Chain 40 may be attached to center bolt 74A by any appropriate means, as by a hook, by extending center bolt 74A through a link 42 in the chain 40 as shown in FIG. 3, or by other conventional means. The free end of the chain 40 is attached to a post B by any conventional means. Such means may include wrapping the chain 40 around the post B with overlapping loops, attaching a clamp, such as horseshoe clamp 44, to the end of the chain 40 for gripping the sides of the post B, a hook 46 (seen in FIG. 5) which may be inserted through a mounting aperture in the post B, a gripper or clamp (not shown) which may be attached to the post B by extending a bolt through the post and one or more links in the chain 40, etc.

Optionally, the puller 10 may include a pair of wheels 80 mounted to the base 20 for transporting the puller 10. The wheels 80 may be attached to the base 20 by bolting a pair of mounting brackets 82, which may have an angle iron shape formed by two flanges defining a right angle, to the rear of legs 22, and mounting axles 84 to the upstanding flange of brackets 82 so that the axles 84 extend outboard from base 20. Wheels 80 are rotatably mounted on axles 84 and may include pneumatic tires 86 mounted about their rims. The diameter of wheels 80 are sized and dimensioned so that the external perimeter of tires 86 are raised above the ground by between about ½" to when the base 20 is flush against the ground A. In order to transport the puller 10, the cross member 70 is grasped and the puller 10 is tilted rearward until the tires 86 contact the ground A and the weight of the puller 10 is balanced so that the puller may be wheeled about after the fashion of a two-wheeled cart or dolly.

In use, the puller 10 is positioned with the base 20 flush against the ground A with the post B disposed in recess 32. The chain 40 is attached to the post B by any appropriate attachment or post gripping means. Initially the operator pumps the handle 66 of the cylinder 60 on one side of the puller 10 to raise the rod 64A, the rod 64B on the other side remaining stationary while the cross member 70 pivots about its end bolt 78B. Then the operator pumps the handle 66 of the cylinder 60 on the opposite side to raise the rod 64B while rod 64A remains stationary, the cross member 70 pivoting about end bolt 78B. The platforms 30 on opposite sides of recess 32 act as a guide, preventing the puller 10 from moving or walking during the pulling process. The operator may repeat the process of alternately pumping first one cylinder and then the other to rock the post B to loosen the surrounding soil, the cross member 70 acting as a second class lever alternately pivoting about one fulcrum 78B and then the other 78A. Finally the operator pumps both handles 66 simultaneously to exert maximum pulling force directly along the axis of the post B, without a net lateral component which might shift the post B to one side or the other, until the post B is extracted from the ground A.

FIG. 5 illustrates use of the post puller 10 to remove a post B from sloping ground A. Since the cylinders 60 may be operated independently, the rod 64A on the lower side may be extended a greater distance than the rod 64B on the higher side until the, cross member 70 is level, and then both rods 64A and 64B may bet extended simultaneously to raise the post B vertically on sloping ground.

The puller 10 has a wide base 20 with elongated legs 22 in order to distribute the pulling force over a wide area of the ground A while exerting a large pulling force on the post B, as compared to pullers which exert a pulling force only from one side of the post. By applying parallel and equal pulling forces from opposite sides of the post B, a greater pulling force may be applied for easier extraction of the post B. Advantageously, the mechanical advantage applied by the employment of parallel hydraulic cylinders 60 to extract posts from the ground reduces the likelihood of back strain and related ailments incurred during post pulling operations.

It is to be understood that the present invention is not limited to the embodiments described above, but encompasses any and all embodiments within the scope of the following claims.

I claim:

1. A post puller for pulling a ground-mounted post, comprising:

a) a base having a first leg and a second leg in parallel, spaced apart relation for engaging the ground on opposite sides of the post;

b) a first hydraulic cylinder and a second hydraulic cylinder attached to said base, each of the cylinders being an independently operable unit having a cylinder base, an extensible rod having an end slidable in the cylinder and a free end, and a pump handle attached to the cylinder base;

c) a cross member having a first end pivotally attached to the free end of said first rod and a second end pivotally attached to the free end of said second rod;

d) a chain depending from said cross member about halfway between said first rod and said second rod; and

e) wherein said chain is attachable to the post and wherein said first and second hydraulic cylinder rods may be extended simultaneously in order to pull the post vertically from the ground.

2. The post puller according to claim 1, wherein said base further comprises a crossbeam joining said first leg and said second leg in parallel spaced relation.

3. The post puller according to claim 2, wherein said base is cast in one piece.

4. The post puller according to claim 2, wherein said crossbeam is normal to said first leg and said second leg and wherein said crossbeam is offset from a midpoint of said first leg and said second leg, said base defining a deep channel and a shallow channel.

5. The post puller according to claim 4, wherein said base further comprises:

a) a first rectangular, box shaped platform joined to said base in the deep channel at the junction of said first leg and said first crossbeam, said first hydraulic cylinder being mounted on the first platform;

b) a second rectangular, box shaped platform joined to said base in the deep channel at the junction of said second leg and said crossbeam, said second hydraulic cylinder being mounted on the second platform; and

7

c) wherein said first and second platforms are spaced apart to define a recess, the post being positionable in said recess.

6. The post puller according to claim 1, wherein said first, and second hydraulic cylinders are single action hydraulic cylinders.

7. The post puller according to claim 1, wherein said cross member comprises:

a) a first elongated plate and a second elongated plate;

b) a plurality of fasteners joining said first plate to said second plate; and

c) a plurality of spacer sleeves disposed about said fasteners in order to maintain said first and second plates in parallel, spaced apart relation.

8. The post puller according to claim 7, wherein said plurality of fasteners includes a center fastener disposed midway between the free end of said first rod and the free end of said second rod, said chain being attached to said center fastener.

9. The post puller according to claim 1, further comprising post attachment means for attaching said chain to the post.

10. The post puller according to claim 9, wherein said post attachment means comprises a hook.

11. The post puller according to claim 9, wherein said post attachment means comprises a clamp.

12. The post puller according to claim 1, further comprising a plurality of wheels attached to said base for transporting the post puller.

13. The post puller according to claim 12, wherein said wheels are mounted at a rear of said base and elevated so that said wheels are raised above ground level when said legs are flush against the ground and so that said wheels engage the ground when the post puller is tilted to raise the legs above the ground.

14. A post puller for pulling a ground-mounted post, comprising:

a) a ground engaging base having two elongated legs and a crossbeam normal to the legs defining an H-shaped base, the crossbeam being offset from the midpoint of the two legs to define a deep channel and a shallow channel;

b) a first platform joined to one of said legs and the crossbeam in the deep channel, and a second platform joined to the other said leg and the crossbeam in the deep channel, the first and second platforms defining a recess for straddling a post;

8

c) a first single action hydraulic cylinder mounted on said first platform, the cylinder having a rod extendable from the cylinder and a pump handle attached to the cylinder for actuating the cylinder to extend and retract the rod;

d) a second single action hydraulic cylinder mounted on said second platform, the cylinder having a rod extendable from the cylinder and a pump handle attached to the cylinder for actuating the cylinder to extend and retract the rod;

e) an elongated cross member having a first end pivotally attached to the rod of said first hydraulic cylinder and a second end pivotally attached to said second rod, the cross member having a center;

f) a link chain attached to the center of said cross member, the chain being aligned vertically above the recess defined by said platforms, the chain being attachable to the post; and

g) wherein said first and second hydraulic cylinders may be actuated sequentially to rock the post from side to side and to adjust for sloping ground, and wherein said cylinders may be actuated simultaneously to pull the post from the ground without lateral movement of the post.

15. The post puller according to claim 14, wherein said base is cast in one piece.

16. The post puller according to claim 14, wherein said base is made from a lightweight aluminum alloy.

17. The post puller according to claim 14, wherein said base and said first and second platforms are cast as a one piece unit.

18. The post puller according to claim 14, further comprising a pair of wheels mounted on said base, said wheels being mounted at an elevation above ground level when said base is engaging the ground, and said wheels engaging the ground for transporting the post puller when said post puller is tilted to raise said base off the ground.

19. The post puller according to claim 18, further comprising a pair of angle shaped brackets attached to said legs, each bracket having an axle mounted thereon, said wheels being rotatably mounted on said axles.

20. The post puller according to claim 14, further comprising post attachment means for attaching said chain to a post.

*   *   *   *   *



# Tab I

## EXHIBIT I

# United States Patent [19]

## Bacon et al.

[11]   **3,718,039**

[45]   **Feb. 27, 1973**

[54]   **PAIL BAIL EAR TESTER**

[75]   Inventors: **James A. Bacon,** Cherry Hill, N.J.; **Charles J. Lindenmuth,** Levittown, Pa.

[73]   Assignee:   **United States Steel Corporation**

[22]   Filed:   **Dec. 2, 1971**

[21]   Appl. No.: **203,992**

[52]   **U.S. Cl.**.....................73/141 AB, 73/88 B, 73/95
[51]   **Int. Cl.**.................................................**G01l 5/00**
[58]   Field of Search..73/141 AB, 88 B, 139, 95, 130, 73/131

[56]   **References Cited**

### UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 1,848,487 | 3/1932 | Linendoll | 73/131 |
| 1,961,368 | 6/1934 | Larson | 73/141 AB |
| 2,450,188 | 9/1948 | Graaf | 73/141 AB |
| 2,821,080 | 1/1958 | Germignani | 73/88 B |

*Primary Examiner*—Charles A. Ruehl
*Attorney*—Donald S. Ferito

[57]   **ABSTRACT**

Device of the invention functions to apply pulling pressure on the bail ear of a pail to determine if the ear is securely affixed to the pail. The device includes a pressure plat attached to a leg extending at an angle from a lever having a spring-loaded bar with an ear-engaging end projecting therefrom, and indicating means connected with the bar to indicate the amount of pressure exerted on the ear when the end of the bar is engaged with the ear as the pressure plate is pressed against the body of the pail by exerting downward pressure on the end of the lever.

**3 Claims, 3 Drawing Figures**



PATENTED FEB 27 1973

3,718,039



FIG. 1.

FIG. 2.

FIG. 3.

3,718,039

1

## PAIL BAIL EAR TESTER

The present invention relates generally to testing apparatus and more particularly to apparatus for testing pail ears to determine if they are securely affixed to the pail body.

In the manufacture of pails having bail ears affixed by welding to the pail bodies, it is essential that the ears be tested to determine whether they are affixed to the pail body securely enough to prevent separation from the pail body when a full pail is lifted by its bail. Prior to our invention such testing was done periodically during production by removing a pail from the production line at intervals and pulling the ears off the pail body with a pair of pliers, channel locks or similar tools. Such testing obviously was crude, inaccurate and time consuming.

It is, accordingly, the primary object of our invention to provide a novel testing apparatus whereby bail ears can be tested non-destructively to determine their resistance to predetermined pressures.

