IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE/OPELOUSAS DIVISION

| | |
|---|---|
| **RANDALL SCARBOROUGH** | * |
| | * CIVIL ACTION NO.: 6:12-CV-00396 |
| **Plaintiff** | * |
| | * |
| **VERSUS** | * |
| | * |
| | * MAGISTRATE JUDGE PATRICK J. HANNA |
| **INTEGRICERT, LLC** | * |
| | * |
| **Defendant** | * |

**MEMORANDUM IN SUPPORT OF**
**MOTION TO EXCLUDE REPORT AND TESTIMONY OF C. BURTON KOLDER**

**May it Please the Court**:

Plaintiff, **Randall Scarborough**, has retained certified public accountant C. Burton Kolder to opine on damages Mr. Scarborough alleges he has suffered as a result of infringement by Defendant, **IntegriCert**, **LLC**, of U.S. patents nos. 6,848,322 and 7,284,447 (the "Patents"). In particular, Mr. Kolder has analyzed certain of IntegriCert's accounting data and performed calculations which he offers as demonstration of a reasonable royalty amount which Mr. Scarborough should be awarded in the event IntegriCert has infringed the Patents.

**Introduction**

Burton Kolder, Defendant acknowledges, would be qualified to render the opinions contained in his report – *if* those opinions were reliable and therefore useful to the trier of fact. But they are not.

"Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (C.A.5, 2007). Federal Rule of Evidence 702, as amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), allows "an expert by knowledge, skill, experience, training or education" to render opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In short, *Daubert* "assigned the trial court a gatekeeper role to ensure [expert] testimony is both reliable and relevant." *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (C.A.5, 2006). According to *Daubert* and its progeny, the district court "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Mr. Kolder does possess specialized knowledge and qualifications in the field of accounting; and there are no apparent errors in his mathematical calculations *vel non*. But his report and his testimony are self-evidently – by his own admission – founded on insufficient information, even though all the necessary data (unbeknownst to Mr. Kolder) was in fact available to him and to Mr. Scarborough. Further, and partly as a result of Mr. Scarborough's failure to supply him with necessary information, Mr. Kolder has made several starkly wrong assumptions that invalidate his methodology.

The opinions offered by Mr. Kolder suffer from three primary shortcomings under *Daubert*. Each is discussed in turn below.

### A. Plaintiff's calculations are based on knowingly incomplete data

By far the most serious problem with Mr. Kolder's opinions is that he was never given sufficient information to distinguish what revenues of IntegriCert's are alleged to arise from infringing activities, and which are not. In particular, he was given only derivative accounting summaries (taken from QuickBooks, the accounting software used by IntegriCert) that had in turn been produced by IntegriCert.

These accounting statements, maintained in the ordinary course of business, (obviously) did not record revenues as "infringing" or "non-infringing" – instead, IntegriCert categorized its sales much as any business does, by product line or activity. So categories like "load test" and "inspection/LT" referred, fairly evidently, to load testing and inspection, respectively.[2]

Of these broad categories, Mr. Kolder has only this to say: first, that they are "obviously income related to IntegriCert's load testing services" (Exhibit A, p. 8); and second, that he "assumed that IntegriCert's load testing methods infringe" the Patents. That was Mr. Kolder's methodology: assume that all activity "related" to load testing actually *was* load testing; and then assume that all load testing by IntegriCert, in any fashion, using any methods and any equipment, infringed the Patents. These assumptions provided the "royalty base" to which Mr. Kolder applied certain proposed "reasonable royalty" rates, 35 U.S.C. 284.

---

[2] See Exhibit A, p. 8.

Both assumptions are wrong. Much load-testing by IntegriCert does not even involve the Patents or devices alleged to infringe them;[3] and inspection services are not at issue in this litigation at all.

But in Mr. Kolder's defense, what he did was all he could do: as he testified, in order to reach useful conclusions about what IntegriCert activities should be categorized as "infringing" and which should not, he would "have to have information that would allow us to be able to say that these items should not be included" (Exhibit B, pp. 27-28).