It is a more specific object of our invention to provide an apparatus as set forth by the above statement of object which includes a pressure plate attached to a leg attached to and extending from a lever having a slidable spring-loaded bar therein formed with an ear-engaging end projecting from the lever, and indicating means connected with the bar to indicate the amount of pressure exerted on the ear when the end of the bar is engaged with the ear as the pressure plate is pressed against the body of the pail by exerting downward pressure on the end of the lever.

These and other objects will become more apparent after referring to the following specification and drawing in which:

FIG. 1 is a plan view partly in section of the apparatus of the invention;

FIG. 2 is an elevational view of FIG. 1; and

FIG. 3 is an elevational substantially schematic view showing the device of the invention in operating position.

Referring more particularly to the drawing, reference numeral 2 designates an elongated hollow handle or lever having a cap 4 at one end which is provided with a center aperture 6 for slidably accommodating a bar 8. The bar 8 extends longitudinally in the handle 2 with a portion thereof projecting outwardly of the handle through aperture 6. The outwardly projecting end of the bar 8 is provided with an upturned end 10 adapted to enter the bail hole of a pail bail ear and engage the inner surface of the bail ear. The opposite end of the bar 8 is rigidly connected with an elongated guide plug 12 slidably disposed in the handle 2. Bar 8 is spring-loaded and is constantly urged inwardly of the handle 2 by means of a coil spring 14 which surrounds the bar 8 and bears at one end against the cap 4 and at its other end against the plug 12.

The handle 2 is formed with a longitudinally extending slot 16 intermediate its ends for accommodating a peg 18 which is attached to and projects normal to the plug 12 to project outwardly of the slot 16. When the bar 8 is in resting position, the peg 18 rests against the end of the slot 16 remote from the cap 4. Indicia marking 20 are provided spaced along the slot 16 to indicate pressures exerted by the bar 8 in use. The spring-loaded bar is calibrated to determine what position the peg 18 will be in as the bar exerts various predetermined pressures.

2

A leg 22 is attached, by welding or similar means, to the handle 2 adjacent its capped end and extends at an acute angle, preferably approximately 45°, to the longitudinal axis of the handle. An arcuate plate 24, which may be lined with a padding 26 of rubber or other resilient cushioning material, is welded or otherwise fixedly attached to the end of the leg 22. The curvature of the plate 24 conforms to the outer contour of the pail body whose bail ears are to be tested. If desired, the end portion of the handle 2 remote from the cap 4 may be knurled to facilitate handling the device during operation.

In operation, the device is used by inserting the upturned end 10 of the bar 8 into the bail hole of a bail ear E to be tested and the plate 24 is rested against the side of the pail body B. A predetermined pressure is then applied downwardly manually on the end of the handle 2 remote from its capped end while the opposite side of the pail is held down manually. When the peg 18 reaches the indicia mark indicating the predetermined pressure the bail ear is required to withstand and the bail ear remains affixed to the pail body, the ear is considered adequately secured to the pail body and passes inspection. If the weld affixing the bail ear to the pail body is faulty, the ear will become detached from the pail body without damage to the pail body before the peg reaches the mark indicating the predetermined pressure.

While we have shown but one embodiment of our invention, other adaptations and modifications may be made without departing from the scope of the following claims.

We claim:

1. Apparatus for testing a pail bail ear having a bail hole therein attached to a pail body to determine if the ear is securely affixed to the pail body which comprises an elongated hollow handle, an elongated leg member attached to said handle adjacent one end thereof and projecting therefrom at an acute angle to the longitudinal axis of said handle, an arcuate pressure plate affixed to the end of said leg, said plate being curved to conform to the outer contour of said pail, said one end of said handle having an aperture therethrough substantially coincidental with the longitudinal axis of said handle, an elongated bar slidably disposed in said handle extending longitudinally thereof with one end of said bar projecting through said aperture, the projecting end of said bar having an upturned end adapted to fit into the bail hole of said bail ear and engage the inner surface of said bail ear, a coil spring surrounding said bar in said handle, an elongated plug affixed to the inner end of said bar slidable in said handle, said spring bearing against said slot, said peg engaging the end of and against the surface around said aperture at said one end and against the surface around said aperture at said one end of said pipe at its other end to constantly urge said bar inwardly of said handle, said handle having a longitudinal slot intermediate its ends and a peg connected with said plug at one end and extending normally therefrom to project slidably through said slot, said peg engaging the end of said slot remote from said one end of said handle when said bar is in retracted position, said peg being adapted to move toward the end of said slot toward said one end of said handle when said upturned end of said bar is in said bail hole of said bail ear engaging the inner surface thereof and said pressure plate is pressed against the outer surface of said pail by the application of

3,718,039

**3**

downward pressure on the end of said handle remote from said one end.

2. Apparatus as defined by claim 1 in which a lining of resilient cushioning material is provided on the pail-contacting face of said pressure plate.

3. Apparatus as defined by claim 1 including indicia

**4**

marks on the surface of said handle spaced along said slot to indicate the distance moved by said peg from its position at the end of said slot to thereby indicate the amount of pressure being exerted by the upturned end 5 of said bar on said pail bail ear.

\* \* \* \* \*

10

15

20

25

30

35

40

45

50

55

60

65

US005548997A

## United States Patent [19]

### Bauer

[11] **Patent Number:** 5,548,997

[45] **Date of Patent:** Aug. 27, 1996

[54] **APPARATUS FOR APPLYING A KNOWN AXIAL FORCE TO A VALVE STEM**

[75] Inventor: **Donald L. Bauer**, Atascadero, Calif.

[73] Assignee: **Westinghouse Electric Corporation**, Pittsburgh, Pa.

[21] Appl. No.: **232,570**

[22] Filed: **Apr. 25, 1994**

#### Related U.S. Application Data

[60] Continuation-in-part of Ser. No. 25,498, Mar. 3, 1993, Pat. No. 5,305,637, which is a division of Ser. No. 753,785, Sep. 3, 1991, Pat. No. 5,199,301.

[51] **Int. Cl.$^6$** ................................................. **G01M 19/00**
[52] **U.S. Cl.** ................................................. **73/168**; 73/806
[58] **Field of Search** ............................ 73/168, 761, 805, 73/825, 806; 251/129.12, 129.03

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,942,368 | 3/1976 | Hoyt . |
| 3,954,005 | 5/1976 | Edwards . |
| 3,965,736 | 6/1976 | Welton et al. . |
| 4,255,967 | 3/1981 | Crymonprez et al. . |
| 4,428,223 | 1/1984 | Trevisan ................................... 73/168 |
| 4,570,903 | 2/1986 | Crass ......................................... 73/168 |
| 4,594,900 | 1/1986 | Pellerin et al. . |

| | | |
|---|---|---|
| 4,607,534 | 8/1986 | Cerbone . |
| 4,802,367 | 2/1989 | Petersen et al. ............................ 73/805 |
| 4,805,451 | 2/1989 | Leon . |
| 4,831,873 | 5/1989 | Charbonneau et al. ................... 73/168 |
| 4,891,975 | 1/1990 | Charbonneau et al. . |
| 4,911,004 | 3/1990 | Leon . |
| 5,174,152 | 12/1992 | Wohld ........................................ 73/168 |
| 5,275,036 | 1/1994 | Schulz et al. ............................. 73/168 |
| 5,454,273 | 10/1995 | Smith ........................................ 73/168 |

#### FOREIGN PATENT DOCUMENTS

2086063   5/1982   United Kingdom .

*Primary Examiner*—William A. Cuchlinski, Jr.
*Assistant Examiner*—Andrew Hirshfeld
*Attorney, Agent, or Firm*—David G. Maire

[57] **ABSTRACT**

Method and apparatus for simulating operating conditions on a motor operated valve. The present invention provides a means for simulating actual operating load conditions, such as a simulated accident condition, for valves. An axial force is placed on the valve stem by a hydraulically operating loading system to simulate loading conditions associated with a postulated accident, and the valve operator is actuated. The response of the valve during the simulated loading condition is monitored to ensure that the valve is capable of operating, such as to close or open, in the event of an unusual condition.

**8 Claims, 5 Drawing Sheets**



**U.S. Patent**　　　Aug. 27, 1996　　　Sheet 1 of 5　　　**5,548,997**



*FIG. 1*
*PRIOR ART*

*FIG. 3*

*FIG. 4*



# Tab J



*FIG. 2*



*FIG. 5*

*FIG. 6*

*FIG. 7*

*FIG. 8*



*FIG. 9*



*FIG. 10*

5,548,997

# 1

## APPARATUS FOR APPLYING A KNOWN AXIAL FORCE TO A VALVE STEM

This application is a continuation-in-part of application Ser. No. 025,498 filed on Mar. 3, 1993, which is now U.S. Pat. No. 5,305,637, which in turn is a divisional application of Ser. No. 753,785, filed Sep. 3, 1991, now U.S. Pat. No. 5,199,301.

## BACKGROUND OF THE INVENTION

The present invention is in the field of mechanical testing and specifically relates to apparatus for applying a known axial force to a valve stem or to a shaft, the ends of which are not accessible.

At numerous points in a nuclear power plant, the flow of a fluid is controlled by large gate valves. When a considerable pressure difference exists between opposite sides of the gate, frictional forces become large and a large force must be exerted by the valve stem to move the gate. Under emergency conditions the pressure difference may reach very large values, and there is concern as to whether the valve will operate or can be operated safely under those conditions. In particular, there is concern about the force on the valve stem or other components.

FIG. 1 shows the type of valve on which the present invention is used. The operator (actuator) is connected to the valve by a yoke, and the valve stem is located between the two legs of the yoke. Obviously, the force in the valve stem is equal to the sum of the force in the two legs, but opposite in direction. It was well-known, even before U.S. Pat. No. 4,805,451, to install a strain sensor on one of the legs of the yoke to measure its elongation, from which the stress in the valve stem can be calculated based on knowledge of the size and material of the legs of the yoke.

With so much at stake, it would be highly desirable to provide for an independent check of the calculated force in the valve stem. This can be done by calibrating the strain sensor(s) mounted on the leg(s) of the yoke, or other sensors mounted at appropriate points on the valve. The calibration consists in applying a known force to the valve stem and noting the corresponding reading(s) of the strain sensor(s).

Once the reading of the strain sensor has been found for known amounts of force applied to the valve stem, there is a basis for believing that a particular reading of the strain sensor implies a particular amount of force on the valve stem.

In 1985 the U.S. Nuclear Regulatory Commission issued Generic Letter 85-03 which required operability verification of certain safety-related motor operated valves. Results, or lack thereof, from that investigation prompted the Commission to issue in 1989 Generic Letter 89-10 which required extensive verification, through in-depth accident condition testing, of a considerable larger number of motor operated valves. However, accident condition testing, i.e., configuring a plant system (piping, pumps, valves, and controls) to simulate accident conditions is costly, potentially hazardous and, in some cases, virtually impossible to perform without jeopardizing plant equipment integrity. In addition, current regulations propose follow-up testing, perhaps at periodic intervals, according to these same difficult accident conditions. Presently, there is no known method of satisfying all GL 89-10 requirements without actually generating system accident differential pressures across the valve and attempting to cycle the motor operated valve to demonstrate capability.