Mr. Kolder himself put it most succinctly: "If there was any other information that was available to us that further broke out this revenue and distinguished it, *it should have been provided*.... It was not" (Exhibit B, pp. 62-63) (emphasis added). He went on to testify that "if there is more detailed information that was used to compile [IntegriCert's] financial statements, then let's see it" (Exhibit B, p. 72).

What Mr. Kolder did not know literally until his deposition was that he could have seen it (Exhibit B, p. 77). When he learned that all of IntegriCert's raw revenue date *was* available to Mr. Scarborough for detailed analysis, and that Mr. Scarborough could have provided and requested he analyze it, Mr. Kolder testified "[h]e could have asked, yeah, he didn't" (Exhibit B, p. 87).[4]

Because Plaintiff did not have Mr. Kolder analyze IntegriCert's raw data – did not even inform Mr. Kolder it was available, much less provide it to him – Mr. Kolder admitted that his "conclusions would be different" if analysis of that underlying data showed his assumptions

---

[3] Drop tests, for example, testing of items other than pad eyes, and certification of rigging equipment each involves load testing but does not involve use of equipment that might infringe the Patents. See Exhibit B-2 to Expert Report of Joan Martin, attached hereto as Exhibit C.

[4] Plaintiff's Memorandum in Support of his Motion to Compel (Rec. Doc. 92-1) production of IntegriCert's underlying sales data, and the Court's Order (Rec. Doc. 102) making them available to Plaintiff for inspection, are attached to Mr. Kolder's deposition transcript as Exhibit 3. Mr. Scarborough has never exercised his right to inspect IntegriCert's business records, for Mr. Kolder's use or any other.

needed adjustment (Exhibit B, p. 88). In fact, Mr. Kolder explained exactly what he would have needed to do in order to produce useful, reliable results: examination of IntegriCert's raw business records using "a judgment-type sampling and a haphazard-type method of selecting data" (Exhibit B, p. 78).[5]

Those assumptions given by Mr. Scarborough's counsel, including categorization of *all* of IntegriCert's load-testing and inspection activities as infringing, are clearly wrong. The Patents do not cover certification inspection, for example, yet Mr. Kolder classified all services ancillary to load-testing as "infringing revenue." Likewise, Mr. Kolder was forced to assume that all load testing was infringing, when reference to the underlying data would have proved otherwise.[6]

Because he could not work from accurate assumptions – "I'm not saying [IntegriCert] didn't use these other methods, I don't know, but I assume that they did not" (Exhibit B, p. 97) – Mr. Kolder's calculations are not useful in determination of damages. The figures given in his report are plainly not "based on sufficient facts or data," a foundational requirement for their admissibility. Mr. Kolder's opinions as to the appropriate "royalty base" must be excluded.

**B. Plaintiff's "hypothetical negotiation" takes place with an entirely fictional Randall Scarborough, yielding unrealistic and unreliable royalty rates**

As Mr. Kolder's report notes, "an appropriate damages calculation will not be based upon lost profits but… on the reasonable royalty" (Exhibit A, p. 4) Mr. Scarborough "would have received through arms-length bargaining."[7]

---

[5] This was in fact the sampling method used by Defendant's own accounting expert, Joan Martin, who *did* examine IntegriCert's underlying business records to evaluate what proportion of revenues should be classified as infringing.
[6] See Exhibit C.
[7] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1330 (C.A.F.C., 2015).

Mr. Kolder's report opines that "IntegriCert has established royalty rates" by way of three[8] prior licensing agreements entered into by IntegriCert, whose royalty on gross revenues averaged 20% (Exhibit A, p. 5). He used that percentage as his floor value of a reasonable royalty, citing case law that "[a]n established royalty is usually the best measure of a 'reasonable' royalty," *Monsanto Co. v. McFarling*, 488 F.3d 973, 978 (C.A.F.C., 2007).