# 2

U.S. Pat. No. 4,891,975 to Charbonneau et al. discloses a prior art method for testing of motor operated valves under simulated loading conditions to determine a power parameter associated therewith. The power parameter is then measured during valve in use. The power parameter measured during imposition of the load is correlated with the power parameter measured during valve in use to provide an indication of thrust load developed in the valve operator during valve in use.

The novel features which are believed to be characteristic of the invention, both as to organization and method of operation, together with further objects and advantages thereof, will be better understood from the following description considered in connection with the accompanying drawings in which several preferred embodiments of the invention are illustrated by way of example. It is to be expressly understood, however, that the drawings are for the purpose of illustration and description only and are not intended as a definition of the limits of the invention.

## SUMMARY OF THE INVENTION

An apparatus for simulating an operating load condition on a valve stem mounted in a valve yoke comprises first and second loading beams positioned on opposite sides of the valve stem and elongated in a direction generally perpendicular to the valve stem, and means connecting the first and second loading beams and holding them together. First and second legs are pivotally connected to said first and second loading beams and extend approximately parallel to the valve stem. A first force means for exerting a force against the first and second loading means to exert a force on the valve stem. Means are provided for adjusting the force exerted on the valve stem, and for measuring the force exerted on the valve stem.

A method of testing a motor operated valve under simulated accident conditions utilizing the apparatus comprises the steps of positioning the loading means on the valve such that a force can be exerted on the valve stem by the adjustable force means. The loading means is actuated to load the valve operator by exerting a force on the valve stem. The valve is actuated by energizing the operator. The force imposed on the stem is controlled by varying the load provided by the loading means. This load is measured by the load measuring means. Operation of the valve and valve operator under simulated loading conditions is then determined. The method is preferably controlled by a programmable computer, which can automatically vary the loading profile of the force exerting means to simulated valve operation during simulated accident scenarios.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a front elevational view of a valve, known in the prior art, of the type on which the present invention is used;

FIG. 2 is a perspective view showing a means for applying a known load to a valve stem;

FIG. 3 is a side elevational view showing another embodiment of the device in FIG. 2 in use to apply a compressive load in an upward direction to the valve stem;

FIG. 4 is a side elevational view showing the device of FIG. 2 in use to apply a tensile load in a downward direction to the valve stem;

FIG. 5 is a perspective view showing half of the split loading beam used in imposing a load on a threaded valve stem;

5,548,997

| 3 | 4 |

FIG. 6 is a perspective view showing half of the split loading beam used in an alternative embodiment of the loading means for use on a threaded valve stem;

FIG. 7 is a perspective view showing parts of force exerting means for use on an unthreaded valve stem;

FIG. 8 is a side elevational view showing parts of the force means in an alternative embodiment for use on an unthreaded valve stem;

FIG. 9 is a side elevational view showing a preferred embodiment of the present invention for testing a valve during simulated loading conditions; and

FIG. 10 is a front elevational view of an alternative embodiment of the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 shows the type of valve with which the present invention was designed to operate. The valve includes a valve body 12 surmounted by a bonnet 13 from which there extends upwardly a yoke structure having legs 16 and 18. The yoke structure serves as a mounting for the valve stem 20 and also provides a point of attachment for the actuator 22 that turns the valve stem, or pushes and pulls it, to close and open the valve. Typically, an actuator plate 24 serves to adapt the actuator to the yoke structure.

It is known that a strain sensor 26 can be attached to one leg 16 of the yoke to provide a signal that is related to the thrust exerted on the valve stem 20.

The device of the present invention applies a force between the valve stem 20 and the body-to-bonnet flange 14 of the valve body.

As shown in FIG. 2, the valve stem 20 is embraced by the two halves 30, 32 of the split loading beam which includes provision for gripping the valve stem, as will be discussed below.

The split loading beam is mounted to the blocks 34 and 36 by means of the pivots 38 and 40 respectively. Blocks 34 and 36 are additionally secured to the split beam halves by U-shaped securing straps 41.

The split loading beam extends through the space between the legs 16, 18 (not shown) of the yoke, and the blocks 42 and 44 rest on top of the body-to-bonnet flange 14 of the valve body 12. The threaded rod 46 provides a means for adjusting the axial position of the split beam along the valve stem 20. Similarly, the block 44, the threaded rod 48, and the block 50 provide a means of adjusting the other leg of the device.

An hydraulic actuator 52 is mounted between the block 50 and the block 34. As is well known in the art, application of pressurized hydraulic fluid to the ram 52 causes the piston of the ram (not visible in FIG. 2) to extend upward a fraction of a centimeter, pushing the block 34 away from the body 52 of the hydraulic ram. The screws 37, 39 serve to couple block 34 to the hydraulic ram 52 and to keep the hydraulic ram positioned directly under the block 34. The force exerted by the hydraulic ram is transmitted through the block 34 and the split loading beam to the valve stem. A pressure gauge 56 measures the hydraulic pressure, from which the magnitude of the force exerted by the hydraulic ram can be calculated.

In an alternative embodiment, air pressure can be used in place of pressurized hydraulic fluid to operate the actuator 52. In another embodiment, the hydraulic actuator 52 can be replaced entirely by a mechanical jack.

In another embodiment, the force exerted by the hydraulic actuator 52 is determined by inserting an instrumented strain button (not shown) in series between the hydraulic actuator 52 and the block 34.

In still another embodiment, the force exerted on the valve stem 20 can be measured by a longitudinally-mounted strain gauge (not shown) on the underside of either of the halves 30, 32 of the split loading beam.

FIGS. 3 and 4 show the device of FIG. 2 in use. In FIG. 3, the blocks 42, 44 bear against the top of the body-to-bonnet flange 14 and the hydraulic actuator exerts an upward force on the valve stem. In FIG. 4, the apparatus is inverted for the purpose of applying a downward force on the valve stem. In this latter use, it is convenient to use the connecting supports 55, 57 for the hydraulic actuator to bear against.

Also as shown in FIGS. 3 and 4, blocks 42a and 44a are modified so as to be securable to the valve flange 14. Holes (not shown) are provided in the blocks 42a, 44a so that the valve building bolt nuts 58 can secure the blocks to either the top (FIG. 3) or bottom (FIG. 4) of the flange 14. In this manner, the device is prevented from moving relative to the valve during loading. Also in FIG. 4, securing straps 41a mounting the blocks 34, 36 and ram 52 to the split beam halves 30, 32 are longer to reach to blocks 59 which are secured to legs 55 and 57.

FIGS. 5 and 6 show two different embodiments of one of the halves of the split loading beam for use in obtaining a grip on a threaded valve stem. In the embodiment of FIG. 5, the half 30 includes a threaded section 60. In the embodiment of FIG. 6, the half 30 includes a cavity 62 for holding half of a split nut 64.

The embodiments shown in FIGS. 7 and 8 show ways of obtaining a grip on a smooth valve stem 66.

In the embodiment of FIG. 7, the blocks 70 and 72 are drawn together by the bolts 74 and 76 so that the blocks nightly grip the smooth valve stem 66. The split loading beam, which in this embodiment includes a clearance hole for the valve stem, is then brought up axially against the blocks 70, 72.

In the embodiment of FIG. 8, the smooth valve stem 66 is gripped by the wedges 78 and 80 that are contained in a tapered cavity 82 within the halves 30, 32 of the split loading beam.

Referring now to FIG. 9, the use of a force exerting means of the type described in applying a load to valve stem and valve operator under simulated accident conditions will now be described in more detail. The force exerting means 101 preferably comprises a double acting hydraulic cylinder 104 attached to one of the legs 55. The hydraulic cylinder 104 is operably connected to an hydraulic fluid supply 107 comprising a pump PMP and an accumulator ACC via a series of solenoid operated valves SOV A, SOV B, SOV C, and two relief valves RV1 and RV2, the operation of which is described in more detail below. A strain sensor 110, preferably mounted to the stem 20, is provided for measuring the force exerted thereon during operation. A pressure transducer PT also provides feedback information of the force exerted by the hydraulic cylinder 104. The system is under the control of a computer 113, which provides for a preprogrammed loading profile to be administered to the valve during testing. Inputs to and from the computer 113 are via a signal conditioner/power supply SC/PWR. In FIG. 9, hydraulic lines are represented by solid lines and electrical connections are represented by dotted lines,

The present invention addresses the major issues of providing a method and apparatus for testing a motor

5,548,997

| 5 | 6 |

operated valve under simulated accident conditions. With the hydraulic load simulator of the present invention one can simulate loading conditions on a valve, such as that might occur during postulated accident conditions, on the electrically powered motor operator. The two halves 30,32 of the split loading beam of the hydraulically operated apparatus is connected to the valve and valve stem as described above. Preferably, a pre-programmed loading profile is established and installed in the memory of the portable computer. The loading profile positions the solenoid valves SOV A, SOV B AND SOV C in the hydraulic cylinder circuit to restrict fluid bleed rate from the cylinder 104 as the operator is actuated to move the stem in either the open or closed direction. This serves to load the operator to any time-dependent variable load. With this capability, actual load profiles determined at less severe conditions can be increased by the computer to simulate operation under accident conditions.

A typical single stroke operation of the motor operated valve loading simulator could be performed according to the following steps. The valve is placed in the full open position. Solenoid operated valve SOV A is placed in the closed position, while solenoid operated valve SOV B is placed in the open position. Solenoid operated valve SOV C, also referred to as the diverting valve, is positioned to pass hydraulic fluid from the pump PMP through SOV C and SOV B to the hydraulic cylinder 104 along hydraulic line 116. The pump PMP is then started to pressurize the hydraulic cylinder 104 to place an upwardly directed load on the valve stem 20 which in turn loads the operator to normal closing thrust at the start of the cycle. A pressure profile associated with any particular thrust profile is maintained within the computer memory, and the thrust profile is generated during specific differential pressure testing, actual or extrapolated, or developed from generic data. The pressure transmitter PT provides feedback information to the computer 113. The SOV B is then closed and the pump PMP stopped. The SOV C is then positioned so as to bleed hydraulic fluid from the cylinder through SOV B to the accumulator via line 119. The operator is energized and stem loading is controlled by throttling SOV B to restrict hydraulic cylinder 104 bleed rate as the operator pulls the loading beams 30,32 downward, thus pulling the hydraulic cylinder piston (not shown) downward as well. The strain sensor 110 on the stem 20 provides loading level feedback to the computer 113 for continuous loading control. SOV A is to be opened after the start of the cycle to receive hydraulic fluid exchanged as the piston is moved to the opposite end of the cylinder. Relief valves RV1 and RV2 prevent overloading of the device and/or the valve operator and stem.