Crucially, though, Mr. Kolder took no account at all of the fact that IntegriCert had not simply licensed use of its technology. Although he testified (Exhibit B, p. 102) he reviewed copies of each cited agreement, Mr. Kolder admitted (Exhibit B, p. 116) he failed to account for the equipment, supplies, repair, calibration, training, certification, and other services which IntegriCert provided its licensees.[9]

Mr. Kolder also acknowledged (Exhibit B, pp. 122-123) that any "hypothetical negotiation" between Mr. Scarborough and IntegriCert *would* need to anticipate the cost of those same services, and the patentee's royalty "could have been lower" as a result (Exhibit B, p. 115). Finally, Mr. Kolder testified (Exhibit B, p. 124) that he had no idea whether Mr. Scarborough would have the ability, the resources, or even the right to provide to IntegriCert, alongside his hypothetical license, the same ancillary products and services IntegriCert provided to its licensees.

The result: admittedly unreliable conclusions.

**Q**: Since we can't say whether Mr. Scarborough could or could not offer those services, we can't say what kind of rate Mr. Scarborough would be able to procure, right?
**A**: Correct.

---

[8] Mr. Kolder testified that he disregarded a fourth arrangement (with Superior Rigging and Testing) because, first, it was a joint venture and not a licensing agreement; and second, IntegriCert's "royalty" was simply a 50/50 profits split. Exhibit B, p. 106.
[9] Two of those agreements, which identify IntegriCert's various obligations to its licensees, are attached to Mr. Kolder's deposition as exhibits 4 and 5.

>    **Q**: Okay. And we don't know – since we don't know the magnitude of those costs, we don't know the magnitude of the difference that that would make, right?
>    **A**: We don't.
>
>    (Exhibit B, pp. 124-125)

As to those costs – which figures he admitted he would need in order to reliably determine what would be a reasonable royalty between these parties – Mr. Kolder testified he had never asked for them, and did not know if Mr. Scarborough ever had, either (Exhibit B, p. 126).

As Mr. Kolder himself put it: "[I]f you put the costs in relative to these numbers, [the royalty rate] may or may not change…. We don't know" (Exhibit B, p. 128).

Because "we don't know," there is no reliable "established royalty rate" evident from Mr. Kolder's report or testimony. He does not know whether Mr. Scarborough could offer what IntegriCert did, nor (if so) at what cost. He does not know, then, whether any of IntegriCert's licensing agreements resembles the result of an hypothetical license negotiation between these parties.

He does not know what royalty Mr. Scarborough could get – because, again, the necessary underlying information was never considered or even, as far as Mr. Kolder is aware, obtained. The proposed royalty rates set forth in Mr. Kolder's report must be excluded as lacking reliability.

## C. Plaintiff's "analytical approach" sanity-check calculation relies on misclassifying IntegriCert's business and sheds no light on a reasonable royalty

Finally, Mr. Kolder testified, as a point of comparison with his earlier "established royalty rate" he employed an "analytical approach," involving subtraction of "industry-standard" net profit margins from IntegriCert's anticipated net profits to yield a reasonable royalty rate.

Aside from the fact that Mr. Kolder himself has opined that a royalty on profits would be inappropriate in this situation (Exhibit A, p. 2), the usefulness of this "analytical approach" obviously relies, first, on accurately calculating IntegriCert's net profit margin; and second, accurately stating "industry-standard" net profit margins.

As to the first calculation, Mr. Kolder admitted (Exhibit B, pp. 143-144) that he had no idea what was IntegriCert's profit margin on "infringing" activities. Because he did not have access to the underlying data – only the QuickBooks statements Mr. Scarborough gave him – he simply calculated the entire company's ratio of gross profit to overhead, and applied the same ratio to "infringing revenues."

It is entirely possible, Mr. Kolder testified, this misstated IntegriCert's profit margin; "I'm just using what's been presented to me. I have no way of being able to allocate those overhead expenses and breaking it out between the two different types of revenues" (Exhibit B, p. 144). And, Mr. Kolder testified (Exhibit B, p. 145) he did not ask Mr. Scarborough and did not ask IntegriCert for any information which might have allowed him to "break out" overhead attributable to infringing versus non-infringing revenues. The result is a question mark – Mr. Kolder testified he does not really know what is IntegriCert's net profit on "infringing" activities.