In an alternate embodiment of the invention, as shown in FIG. 10, a hydraulic cylinder 204 is mounted on an adjustable support 213 which in turn is mounted on top of a valve motor operator (not shown). A threaded rod 210 is threaded into the end of the valve stem 211 which is exposed at the top of the motor operator (not shown). The opposite end of the threaded rod 210 is connected to an instrumented coupler 207 which, in turn, is connected to the hydraulic cylinder 204. As in the previous embodiment, a pre-programmed loading profile is administered by a computer to position the solenoid valves in the hydraulic circuit as the operator is moved in either direction. The instrumented coupler 207 provides loading level feedback to the computer for the continuous loading control. The cylindrical, adjustable supports 213 includes an access window 216 for the installation of the instrumented coupler and attaching collar. Overall operation of this embodiment is similar to the operation of the embodiment shown in FIG. 9.

According to the present invention, margins above accident conditions can be imposed to assure accident condition operational capabilities, an assurance not presently achievable with current methods and apparatus. Industry generated or vendor provided loading profiles may be acceptable, thereby eliminating the need to individually generate plant specific or valve specific profiles. Periodic re-verification using the simulator could eliminate the need also to perform difficult and costly operational flow tests, which is another operating condition that can be simulated on a valve operator by the present invention. Operational testing required when certain maintenance is performed or when operator or valve parts are replaced could be satisfied by simulating maximum loading to ensure motor operated valve capability.

In addition to simulating accident loading conditions on a motor operated valve, the present invention can also be used to resolve other operational concerns, such as pre-testing of re-built actuator parts, degraded voltage testing, and troubleshooting.

Re-building of motor operated valve operators, which includes spare parts for future installation or active operators which are being overhauled, is usually performed in a plant's maintenance machine shop. Since loaded operability testing is delayed until the operator is re-installed on the valve in the field, re-build and defective component errors are discovered at a most inopportune time. In this instance the operator must then be removed and returned to the machine shop or disassembled in the field for subsequent repairs. With the loading simulator of the present invention, a several cycle run-in test, as part of the re-build operation, could be quickly and easily conducted while the operator is still in the shop. Any errors or defective parts can be conveniently corrected. Since the operator's future location when it is reinstalled would typically be known, a test which includes the valve operator's expected accident differential pressure loading profile could be imposed on the operator. This can be done for several iterations, to verify operability before the operator is removed from the maintenance area and re-installed on the valve. Pre-setting of valve operator torque and limit switches could also be accomplished prior to re-installation.

Another current concern is over the operability of the valve under de-graded voltage conditions. This could also be easily investigated on each re-built operator. Supplying other than line voltage in the field on an installed motor operator is difficult. However, supplying a reduced voltage in the maintenance machine shop can be easily accomplished. The hydraulic load simulator of the present invention would be used to impose accident loading conditions, or other loading profiles, while the operator was powered in the shop at the minimum accident voltage. Low voltage operability would then be proven and not have to be calculated based upon other operational parameters.

A valve operator may falter or fail under process condition loading but will perform flawlessly when a technician is sent to the field to investigate the valve. This usually occurs under static conditions. This can result when process pressures, temperatures and flows are re-routed as a result of a valve failure and are not present during the troubleshooting test. In this case, the hydraulic simulator can be quickly moved into the field and installed on the suspect valve. The device would then be utilized to supply the variable loading necessary to exercise and locate the load sensitive failed component.

The foregoing detailed description is illustrative of several embodiments of the invention, and it is to be understood

5,548,997

**7**

that additional embodiments thereof will be obvious to those skilled in the art. The embodiments described herein together with those additional embodiments are considered to be within the scope of the invention. Certainly there are other numerous applications for the hydraulic simulator of the present invention. The above examples are included simply to illustrate the versatility and operational testing techniques that the present invention can perform.

I claim:

1. A method of testing a motor operated valve having a valve operator and a valve stem, the method comprising the steps of:

  providing a means for exerting an adjustable force on an object;

  positioning said adjustable force means on said valve such that said force can be exerted on said valve stem by said adjustable force means;

  operating said adjustable force means to exert said force on said valve stem prior to actuating said valve operator;

  without releasing said force, actuating said valve operator to cause said valve stem to move;

  varying said force as said valve stem moves in accordance with a predetermined loading profile; and

  monitoring the operation of said valve.

2. The method of claim 1, wherein electric power is supplied to said valve operator at a degraded voltage during the step of actuating said valve operator.

3. The method of claim 1, wherein said predetermined loading profile simulates accident loading conditions on said valve.

4. The method of claim 1, wherein said predetermined loading profile simulates flow test conditions on said valve.

**8**

5. The method of claim 1, further comprising the step of providing a load sensing device for sensing a load in said valve stem, said load sensing device operable to provide a signal corresponding to the load in said valve stem, and

  using said signal as feedback for controlling said force in accordance with said predetermined loading profile.

6. A method of testing a valve motor operator having a valve stem comprising the steps of:

  placing said valve motor operator in a shop maintenance environment;

  providing a hydraulic cylinder operable to exert a force on an object;

  connecting said hydraulic cylinder to said valve stem;

  operating said hydraulic cylinder to exert said force on said valve stem prior to actuating said valve operator;

  without releasing said force, actuating said valve operator to cause said valve stem to move;

  varying said force as said valve stem moves in accordance with a predetermined loading profile; and

  monitoring the operation of said valve operator.

7. The method of claim 6, wherein the step of connecting said hydraulic cylinder to said valve stem further comprises the steps of:

  connecting an instrumented coupler between said valve stem and said hydraulic cylinder, said coupler operable to provide a signal corresponding to said force;

  using said signal as feedback for controlling said force in accordance with said predetermined loading profile.

8. The method of claim 6, wherein electrical power is supplied to said valve operator at a degraded voltage during the step of actuating said valve operator.

\* \* \* \* \*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| RANDALL SCARBOROUGH | * | |
| | * | CIVIL ACTION NO. |
| Plaintiff | * | |
| | * | 6:12-cv-00396-RFD-CMH |
| VERSUS | * | |
| | * | Judge Rebecca F. Doherty |
| INTEGRICERT, LLC | * | Magistrate Judge C. Michael Hill |
| | * | |
| Defendant | * | JURY TRIAL DEMANDED |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S AMENDED NOTICE OF DEPOSITION OF
## STEPHEN A. KILLINGSWORTH

TO: Stephen A. Killingsworth, c/o William W. Stagg of Durio, McGoffin, Stagg & Ackermann, 220 Heymann Boulevard, Lafayette, LA 70505, counsel for Defendant, IntegriCert, LLC.

Pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, Plaintiff Randall Scarborough will take the oral and videotaped deposition of Stephen Killingsworth, under oath, on May 23, 2016 at 1:00 p.m. and continuing from day to day until completed, at the offices of Durio, McGoffin, Stagg & Ackermann, 220 Heymann Boulevard, Lafayette, Louisiana. His oral and videotaped deposition will be before a qualified stenographer and videographer. The deposition will be taken for all purposes and uses authorized by the Federal Rules of Civil Procedure.

DATED: May 6, 2016.

/s/ *Holly H. Barnes*

RESPECTFULY SUBMITTED
MATTHEWS LAWSON
MCCUTCHEON & JOSEPH, PLLC
Holly H. Barnes
Texas Bar No. 24045451
Guy E. Matthews
Texas Bar No. 1320700



DEPOSITION EXHIBIT
KILLINGSWORTH
2

2000 Bering, Suite 700
Houston, Texas 77057
Telephone: (713) 355-4200
Facsimile:  (713) 355-9689
Email: hbarnes@matthewsfirm.com
Email: gmatthews@matthewsfirm.com

and

DOMENGEAUX, WRIGHT, ROY, EDWARDS
&COLOMB, LLC

Bob F. Wright (La. Bar #13,691)
Elwood C. Stevens, Jr. (T.A.)
(La. Bar #12,459)
P. O. Box 3668
Jefferson Towers, Suite 500
556 Jefferson Street
Lafayette, LA 70501-3668
Telephone: (337) 233-3033
Facsimile:  (337) 232-8213
Email: bobw@wrightroy.com
Email: elwoods@wrightroy.com

*ATTORNEYS FOR PLAINTIFF,*
*RANDALL SCARBOROUGH*

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served on Defendants' counsel of record via hand delivery, electronic mail, facsimile transmission, Federal Express, and/or certified mail, return receipt requested on this the 6th day of May, 2016:

*/s/ Holly H. Barnes*
Holly H. Barnes

### S<small>UBPOENA</small> *D<small>UCES</small> T<small>ECUM</small>*

**Request No. 1:**    All documents, notes, memos, emails, recordings, or audio files reflecting any interview or discussion between you and Integricert, LLC.

**Request No. 2:**    All documents, notes, memos, emails, recordings, or audio files reflecting any interview or discussion between you and any third party relating to your report, including any supplemental or amended report, prepared by you in this matter or the opinions you may provide in this matter.

**Request No. 3:**    All correspondence, emails, or other communications between you and Integricert, LLC relating to your work in this matter.

**Request No. 4:**    All correspondence, emails, or other communications between you and any third party relating to your report, including any supplemental or amended report, or the opinions you may provide in this matter.

**Request No. 5:**    To the extent not already produced and identified by Bates number in the litigation, your complete file of every document, information source, or tangible thing that was used, relied upon, compiled or created by, or given to you for purposes of rendering any opinions and/or testimony in this case.

**Request No. 6:**    All workbooks, research materials and any other information that identifies and explains your assumptions, calculations, conclusions, or opinions as set forth in your report, including any supplemental or amended report, produced in this matter to the extent such materials are not produced in response to No. 5, above.

**Request No. 7:**    Any photos, sketches, drawings or schematics of the accused IntegriCert device that you have taken, made, created or reviewed in this matter.

**Request No. 8:**    To the extent not provided with your report, all prior art you have considered or relied upon in drafting your report.

**Request No. 9:**    All prior art searches and search results you have conducted and/or reviewed on behalf of IntegriCert related to this matter.

**Request No. 10:**    All documents and communications relied upon by you to determine the person of skill in the art described in your report.

**Request No. 11:**    Any materials provided to you by any other person or entity in connection with your engagement in this matter that you reviewed or relied upon in drafting your report and any supplemental or amended report or in rendering your opinions in this matter.

**Request No. 12:**    Your billing records, invoices, and engagement agreement.

Compute Force

DEPOSITION
EXHIBIT
KILLINGSWORTH
3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE/OPELOUSAS DIVISION

| | |
|---|---|
| RANDALL SCARBOROUGH | * |
| | * CIVIL ACTION NO.: 6:12-CV-00396 |
| Plaintiff | * |
| | * |
| VERSUS | * JUDGE REBECCA F. DOHERTY |
| | * |
| | * MAGISTRATE JUDGE C. MICHAEL HILL |
| INTEGRICERT, LLC | * |
| | * |
| Defendant | * |

# AFFIDAVIT OF STEPHEN A. KILLINGSWORTH, P.E.

BEFORE ME, the undersigned Notary, on this day personally appeared Stephen Killingsworth, a person whose identity is known to me. After I had administered an oath to him, upon his oath he stated:

1) My name is Stephen A. Killingsworth. I am a registered professional engineer in the State of Louisiana in the field of mechanical engineering, Louisiana Reg. No. 16,223.