The second problematic element of his "analytical approach" is that "industry-standard" net profit margin, which Mr. Kolder identified as 8-9% (Exhibit A, p. 7). This figure is derived from Exhibit D to his report, specifically Chart 3 on p. 9, whose X-axis is "Licensee average

operating profits" and which includes the industry segment "Machines/Tools," to which Mr. Kolder testified he assigned IntegriCert (Exhibit B, p. 153).

(Notably, that same Chart 3 shows the "median royalty rate" in that same industry segment as between 3 and 4 percent – far lower than Mr. Kolder's report concludes. His report nowhere mentions this fact.)

Classification of IntegriCert as a "machines/tools" business, according to Mr. Kolder, is based on the Standard Industrial Classification (SIC) codes assigned by the Occupational Safety and Health Administration, of which he assigns to IntegriCert SIC 3569 (general industrial machinery, not otherwise classified),[10] reasoning that "I don't think it fits any of the other categories" (Exhibit B, p. 154).

There is no indication, though, that Mr. Kolder's Exhibit D was intended to cover all possible industry segments. It includes no SIC codes, for example, from OSHA Industry Group 873 (Research, Development, and Testing Services). In particular, it does not include any information about SIC 8734 (testing laboratories), which IntegriCert's activities much more closely resemble: certification testing, metallurgical testing, product testing, *weld* examination.[11]

Cursory inspection of OSHA's SIC classifications indicates that IntegriCert's load-testing services are not, in fact, within "Major Group 35" for "Industrial and Commercial Machinery and Computer Equipment."[12] They are not even in the relevant Division D, "Manufacturing," as load-testing is self-evidently not a manufacturing activity.

"Testing Services," however, are specifically categorized in Major Group 87, "Engineering, Accounting, Research, Management, and Related Services," and Industry Group

---

[10] OSHA's SIC 3569 categories attached as Exhibit D.
[11] OSHA's SIC 8734 categories attached as Exhibit E.
[12] OSHA's SIC Division Structure attached as Exhibit F.

873.[13] None of these business activities is anywhere addressed by Mr. Kolder's Exhibit D – that document has no relevance to IntegriCert's load-testing business. The information contained in it is self-evidently inapplicable to Mr. Kolder's purpose, which was to determine an "industry-standard" net profit margin and plug that figure into his "analytical approach" methodology. But neither Exhibit D nor any other source cited by Mr. Kolder actually supplies a standard profit margin for IntegriCert's industry.

The "analytical approach," then, founders on the unreliability of both of its component assumptions: first, Mr. Kolder admitted he does not know what is IntegriCert's actual or anticipated profit margin on "infringing" services; second, his Exhibit D actually says nothing about industry-standard profit margins on load testing. Computations performed with faulty inputs yield nothing useful.

Mr. Kolder's opinions on his "analytical approach" to calculating a reasonable royalty rate must be excluded as unreliable, because they are founded on assumptions one of which is (to an unknown extent) inaccurate, and another which is entirely wrong.

**Conclusion**

There is nothing the matter with Mr. Scarborough's expert on damages. Mr. Kolder is an eminently qualified accountant with decades of experience in the field. But there is everything wrong with, first, the information he was given (and the information he was not); and, second, with the assumptions that underlie his conclusions. These problems irretrievably disqualify his testimony in light of FRE 702's and *Daubert*'s demand for relevant, *reliable* expert opinion. Mr. Kolder's opinions must be excluded.

---

[13] OSHA's SIC Major Group 87 structure attached as Exhibit G.

Respectfully submitted,

/s/__Ryan Goudelocke_____
William W. Stagg, T.A. (#1613)
Ryan M. Goudelocke (#30525)
Chase A. Manuel (#34223)
*Durio, McGoffin, Stagg & Ackermann*
220 Heymann Boulevard
Lafayette, Louisiana 70503
Telephone: (337) 233-0300
Facsimile: (337) 233-0694
*Attorneys for IntegriCert, LLC*

## CERTIFICATE OF SERVICE

I certify that I have, this 24th day of June, 2016, provided all parties with a copy of the foregoing pleading by means of the Western District's CM/ECF electronic filing system.

_____/s/ Ryan Goudelocke_____
Ryan M. Goudelocke