2) I have reviewed U.S. Patent 6,648,322 (the '322 patent) with Ex Parte Reexamination Certificate (10455th), attached *in globo* as Exhibit A, and U.S. Patent 7,284,447 (the '447 patent) with Ex Parte Reexamination Certificate (10473rd), attached *in globo* as Exhibit B.

3) I have also reviewed the Response made by Scarborough during the ex parte reexamination of the '322 patent, attached as Exhibit C, and the reasons for allowance made by the Patent Examiner in the Notice of Intent to Issue Ex Parte Reexamination Certificate for the '322, attached as Exhibit D.

4) I have also reviewed the Response made by Scarborough during the ex parte reexamination of the '447 patent, attached as Exhibit E, and the reasons for allowance made by the Patent Examiner in the Notice of Intent to Issue Ex Parte Reexamination Certificate for the '447, attached as Exhibit F.

5) In my inspection I found that the language of Claims 1 – 21 of Scarborough's '332 patent and the language of language of Claims 1, 14, 15, and 27 of Scarborough's '447 patent were amended by Scarborough in response to final rejections made by the patent examiner during the re-examination.



6)      In my inspection I also found that the amendments to language of Claims 1 – 21 of Scarborough's '332 patent and the amendments to the language of Claims 1, 14, 15, and 27 of Scarborough's '447 patent resulted in substantive changes to the scope of these re-examined claims.

### The '322 Patent

7)      The amendments to the claim language of Claims 1 – 21 of Scarborough's '332 patent are set out and highlighted in the Reexamination Certificate of the '332 patent that is attached to this Affidavit in Exhibit A.  In the Reexamination Certificate text enclosed within brackets [ ] is shown as being omitted and text that is *italicized* is shown as being inserted.

8)      Claim 1 of Scarborough's '322 patent as amended during reexamination and recited in Exhibit A, the reexamination certificate, reads as follows:

    1. An apparatus for testing the weld strength and integrity
    of an *attachment* weld, comprising:
        a framework including a base, top, and side pieces;
        at least one fluid containing cylinder, mounted with the
            framework, for moving a piston therein inwardly and
            outwardly as fluid is moved out or in respectively; and
        structure for releaseably or permanently attaching to a pad
            eye, *lifting lug* or [any] *other* device [to be tested] *joined*
            *by the attachment weld to another structure;*
        whereby moving fluid into the cylinder causes the piston
            to move outwardly to tension the pad eye, *lifting lug or*
            *other device* to [testing] *test* the integrity of the
            [welding] *attachment weld* in a [non destructive] *non-*
            *destructive* manner.

9)      When reading Claim 1 of Scarborough's '322 patent as amended during reexamination, it is clear that the scope of Claim 1 was re-directed to only on an *attachment* weld rather than any weld in a device as originally claimed.

10)     The change in scope of Claim 1 of Scarborough's '322 patent can be seen in the following illustration which shows structural elements conforming to Claim 1 as it read before reexamination and as it reads after the amendments made during reexamination:

**'322 PATENT – CLAIM 1**
**BEFORE REEXAMINATION**



Force from movement of cylinder piston

Pad eye or any device to be tested

Welding (Note the welding could be part of the "device to be tested" and its location is not included in or limited by the claim.)

Connection to another structure – (**Note:** this connection is not disclosed in the claim and it could be a bolted, threaded, welded, wedged, or other type of connection and the type of connection is not part of the claim. **Also note:** "**another structure**" is not recited in Claim 1

Another Structure

**'322 PATENT – CLAIM 1**
**AFTER REEXAMINATION**



Force exerted by movement of the cylinder piston

Pad eye, *lifting lug or other* device *joined by the attachment weld to another structure. This is new structure added during reexamination.*

*"Attachment" weld is new language added to Claim 1 during reexamination.*

*"Another structure" is new language added to Claim 1 during reexamination.*

Another Structure

11)     Claim 1 of Scarborough's '322 patent, as it read prior to the amendments made during reexamination, was directed to testing "any device". Claim 1 of Scarborough's '322, as it reads after the amendments made during reexamination, is directed only to testing the attachment weld, i.e., the weld joining the pad eye, lifting lug or other device to another structure. This

amendment substantively changed the scope of Claim 1 by making the coverage of Claim 1 narrower and less broad than it was when originally issued. See Exhibit A.

12)     As can be seen from a reading of Claim 1 of Scarborough's '322 patent as amended after reexamination, the scope of this Claim 1 has changed and that the claim is limited only to non-destructive testing  of the attachment weld joining a pad eye, lifting lug, or other device to another structure. This is not true for Claim 1 of Scarborough's '322 patent as it existed prior to the amendments made during reexamination. At that time Claim 1 could have covered testing of "any device", including a weld, welding, or other connection within the device being tested and not just the "attachment weld" joining that "any device" to another structure as is shown it the illustration of paragraph (10) of this Affidavit.

13)     Claim 13 of Scarborough's '322 patent as amended after reexamination was amended and re-directed to only on an *attachment weld joining a pad eye, lifting lug, or other device to another structure*. See Reexamination Certificate of '332 Patent, Exhibit A.  This amendment substantively changed the scope of Claim 13 by making the coverage of Claim 13 narrower and less broad than it was when originally issued. See Exhibit A.

14)     As shown in Exhibit A, Claim 13 of Scarborough's '322 patent as amended after reexamination eliminated  the term "test piece, wherein said test piece comprises (i.e., included) a pad eye, lifting lug, or other device being tested" and replaced that term with "attachment weld joining a pad eye, lifting lug, or other device to another structure".  This is shown for example by the following portions of amended Claim 13:

identifying a desired [test piece wherein said test piece comprises] *attachment weld joining* a pad eye, lifting lug, or other device [being tested] *to another structure;*

*       *       *

providing an attachment structure for attaching externally to said [test piece] *pad eye, lifting lug or other device joined to said another structure by the attachment weld;* and

assembling the framework with the mounted cylinder fixedly attached at the first end of said cylinder externally to said [test piece] *pad eye, lifting lug  or other  device joined to said another structure;*

[whereby]urging fluid into the cylinder *to* causes the piston to move outwardly to tension the pad eye, *lifting lug or other device joined to said another structure* thus testing the integrity of the *attachment* weld.

*       *       *

15)     The change in scope of Claim 13 of Scarborough's '322 patent can be seen in the following illustration which shows structural elements conforming to Claim 13 as read before reexamination and as it reads after the amendments made during reexamination:



**'322 PATENT – CLAIM 13
BEFORE REEXAMINATION**

Force from outward movement of cylinder piston

Desired test piece

Weld (**Note**: the weld could be part of the "test piece" and its location is not included in or limited by the claim language.)

Connection to another structure – (**Note**: this connection could be a bolted, threaded, welded, wedged, or other type of connection and the type of connection is not part of the claim.  **Also note**: "**another structure**" is not recited in Claim 13 before reexamination.

Another Structure



**'322 PATENT – CLAIM 13
AFTER REEXAMINATION**

Force exerted from outward movement of the cylinder piston

Pad eye, *lifting lug* or *other* device.  Broad term of "test piece" was eliminated.

*"Attachment weld joining the pad eye, lifting lug or other device to another structure.*  This is a new element added to Claim 13 during reexamination.

Another Structure

*"Another structure"* is a new element added to Claim 13 during reexamination.

16)    As can be seen from a reading of Claim 13 of Scarborough's '322 patent as amended after reexamination, the scope of Claim 13 has changed. The term "test piece" was completely eliminated from Claim 13. In its place new language was added narrowing and restricting the focus of the claim to a desired "attachment weld joining a pad eye, lifting lug, or other device to another structure". This was not true for Claim 13 of Scarborough's '322 patent as it existed prior to the amendments made during reexamination. Prior to amendment during reexamination, Claim 13 could have covered testing of "test piece", including a weld, welding, or other connection within the test piece "being tested" (also eliminated) and not just the attachment weld joining a "pad eye, lifting lug, or other device" to "another structure" as now recited as is shown it the illustration of paragraph (15) of this Affidavit.

17)    Claim 20 of Scarborough's '322 patent as amended after reexamination was amended and re-directed to only on an *attachment weld joining a pad eye, lifting lug, or other device to another structure*. See Reexamination Certificate of '332 Patent, Exhibit A. This amendment substantively changed the scope of Claim 20 by making the coverage of Claim 20 narrower and less broad than it was when originally issued. See Exhibit A.

18)    Claim 20 of Scarborough's '322 patent as amended after reexamination was amended to further describe the term "identifying test piece, wherein said test piece comprises a pad eye, lifting lug, or other device" and added to the definition of test piece "*the attachment weld joining a pad eye, lifting lug, or other device to another structure*." The term "being tested" as a modifier was also eliminated with that addition. This is shown for example by the following portions of amended Claim 20:

> 20. A method for testing weld strength and integrity of an attachment weld when desired with a single cylinder apparatus comprising the steps of:

> identifying a desired test piece [wherein said test piece comprises *the attachment weld joining* a pad eye, lifting lug, or other device [being tested] *to another structure*;

> > * * *

> retracting the cylinder shaft thereby exerting a force substantially perpendicular to a plane formed between [a pad eye or other lifting lug being tested and a weld attaching said pad eye or lifting lug to a base and away from said test piece] *the attachment weld and the pad eye, lifting lug or other device joined to said another structure by the attachment weld;*

> > * * *

> inspecting the test piece[ and its attachment weld] for any structural damage or deformation;

> whereby increasing said substantially perpendicular force by increasing the pressure of the pressurized fluid in the cylinder is non-destructive in nature.

19)    Scarborough then argued to the Examiner in response to the rejection of Claim 20 that the purpose of Claim 20 as recited in the claim preamble was a limiting feature of Claim 20 and must be considered. Scarborough also argued the cited prior art was directed to an "attachment weld" of a lifting lug as recited in Claim 12 (sic).

Rather than testing the integrity or weld strength of the valve stem, Bauer's apparatus "simulates the loading condition of a motor operated valve." The loading is monitored to ensure that the valve is capable of operating, such as to open or close, in the event of an unusual condition." Phrased differently, Bauer hydraulically loads the valve stem and determines if the motor can turn the valve stem. Thus, Bauer fails to teach or suggest a device used to test a weld between a pad eye and another object in a non-destructive manner.

Bauer instead relates to testing the ability of a motor to turn a valve stem under a fluid load. Bauer also fails to teach or suggest any reference to a "weld" or "testing the integrity of the weld." The term "weld" has an antecedent basis in the preamble, so the preamble's purpose language is applicable to this consideration. For the reasons described above, Bauer cannot render claim 20 obvious as each and every element is not taught or suggested, much less with the required enablement.

| Claim 20 Elements | Do Bauer and Hogan Teach or Suggest Element? |
|---|---|
| 20. A method for testing weld strength and integrity of an attachment weld when desired with a single cylinder apparatus comprising the steps of: | No – Requester admits that Bauer teaches, "a device for applying a known desired axial load by means of a hydraulic cylinder for testing a valve stem." Thus, the Office Action fails to show "an apparatus for testing weld strength and integrity of a weld. In fact, as discussed above, Bauer never discusses weld strength or weld integrity. Hogan fails to disclose testing weld |
| | strength or weld integrity of an attachment weld disclosed by the '322 patent. These deficiencies are not remedied by Hogan because Hogan's lug 23 is not a "lifting lug." The '322 patent recites, "[p]ad eyes and lifting lugs are primarily used as an attachment point for any rigging employed to hoist, transport, or secure heavy equipment (such as drill string piping weighing many tons.) See '322 patent, col. 1, lines 18-23. Hogan's lug 23 is not an attachment lug comparable to the lifting lug of claim 12. Further, a combination of Bauer and Hogan would render Bauer inoperative because Hogan's clamps 83 and 85 would prevent Bauer's valve stem 20 from rotating, and, thereby, render Bauer inoperative. |

| | |
|---|---|
| identifying a desired test piece wherein said test piece comprises the attachment weld joining a pad eye, lifting lug, or other device to another structure; | No – Bauer does not disclose, teach or suggest a pad eye or lifting lug or other device to be tested. These deficiencies are not remedied by Hogan because Hogan's lug 23 is not a "lifting lug." The '322 patent recites that "[p]ad eyes and lifting lugs are primarily used as an attachment point for any rigging employed to hoist, transport, or secure heavy equipment (such as drill string piping weighing many tons.) *See* '322 patent, col. 1, lines 18-23. Hogan's lug 23 is not an attachment lug comparable to the lifting lug of claim 12. Further, a combination of Bauer and Hogan would render Bauer inoperative because Hogan's clamps 83 and 85 would prevent Bauer's valve stem 20 from rotating, and, thereby, render Bauer inoperative. |

See Response made by Scarborough during the ex parte reexamination of the '322 patent, attached as Exhibit C.

20)     The Examiner then made following statement when allowing Claim 20:

**The following is an examiner's statement of reasons for allowance:**

It is agreed with the Patent Owner in his Remarks dated 07/08/14 that none of the references of record teach or suggest an apparatus or method for testing weld strength and integrity of an attachment weld including structure for attaching to a pad eye, lifting lug, or other device joined by the attachment weld to another structure as now amended in claims 1, 13, 20, and 21.

See Notice of Intent to Issue Reexamination Certificate, Exhibit D.

Scarborough made no comment or disagreement with these Reasons for Allowance.

21)     As can be seen from a reading of Claim 20 of Scarborough's '322 patent as amended after reexamination, the scope of this Claim 20 has changed and that the claim is limited only to non-destructive testing of the attachment weld joining a pad eye, lifting lug, or other device to another structure. This is not true for Claim 20 of Scarborough's '322 patent as it existed prior to the amendments made during reexamination.

22)     At that time Claim 20 could have covered testing of any "test piece", including a weld, welding, or other connection within the device being tested and not just the "attachment weld" joining that "test piece" to "another structure" as is shown below:



**'322 PATENT – CLAIM 20
BEFORE REEXAMINATION**

**Force from movement of cylinder piston**

**Desired test piece wherein said test piece comprises a pad eye, lifting lug, or other device being tested**

**Weld** (Note: this weld could be part of the "test piece" and its location is not recited in or limited by Claim 20 as it originally issued.)

Another Structure

Connection to another structure – (**Note: "another structure"** is not recited in Claim 20 before reexamination. "Attachment weld" is not defined or used in the body of the claim.

**'322 PATENT – CLAIM 20
AFTER REEXAMINATION**

**Force exerted by extraction of the cylinder piston**

A pad eye, lifting lug, or other device

*The attachment weld joining a pad eye, lifting lug, or other device to another structure. This limitation on weld is new language added after reexamination.*

Another Structure

*"Another structure" was new language added to Claim 20 during reexamination*

23)     Claim 21 of Scarborough's '322 patent as amended after reexamination was amended and re-directed to only a *weld joining a pad eye, lifting lug, or other device to another structure.* See Reexamination Certificate of '332 Patent, Exhibit A. This amendment substantively changed the scope of Claim 20 by making the coverage of Claim 21 narrower and less broad than it was when originally issued. See Exhibit A.

24)     As shown in Exhibit A, Claim 21 of Scarborough's '322 patent was amended during reexamination  to delete the terms "desired test piece wherein the test piece comprises" and "being tested" which were replaced with the new term elements a "weld joining" and "to another structure" to modify a pad eye, lifting lug, or other device. This is shown for example by the following portions of amended Claim 21:

21. A method for testing weld strength and integrity of an attachment weld when desired with a multiple cylinder apparatus comprising the steps of:

identifying a [desired test piece wherein said test piece comprises] *weld joining* a pad eye, lifting lug, or other device [being tested] *to another structure;*

\* \* \*

providing an attachment structure for attaching externally to said (test piece] *pad eye, lifting lug, or other device joined to said another structure by the weld*;

\* \* \*

transferring said force from said bridge plate or cross bar to a support beam which is attached externally to the (test piece;] *pad eye, lifting lug, or other device joined to another structure by the weld*;

transferring said force from said support beam to said [test piece;] *pad eye, lifting lug, or other device joined to another structure by the weld*;

increasing said force by increasing the pressure of the pressurized fluid in the cylinder;

increasing the pressure until the calculated required pressure is reached; and

inspecting the (test piece] *pad eye, lifting lug, or other device* and its attachment weld for any structural damage or deformation;

\* \* \*

25)     Claim 21 as amended after reexamination completely eliminated the term "test piece" from the language of the claim and replaced it with much narrower and restrictive language, a "*weld joining* a pad eye, lifting lug, or other device *to another structure*".

26)     Claim 21 of Scarborough's '322 patent, as it read prior to the amendments made during reexamination, was directed to identifying and testing a "test piece". Claim 21 of Scarborough's '322, as it reads after the amendments made during reexamination, is directed only to testing the weld joining the pad eye, lifting lug or other device to another structure, i.e., attachment weld.

27)     Claim 21 of Scarborough's '322, as it reads after the amendments made during reexamination, contains additional elements not previously contained in the claim, i.e., the

limiting language of "weld joining" the pad eye, lifting lug, or device and the term "another structure". The claim is now narrower and more restrictive as is shown below:



### '322 PATENT – CLAIM 21
### BEFORE REEXAMINATION

Force from extraction of cylinder piston

Desired test piece wherein said test piece comprises a pad eye, lifting lug, or other device being tested

Weld or connection (Note: this weld could be part of the "test piece" and its location is not recited in or limited by Claim 21 as it originally issued.)

Connection. Note: Neither a "joining" weld to another structure or its location is recited in the original claim.
Also note: "another structure" is not recited in Claim 21 before reexamination.

Another structure

### '322 PATENT – CLAIM 21
### AFTER REEXAMINATION

Force exerted by extraction of the cylinder piston

A pad eye, lifting lug, or other device

weld joining a pad eye, lifting lug, or other device to another structure. This limitation on weld is new language added after reexamination.

Another structure

"another structure" is new language added to Claim 21 after reexamination.

Page 11 of 25

28)    As can be seen from a reading of Claim 21 of Scarborough's '322 patent as amended after reexamination, the scope of Claim 21 has changed and that the claim has been narrowed and is limited only to non-destructive testing of the weld joining a pad eye, lifting lug, or other device to another structure. This is not true for Claim 21 of Scarborough's '322 patent as it existed prior to the amendments made during reexamination. At that time Claim 21 could have covered testing of "test piece", including a weld, welding, or other connection within the test piece and not just the "weld joining" that "test piece" to "another structure" as is shown in the illustration of paragraph (27) of this Affidavit.

29)    Claims 1, 13, 20, and 21 of Scarborough's '322 patent are independent claims. Because they have been narrowed during reexamination, the claims that depend from these claims also have a narrower scope and provide a narrower range of coverage. The narrower scope and range of coverage provide substantive changes to these dependent claims due to the amendments made to their corresponding independent claims during reexamination.

### The '447 Patent

30)    Claim 29 of Scarborough's '447 patent was cancelled during reexamination. Claims 1, 14, 15, and 27 of Scarborough's '447 patent were amended during reexamination and determined to be allowable as amended. See Exhibit B.

31)    The amendments to the claim language of Claims 1, 14, 15, and 27 of Scarborough's '447 patent are set out and highlighted in the Reexamination Certificate of the '332 patent that is attached to this Affidavit in Exhibit B. In the Reexamination Certificate text enclosed within brackets [ ] is shown as being omitted and text that is *italicized* is shown as being inserted.

32)    Claim 1 of Scarborough's '447 patent as amended during reexamination and recited in Exhibit B, the reexamination certificate, reads as follows:

    1. An apparatus for non-destructively testing [the] weld strength and integrity of at least one *attachment* weld [when desired], comprising:
    a framework including at least two pieces;
    at least one fluid containing cylinder, for moving a piston therein inwardly and outwardly as
        fluid is moved out of or into the at least one fluid containing cylinder, respectively;
    an attachment structure for attaching to a pad eye or [any] other device [to be tested] *joined
        by the at least one attachment weld to another structure*;
    a base;
    said base including a clamp;
    said at least one fluid containing cylinder attached to said clamp;
    at least one bracket; and
    said at least one bracket being releasably attached to said pad eye *or other device*;
    whereby moving fluid into said at least one fluid cylinder causes said piston to move
        outwardly, thereby pushing the at least one bracket upward, thereby creating tension

on the pad eye[,] *or other device*, thereby testing the integrity of *the at least one attachment* weld.

33) When reading Claim 1 of Scarborough's '447 patent as amended during reexamination it is clear that the scope of Claim 1 was re-directed to only on an *attachment* weld rather than any weld in a device as originally claimed. This amendment substantively changed the scope of Claim 1 by making the coverage of Claim 1 narrower and less broad than it was when originally issued. See Exhibit B.

34) The change in scope of Claim 1 of Scarborough's '447 patent can be seen in the following illustration which shows structural elements conforming to Claim 1 as it read before reexamination and as it reads after the amendments made during reexamination:

### '447 PATENT – CLAIM 1
### BEFORE REEXAMINATION



**Force from outward movement of cylinder piston**

**A pad eye or any device to be tested**

**Weld (Note:** the weld could be part of the "any device to be tested" and the weld location is not included in or limited by the claim language.)

Another Structure

Connection to another structure – (**Note:** this connection could be a bolted, threaded, welded, wedged, or other type of connection and the type of connection is not part of the claim. **Also note:** "**attachment weld**" and "**joined to another structure**" is not rec.ted in Claim 1 before reexamination.

### '447 PATENT – CLAIM 1
### AFTER REEXAMINATION



**Force exerted from outward movement of the cylinder piston**

**Pad eye or *other* device. Broad term of "any" device was eliminated.**

*"the at least one attachment weld"* that *"joined"* the pad eye or other device *"to another structure"*. **These are new elements added to Claim 1 during reexamination.**

Another Structure

*"Another structure"* is a new element added to Claim 1 during reexamination.

35)   Claim 1 of Scarborough's '447 patent, as it read prior to the amendments made during reexamination, was directed to testing "any weld" and "any device". Claim 1 of Scarborough's '447, as it reads after the amendments made during reexamination, is directed only to testing the attachment weld, i.e., the weld joining the pad eye or other device to another structure.

36)   Scarborough used the amendments to Claim 1 made during reexamination, including the new term "providing the attachment weld joining a pad eye, lifting lug, or other device to another structure" to distinguish the amended Claim 1 from the prior art cited by the Examiner to reject the original Claim 1. This can be seen in Scarborough's remarks and arguments for allowance as shown in Exhibit E and noted below:

> With respect to claim 1, Hogan fails to describe at least the following elements: 1) "An apparatus for non-destructively testing weld strength and integrity of at least one attachment weld;" 2) "at least one fluid containing cylinder, for moving a piston therein inwardly and outwardly as fluid is moved out of or into the at least one fluid containing cylinder, respectively;" 3) "an attachment structure for attaching to a pad eye or other device joined by the at least one attachment weld to another structure;" 4) "said base including a clamp;" 5) "said at least one fluid containing cylinder attached to said clamp;" 6) "said at least one bracket being releasably attached to said pad eye;" 7) "whereby moving fluid into said at least one fluid cylinder causes said piston to move outwardly, thereby pushing the at least one bracket upward, thereby creating tension on the pad eye or other device, thereby testing the integrity of the at least one attachment weld."

> Hogan fails to describe any form of a "test piece" wherein that test piece comprises a "pad eye, lifting lug, or other device joined by an attachment weld to another structure." The "lug" as described in Hogan is not a "pad eye," "lifting lug," or "other device joined by an attachment weld, "but one for connecting a crimp or wire to a battery's positive and negative adapters. The pad eye or lifting lug described and claimed in the '447 Patent is "primarily used as an attachment point for any rigging employed to hoist, transport, or secure heavy equipment." The '447 Patent at 1:29-31. Hogan's "weld" is completely unlike the "attachment weld" of claim 1 of the '447 Patent. Hogan's weld is described and claimed as "electrically connect[ing] two spaced lugs" and is not a structural point of attachment for lifting a structure to which a pad eye or lifting lug has been welded, as is the case with the attachment weld in the '447 Patent's claims. Hogan, 2:40-47.

37)   As can be seen from a reading of Claim 1 of Scarborough's '447 patent as amended after reexamination, the scope of this Claim 1 has changed and that the claim is limited only to non-destructive testing of the attachment weld joining a pad eye or other device to another structure. This is not true for Claim 1 of Scarborough's '447 patent as it existed prior to the amendments made during reexamination. At that time Claim 1 could have covered testing of "any weld" or "any device", including a weld, welding, or other connection within the device "to be tested" and not just the "attachment weld" joining that "any device to be tested" to another structure as is now recited in the amended Claim 1 as shown in the illustration of paragraph (34) of this Affidavit. The amendments made to Claim 1 of Scarborough's '447 patent narrow the scope of Claim 1.

38)   Claim 14 of Scarborough's '447 patent as amended after reexamination was re-directed to only on an *attachment weld joining a pad eye, lifting lug, or other device to another structure*. The amendments to Claim 14 substantively changed the scope of Claim 14 by making the coverage narrower and less broad than it was when originally issued. See Reexamination Certificate of '447 Patent, Exhibit B.

39)   As shown in Exhibit B, Claim 14 of Scarborough's '447 patent was amended during reexamination to eliminate the term phrase "desired test piece, wherein said test piece comprises". That phrase was replaced with the term phrase "*the attachment weld joining*" a pad eye, lifting lug, or other device "*to another structure*". There were also amendments to the term phrase "whereby [the] a testing technician or test operator can inspect the [tested device and the weld] *attachment weld for any structural damage or deformation."*   This is shown in the amended portions of Claim 14 recited below:

> 14. A method for testing weld strength and integrity of an attachment weld [when desired], comprising the steps of:
>
> providing [a desired test piece wherein said test piece comprises] the attachment weld joining a pad eye, lifting lug, or other device [being tested] to another structure;
>
> providing a framework including at least two pieces;
>
> providing at least one fluid cylinder, having a first end and a second end, mounted with the framework *to produce a mounted cylinder within a mounted framework*, for moving a piston therein inwardly and outwardly as fluid is moved out or in respectively;
>
> providing a first and second attachment apparatus, wherein a pressurized fluid can enter in or exhaust from said *at least one fluid cylinder;*
>
> providing an attachment structure for attaching to said [test piece]*pad eye, lifting lug or other device joined to said another structure by the attachment weld;* and
>
> [providing said mounted framework; and]
>
> assembling the framework with the mounted cylinder fixedly attached on the mounted framework;

[whereby] urging fluid into the cylinder [causes] to cause the piston to move outwardly to tension the pad eye, *lifting lug or other device joined to said another structure*, thus testing the integrity of the attachment weld, and whereby [the] a testing technician or test operator can inspect the [tested device and the weld] *attachment weld for any structural damage or deformation.*

40) When reading Claim 14 of Scarborough's '447 patent as amended during reexamination it is clear that the scope of Claim 14 was re-directed to testing and inspecting an *attachment* weld rather than the tested device and any weld as originally claimed. The modification of the term phrase "whereby [the] a testing technician or test operator can inspect the [tested device and the weld] *attachment weld for any structural damage or deformation" also further limited the scope of Claim 14.* These amendments substantively changed the scope of Claim 14 by making the coverage of Claim 14 narrower and less broad than it was when originally issued. See Exhibit B.

41) The change in scope of Claim 14 of Scarborough's '447 patent can be seen in the following illustration which shows structural elements conforming to Claim 14 as it read before reexamination and as it reads after the amendments made during reexamination:



**'447 PATENT – CLAIM 14**
**BEFORE REEXAMINATION**



Force from outward movement of cylinder piston

A test piece comprising a pad eye, lifting lug, or other device being tested

Weld (Note: the weld could be part of the "test piece" or "other device to be tested" and the weld location is not included in or limited by the claim

Connection to another structure – (Note: "another structure" not recited in original Claim 14. **Also note: "another structure"** and **"joining" "to another structure"** is not recited in Claim 14 before reexamination. The term **"attachment weld"** was only recited in the preamble of Claim 14, not in the claim

Another Structure

**'447 PATENT – CLAIM 14**
**AFTER REEXAMINATION**



Force exerted from outward movement of the cylinder piston

Pad eye, lifting lug, or other device. Broad term of providing a "desired test piece" was eliminated, as was attaching to a test piece.

*"the at least one attachment weld"* that *"joined"* the pad eye or other device *"to another structure"*. These are new elements added to Claim 14 during reexamination.

Another Structure

*"Another structure"* is a new element added to Claim 14 during reexamination.

42)     Scarborough used the amendments made to Claim 14 during reexamination, including the new term phrase "providing the attachment weld joining a pad eye, lifting lug, or other device to another structure" to distinguish amended Claim 14 from the prior art cited by the Examiner to reject the original Claim 14. This can be seen in Scarborough's remarks and arguments for allowance shown in Exhibit E as noted below:

> With respect to claim 14, Bauer fails to describe at least the following elements 1) "a method for testing weld strength and integrity of an attachment weld:" 2) "providing the attachment weld joining a pad eye, lifting lug, or other device to another structure;" 3) "urging fluid into the cylinder to cause the piston to move outwardly to tension the pad eye, lifting lug or other device joined to said another structure, thus testing the integrity of the attachment weld;" and 4) "whereby a testing technician or test operator can inspect the attachment weld for any structural damage or deformation."
>
> For the same reasons discussed with respect to the rejection of claim 1, Bauer relates to "valve stems" and not "attachment welds," "pad eyes" or "lifting lugs." Bauer fails to describe "caus[ing] the piston to tension the pad eye." Bauer also fails to describe or have any reference to a "weld," much less "testing the integrity of the weld," or "inspect[ing] the tested device and the weld for any structural damage or deformation." Bauer cannot anticipate claim 14 as each and every element is not described by Bauer.
>
> Simmons fails to describe a test piece comprising "a pad eye" or "lifting lug" or that a "pad eye" is tensioned in order to test the integrity of a weld. Again, Simmons is specifically directed to test an upset or "butt" weld between two elongate strands or cables and is completely inapposite with claim 14 of the '447 Patent, which is directed to a "pad eye" and an "attachment weld" for the "pad eye".

43)     As can be seen from a reading of Claim 14 of Scarborough's '447 patent as amended after reexamination and Scarborough's statements on the claim coverage, the scope of Claim 14 changed and that Claim 14 is now limited only to non-destructive testing of an attachment weld joining a pad eye, lifting lug, or other device to another structure. This is not true for Claim 1 of Scarborough's '447 patent as it existed prior to the amendments made during reexamination. At that time Claim 14 could have covered testing of "any weld" or any "test piece", including a weld, welding, or other connection within the device "to be tested" and not just the "attachment weld" joining a "pad eye, lifting lug, or other device to another structure" as is now recited in the amended Claim 14 as shown in the illustration of paragraph (41) of this Affidavit. The amendments made to Claim 14 of Scarborough's '447 patent substantively narrow the scope of Claim 14.

44)    Claim 15 of Scarborough's '447 patent as amended after reexamination is now directed to only on an *attachment weld joining a pad eye, lifting lug, or other device to another structure*. This amendment substantively changed the scope of Claim 15 by making the coverage of Claim 15 narrower and less broad than it was when originally issued. See Reexamination Certificate of '447 Patent, Exhibit B.

45)    As shown in Exhibit B. Claim 15 of Scarborough's '447 patent as amended after reexamination eliminated the term "test piece" and that term was replaced with "*pad eye, lifting lug, or other device*. The term "weld" in Claim 15 was modified to read "attachment weld". These amendments are shown in the following amended portions of Claim 15 recited below:

15. The method as in claim 14, whereby *the* urging fluid into the *at least one fluid cylinder* causes the piston to move inwardly to tension the [test piece]*pad eye, lifting lug or other device*, thus testing the integrity of the *attachment* weld.

46)    Scarborough used the amendments made to Claim 15 during reexamination, including the new terms "attachment weld" and "pad eye, lifting lug, or other device" to distinguish amended Claim 15 from the prior art cited by the Examiner to reject the original Claim 15. This can be seen in Scarborough's remarks and arguments for allowance shown in Exhibit E as noted below:

| Claim 15 Element | Does Bauer Describe Element? |
|---|---|
| The method as in claim 14, whereby the urging fluid into the at least one fluid cylinder causes the piston to move inwardly to tension the pad eye, lifting lug or other device, thus testing the integrity of the attachment weld. | No – Bauer describes a fluid, not a piston, directly loading a valve stem 20. Bauer does not mention a "weld" or "testing the integrity of the weld." Bauer describes, "at numerous points in a nuclear power plant, the flow of fluid is controlled by large gate valves. When a considerable pressure difference exists on opposite sides of the gate, frictional forces become large and a large force must be exerted by the valve stem to move the gate." Bauer, Col. 1, lines 16-20. As such, Bauer fails to describe a piston tensioning a pad eye to test the integrity of a weld. |

47)    Claim 15 depends upon Claim 15 and has all of the limitations of Claim 14. As can be seen from a reading of Claim 14 and 15 of Scarborough's '447 patent as amended after reexamination and Scarborough's statements on the claim coverage, the scope of Claim 15 changed and that Claim 15 is now limited only to non-destructive testing of an attachment weld joining a pad eye, lifting lug, or other device to another structure. This is not true for Claim 15 of Scarborough's '447 patent as it existed prior to the amendments made during reexamination. At that time Claim 15 could have covered testing of "any weld" or any "test piece", including a weld, welding, or other connection within the device "to be tested" and not just the "attachment weld" joining a "pad eye, lifting lug, or other device to another structure" as is now recited in the amended Claim 15 and in amended Claim 14 as shown in the illustration of paragraph (41) of

this Affidavit.  The amendments made to Claim 14 and Claim 15 of Scarborough's '447 patent substantively narrow the scope of Claim 15.

48)    Claim 27 of Scarborough's '447 patent as amended after reexamination was re-directed to only on an *attachment weld joining a pad eye to another structure*. The amendments to Claim 27 substantively changed the scope of Claim 14 by making the coverage narrower and less broad than it was when originally issued. See Reexamination Certificate of '447 Patent, Exhibit B.

49)    As shown in Exhibit B, Claim 27 of Scarborough's '447 patent was amended during reexamination to eliminate the term "when desired" from the claim preamble, term "desired" from the phrase "desired test piece", and to add the term phrase "comprising a pad eye and the attachment weld joining the pad eye to another structure" after the term "test piece". This is shown in the amended portions of Claim 27 recited below:

> 27. A method for testing [the] strength and integrity of an attachment weld [when desired] with a single cylinder apparatus comprising the steps of:
> providing at least one [desired] test piece comprising a pad eye and the attachment weld joining the pad eye to another structure;
> providing a framework including at least two pieces;
> mounting said single cylinder apparatus to the framework, said single cylinder apparatus having a first end, a second end, and a piston therein, wherein said piston moves inwardly and outwardly as fluid is moved out of or into said single cylinder apparatus respectively;
> mounting said framework about said at least one [desired] test piece;
> assembling the framework with said [at least one mounted] single cylinder apparatus fixedly attached at one end of said single cylinder apparatus to said [desired] at least one test piece;
> retracting [the] a cylinder shaft of the single cylinder apparatus, thereby exerting a force substantially perpendicular to a plane formed between said [desired] pad eye of
> the at least one test piece[, being tested.] and a base and in a direction away from said pad eye of said at least one test piece;
> increasing said substantially perpendicular force by increasing the pressure of the fluid in the cylinder;
> increasing [said] pressure until a pre-calculated, required pressure is reached; and
> inspecting the at least one test piece for damage or deformation.

50)    When reading Claim 27 of Scarborough's '447 patent as amended during reexamination it is clear that the scope of Claim 27 was re-directed to testing an *attachment weld joining a pad eye to another structure* rather than a "test piece" and any weld as originally claimed.    These amendments substantively changed the scope of Claim 27 by making the coverage of Claim 27 narrower and less broad than it was when originally issued. See Exhibit B.

51)     The change in scope of Claim 27 of Scarborough's '447 patent can be seen in the following illustration which shows structural elements conforming to Claim 27 as it read before reexamination and as it reads after the amendments made during reexamination:



**'447 PATENT – CLAIM 27
BEFORE REEXAMINATION**

Force from retracting cylinder piston

A desired test piece

Weld (**Note:** the weld could be part of the "test piece" and the weld location is not included in or limited by the claim language.)

Connection to another structure – (**Note:** "another structure" not recited in original Claim 27.  **Also note:** "**another structure**" and "**joining**" "**to another structure**" is not recited in Claim 27 before reexamination.  The term "**attachment weld**" was only recited in the preamble of Claim 27, not in the claim body.

Another Structure

**'447 PATENT – CLAIM 27
AFTER REEXAMINATION**

Force from retracting cylinder piston

Test piece comprising a pad eye.  Broad term of providing a "desired test piece" was eliminated.

"*the attachment weld joining the pad eye to another structure*".  These are new elements added to Claim 27 during reexamination.

Another Structure

"*Another structure*" *is a new element added to Claim 27 during reexamination.*

52)  Scarborough used the amendments made to Claim 27 during reexamination, including the new term phrase "providing at least one test piece comprising a pad eye and the weld joining a pad eye to another structure" to distinguish amended Claim 27 from the prior art cited by the Examiner to reject the original Claim 27.  This can be seen in Scarborough's remarks and arguments for allowance shown in Exhibit E as noted below:

### Bauer does not anticipate Claim 27

With respect to claim 27, Bauer fails to describe at least the following elements: 1) "A method for testing strength and integrity of an attachment weld with a single cylinder apparatus;" 2) "retracting a cylinder shaft of the single cylinder apparatus, thereby exerting a force substantially perpendicular to a plane formed between said pad eye of the at least one test piece and a base and in a direction away from said pad eye of said at least one test piece;" and 3) "increasing said substantially perpendicular force by increasing the pressure of the fluid in the cylinder."

Again, Bauer fails to describe any kind of "weld" or "attachment weld" as well as "exerting a force substantially perpendicular to a plane formed between" a test piece and a base. As stated above, Bauer instead describes application of a force applied axially or parallel to the valve stem being tested.

| Selected Claim 27 Elements | Does Bauer Describe Element? |
|---|---|
| A method for testing strength and integrity of an attachment weld with a single cylinder apparatus comprising the steps of: | No – At the cited sections, Bauer describes measurement of an exerted hydraulic force to load a valve stem.  Not only does Bauer never even mention a "weld," but the cited description does not describe testing weld strength and integrity of an attachment weld when desired with a single cylinder apparatus. |
| an attachment structure for attaching to a pad eye or other device joined by the at least one attachment weld to another structure; | No – Bauer fails to describe a pad eye or other device joined by an attachment weld to another structure. |
| said base including a clamp; | No – Bauer fails to describe a pad eye or other device joined by an attachment weld to another structure. |
| said at least one fluid containing cylinder attached to said clamp; | No – Hogan's cylinders (53,55) are attached to "member 51".  See Hogan Col. 2, lines 56-64.  As such, Hogan's bracket 67 is not attached to a cylinder. |

Page 23 of 25

| | |
|---|---|
| said at least one bracket being releasably attached to said pad eye; | No – Hogan does not describe a "pad eye." |
| whereby moving fluid into said at least one fluid cylinder causes said piston to move outwardly, thereby pushing the at least one bracket upward, thereby creating tension on the pad eye or other device, thereby testing the integrity of the at least one attachment weld. | No – Hogan does not describe a pad eye or an attachment weld. |

Hogan does not anticipate Claim 27

With respect to claim 27, Hogan fails to describe at least the following elements: "a method for testing strength and integrity of an attachment weld with a single cylinder apparatus." Hogan's "weld" is completely unlike the "attachment weld" of claim 27 of the '447 Patent; Hogan's weld is described and claimed as "electrically connect[ing] two spaced lugs" and is not a structural point of attachment for lifting the device welded to a pad eye or lifting lug, Hogan, 2:40-47.

| Selected Claim 27 Elements | Does Hogan Describe Element? |
|---|---|
| A method for testing strength and integrity of an attachment weld with a single cylinder apparatus comprising the steps of: | No – Hogan does not describe an attachment weld. Rather, Hogan describes a device to test an electric connective weld, not an attachment weld. |
| providing at least one test piece comprising a pad eye and the attachment weld joining the pad eye to another structure; | No – Hogan does not describe a pad eye or an attachment weld and does not describe joining a pad eye to another structure. |

## Claim 27 is not rendered obvious by Bauer in view of Lemoine, Hogan and Weinhold

With respect to claim 27, as discussed above, Bauer fails to teach at least the following elements: 1) "A method for testing strength and integrity of an attachment weld with a single cylinder apparatus;" 2) "retracting a cylinder shaft of the single cylinder apparatus, thereby exerting a force substantially perpendicular to a plane formed between said pad eye of the at least one test piece and a base and in a direction away from said pad eye of said at least one test piece;" and 3) "increasing said substantially perpendicular force by increasing the pressure of the fluid in the cylinder." The citation and reliance upon Lemoine, Hogan, and Weinhold does not overcome Bauer's base deficiencies of teaching each and every element of claim 27.

53)     As can be seen from a reading of Claim 27 of Scarborough's '447 patent as amended after reexamination and Scarborough's statements on the claim coverage, the scope of Claim 27 changed and that Claim 27 is now limited only to non-destructive testing of an attachment weld joining a pad eye to another structure. This is not true for Claim 27 of Scarborough's '447 patent

as it existed prior to the amendments made during reexamination. At that time Claim 27 could have covered testing of "any weld" or any "test piece", including a weld, welding, or other connection within the test piece and not just the "attachment weld" joining a "pad eye, lifting lug, or other device to another structure" as is now recited in the amended Claim 27 as shown in the illustration of paragraph (51) of this Affidavit. The amendments made to Claim 27 of Scarborough's '447 patent substantively narrow the scope of Claim 27.

54) Claims 1, 14, and 27 of Scarborough's '447 patent are independent claims. Because they have been narrowed during reexamination, the claims that depend from these claims also have a narrower scope and provide a narrower range of coverage. The narrower scope and range of coverage provide substantive changes to these dependent claims due to the amendments made to their corresponding independent claims during reexamination.

55)   The statements of fact contained in this Affidavit are true and correct, and are my personal, unbiased, and professional analysis, opinions, and conclusions.

56)   I have no personal interest in the claim or bias with respect to the parties involved.

_Stephen A. Killingsworth, P.E._ License No. 16223

**Sworn to and subscribed** before me, the undersigned notary, on this _____ day of April, 2015.

NOTARY PUBLIC
Printed Name: _Dallas Fleming_
ID # or Bar Roll #: _38693_
Parish and State: _Lafayette, LA_
My Commission Expires: _@ Death_

Page 25 of **25**

**Fig. 1- IntegriCert '569 patent
(Doc. 163.4)**









































